## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| **v.** | ) | **Criminal No. 07-204 (CKK)** |
| | ) | |
| **PATICK SYRING,** | ) | |
| | ) | |
| **Defendant** | ) | |
| | ) | |

## DEFENDANT'S MOTION TO DISMISS THE INDICTMENT

COMES NOW the Defendant, Patrick Syring, by his undersigned counsel, and hereby moves the Court for an Order dismissing the Indictment in this case. Grounds for this Motion are that the Indictment violates Mr. Syring's constitutional rights by attempting to criminalize protected speech, as more fully set forth in the accompanying Memorandum of Points and Authorities in support of this Motion; and that the statutes under which he has been charged, as applied to his conduct in this case, are unconstitutional. This Motion is based upon the First, Fifth and Fourteenth Amendments to the Constitution of the United States; and upon F.R.Crim.P. 12(b)(2).

WHEREFORE, the Defendant respectfully requests that this Motion be granted.

Dated this 12th day of October, 2007.

Respectfully submitted,

SCHERTLER & ONORATO, L.L.P.

_____/s/_____

David Schertler (#367203)
Peter V. Taylor (#419524)
601 Pennsylvania Avenue, NW
North Building, 9th Floor
Washington, DC 20004
Telephone: (202) 628-4199
Facsimile: (202) 628-4177

*Counsel for Mr. Patrick Syring*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY THAT the foregoing, together with the Memorandum of
Points and Authorities in support of this motion, the Declaration of Peter V. Taylor and a
proposed Order were, this 12th day of October, 2007 sent, via ECF, to the following:

Julieanne Himelstein, Esq.
Assistant United States Attorney
Federal Major Crimes Section
United States Attorney's Office
        for the District of Columbia
555 Fourth Street, NW, 4th Floor
Washington, DC 20530

Barry Kowalski, Esq.
Karen Ruckert, Esq.
Assistant United States Attorneys
Criminal Division
601 D Street, NW, Room 5802
Washington, D.C. 20004

_____/s/_____
Peter V. Taylor

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| v. | ) Criminal No. 07-204 (CKK) |
| | ) |
| PATICK SYRING, | ) |
| | ) |
| Defendant | ) |
| | ) |

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT
OF DEFENDANT'S MOTION TO DISMISS THE INDICTMENT**

COMES NOW the Defendant, Patrick Syring, by his undersigned counsel, and hereby files this Memorandum of Points and Authorities in Support of his Motion to Dismiss the Indictment. As discussed below, the Indictment in this case violates Mr. Syring's First Amendment right of free speech by attempting to criminalize protected speech and, thereby, also violates his due process rights under the Fifth and Fourteenth Amendments to the Constitution of the United States. For the same reasons, the statutes under which Mr. Syring has been charged, as applied to his conduct, are unconstitutional. Therefore, the Indictment must be dismissed in its entirety and with prejudice.

**INTRODUCTION**

The Indictment in this case charges Mr. Syring with two counts, both based on alleged threats. However, as discussed below, criminal charges may be based only on "true threats." *Virginia v. Black,* 538 U.S. 343, 359 (2003); *NAACP v. Claiborne Hardware Co.,* 458 U.S. 886 (1982); *Watts v. United States,* 394 U.S. 705 (1969) (*per curium*). Mr. Syring's comments, made in the context of the then-ongoing war between Israel and Hezbollah and in response to comments by Dr. James Zogby, President of the

Arab American Institute ("AAI") that Mr. Syring had just read on the MSNBC website, do not rise to the level of "true threats." Rather, as made clear by the comments, including the context reflected therein, Mr. Syring's communications constitute speech on social and political issues (including some "political hyperbole") and are protected by the First Amendment against governmental suppression.

Mr. Syring has been charged with making threats and, therefore, the appropriate legal issue is limited to whether his comments are "true threats." However, it is equally clear that Mr. Syring's comments do not fall within any of the other narrow exceptions to the broad protections afforded by the First Amendment, such as fighting words or obscenity.

For these reasons, the Indictment in this case must be dismissed in its entirety and with prejudice. The Indictment is an unconstitutional attempt by the government to suppress speech that is protected under the First Amendment.

## FACTS[1]

The Indictment charges Patrick Syring with two crimes based solely on his alleged communications to six employees of the AAI. Indictment at ¶ 1 - 10. The AAI is a private, non-profit interest group that represents the interests of Arab Americans in the United States. *Id.* at ¶ 1. Its offices are in the District of Columbia. *Id.* Mr. Syring resides in Arlington, Virginia. *Id.* at 3.

The six AAI employees identified in the Indictment were AAI's "public face" at the time in question. That is, if one went to the AAI website during the timeframe

---

[1]    Given the nature of this Motion, the facts as stated in the Indictment are deemed to be true. *United States v. Lattimore,* 215 F.2d 847, 851 (D.C. Cir. 1954). Thus, for purposes of this Motion, and without waiving his right to put the government to its proof in the event this Motion is denied, the communications set forth in the Indictment will be referred to herein as having been made by Mr. Syring.

covered by the Indictment, these were the people who were listed by name, title and AAI

e-mail address. *See* Declaration of Peter V. Taylor ("Taylor Decl."), attached hereto as

Exhibit A, at ¶ 1. Moreover, when one calls AAI's main telephone number after hours,

one is given access to an AAI telephone directory, from which the office telephones of

AAI employees can be accessed. *Id.* at ¶ 2.

All communications underlying the charges occurred between July 17 and July

29, 2006. Indictment at ¶¶ 4 – 10. All but one occurred during a two-day period, July

17-19, *id.,* during which the war between Israel and Hezbollah was raging.[2]

According to the Indictment, the first communication was a voice-mail left on the

AAI's main telephone line at 11:17 p.m. on July 17, 2006.    Indictment at ¶ 4. This was

no anonymous message. Rather, the first words out of the speaker's mouth were, "This is

Patrick Syring." *Id.* Next, he refers to what prompted his call: "I just read [AAI

President Dr.] James Zogby's statements online on the MSNBC website . . ." *Id.* The

Indictment omits the contents of Dr. Zogby's comments on the MSNBC website, to

which Mr. Syring was reacting.

After identifying himself and stating what motivated him to call the AAI's main

telephone line well after normal working hours, Mr. Syring states his mind: ". . . I

condemn [Dr. Zogby] for his anti-Semitism and anti-American statements. The only

good Lebanese is a dead Lebanese. The only good Arab is a dead Arab. Long live the

IDF. Death to Lebanon and death to the Arabs." *Id.*[3]

---

[2]        According to Wikipedia, the war began on July 12, 2006 when Hezbollah launched both a missile and ground attack on Israel; and continued until August 14, 2006 when a UN-brokered ceasefire went into effect.

[3]        IDF is the Israel Defense Forces which, according to Wikipedia, "was founded May 26, 1948 after the establishment of the State of Israel 'to protect the inhabitants of Israel and to combat all forms of terrorism which threaten daily life'" (quoting a summary from the Israel Democracy Institute).

As the Indictment makes clear, the phrases "the only good Lebanese/Arab is a dead Lebanese/Arab" and "death to Lebanon/the Arabs" recur throughout the subject communications in the context of Mr. Syring's reactions to what he perceives to be the anti-American, anti-Semitic and pro-Hezbollah messages being conveyed by the AAI, in general, and by its president, Dr. Zogby, in particular. With regard to the "only good . . . is a dead . . ." phrase, it is important to note that in the Middle East, this is a common phrase and is considered an insult or put-down, not a threat.

This fact was made clear to the government before it ever sought to indict Mr. Syring. For example, in an October 10, 2006 Form FD-302, the FBI Special Agent investigating this case reflects his interview with Ms. Rebecca Abou-Chedid, whom the Indictment lists as a recipient of two of the subject communications here. Indictment at ¶¶ 8, 10. Ms. Abou-Chedid is the AAI's Government Relations and Policy Analyst and, in her interview with the Agent, she identifies herself as someone of Lebanese origin. Taylor Decl. at ¶ 3. According to the Form FD-302, Ms. Abou-Chedid told the Agent that

> the phrase 'The only good Lebanese is a dead Lebanese'
> . . . is a well known phrase to use when you want to
> 'dehumanize' a Palestinian or someone from Lebanon.
> That phrase was used by Israeli Chief of Staff Rafael Eitan
> in 1983 . . . when he was talking negatively towards
> Lebanon, according to Abou-Chedid. When Abou-Chedid
> attended college she recalled discussing that phrase during
> Arab/Israeli conflict classes.

Taylor Decl. at ¶ 3.

Thus, as Ms. Abou-Chedid made clear to the Agent, this common phrase is dehumanizing, but not a threat. The phrase is so common in the Middle East that it was the topic of discussion in Ms. Abou-Chedid's college classes. *Id.*

This meaning would have been clear to Mr. Syring who, according to another Form FD-302 prepared by the Agent, was stationed in Lebanon in 1993-94, and again in 1998-99, as part of his State Department career.  Taylor Decl. at ¶ 4.

Similarly, the "death to Lebanon/Arabs" phrase is simply a modified "echo" of Hezbollah's mantra, "Death to America."  That this slogan is a central Hezbollah tenet was made clear in a speech given by President Bush on September 5, 2006:

> Just as we must take the words of the Sunni extremists seriously, we must take the words of the Shia extremists seriously. Listen to the words of *Hezbollah's leader*, the terrorist Nasrallah, who has declared his hatred of America. He says, "Let the entire world hear me.  Our hostility to the Great Satan [America] is absolute ... Regardless of how the world has changed after 11 September, *Death to America will remain our reverberating and powerful slogan: Death to America."*

Taylor Decl. at ¶ 5 (emphasis added).

Thus, in responding to what he perceives as the AAI's pro-Hezbollah pronouncements, it is not surprising that Mr. Syring would mimic Hezbollah's own "reverberating and powerful slogan."  By twisting it back on those whom he obviously sees as being aligned with Hezbollah, the ironic, sarcastic nature of its use is evident.

The use of those phrases in Mr. Syring's communications, in context, then, is not as shocking as it may appear in isolation.  Both are common phrases to his intended audience – one, a put-down, the other, a twist on Hezbollah's central slogan.

That context is, again, made clear in Mr. Syring's second communication, which came four minutes after the voice-mail set forth above.  This second message is an e-mail

was sent to Dr. Zogby and Ms. Natasha Tynes.[4]    *Id.* at ¶ 5.  The subject line of the e-mail says, "James Zogby's statement on MSNBC website (July 17)."  The body of the message reads:

> Zogby's anti-Semitic, anti-American statements (and those of the AAI in general) are abhorrent, repulsive and disgusting.
>
> The only good Lebanese is a dead Lebanese (as the IDF knows and is carrying out in its security operations, God bless them.)
>
> Fuck the Arabs and Fuck James Zogby and his wicked Hizbollah [*sic*] brothers.  They will burn in hellfire on this earth and in the hereafter.

*Id.*

The Indictment next recounts a voice-mail that was left on the office telephone of Ms. Valerie Smith at her AAI office.  *Id.* at ¶ 6.[5]  This message was left sometime "[o]n or between July 18 and 19, 2006 . . ."  *Id.*  Thus, like all the communications set forth in the Indictment, this message appears to have been left well after normal working hours.  Unlike the other messages, there is nothing in or connected with this message that identifies the caller.  In any event, the message quoted in that paragraph reads, "Hello Valerie, you fucking Arab American shit.  James Zogby and you are all Hezballah [*sic*] supporters.  The only good Arab is a dead Arab . . . You God [inaudible] bitch."[6]

---

[4]    Unlike the other recipients of Mr. Syring's communications, Ms. Tynes is not listed on the AAI website excerpts attached to the Taylor Declaration.  Nonetheless, the Indictment makes clear that, at the time in question, she was an AAI employee.  Indictment at ¶ 2.

[5]    According to the AAI's website, Valerie Smith is its Director of Community Relations.  That website says that she holds a B.A. in Egyptology and Linguistic Anthropology, an M.A. in Middle East Studies and that she has studied in Jordan and Yemen.  Her e-mail address was provided on that website, and her direct AAI telephone line was provided via the phone directory to which callers were given access through AAI's main telephone line which was, itself, listed on the website.  Taylor Decl. at ¶¶ 1, 2.

[6]    There is no explanation of the ellipsis in the government's transcription of this oral message, *i.e.,* whether part of the message was excluded by the government, or whether it simply represents a pause.

The next communication is an e-mail, sent around 12:32 a.m. on or about July 19,

2006.  *Id.*  at ¶ 7.  This e-mail was sent to Ms. Valerie Smith's office e-mail address at the

AAI.  The subject line of that message reads, "URGENT:  Emergency Summit

Registration for July 19."  *Id.*  That message reads:

> You are a fucking anti-Semitic Arab-American stooge who
> sympathizes with Hezballah [*sic*] terror.
>
> You and your Arab American Institute fuckers should burn
> in the fires of hell for eternity.  The IDF is bombing
> Lebanon back into the stone age where it belongs.  Arabs
> are dogs.
>
> Long live the State of Israel.  Death to Arab American
> terrorists.  The only good Lebanese is a dead Lebanese.

*Id.*

About three minutes later, another e-mail is sent, this time to Ms. Rebecca Abou-

Chedid's work e-mail at her AAI office.  *Id.*[7]  The subject line of that e-mail reads,

"Information for Arab Americans."  The body of the message reads:

> You are a fucking Arab American terrorist, a Hezbollah
> sympathizer pig.
>
> James Zogby is a vile evil anti-Semitic pig terrorist
> member of Hezbollah who is attempting to destroy the
> State of Israel.
>
> God bless America.
>
> God Bless the State of Israel.
>
> The only good Lebanese is a dead Lebanese  ☺

*Id.* (smiley face graphic in original).

---

[7]     As noted above, Ms. Abou-Chedid, AAI's Government Relations and Policy Analyst, told the FBI
that the phrase, "the only good Lebanese is a dead Lebanese" is not considered a threat in Lebanon.  *See* p.
3, above.

The next (and next-to-last) message is a voice-mail left the next night, at or about 11:32 p.m. on or about July 19, 2006. *Id.* at ¶ 9. This voice-mail was left on the AAI's "main" telephone line at its offices. *Id.* This voice-mail says,

> Hello, I'm Patrick[.]  I'm in Arlington VA, and I think James Zogby is worse than Osama bin Laden. Since he supports Hezballah [*sic*], he's an anti-Semitic motherfucker, and the only good Arab is a dead Arab.

*Id.*

After a ten-day gap, but while the war between Israel and Hezbollah was still raging, the final communication was sent. *Id.* at ¶ 10. This one was an e-mail and, again, it was sent well after business hours, *i.e.,* at 12:13 a.m. on Saturday, July 29, 2006. *Id.* This e-mail was sent to five AAI employees, all of whom, as mentioned above, appeared on AAI's website as AAI's "public faces." The subject line of this e-mail is, "AAI murders in Seattle on July 28."[8] The message reads,

> I condemn James Zogby and the AAI for perpetrating the murder and shootings at the Jewish Federation in Seattle on Friday[,] July 28 (as well as the killings in Israel).
>
> You wicked[,] evil[,] Hezbollah-supporting Arabs should burn in the fires of hell for eternity and beyond. The United States would be safer without you.
>
> God bless the State of Israel[.]
>
> God bless America[.]
>
> Sincerely,
>
> Patrick in Arlington, VA.

*Id.*

---

[8]    Hours earlier, a Muslim man opened fire on Jewish women at the Jewish Federation building in Seattle, killing one and wounding several others. Early news reports of the shooting quoted the gunman, Naveed Afzal Haq, as having said, "I am a Muslim American, angry at Israel" before opening fire. Taylor Decl. at ¶ 6.

## THE CHARGES

Based on these facts, Mr. Syring was charged with one count of Federally

Protected Activities, in violation of 18 U.S.C. § 245(b)(2)(C) (*id.,* Count One); and one

count of Threatening Communication in Interstate Commerce, in violation of 18 U.S.C.

§ 875(c) (*id.,* Count Two).  Those two statutes provide, in pertinent part:

### § 245. Federally protected activities.

**(b)**     Whoever . . . by *force or threat of force* willfully injures, intimidates or interferes with, or attempts to injure, intimidate or interfere with –

\*   \*   \*   \*   \*

**(2)**     any person because of his race, color, religion or national origin and because he is or has been –

**(C)**     . . . enjoying employment, or any perquisite thereof, by any private employer . . .  (Emphasis added.)

### § 875. Interstate communications.

\*   \*   \*   \*   \*

**(c)**     Whoever transmits in interstate . . . commerce any communication containing any *threat to kidnap any person or any threat to injure the person of another*, shall be fined . . . or imprisoned not more than five years or both. (Emphasis added.)

Count One of the Indictment alleges that Mr. Syring

transmit[ted] e-mail and telephone communications to the offices of the Arab American Institute . . . and, *by threat of force* . . . did attempt to and did willfully intimidate and interfere with Arab American Institute employees because of their race and national origin, that is because they were

9

> Arab and Lebanese Americans, and because they were and
> had been enjoying employment, and the perquisites thereof,
> by a private employer, the Arab American Institute.
> (Emphasis added.)

Count Two alleges that Mr. Syring "willfully and knowingly did transmit in interstate commerce . . . telephone and e-mail communications to Arab American Institute employees, in which [he] *threatened to injure* Arab American Institute employees." (Emphasis added.)

Thus, the issue here is whether the voice- and e-mail communications fall within the narrow "true threats" exception to the broad protections of the First Amendment or whether they are, instead, protected speech. This is a question of law, to be decided by this Court. *United States v. Popa,* 187 F.3d 672, 674 (D.C. Cir. 1999). For the reasons discussed below, it is clear that none of the communications set forth in the Indictment constitutes a "true threat" and that they are, therefore, protected speech. It is equally clear that the statutes upon which the Indictment is based are, as applied to Mr. Syring under the facts alleged in the Indictment, an unconstitutional breach of his right to free speech and to due process. The indictment must, therefore, be dismissed in its entirety.

## ARGUMENT

### I.     The Hallmark of the First Amendment's Protection of Speech is to Allow Free Trade in Ideas, Even Ideas Most Find Distasteful or Discomforting.

"The hallmark of the protection of free speech is to allow free trade in ideas – even ideas that the overwhelming majority of people might find distasteful or discomforting." *Virginia v. Black,* 538 U.S. 343, 358 (2003).

> If there is a bedrock principle underlying the First
> Amendment, it is that *the government may not prohibit the*

> *expression of an idea simply because society finds the idea*
> *itself offensive* or disagreeable.  Thus, *the First Amendment*
> *ordinarily denies a State the power to prohibit*
> *dissemination of social*, economic and *political doctrine*
> *which a vast majority of its citizens believes to be false and*
> *fraught with evil consequence.*

*Id.* (emphasis added; cites and internal quotation marks omitted).

"Above all else, the First Amendment means that government has no power to restrict expression because of its message, its ideas, its subject matter or its content." *Collin v. Smith,* 578 F.2d 1197, 1202 (7th Cir), *cert. denied* 439 U.S. 916 (1978) (cites and internal quotation marks omitted).

## II.    Criminalizing Protected Speech is one of the Starkest Examples of Unconstitutional Speech Suppression.

The Supreme Court has declared that one of gravest threats to First Amendment freedom of speech is a law that criminalizes protected speech.  "The First Amendment commands, 'Congress shall make no law  . . . abridging the freedom of speech.'  The government may violate this mandate in many ways . . . but *a law imposing criminal penalties on protected speech is a stark example of speech suppression.*"  *Ashcroft v. Free Speech Coalition,* 535 U.S. 234, 244 (2002) (emphasis added; cites omitted).

Of course, the government may legally penalize certain narrowly circumscribed categories of speech.  It may, for example, impose criminal sanctions on the expression of "true threats," fighting words, obscenity and, as limited by constitutional requirements, libel.  *Police Dept. of Chicago v. Mosley,* 408 U.S.92, 102-03 (1972) (Burger, concurring).  However, "analysis of *content restrictions* must begin with a healthy respect for *the truth that they are the most direct threat to the vitality of First Amendment rights.*"  *Collin,* 578 F.2d at 1202 (emphasis added; cites omitted).

In this case, the comments contained in the subject voice- and e-mails fall under no exception to the protections afforded by the First Amendment. The Indictment charges that Mr. Syring's communications constitute threats but, as shown below, those communications do not rise to the level of "true threats." Nor do they fall within any of the other limited, narrow exceptions to the First Amendment's broad protections, such as fighting words or obscenity. Rather, they are clearly protected speech, expressing the speaker's political and social views on the situation in the Middle East and on an ethnically-motivated shooting in Seattle; and reacting to what he finds to be offensive anti-Semitism, anti-Americanism and a pro-Hezbollah position in the equally protected comments made by Dr. Zogby as spokesman for the AAI.

### III.    The Comments Here are not "True Threats" and Cannot, Therefore, Form the Basis for Criminal Threats Charges.

#### A. Criminal Threats Charges can be Based Only on "True Threats."

Both Counts of the Indictment are based on allegations that Mr. Syring's communications constituted threats. Count One is based upon 18 U.S.C. § 245(b)(2)(C), which requires there to have been "force or [the] threat of force . . ." Count Two is based upon 18 U.S.C. § 875(c), which requires there to have been "communication containing any threat to kidnap any person or any threat to injure the person of another . . ."

As the Supreme Court has made clear, in order for communication to constitute a threat that can be suppressed without violating the First Amendment, it must rise to the level of a "true threat." *Black,* 538 U.S. at 359. A "true threat" is one "where the speaker means to communicate *a serious expression of intent to commit an act of unlawful violence* to a particular individual or group of individuals." *Id.* (emphasis added; cites

omitted).  The two seminal Supreme Court opinions on the issue of "true threats" are

*Claiborne Hardware* and *Watts*.  An analysis of those cases shows that the comments

attributed to Mr. Syring here do not constitute "true threats" and cannot, therefore, be

suppressed by the government, either through censorship or through criminalization.

### 1.  *Claiborne Hardware.*

*Claiborne Hardware* arose out of the Civil Rights movement.  White merchants –

who claimed they had been harmed by an economic boycott organized by the NAACP in

Mississippi in the 1960s – sued those responsible for the boycott.  Part of the factual basis

for the suit involved comments made at speeches by Charles Evers, Field Secretary of the

NAACP at the time.

To help enforce the boycott, a group of men called the Black Hats (also called the

Deacons and the Enforcers) monitored white-owned stores and took down the names of

African Americans who violated the boycott.  458 U.S. at 903-904.  The names of these

boycott-violators were then read aloud at meetings and published in the newspaper.  *Id.*

Approximately ten acts of violence were associated with enforcement of the boycott,

including the making of threatening phone calls and the spraying of one boycott-

violator's house with bullets.  *Id*

In this setting, Evers gave a speech before supporters on April 1, 1966.  In that

speech, Evers is alleged to have told the crowd that any "Uncle Toms who broke the

boycott would 'have their necks broken' by their own people."  *Id.* at 900 at n. 28.  Those

remarks, noted the Court, were directed to the more than 8,000 African American

residents of Claiborne County, Mississippi.  *Id.*

13

On April 19, 1969 Evers addressed another crowd gathered at a church. There, he told the crowd,

> [Y]ou better not be caught on these streets shopping in these stores until these demands are met . . . Remember[,] you voted this. We intend to enforce it. You needn't go calling the chief of police, he can't help you none. You needn't go calling the sheriff, he can't help you none. . . .

*Id.* at 938.

Two days later, in another speech that was delivered to several hundred people, Evers said, "If we catch any of you going in any of them racist stores, we're gonna break your damn neck," or words to that effect. *Id.* at 902.[9] As noted above, the Black Hats had been taking down names, so the universe of known boycott-violators and, thus, the "targets" of Evers comments, was known and had been publicized through speeches and publication.

In defending against the white merchants' lawsuit, the NAACP contended that the boycott, including Evers' speeches, was protected by the First Amendment. Mississippi's Supreme Court sided with the merchants, finding that Evers' comments constituted "true threats."

The United States Supreme Court, however, reversed. While acknowledging that violence and the threat of violence are not protected by the First Amendment, the Court held that Evers' comments were protected speech. In so doing, the Court noted that in previous holdings, it "made clear . . . that mere *advocacy* of the use of force or violence does not remove speech from the protection of the First Amendment." *Id.* at 927 (emphasis in original). The Supreme Court stated:

---

[9]    Unlike the April 19 speech, this one was unrecorded. Witnesses' memories of Evers' exact words varied slightly. *Id.*

> While many of the comments in Evers' speeches might
> have contemplated "discipline" in the permissible form of
> social ostracism, it cannot be denied that references to the
> possibility that necks would be broken and to the fact that
> the Sheriff could not sleep with boycott violators at night
> *implicitly conveyed a sterner message.* In the passionate
> atmosphere in which the speeches were delivered, *they
> might have been understood as inviting an unlawful form of
> discipline or, at least, as intending to create fear of
> violence whether or not improper discipline was
> specifically intended.*

*Id.* at 927 (emphasis added).

Nonetheless, held the Court, Evers' speech was protected by the First

Amendment:

> This Court has made clear, however, that mere *advocacy* of
> the use of force or violence does not remove speech from
> the protection of the First Amendment. In *Brandenburg v.
> Ohio,* 395 U.S. 444, we reversed the conviction of a Ku
> Klux Klan leader for threatening "revengeance" if the
> "suppression" of the white race continued; we relied on
> "the principle that the constitutional guarantees of free
> speech and free press do not permit a State to forbid or
> proscribe advocacy of the use of force or of law violation
> *except where such advocacy is directed to inciting or
> producing imminent lawless action and is likely to incite or
> produce such action.*" *Id.* at 447.

*Id.* at 927-928 (emphasis added).

Continuing, the Court in *Claiborne Hardware* held:

> The emotionally charged rhetoric of Charles Evers'
> speeches did not transcend the bounds of protected speech
> set forth in *Brandenburg.* . . . In the course of those pleas,
> strong language was used. If that language had been
> followed by acts of violence, a substantial question would
> be presented whether Evers could be held liable for the
> consequences of that unlawful conduct. In this case,
> however . . . the chancellor made no finding of any
> violence after the challenged 1969 speech. Strong and
> effective extemporaneous rhetoric cannot be nicely
> channeled in purely dulcet phrases. An advocate must be

15

> free to stimulate his audience with spontaneous and
> emotional appeals for unity and action in a common cause.
> When such appeals do not incite lawless action, they must
> be regarded as protected speech. To rule otherwise would
> ignore the "profound national commitment" that "debate on
> public issues should be uninhibited, robust, and wide-
> open."

*Id.* at 928 (quoting *New York Times Co. v. Sullivan,* 376 U.S. 254, 270 (1964)).

Concluding, the Court held:

> For these reasons, we conclude that *Evers' addresses did
> not exceed the bounds of protected speech.* If there were
> other evidence of his authorization of wrongful conduct,
> the references to discipline in the speeches could be used to
> corroborate that evidence. But any such theory fails for the
> simple reason that *there is no evidence – apart from the
> speeches themselves – that Evers authorized, ratified, or
> directly threatened acts of violence.*

*Id.* at 929 (emphasis added).

### 2.    *Watts.*

*Watts* involved a public rally on the grounds of the Washington Monument during

the Vietnam War. Watts, an eighteen-year old man, joined a gathering to discuss police

brutality. He told his listeners that he had received his draft notice, requiring him to

report the next week for a military physical. He further told them that he was not going

to go into the military and that if "'they ever make me carry a rifle the first man I want to

get in my sights is [President] L.B.J.'" *Watts*, 394 U.S. at 706.

Watts was charged under the statute making it a crime to knowingly or willfully

threaten the President. He was convicted. He challenged his conviction as well as the

statute on which it was based, arguing that the statute was unconstitutional both on its

face and as applied to him.

16

The Supreme Court found the statute to be constitutional on its face.

"Nevertheless," noted the Court, "a statute such as this one, which makes criminal a form

of pure speech, must be interpreted with the commands of the First Amendment clearly in

mind. What is a threat must be distinguished from what is constitutionally protected

speech." *Id.* at 707. The Court unanimously concluded that it "did not believe that the

kind of political hyperbole indulged in by [Watts] fits within that statutory term [of a true

threat]." *Id.* at 708. In so doing, the Court recognized:

> *The language of the political arena*, like the language used
> in labor disputes . . . *is often vituperative, abusive, and*
> *inexact. We agree with petitioner that his only offense here*
> *was "a kind of very crude offensive method of stating a*
> *political opposition to the President."* Taken in context,
> and regarding the expressly conditional nature of the
> statement and the reaction of the listeners, we do not see
> how it could be interpreted otherwise.

*Id.* at 708 (emphasis added).

The Second Circuit analyzed *Watts* in the context of a defendant who, like Mr.

Syring here, was charged under 18 U.S.C. § 875(c) with making threats. *United States v.*

*Kelner,* 534 F.2d 1020 (2nd Cir.), *cert. denied* 429 U.S. 1022 (1976). Unlike the present

case, Kelner's statements concerned a single person, PLO leader Yasser Arafat, who was

in New York City to attend a session of the United Nations which he had been invited to

address. *Id.* at 1020-1021.

Kelner, a member of the Jewish Defense League, made a videotape which was

televised and in which Kelner, dressed in military fatigues and holding a .38 caliber

"police special" handgun, said he and his group planned to assassinate Mr. Arafat. *Id.* at

1021. He declared that "[w]e have people who have been trained and who are out now

and who intend to make sure that Arafat and his lieutenants do not leave this country

17

alive." *Id.* Kelner said everything had been "planned in detail" and that "[i]t's going to come off." *Id.* Kelner was convicted of a violation of § 875(c).

On appeal, Kelner raised five issues, including one that his statements were not "threats" within the meaning of the statute. On that issue, Kelner argued, *inter alia*, that his statements were simply "political hyperbole." *Id.* at 1022. Given the facts in *Kelner*, which stand in stark contrast to those presented here, it is unsurprising that Kelner's conviction was upheld. Nonetheless, the Second Circuit's analysis of the "true threats" issue under *Watts* is instructive here.

The court in *Kelner* noted that the "question of the application of the First Amendment to the statute here is properly for the court rather than the jury under *Dennis v. United States,* 341 U.S. 494, 511-515 (1951)." *Id.* at 1028 (fn. omitted). Regarding the issue of "true threats" under *Watts*, the Second Circuit found,

> In effect, the Court [in *Watts*] was stating that threats punishable consistently with the First Amendment were only those which according to their language and context conveyed *a gravity of purpose and likelihood of execution* so as to constitute speech *beyond the pale of protected vehement, caustic . . . unpleasantly sharp attacks* on government and public officials. . . .

*Id.* at 1026 (emphasis added; internal quotation marks and cite omitted).

Continuing, the court in *Kelner* held, "The purpose and effect of the *Watts* constitutionally-limited definition of the term 'threat' is *to insure that only unequivocal, unconditional and specific expressions of intention immediately to inflict injury may be punished.*" *Id.* at 1027 (emphasis added). In response to (and rejection of) Kelner's argument that the First Amendment required proof of his specific intent to carry out the threat, the Second Circuit noted:

18

> The *Watts* requirement of proof of a "true threat," it may be
> seen, works ultimately to much the same purpose and effect
> as would a requirement of proof of specific intent to
> execute the threat because *both requirements focus on
> threats which are so unambiguous and have such
> immediacy that they convincingly express an intention of
> being carried out.*

*Id.* (emphasis added)

"It is for these reasons," the Second Circuit continued, "that we believe a narrow

construction of the word 'threat' in the statute here, 18 U.S.C. § 875(c), as approved in

*Watts*, 394 U.S. at 708, is consonant with the protection of First Amendment interests."

*Id.* "So long as the threat *on its face and in the circumstances* in which it is made *is so

unequivocal, unconditional, immediate and specific as to the person threatened*, as to

convey a gravity of purpose and *imminent prospect of execution*, the statute [§ 875(c)]

may properly be applied." *Id.* (emphasis added).

### 3.    Related Points.

#### a.    First Amendment Protections are at Their Zenith When Political or Social Advocacy is at Issue.

Before turning to the statements at issue here, four other points are worth

mentioning. First, in the realm of political and/or social advocacy, First Amendment

protections are at their zenith, even allowing advocacy of the use of force or violation of

the law. "[T]he constitutional guarantees of free speech and free press do not permit a

State to forbid or proscribe advocacy of the use of force or of law violation except where

such advocacy is directed to inciting or producing imminent lawless action and is likely

to incite or produce such action." *Black*, 538 U.S. at 359. The Supreme Court has

recognized that the "language of the political arena . . . is often vituperative, abusive, and

inexact." *Watts,* 394 U.S. at 708. *See also Anti-Defamation League of B'nai B'rith v.*

*FCC,* 403 F.2d 169, 174 (D.C. Cir. 1967), *cert. denied,* 394 U.S. 930 (1969) (J. Skelly

Wright, concurring) ("And this kind of speech, detestable as some of its anti-Semitic and

racist aspects may be, approaches the area of political and social commentary. *To this*

*extent it makes a stronger claim for First Amendment protection"*) (emphasis added)).

  b.  **Words Convey Deeply-Held Emotions as Well as**
      **Facts and Ideas, and the Expression Thereof is**
      **Also Constitutionally Protected.**

The Court has recognized that "much linguistic expression serves a *dual*

*communicative purpose*: it conveys not only ideas capable of relatively precise, detached

explication, but otherwise inexpressible emotions as well. In fact, words are often chosen

as much for their emotive as their cognitive force." *Cohen v. California,* 403 U.S. 15, 26

(1971) (emphasis added).[10] The First Amendment protects both of these "dual

communicative purpose[s]."

  c.  **"True Threats" Rarely Involve Comments**
      **Directed at Large Groups.**

Third, attempts to criminalize comments directed at large groups are especially

suspect. This might be seen as a subset of the principle, articulated in *Kelner* and other

cases, that for a communication to constitute a "true threat" and, thus, be suppressible,

there must be a sense that the threat "target" is discrete, and that the threat has some

immediacy and is possible to carry out. Thus, in his concurring opinion in *Anti-*

---

[10]     This point was recently made by Columbia University President Lee Bollinger, after the recent
visit to Columbia by Iranian President Mahmoud Ahmadinejad. Bollinger, whom some criticized for his
pointed remarks in introducing President Ahmadinejad, defended himself, according to the *Washington
Post*: "Bollinger . . . who once clerked for Chief Justice Warren E. Burger, said his comments reflected his
belief that, in extreme cases, *it is important to express not only intellectual opposition, but also emotional
revulsion.* 'I wanted the emotions to match the words,' he said." *Washington Post*, Sept. 30, 2007 at A6
(emphasis added).

*Defamation League,* Judge Skelly Wright recognized that verbally "[a]ttacking a group presents a harder problem.  Under the law of libel, defamation of a broad group or class is not usually actionable.  And this kind of speech . . . approaches the area of political and social commentary.  To this extent it makes a stronger claim for First Amendment protection." *Id.,* 403 F.2d at 174.

**d.    Those who Voluntarily put Themselves in the Midst of the Public Arena of Political or Social Issues are Reasonably Expected to Possess "Thicker Hides."**

Finally, the law recognizes that whether speech can legitimately be suppressed or criminalized cannot turn on what, for want of a better term, is an "eggshell plaintiff." This principle was recognized by the D.C. Circuit in *Anti-Defamation League*:

> If what the ADL calls "appeals to racial or religious
> prejudice" is to be classed with hard-core obscenity, then it
> has no right to be heard on the air, and the only views
> which are entitled to be broadcast on matters of concern to
> the ADL are those which the ADL holds or finds
> acceptable.  This is irreconcilable with either the Fairness
> Doctrine or the right of free speech.

*Id.,* 403 F.2d at 172.

Indeed, as the Supreme Court has recognized, "a function of free speech under our system of government is to invite dispute.  It may indeed best serve its high purpose when it induces a condition of unrest, creates dissatisfaction with conditions as they are, or even stirs people to anger." *Terminiello v. Chicago,* 337 U.S. 1, 4 (1949). Terminiello's conviction for disorderly conduct was overturned, even though his speech had condemned some of his opponents "and vigorously, if not *viciously, criticized*

21

*various political and racial groups whose activities he denounced as inimical to the nation's welfare.*" *Id.* at 3 (emphasis added).

In *Collin,* in attempting to defend the constitutionality of local ordinances that banned dissemination of materials promoting racial hatred, the Village of Skokie, Illinois argued that "the Nazi march, involving as it does the display of uniforms and swastikas, will create a substantive evil that it has a right to prohibit: *the infliction of psychic trauma* on resident holocaust survivors and other Jewish residents." *Id.*, 578 F.2d at 1205 (emphasis added). In rejecting that argument, the Seventh Circuit recognized that

> [i]t would be grossly insensitive to deny, as we do not, that *the proposed demonstration would seriously disturb, emotionally and mentally, at least some, and probably many of the Village's residents.* The problem with engrafting an exception on the First Amendment for such situations is that they are indistinguishable in principle from speech that invite(s) dispute . . . induces a condition of unrest, creates dissatisfaction with conditions as they are, or even stirs people to anger. . . . Yet these are among the high purposes of the First Amendment. . . . It is perfectly clear that *a state may not make criminal the peaceful expression of unpopular views. . . . Likewise, mere public intolerance or animosity cannot be the basis for abridgement of these constitutional freedoms.*

*Id.* at 1205-1206 (emphasis added; cites, fns. and internal quotation marks omitted).

The court in *Collin* noted that, with regard to the Nazis' message, "'any shock effect . . . must be attributed to the content of the ideas expressed. It is firmly settled that under our Constitution the public expression of ideas may not be prohibited merely because the ideas are themselves offensive to some of their hearers.'" *Id.* at 1206 (quoting *Street v. New York,* 394 U.S. 576, 592 (1969)).

> There is room under the First Amendment for the government to protect targeted listeners from offensive speech, but *only when the speaker intrudes on the privacy*

> *of the home, or a captive audience cannot practically avoid
> exposure. . . .* The ability of government, consonant with
> the Constitution, to shut off discourse solely to protect
> others from hearing it is, in other words, *dependent upon a
> showing that substantial privacy interests are being
> invaded in an essentially intolerable manner.* Any broader
> view of this authority would effectively empower a
> majority to silence dissidents simply as a matter of personal
> predilections.

*Id.* (emphasis added).

So, whereas the First Amendment's scope cannot be determined by the squeamish

or overly sensitive, it is also recognized that certain groups, because of their role in

society, are expected to exercise a greater degree of fortitude when it comes to offensive

speech. This principle is recognized in *Matter of M.W.G.,* 427 A.2d 427 (D.C. 1981).

> Police officers are trained to deal with unruly and
> uncooperative members of the public. A police officer is
> expected to have a greater tolerance for verbal assaults
> [Cite omitted]; and because the police are especially trained
> to resist provocation, we expect them to remain peaceful in
> the face of verbal abuse that might provoke or offend the
> ordinary citizen.

*Id.* at 442.

While the recipients of the communications outlined in the Indictment here are

obviously not police officers, the principle of *Matter of M.W.G.* nonetheless applies.

Those who choose or consent to be the public faces of interest groups, especially interest

groups that represent controversial or politicized people or causes, must be expected to

develop a "thicker hide" than those not so engaged. Part of this expectation is a natural

outgrowth of the fact that the positions such people hold tend to be "lightening rods" to

those whose views differ from their own; that, consequently, they are going to be

subjected more frequently to opponents who have their own strongly-held views; and that

this interaction will result in a psychic "callous" that those in other walks of life may not develop. When, as here, the recipients of communications are all folks who have their names and contact information on an interest group's website, they are naturally seen as the "public faces" of their interest group and are going to be the ones contacted both by supporters and opponents.

With these principles in mind, it is clear that the communications set forth in the Indictment do not constitute "true threats" and cannot, therefore, form the basis for criminal charges or other suppression by the government.

### B. The Comments Here are not Threats, let Alone the Requisite "True Threats."

The comments attributed to Mr. Syring in the indictment are simply not threats. Rather, they are expressions of deeply felt views and emotions in response to public comments made by the AAI's President, Dr. James Zogby, on the MSNBC website and which Mr. Syring had "just read." Indictment at ¶ 4. Those communications all concern events then unfolding between Israel and Hezbollah or, in the final instance, a shooting by a Muslim-American man at the Jewish Federation building in Seattle.

However, even looking in isolation at what many people might find to be the most offensive or troubling comments – the recurring comments that the only good Lebanese or Arab is a dead Lebanese or Arab; and the "death to Lebanon and death to the Arabs" comments – it is clear that those comments are not threats. No one is targeted. There is no statement that Mr. Syring is going to do anything to anybody. There is no suggestion of anything imminent happening. There is no "you do this or I'm going to do that"

24

content to these comments. Rather, there is simply a statement of belief that the only good Lebanese or Arab person is a dead one.

This is not a threat. Even one of the "victims," Rebecca Abou-Chedid, admitted to the FBI that, in Lebanon, the phrase "the only good Lebanese is a dead Lebanese" is: 1) common; and 2) not a threat but is, instead, an insult, a way of dehumanizing a Palestinian or a Lebanese person. *See* p. 3, above. Mr. Syring, who – as a career State Department employee – was stationed in Lebanon for a couple years, was aware that this is how Lebanese people would interpret such a comment, in keeping with the other insults contained in his communications (*e.g.*, "Arabs are dogs," Indictment at ¶ 7).

More importantly, these comments do not rise to the level of "true threats," as defined by the courts. Seen in the context provided by the Indictment itself, the comments are those of a person who clearly sees himself as pro-American, pro-Israel and anti-Hezbollah, who is reacting to public comments by Dr. Zogby – in his role as president of the AAI – which Mr. Syring finds to be anti-Semitic (Indictment at ¶¶ 4, 5, 7, 8 and 9), anti-American (Indictment at ¶¶ 4, 5 and 9), pro-Hezbollah (Indictment at ¶¶ 4, 5, 7, 8 and 9), worthy of condemnation, including in religious terms concerning Hell (Indictment at ¶¶ 4, 5, 7 and 10), "abhorrent, repulsive and disgusting" (Indictment at ¶ 5); and who, in Mr. Syring's view, "is worse than Osama bin Laden" (Indictment at ¶ 9).

That all these comments are triggered in reaction to Dr. Zogby's public comments on the internet is made clear by the first two messages, which specifically refer to the fact that Mr. Syring has "just read James Zogby's statements online on the MSNBC website

25

. . ." (*id.* at ¶ 4) or, in the case of the first e-mail, refers to the same in its subject line (*id.* at ¶ 5).    Dr. Zogby, because of his position, has a national platform on issues that are obviously of deep concern to Mr. Syring.  Mr. Syring is using the only platform he has to directly respond to Dr. Zogby and those who work with him at the AAI, to voice his own deeply-held political views and his opposition to the publicly expressed views of Dr. Zogby and the AAI.  Indeed, this is the platform that the AAI invites people to use, via the "Contact Us" portion of AAI's website.

All the communications are sent to the recipients at their AAI offices, as opposed to at their homes or to their personal telephones or e-mail addresses.  All occur during the war between Israel and Hezbollah.  All concern that conflict, or the larger and ongoing conflict between Israel and its Arab neighbors (including the Seattle shooting).

Mr. Syring does not even attempt to hide his identity.  In the very first message to the AAI, in a call to their main telephone line, the first words out of his mouth are, "This is Patrick Syring."  *Id.* at ¶ 4.  His communications are analogous, then, to a letter-to-the-editor in which someone responds to something another person has said or written.

Mr. Syring's comments, though perhaps crude and offensive, clearly fall under the umbrella of the First Amendment's protections.  He is expressing his political and social views in reaction to having read those of Dr. Zogby.  He never threatens to harm Dr. Zogby or any of the other recipients of his communications and, for that matter, any other individual.  Instead, he touts his support of America and Israel; his disgust with what he views as AAI's pro-Hezbollah positions; and uses some terminology that his recipients would recognize as put-downs ("the only good Lebanese is a dead Lebanese")

or that mimic Hezbollah's own slogan ("Death to America") by twisting it against those whom Mr. Syring perceives to be Hezbollah's allies.

In short, his comments fall far short of the more direct (yet still not "true") threats that were found by the Supreme Court to constitute protected speech in *Claiborne Hardware*. Unlike this case, where the "targets" of Mr. Syring's comments are about as broad as can be (all Lebanese and Arabs), the "targets" in *Claiborne Hardware* were the much more limited universe of African-Americans whose names had been taken down, and publicized, for violating the boycott of white merchants. Unlike the amorphous comments by Mr. Syring, the comments by Mr. Evers in *Claiborne Hardware* were that the "Uncle Toms" who had violated the boycott would "have their necks broken" by their "own people." 458 U.S. at 900. Evers further declared that if "we catch any of you going in any of them racist stores, we're gonna break your damn neck," or words to that effect. *Id.* at 902. Evers, Field Secretary for the NAACP, told his listeners that "we" intend to "enforce" the boycott. *Id.* at 938-939. Unlike this case, Evers made his comments in the context of approximately ten violent acts associated with enforcing the boycott, including a hail of bullets directed at the house of one of the boycott violators. *Id.* at 903-904.

Thus, *Claiborne Hardware* presents facts that seem much closer to "true threats" than does this case. Nonetheless, a unanimous Supreme Court found in *Claiborne Hardware* that Evers' speech was protected by the First Amendment. The Court found Evers' speech to be "highly charged political rhetoric lying at the core of the First Amendment." *Id.* at 926-927.

27

So it is here. Mr. Syring's comments are, at worst, insulting political hyperbole, communicated in reaction to what he felt to be anti-American, anti-Semitic and pro-Hezbollah statements made by Dr. Zogby in his role as president of the AAI. Unlike Dr. Zogby, Mr. Syring had no national platform from which to respond to what, from his viewpoint, he considered to be the outrageous positions of the AAI. Thus, he used the channel AAI provided on or through its website – the names and office e-mails and telephone numbers of its "public faces" – to respond with strong expressions of his position.

Under First Amendment jurisprudence, it is clear that the comments contained in the Indictment and underlying the criminal charges against Mr. Syring fall far short of "true threats." They meet none of the tests set forth by the Second Circuit in *Kelner,* set forth above.

They cannot, therefore, be suppressed by the government, either through criminalization or censorship, because they are constitutionally protected speech. The government's attempt to criminalize this speech violates Mr. Syring's rights under the First, Fifth and Fourteenth Amendments to the Constitution. As applied to Mr. Syring in this case, the statutes under which he is charged are unconstitutional. The indictment must, therefore, be dismissed in its entirety.

### IV.    The Communications Here Fall Under no Other Narrow Exception to the First Amendment's Broad Protections.

Mr. Syring has been charged with making threats. For the reasons discussed above, the communications set forth in the Indictment fall far short of "true threats" and are, therefore, protected speech under the First Amendment. Although Mr. Syring is not

28

charged with having engaged in fighting words or in obscenity, it is clear that neither of those narrow "carve-outs" to the First Amendment would apply here, either.

### A.    The Comments are not Fighting Words.

Another narrow category of speech that falls outside the First Amendment's broad protections is "fighting words." However, speech cannot constitutionally be categorized as "fighting words" unless it is likely to provoke an immediate violent response from the person to whom it is addressed:

> [A] State may punish those words which by their very utterance inflict injury or tend to incite an immediate breach of the peace. . . . We have consequently held that fighting words – those personally abusive epithets which, when addressed to the ordinary citizen, are, as a matter of common knowledge, inherently likely to provoke violent reaction – are generally proscribable under the First Amendment.

*Black,* 538 U.S. at 359 (cites and internal quotation marks omitted).

In determining whether certain speech constitutes "fighting words," it is appropriate to look at the actual reaction of the addressees to those words. *Texas v. Johnson,* 491 U.S. 397 (1989); *Cohen,* 403 U.S. at 20. *Johnson,* for example, involved a flag burning at the 1984 Republican National Convention. Johnson burned the flag in protest of President Reagan's policies. The Supreme Court ruled that the First Amendment barred Johnson's conviction for desecrating the flag. In rejecting the State's argument that it could ban flag burning in order to prevent a disturbance of the peace, the Court noted that "no disturbance of the peace actually occurred or threatened to occur because of Johnson's burning of the flag. . . . [Texas] also fails to show that a

29

disturbance of the peace was a likely reaction to *Johnson's* conduct." *Id.* at 408 (emphasis in original). The Court further held:

> [W]e have not permitted the government to assume that every expression of a provocative idea will incite a riot, but have instead required careful consideration of the actual circumstances surrounding such expression, asking whether the expression is "directed to inciting or producing imminent lawless action *and* is likely to incite or produce such action."

*Id.* at 409 (quoting *Brandenburg,* 395 U.S. at 447; emphasis added).

Here, neither prong of the *Johnson/Brandenburg* test is met. The comments at issue were not directed to inciting or producing "imminent lawless action" and were unlikely to incite or produce such action from the recipients. Therefore, they do not constitute "fighting words" and cannot form the basis of a criminal charge under that theory.

In *Cohen,* the defendant wore a jacket to court that said on its back, "Fuck the draft." He testified at trial that he wore the jacket as a means of informing the public of the depth of his feelings against the Vietnam War and the draft. 403 U.S. at 16-17. No bystander threatened to commit any act of violence in response to Cohen's jacket. *Id.*

In overturning Cohen's conviction for disturbing the peace, the Supreme Court noted that States are free to ban "fighting words," which it reiterated were "those personally abusive epithets which, when addressed to the ordinary citizen, are, as a matter of common knowledge, inherently likely to provoke violent reaction." *Id.* at 20. The phrase on Cohen's jacket did not rise, however, to this level. "Nor do we have here an instance of the exercise of the State's police power to prevent a speaker from intentionally provoking a given group to hostile reaction. . . . There is, as noted above,

no showing that anyone who saw Cohen was in fact violently aroused or that appellant intended such a result." *Id.* (cite omitted).

The Court in *Cohen* went on to hold that an undifferentiated fear or apprehension of disturbance is not enough to overcome the right of freedom of expression. "We have been shown no evidence that substantial numbers of citizens are standing ready to strike out physically at whoever may assault their sensibilities with execrations like that uttered by Cohen." *Id.* at 22-23.

In reaching its holding and as noted above, the Supreme Court in *Cohen* noted the "dual communicative function" of certain language: "it conveys not only ideas capable of relatively precise, detached explication, but otherwise inexpressible emotions as well. In fact, words are often chosen as much for their emotive as their cognitive force." *Id.* at 26.

So it is here. Mr. Syring's messages use strong language to convey his strong emotional reaction to what he perceived as the anti-Semitic, anti-American, pro-Hezbollah statements of AAI President Zogby; and to what he perceived as AAI's connection to the ethnically-motivated shootings in Seattle. This is classic political speech which, though protected by the First Amendment nonetheless, as the Court has noted, sometimes gets quite heated. *Watts,* 394 U.S. at 708 ("The language of the political arena . . . is often vituperative, abusive, and inexact. We agree with petitioner that his only offense here was 'a kind of very crude offensive method of stating a political opposition to the President'").

The fact that such "vituperative, abusive, and inexact" language upsets those who hear it is not a valid basis for suppressing it. As noted above, "a function of free speech

under our system of government is to invite dispute. It may indeed best serve its high purpose when it induces a condition of unrest, creates dissatisfaction with conditions as they are, or even stirs people to anger." *Terminiello,* 337 U.S. at 4. Terminiello's conviction for disorderly conduct was overturned, even though his speech had condemned some of his opponents "and vigorously, if not viciously, criticized various political and racial groups whose activities he denounced as inimical to the nation's welfare." *Id.* at 3.

As also noted above, in *Collin, supra,* the Seventh Circuit struck down as unconstitutional local ordinances that, *inter alia,* prohibited dissemination of materials that promoted racial hatred and were used to deny a parade permit to some American Nazis. These ordinances were challenged by the Nazis, who wanted to march in Skokie, Illinois, a community made up largely of people of Jewish heritage, some of whom were survivors of Hitler's concentration camps.

In this context, the court first considered the ordinance that prohibited "dissemination of materials which would promote hatred towards person of the basis of their heritage." *Collin, supra,* 578 F.2d at 1202. In striking down this ordinance, the court held:

> The ordinance cannot be sustained on the basis of some of the more obvious exceptions to the rule against content control. . . . [A]lthough the Village introduced evidence in the district court tending to prove that some individuals, at least, might have difficulty restraining their reactions to the Nazi demonstration, the Village tells us that it does not rely on a fear of responsive violence to justify the ordinance, and does not even suggest that there will be any physical violence if the march is held. This confession takes this case out of the scope of *Brandenburg[, supra].*

> The concession also eliminates any argument based on the fighting words doctrine of *Chaplinsky v. New Hampshire,* 315 U.S. 568 (1942). The Court in *Chaplinsky* affirmed a conviction under a statute that, as authoritatively construed, applied only to words with a direct tendency to cause violence by the persons to whom, individually, the words were addressed. . . . *A conviction for less than words that at least tend to incite an immediate breach of the peace cannot be justified under Chaplinsky.* The Illinois Supreme Court . . . has squarely ruled that responsive violence fears and the fighting words doctrine could not support the prohibition of appellees' demonstration.

*Id.* at 1202-1203 (emphasis added; fn. and cites omitted).

As noted above, in its attempt to sustain its ordinances, the Village of Skokie also argued that "the Nazi march, involving as it does the display of uniforms and swastikas, will create a substantive evil that it has a right to prohibit: the infliction of psychic trauma on resident holocaust survivors and other Jewish residents." *Id.* at 1205. The Seventh Circuit rejected that argument, as well. *Id.* at 1205-1206. It noted that with regard to the Nazis' message, "'any shock effect . . . must be attributed to the content of the ideas expressed. It is firmly settled that under our Constitution the public expression of ideas may not be prohibited merely because the ideas are themselves offensive to some of their hearers.'" *Id.* at 1206 (quoting *Street v. New York,* 394 U.S. 576, 592 (1969)).

For all of these reasons, Mr. Syring's comments cannot be punished as "fighting words." None of the recipients was provoked, or likely to be provoked, into a violent reaction by the comments. Again, then, Mr. Syring's comments constitute speech that is protected by the First Amendment.

**B.    The Comments are not Obscene.**

Although some of Mr. Syring's comments are laced with expletives, these phrases cannot be criminalized as obscenity. First, the constitutional rule that obscenity is unprotected applies only to material with erotic content. *Cohen,* 403 U.S. at 20. The comments clearly do not meet that test.

Second, "the statutory prohibition against profane or obscene language in public is constitutional only if interpreted to include the requirement that the language used created a substantial risk of provoking violence or was so grossly offensive as to constitute a nuisance." *Matter of M.W.G.,* 427 A.2d at 442. Here, there is no evidence that the comments created a substantial risk of provoking violence or that, given current cultural standards and practices, they were so grossly offensive that they could be subject to criminal sanction. Thus, the communications set forth in the Indictment do not meet this test.

Having failed both prongs of the test for obscenity, Mr. Syring's communications cannot be punished under that narrow exception to the First Amendment, either.

## CONCLUSION

The *Washington Post* recently quoted a senior aide to Secretary of State Rice as saying, "These are scary times we live in. Nothing's working. We can blame Iran, we can blame North Korea, and *we can blame Hezbollah. You can blame them all because they are terrible people.* But at some point you have to ask yourself, are you going about this right?" *Washington Post,* Sept. 3, 2007 at A6 (emphasis added).

Here, one might ask the same question concerning Mr. Syring's reaction to statements by AAI President Zogby during the throes of the Israeli/Hezbollah war, and

after the shooting at the Jewish Federation building in Seattle, last year:  did he "go[]

about this right?"  Regardless of what one thinks about the advisability of the way Mr.

Syring chose to express his strongly held political opinions about current world affairs,

one thing is clear:  those expressions do not constitute "true threats" or fall within any

other narrow exception to the broad protections we enjoy under the First Amendment.

Therefore, the government has no business trying to punish him for exercising his First

Amendment right of free speech.

Mr. Syring is entitled to his views.  His right to express those views is

constitutionally protected from governmental interference.  The Indictment here attempts

to punish Mr. Syring for exercising his right to express "pure speech," and it must be

dismissed with prejudice.

That is the relief he respectfully seeks from this Court.

Dated this 12th day of October, 2007.

Respectfully submitted,

SCHERTLER & ONORATO, L.L.P.

_____/s/_____

David Schertler (#367203)
Peter V. Taylor (#419524)
601 Pennsylvania Avenue, NW
North Building, 9th Floor
Washington, DC 20004
Telephone:  (202) 628-4199
Facsimile:  (202) 628-4177

*Counsel for Mr. Patrick Syring*

# EXHIBIT A

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| v. | ) Criminal No. 07-204 (CKK) |
| | ) |
| PATICK SYRING, | ) |
| | ) |
| Defendant | ) |
| | ) |

## DECLARATION OF PETER V. TAYLOR

I, PETER V. TAYLOR, pursuant to 28 U.S.C. § 1746, state the following:

1.    Attached as Exhibit 1 are pages printed from the website of the Arab American Institute ("AAI"). Some were printed from that website on November 1, 2006, and some were printed on October 9, 2007, as reflected on the bottom of each such page.

2.    I have called the AAI's main telephone number, as listed on the "Contact Us" page of Exhibit 1, after normal business hours. When I did so, I was provided with an oral AAI telephone directory and given the option to call individual AAI employees' direct telephone numbers.

3.    As part of its discovery obligations, the government has turned over to Mr. Syring's counsel an October 10, 2006 Form FD-302, reflecting the interview that the FBI Special Agent investigating this case ("Agent") conducted with Ms. Rebecca Abou-Chedid. According to the AAI's website, Ms. Abou-Chedid is the AAI's Government Relations and Policy Analyst. *See* Ex. 1, attached hereto. In her interview with the Agent, Ms. Abou-Chedid identifies herself as being of Lebanese origin. According to the Agent's October 10 Form FD-302, Ms. Abou-Chedid told him that

the phrase 'The only good Lebanese is a dead Lebanese'
. . . is a well known phrase to use when you want to 'dehumanize'
a Palestinian or someone from Lebanon. That phrase was used by
Israeli Chief of Staff Rafael Eitan in 1983 . . . when he was talking
negatively towards Lebanon, according to Abou-Chedid. When
Abou-Chedid attended college she recalled discussing that phrase
during Arab/Israeli conflict classes.

4.      According to another Form FD-302 prepared by the Agent, Mr. Syring was

stationed in Lebanon in 1993-94, and again in 1998-99, as part of his State Department career.

5.      Attached hereto as Exhibit 2 is a copy of a speech given by President Bush on

September 5, 2006. In that speech, the President stated:

> Just as we must take the words of the Sunni extremists seriously,
> we must take the words of the Shia extremists seriously. Listen to
> the words of *Hezbollah's leader*, the terrorist Nasrallah, who has
> declared his hatred of America. He says, "Let the entire world hear
> me. Our hostility to the Great Satan [America] is absolute ...
> Regardless of how the world has changed after 11 September,
> *Death to America will remain our reverberating and powerful*
> *slogan: Death to America."*

Ex. 2 at p. 5 (emphasis added).

6.      Attached hereto as Exhibit 3 is an internet news article from the website

seattlepi.com concerning the July 28, 2006 shooting at the Seattle Jewish Federation, in which a

Muslim man opened fire on Jewish women, killing one and wounding several others. That

report quotes the gunman, Naveed Afzal Haq, as having said, "I am a Muslim American, angry

at Israel" before opening fire.

I declare, under penalty of perjury, that the foregoing is true and correct.

Executed this ___12th___ day of October, 2007.

_____
PETER V. TAYLOR

2

# EXHIBIT A-1



## About AAI



### Meet the Staff

### Office of the President

Select A State



PRESS R

#### Dr. James Zogby

Dr. Zogby serves as the President of the Arab American Institute in Washington, DC. He co-founded the organization in 1985 and has been involved in a full range of Arab American issues for over two decades. He also co-founded the Palestine Human Rights Campaign in the late 1970s, and later co-founded and served as the Executive Director of the American-Arab Anti-Discrimination Committee. He serves on the National Democratic Ethnic Coordinating Committee as well as on the Council on Foreign Relations. Dr. Zogby hosts a weekly television show called, "Viewpoint with James Zogby" and writes a weekly newspaper column, "Washington Watch."

**How Arab Ameri**
**in 2006**

*Washington Watch*
by James Zogby

#### Rebecca Brown

Brown joined AAI in 2002 as Dr. Zogby's Executive Assistant, and also serves as the president's staff liaison. She manages the president's schedule, communications, and special projects, and is the Institute's Board administrator. Prior to joining the Institute, she worked for Amnesty International USA's Country Specialist Program and served as an investigator of police misconduct at the New York City Civilian Complaint Review Board, taking many cases by complainants in the Arab American community. Rebecca holds a Master's degree in Arab Studies from Georgetown University, and a BA in German language and literature from Heidelberg College in Ohio.

**American Arabs :**
**Begin to Flex Pol**
*The Eagle-Tribune*

**Arab American V**
**OH, FL and PA Gi**
**Strong Nod in Ke**
*AAI Press Release*

#### Nidal Ibrahim

Ibrahim is the Executive Director at AAI. Prior to joining, Ibrahim was formerly the founder and publisher of *Arab American Business Magazine*, a national publication launched in November 2000. A 12-year veteran of the news business, Ibrahim has held reporting and editing positions with mainstream American newspapers, business publications and *The Jordan Times* in Amman, Jordan. He has written extensively on political, economic and social affairs. He is a graduate of California State University, Fullerton.

**Arab Americans I**
*JTA Global News S*

Read More



IN OUR CO

**Arab Americans :**
**Pespective"**

## AAI Foundation

*AAI Bulletin*

#### Helen Samhan

Helen is Executive Director of the Arab American Institute Foundation, a 501©(3) in Washington D.C., a non-profit dedicated to promoting and studying the Arab American experience. AAIF is an affiliate of the Arab American Institute that represents Arab American issues in politics, elections, leadership training and public policy. She has been with the Institute since its formation in 1985. Ms. Samhan's professional memberships include the 2010 Census Advisory Committee to the U.S. Bureau of the Census , the Arab American National Museum Advisory Board, and she is a 2003 graduate of Leadership America.

Community Activis

**2006 Arab Ameri**
**Candidates**

**National Arab An**
**Day Resource Pa**

#### Sabeen Altaf

Altaf is a Program Coordinator for the AAI Foundation. She earned a Bachelor's degree in International Relations and Economics from the University of Minnesota. She holds a joint Master's degree in Public Policy and Business Administration from Humphrey School of Public Policy and Carlson School of Management. Altaf previously worked in Pakistan at the Aga Khan Foundation



AAI POS

specializing in poverty alleviation and debt relief. She first joined AAIF in 2005 as a Cultural Outreach Specialist and a member of the Arab American Resource Corps (ARC).

**Rudy Gharib**
Gharib is the Cultural Outreach Specialist and AmeriCorps representative for the AAI Foundation. Gharib, previously worked as the AAI-Southern California Programs Coordinator. Gharib, a Cal State Fullerton graduate of Political Science and Communications, first interned with the AAIF summer program at the Palestine Media Center, and later worked as the AAI Communications intern.

## Communications

**Keith McAllister**

## Government Relations and Policy Research

**Rebecca Abou-Chedid**
Abou-Chedid is Director of Government Relations. She has worked for AAI since August 2003, as Public Affairs Coordinator and Government Relations and Policy Analyst. Abou-Chedid has extensive experience working on behalf of the Arab American community with federal agencies and congressional offices on foreign policy, civil liberties, and immigration policy issues. She is the author of *Countdown* and *Election Insider*. Abou-Chedid is a graduate of Cornell University where she received a B.A. in Economics and Near Eastern Studies. Abou-Chedid has also been published in *The Boston Globe*, *The Daily Star* and *An Nahar*.

## Community Relations

**Valerie Smith**
Smith is AAI's Director of Community Relations. She previously served as AAI's Iowa Field Organizer, Community Relations Coordinator, and Program Manager. Smith holds a B.A. in Egyptology and Linguistic Anthropology from UC Berkeley and an M.A. in Middle East Studies – Arabic, from the University of Utah. Smith has also studied in Jordan and Yemen. She was treasurer of the 1988 Berkeley ballot measure to adopt Jabaliya as a sister city, newsletter editor for the East Bay Arab Community Center, and administrative secretary at the University of Utah's Middle East Center.

**Maram Abdelhamid**
Abdelhamid is the Community Relations Associate at AAI. Abdelhamid's career in political organizing and activism began with her work as a legislative assistant to Colorado State Representative Desiree Sanchez. Abdelhamid then worked as the National Field Organizer for 21st Century Democrats and served as deputy campaign manager for Congressman Jim Moran of Virginia. Abdelhamid earned her Bachelor's degree from the University of Denver in Political Science and Economics.

**Jason Assir**
Assir assists the community relations department in developing AAI's election and policy efforts on the local level. Prior to working at AAI, Jason worked as a Project Assistant in Education Technology Programs at the National School Boards Association; served in Turkmenistan with the Peace Corps; and wrote for weekly and daily news sources in Central Texas. Jason graduated in 2000 with a B.A. in English from the University of Texas at Austin.

© 2006 Arab American Institute. All rights reserved.    Sitemap | Contact us

11/1/2006



## Contact Us

Arab American Institute
1600 K Street, NW Suite 601
Washington, DC 20006

Phone: (202) 429-9210
Fax: (202) 429-9214

## Management

**James Zogby**, President
**Helen Samhan**, AAIF Executive Director

jzogby@aaiusa.org
hsamhan@aaiusa.org

## Departments

General Information and publications requests
Membership
Community Relations

Media

Policy Research

Human Resources

Web and Print

aai@aaiusa.org
membership@aaiusa.org
**Valerie Smith**, Director of Community Relations
vsmith@aaiusa.org
**Andy Sabino**, Public Affairs Associate
jkauffman@aaiusa.org
**Rebecca Abou-Chedid**, Government Relations &
Policy Analyst
rabouchedid@aaiusa.org
**Dianne Davidson**, Office Manager
ddavidson@aaiusa.org
Web/Publications Manager
web@aaiusa.org

## Opportunities

Volunteers

**If you would like to volunteer in our offices please
email: Maram Abdelhamid at**
mabdelhamid@aaiusa.org

* Check out our For Students section for information
on internships

## Affiliates



**Arab American Institute Foundation**
The Arab American Institute Foundation supports
public information and education programs on the
role of the Arab American community in American
society. AAIF sponsors outreach efforts to inform
the American public about the contributions of Arab
Americans to civic life, government service,
business and professional life, and education.
**Arab American Leadership Council Political
Action Committee**



The Arab American Leadership Council PAC (ALCPAC) is the major vehicle for supporting Arab Americans and other candidates supported by the Arab American community. Active since 1996, ALCPAC distributes contributions to select campaigns, provides voter contact information, and encourages party-related activities by Arab American voters.

ALCPAC is active in local, state and federal election campaigns. Its efforts are supported by contributors across the United States who want to amplify the role of the Arab American community in the electoral system of this country.

For more information on ALCPAC, see www.aaleadershipcouncil.org.

**CAAO**

**Congress of Arab American Organizations**
The Congress of Arab American Organizations (CAAO) is an umbrella organization launched in August 2001 to enhance cooperation, communication, and coordination among the more than 120 local, regional, and national groups that serve Arab Americans. For more information about the Congress, please contact **Sabeen Altaf** at (202) 429-9210 or saltaf@aaiusa.org

© 2006 Arab American Institute. All rights reserved.    Sitemap | Contact us

# EXHIBIT A-2



THE WHITE HOUSE
PRESIDENT
GEORGE W. BUSH



For Immediate Release
Office of the Press Secretary
September 5, 2006

## President Discusses Global War on Terror

Capital Hilton Hotel
Washington, D.C.

  📄 National Strategy for Combating Terrorism
  📄 Fact Sheet: The President's National Strategy for Combating
Terrorism
    📄 In Focus: National Security



**VIDEO  Multimedia**

President's Remarks
🎬 view

1:15 P.M. EDT

THE PRESIDENT: Thank you all very much. (Applause.) Thank you all. Please be seated. General Hendrix, thank you for the invitation to be here. Thanks for the kind introduction. I'm honored to stand with the men and women of the Military Officers Association of America. I appreciate the Board of Directors who are here, and the leaders who have given me this platform from which to speak. I'm proud to be here with active members of the United States military. Thank you for your service. I'm proud to be your Commander-in-Chief. (Applause.)



I am pleased also to stand with members of the diplomatic corps, including many representing nations that have been attacked by al Qaeda and its terrorist allies since September the 11th, 2001. (Applause.) Your presence here reminds us that we're engaged in a global war against an enemy that threatens all civilized nations. And today the civilized world stands together to defend our freedom; we stand together to defeat the terrorists; and were working to secure the peace for generations to come.

I appreciate my Attorney General joining us today, Al Gonzales. Thank you for being here. (Applause.) The Secretary of Homeland Security, Michael Chertoff, is with us. (Applause.) Three members of the United States Senate -- I might say, three important members of the United States Senate -- Senate President Pro Tem Ted Stevens of Alaska. Thank you for joining us, Senator. (Applause.) Chairman of the Appropriations Committee, Senator Thad Cochran of Mississippi. (Applause.) The Chairman of the Armed Services Committee, John Warner of Virginia. (Applause.)

I thank Norb Ryan, as well, for his leadership. I do appreciate all the folks that are at Walter Reed who have joined us today. I'm going to tell the parents of our troops, we provide great health care to those who wear the uniform. I'm proud of those folks at Bethesda and Walter Reed -- are providing you the best possible care to help you recover from your injuries. Thank you for your courage. Thank you for joining us here today. May God bless you in your recovery. (Applause.)

Next week, America will mark the fifth anniversary of September the 11th, 2001 terrorist attacks. As this day approaches, it brings with it a flood of painful memories. We remember the horror of watching planes fly into the World Trade Center, and seeing the towers collapse before our eyes. We remember the sight of the Pentagon, broken and in flames. We remember the rescue workers who rushed into burning buildings to save lives, knowing they might never emerge again. We remember the brave passengers who charged the cockpit of their hijacked plane, and stopped the terrorists from reaching their target and killing more innocent civilians. We remember the cold brutality of the enemy who inflicted this harm on our country -- an enemy whose leader, Osama bin Laden, declared the massacre of nearly 3,000 people that day -- I quote -- "an unparalleled and magnificent feat of valor, unmatched by any in humankind before them."

In five years since our nation was attacked, al Qaeda and terrorists it 

has inspired have continued to attack across the world. They've killed the innocent in Europe and Africa and the Middle East, in Central Asia and the Far East, and beyond. Most recently, they attempted to strike again in the most ambitious plot since the attacks of September the 11th -- a plan to blow up passenger planes headed for America over the Atlantic Ocean.

Five years after our nation was attacked, the terrorist danger remains. We're a nation at war -- and America and her allies are fighting this war with relentless determination across the world. Together with our coalition partners, we've removed terrorist sanctuaries, disrupted their finances, killed and captured key operatives, broken up terrorist cells in America and other nations, and stopped new attacks before they're carried out. We're on the offense against the terrorists on every battlefront -- and we'll accept nothing less than complete victory. (Applause.)

In the five years since our nation was attacked, we've also learned a great deal about the enemy we face in this war. We've learned about them through videos and audio recordings, and letters and statements they've posted on websites. We've learned about them from captured enemy documents that the terrorists have never meant for us to see. Together, these documents and statements have given us clear insight into the mind of our enemies -- their ideology, their ambitions, and their strategy to defeat us.

We know what the terrorists intend to do because they've told us -- and we need to take their words seriously. So today I'm going to describe -- in the terrorists' own words, what they believe... what they hope to accomplish, and how they intend to accomplish it. I'll discuss how the enemy has adapted in the wake of our sustained offensive against them, and the threat posed by different strains of violent Islamic radicalism. I'll explain the strategy we're pursuing to protect America, by defeating the terrorists on the battlefield, and defeating their hateful ideology in the battle of ideas.

The terrorists who attacked us on September the 11th, 2001, are men without conscience -- but they're not madmen. They kill in the name of a clear and focused ideology, a set of beliefs that are evil, but not insane. These al Qaeda terrorists and those who share their ideology are violent Sunni extremists. They're driven by a radical and perverted vision of Islam that rejects tolerance, crushes all dissent, and justifies the murder of innocent men, women and children in the pursuit of political power. They hope to establish a violent political utopia across the Middle East, which they call a "Caliphate" -- where all would be ruled according to their hateful ideology. Osama bin Laden has called the 9/11 attacks -- in his words -- "a great step towards the unity of Muslims and establishing the Righteous... [Caliphate]."

This caliphate would be a totalitarian Islamic empire encompassing all current and former Muslim lands, stretching from Europe to North Africa, the Middle East, and Southeast Asia. We know this because al Qaeda has told us. About two months ago, the terrorist Zawahiri -- he's al Qaeda's second in command -- declared that al Qaeda intends to impose its rule in "every land that was a home for Islam, from [Spain] to Iraq. He went on to say, "The whole world is an open field for us."

We know what this radical empire would look like in practice, because we saw how the radicals imposed their ideology on the people of Afghanistan. Under the rule of the Taliban and al Qaeda, Afghanistan was a totalitarian nightmare -- a land where women were imprisoned in their homes, men were beaten for missing prayer meetings, girls could not go to school, and children were forbidden the smallest pleasures like flying kites. Religious police roamed the streets, beating and detaining civilians for perceived offenses. Women were publicly whipped. Summary executions were held in Kabul's soccer stadium in front of cheering mobs. And Afghanistan was turned into a launching pad for horrific attacks against America and other parts of the civilized world -- including many Muslim nations.

The goal of these Sunni extremists is to remake the entire Muslim world in their radical image. In pursuit of their imperial aims, these extremists say there can be no compromise or dialogue with those they call "infidels" -- a category that includes America, the world's free nations, Jews, and all Muslims who reject their extreme vision of Islam. They reject the possibility of peaceful coexistence with the free world. Again, hear the words of Osama bin Laden earlier this year: "Death is better than living on this Earth with the unbelievers among us."

These radicals have declared their uncompromising hostility to freedom. It is foolish to think that you can negotiate with them. (Applause.) We see the uncompromising nature of the enemy in many captured terrorist documents. Here are just two examples: After the liberation of Afghanistan, coalition forces searching through a terrorist safe house in that country found a copy of the al Qaeda charter. This charter states that "there will be

continuing enmity until everyone believes in Allah. We will not meet [the enemy] halfway. There will be no room for dialogue with them." Another document was found in 2000 by British police during an anti-terrorist raid in London -- a grisly al Qaeda manual that includes chapters with titles such as "Guidelines for Beating and Killing Hostages." This manual declares that their vision of Islam "does not... make a truce with unbelief, but rather confronts it." The confrontation... calls for... the dialogue of bullets, the ideals of assassination, bombing, and destruction, and the diplomacy of the cannon and machine gun."

Still other captured documents show al Qaeda's strategy for infiltrating Muslim nations, establishing terrorist enclaves, overthrowing governments, and building their totalitarian empire. We see this strategy laid out in a captured al Qaeda document found during a recent raid in Iraq, which describes their plans to infiltrate and take over Iraq's western Anbar Province. The document lays out an elaborate al Qaeda governing structure for the region that includes an Education Department, a Social Services Department, a Justice Department, and an "Execution Unit" responsible for "Sorting out, Arrest, Murder, and Destruction."

According to their public statements, countries that have -- they have targeted stretch from the Middle East to Africa, to Southeast Asia. Through this strategy, al Qaeda and its allies intend to create numerous, decentralized operating bases across the world, from which they can plan new attacks, and advance their vision of a unified, totalitarian Islamic state that can confront and eventually destroy the free world.

These violent extremists know that to realize this vision, they must first drive out the main obstacle that stands in their way -- the United States of America. According to al Qaeda, their strategy to defeat America has two parts: First, they're waging a campaign of terror across the world. They're targeting our forces abroad, hoping that the American people will grow tired of casualties and give up the fight. And they're targeting America's financial centers and economic infrastructure at home, hoping to terrorize us and cause our economy to collapse.

Bin Laden calls this his "bleed-until-bankruptcy plan." And he cited the attacks of 9/11 as evidence that such a plan can succeed. With the 9/11 attacks, Osama bin Laden says, "al Qaeda spent $500,000 on the event, while America... lost -- according to the lowest estimate -- $500 billion... Meaning that every dollar of al Qaeda defeated a million dollars" of America. Bin Laden concludes from this experience that "America is definitely a great power, with... unbelievable military strength and a vibrant economy, but all of these have been built on a very weak and hollow foundation." He went on to say, "Therefore, it is very easy to target the flimsy base and concentrate on their weak points, and even if we're able to target one-tenth of these weak points, we will be able [to] crush and destroy them."

Secondly, along with this campaign of terror, the enemy has a propaganda strategy. Osama bin Laden laid out this strategy in a letter to the Taliban leader, Mullah Omar, that coalition forces uncovered in Afghanistan in 2002. In it, bin Laden says that al Qaeda intends to "[launch]," in his words, "a media campaign... to create a wedge between the American people and their government." This media campaign, bin Laden says, will send the American people a number of messages, including "that their government [will] bring them more losses, in finances and casualties." And he goes on to say that "they are being sacrificed... to serve... the big investors, especially the Jews." Bin Laden says that by delivering these messages, al Qaeda "aims at creating pressure from the American people on the American government to stop their campaign against Afghanistan."

Bin Laden and his allies are absolutely convinced they can succeed in forcing America to retreat and causing our economic collapse. They believe our nation is weak and decadent, and lacking in patience and resolve. And they're wrong. (Applause.) Osama bin Laden has written that the "defeat of... American forces in Beirut" in 1983 is proof America does not have the stomach to stay in the fight. He's declared that "in Somalia... the United States [pulled] out, trailing disappointment, defeat, and failure behind it." And last year, the terrorist Zawahiri declared that Americans "know better than others that there is no hope in victory. The Vietnam specter is closing every outlet."

These terrorists hope to drive America and our coalition out of Afghanistan, so they can restore the safe haven they lost when coalition forces drove them out five years ago. But they've made clear that the most important front in their struggle against America is Iraq -- the nation bin Laden has declared the "capital of the Caliphate." Hear the words of bin Laden: "I now address... the whole... Islamic nation: Listen and understand... The most... serious issue today for the whole world is this Third World War... [that] is raging in [Iraq]." He calls it "a war of destiny between infidelity and Islam." He says, "The whole world is watching this war," and that it will end in "victory and glory or misery and humiliation." For al Qaeda, Iraq is not a distraction from their war on America -- it is the central battlefield where the outcome of this struggle will be decided.

Here is what al Qaeda says they will do if they succeed in driving us out of Iraq: The terrorist Zawahiri has said that al Qaeda will proceed with "several incremental goals. The first stage: Expel the Americans from Iraq. The second stage: Establish an Islamic authority or amirate, then develop it and support it until it achieves the level of Caliphate... The third stage: Extend the jihad wave to the secular countries neighboring Iraq. And the fourth stage: ...the clash with Israel."

These evil men know that a fundamental threat to their aspirations is a democratic Iraq that can govern itself, sustain itself, and defend itself. They know that given a choice, the Iraqi people will never choose to live in the totalitarian state the extremists hope to establish. And that is why we must not, and we will not, give the enemy victory in Iraq by deserting the Iraqi people. (Applause.)

Last year, the terrorist Zarqawi declared in a message posted on the Internet that democracy "is the essence of infidelity and deviation from the right path." The Iraqi people disagree. Last December, nearly 12 million Iraqis from every ethnic and religious community turned out to vote in their country's third free election in less than a year. Iraq now has a unity government that represents Iraq's diverse population -- and al Qaeda's top commander in Iraq breathed his last breath. (Applause.)

Despite these strategic setbacks, the enemy will continue to fight freedom's advance in Iraq, because they understand the stakes in this war. Again, hear the words of bin Laden, in a message to the American people earlier this year. He says: "The war is for you or for us to win. If we win it, it means your defeat and disgrace forever."

Now, I know some of our country hear the terrorists' words, and hope that they will not, or cannot, do what they say. History teaches that underestimating the words of evil and ambitious men is a terrible mistake. In the early 1900s, an exiled lawyer in Europe published a pamphlet called "What Is To Be Done?" -- in which he laid out his plan to launch a communist revolution in Russia. The world did not heed Lenin's words, and paid a terrible price. The Soviet Empire he established killed tens of millions, and brought the world to the brink of thermonuclear war. In the 1920s, a failed Austrian painter published a book in which he explained his intention to build an Aryan super-state in Germany and take revenge on Europe and eradicate the Jews. The world ignored Hitler's words, and paid a terrible price. His Nazi regime killed millions in the gas chambers, and set the world aflame in war, before it was finally defeated at a terrible cost in lives.

Bin Laden and his terrorist allies have made their intentions as clear as Lenin and Hitler before them. The question is: Will we listen? Will we pay attention to what these evil men say? America and our coalition partners have made our choice. We're taking the words of the enemy seriously. We're on the offensive, and we will not rest, we will not retreat, and we will not withdraw from the fight, until this threat to civilization has been removed. (Applause.)

Five years into this struggle, it's important to take stock of what's been accomplished -- and the difficult work that remains. Al Qaeda has been weakened by our sustained offensive against them, and today it is harder for al Qaeda's leaders to operate freely, to move money, or to communicate with their operatives and facilitators. Yet al Qaeda remains dangerous and determined. Bin Laden and Zawahiri remain in hiding in remote regions of this world. Al Qaeda continues to adapt in the face of our global campaign against them. Increasingly, al Qaeda is taking advantage of the Internet to disseminate propaganda, and to conduct "virtual recruitment" and "virtual training" of new terrorists. Al Qaeda's leaders no longer need to meet face-to-face with their operatives. They can find new suicide bombers, and facilitate new terrorist attacks, without ever laying eyes on those they're training, financing, or sending to strike us.

As al Qaeda changes, the broader terrorist movement is also changing, becoming more dispersed and self-directed. More and more, we're facing threats from locally established terrorist cells that are inspired by al Qaeda's ideology and goals, but do not necessarily have direct links to al Qaeda, such as training and funding. Some of these groups are made up of "homegrown" terrorists, militant extremists who were born and educated in Western nations, were indoctrinated by radical Islamists or attracted to their ideology, and joined the violent extremist cause. These locally established cells appear to be responsible for a number of attacks and plots, including those in Madrid, and Canada, and other countries across the world.

As we continue to fight al Qaeda and these Sunni extremists inspired by their radical ideology, we also face the threat posed by Shia extremists, who are learning from al Qaeda, increasing their assertiveness, and stepping up their threats. Like the vast majority of Sunnis, the vast majority of Shia across the world reject the vision of

extremists -- and in Iraq, millions of Shia have defied terrorist threats to vote in free elections, and have shown their desire to live in freedom. The Shia extremists want to deny them this right. This Shia strain of Islamic radicalism is just as dangerous, and just as hostile to America, and just as determined to establish its brand of hegemony across the broader Middle East. And the Shia extremists have achieved something that al Qaeda has so far failed to do: In 1979, they took control of a major power, the nation of Iran, subjugating its proud people to a regime of tyranny, and using that nation's resources to fund the spread of terror and pursue their radical agenda.

Like al Qaeda and the Sunni extremists, the Iranian regime has clear aims: They want to drive America out of the region, to destroy Israel, and to dominate the broader Middle East. To achieve these aims, they are funding and arming terrorist groups like Hezbollah, which allow them to attack Israel and America by proxy. Hezbollah, the source of the current instability in Lebanon, has killed more Americans than any terrorist organization except al Qaeda. Unlike al Qaeda, they've not yet attacked the American homeland. Yet they're directly responsible for the murder of hundreds of Americans abroad. It was Hezbollah that was behind the 1983 bombing of the U.S. Marine barracks in Beirut that killed 241 Americans. And Saudi Hezbollah was behind the 1996 bombing of Khobar Towers in Saudi Arabia that killed 19 Americans, an attack conducted by terrorists who we believe were working with Iranian officials.

Just as we must take the words of the Sunni extremists seriously, we must take the words of the Shia extremists seriously. Listen to the words of Hezbollah's leader, the terrorist Nasrallah, who has declared his hatred of America. He says, "Let the entire world hear me. Our hostility to the Great Satan [America] is absolute… Regardless of how the world has changed after 11 September, Death to America will remain our reverberating and powerful slogan: Death to America."

Iran's leaders, who back Hezbollah, have also declared their absolute hostility to America. Last October, Iran's President declared in a speech that some people ask -- in his words -- "whether a world without the United States and Zionism can be achieved… I say that this… goal is achievable." Less than three months ago, Iran's President declared to America and other Western powers: "open your eyes and see the fate of pharaoh… if you do not abandon the path of falsehood… your doomed destiny will be annihilation." Less than two months ago, he warned: "The anger of Muslims may reach an explosion point soon. If such a day comes… [America and the West] should know that the waves of the blast will not remain within the boundaries of our region." He also delivered this message to the American people: "If you would like to have good relations with the Iranian nation in the future… bow down before the greatness of the Iranian nation and surrender. If you don't accept [to do this], the Iranian nation will… force you to surrender and bow down."

America will not bow down to tyrants. (Applause.)

The Iranian regime and its terrorist proxies have demonstrated their willingness to kill Americans -- and now the Iranian regime is pursuing nuclear weapons. The world is working together to prevent Iran's regime from acquiring the tools of mass murder. The international community has made a reasonable proposal to Iran's leaders, and given them the opportunity to set their nation on a better course. So far, Iran's leaders have rejected this offer. Their choice is increasingly isolating the great Iranian nation from the international community, and denying the Iranian people an opportunity for greater economic prosperity. It's time for Iran's leader to make a different choice. And we've made our choice. We'll continue to work closely with our allies to find a diplomatic solution. The world's free nations will not allow Iran to develop a nuclear weapon. (Applause.)

The Shia and Sunni extremists represent different faces of the same threat. They draw inspiration from different sources, but both seek to impose a dark vision of violent Islamic radicalism across the Middle East. They oppose the advance of freedom, and they want to gain control of weapons of mass destruction. If they succeed in undermining fragile democracies, like Iraq, and drive the forces of freedom out of the region, they will have an open field to pursue their dangerous goals. Each strain of violent Islamic radicalism would be emboldened in their efforts to topple moderate governments and establish terrorist safe havens.

Imagine a world in which they were able to control governments, a world awash with oil and they would use oil resources to punish industrialized nations. And they would use those resources to fuel their radical agenda, and pursue and purchase weapons of mass murder. And armed with nuclear weapons, they would blackmail the free world, and spread their ideologies of hate, and raise a mortal threat to the American people. If we allow them to do this, if we retreat from Iraq, if we don't uphold our duty to support those who are desirous to live in liberty, 50 years from now history will look back on our time with unforgiving clarity, and demand to know why we did not act.

I'm not going to allow this to happen -- and no future American President can allow it either. America did not seek this global struggle, but we're answering history's call with confidence and a clear strategy. Today we're releasing a document called the "National Strategy for Combating Terrorism." This is an unclassified version of the strategy we've been pursuing since September the 11th, 2001. This strategy was first released in February 2003; it's been updated to take into account the changing nature of this enemy. This strategy document is posted on the White House website -- whitehouse.gov. And I urge all Americans to read it.

Our strategy for combating terrorism has five basic elements:

First, we're determined to prevent terrorist attacks before they occur. So we're taking the fight to the enemy. The best way to protect America is to stay on the offense. Since 9/11, our coalition has captured or killed al Qaeda managers and operatives, and scores of other terrorists across the world. The enemy is living under constant pressure, and we intend to keep it that way -- and this adds to our security. When terrorists spend their days working to avoid death or capture, it's harder for them to plan and execute new attacks.

We're also fighting the enemy here at home. We've given our law enforcement and intelligence professionals the tools they need to stop the terrorists in our midst. We passed the Patriot Act to break down the wall that prevented law enforcement and intelligence from sharing vital information. We created the Terrorist Surveillance Program to monitor the communications between al Qaeda commanders abroad and terrorist operatives within our borders. If al Qaeda is calling somebody in America, we need to know why, in order to stop attacks. (Applause.)

I want to thank these three Senators for working with us to give our law enforcement and intelligence officers the tools necessary to do their jobs. (Applause.) And over the last five years, federal, state, and local law enforcement have used those tools to break up terrorist cells, and to prosecute terrorist operatives and supporters in New York, and Oregon, and Virginia, and Texas, and New Jersey, and Illinois, Ohio, and other states. By taking the battle to the terrorists and their supporters on our own soil and across the world, we've stopped a number of al Qaeda plots.

Second, we're determined to deny weapons of mass destruction to outlaw regimes and terrorists who would use them without hesitation. Working with Great Britain and Pakistan and other nations, the United States shut down the world's most dangerous nuclear trading cartel, the AQ Khan network. This network had supplied Iran and Libya and North Korea with equipment and know-how that advanced their efforts to obtain nuclear weapons. And we launched the Proliferation Security Initiative, a coalition of more than 70 nations that is working together to stop shipments related to weapons of mass destruction on land, at sea, and in the air. The greatest threat this world faces is the danger of extremists and terrorists armed with weapons of mass destruction -- and this is a threat America cannot defeat on her own. We applaud the determined efforts of many nations around the world to stop the spread of these dangerous weapons. Together, we pledge we'll continue to work together to stop the world's most dangerous men from getting their hands on the world's most dangerous weapons. (Applause.)

Third, we're determined to deny terrorists the support of outlaw regimes. After September the 11th, I laid out a clear doctrine: America makes no distinction between those who commit acts of terror, and those that harbor and support them, because they're equally guilty of murder. Thanks to our efforts, there are now three fewer state sponsors of terror in the world than there were on September the 11th, 2001. Afghanistan and Iraq have been transformed from terrorist states into allies in the war on terror. And the nation of Libya has renounced terrorism, and given up its weapons of mass destruction programs, and its nuclear materials and equipment. Over the past five years, we've acted to disrupt the flow of weapons and support from terrorist states to terrorist networks. And we have made clear that any government that chooses to be an ally of terror has also chosen to be an enemy of civilization. (Applause.)

Fourth, we're determined to deny terrorist networks control of any nation, or territory within a nation. So, along with our coalition and the Iraqi government, we'll stop the terrorists from taking control of Iraq, and establishing a new safe haven from which to attack America and the free world. And we're working with friends and allies to deny the terrorists the enclaves they seek to establish in ungoverned areas across the world. By helping governments reclaim full sovereign control over their territory, we make ourselves more secure.

Fifth, we're working to deny terrorists new recruits, by defeating their hateful ideology and spreading the hope of freedom -- by spreading the hope of freedom across the Middle East. For decades, American policy sought to achieve peace in the Middle East by pursuing stability at the expense of liberty. The lack of freedom in that region helped create conditions where anger and resentment grew, and radicalism thrived, and terrorists found willing

recruits. And we saw the consequences on September the 11th, when the terrorists brought death and destruction to our country. The policy wasn't working.

The experience of September the 11th made clear, in the long run, the only way to secure our nation is to change the course of the Middle East. So America has committed its influence in the world to advancing freedom and liberty and democracy as the great alternatives to repression and radicalism. (Applause.) We're taking the side of democratic leaders and moderates and reformers across the Middle East. We strongly support the voices of tolerance and moderation in the Muslim world. We're standing with Afghanistan's elected government against al Qaeda and the Taliban remnants that are trying to restore tyranny in that country. We're standing with Lebanon's young democracy against the foreign forces that are seeking to undermine the country's sovereignty and independence. And we're standing with the leaders of Iraq's unity government as they work to defeat the enemies of freedom, and chart a more hopeful course for their people. This is why victory is so important in Iraq. By helping freedom succeed in Iraq, we will help America, and the Middle East, and the world become more secure.

During the last five years we've learned a lot about this enemy. We've learned that they're cunning and sophisticated. We've witnessed their ability to change their methods and their tactics with deadly speed -- even as their murderous obsessions remain unchanging. We've seen that it's the terrorists who have declared war on Muslims, slaughtering huge numbers of innocent Muslim men and women around the world.

We know what the terrorists believe, we know what they have done, and we know what they intend to do. And now the world's free nations must summon the will to meet this great challenge. The road ahead is going to be difficult, and it will require more sacrifice. Yet we can have confidence in the outcome, because we've seen freedom conquer tyranny and terror before. In the 20th century, free nations confronted and defeated Nazi Germany. During the Cold War, we confronted Soviet communism, and today Europe is whole, free and at peace.

And now, freedom is once again contending with the forces of darkness and tyranny. This time, the battle is unfolding in a new region -- the broader Middle East. This time, we're not waiting for our enemies to gather in strength. This time, we're confronting them before they gain the capacity to inflict unspeakable damage on the world, and we're confronting their hateful ideology before it fully takes root.

We see a day when people across the Middle East have governments that honor their dignity, and unleash their creativity, and count their votes. We see a day when across this region citizens are allowed to express themselves freely, women have full rights, and children are educated and given the tools necessary to succeed in life. And we see a day when all the nations of the Middle East are allies in the cause of peace.

We fight for this day, because the security of our own citizens depends on it. This is the great ideological struggle of the 21st century -- and it is the calling of our generation. All civilized nations are bound together in this struggle between moderation and extremism. By coming together, we will roll back this grave threat to our way of life. We will help the people of the Middle East claim their freedom, and we will leave a safer and more hopeful world for our children and grandchildren.

God bless. (Applause.)

END 1:59 P.M. EDT

---

**Return to this article at:**
http://www.whitehouse.gov/news/releases/2006/09/20060905-4.html

 CLICK HERE TO PRINT

# EXHIBIT A-3





WESTERN WASHINGTON TOYOTA DEALERS

MySeattlePix • Reader Page • My account

[search]

| Local | US/World | Sports | Business | A&E | Life | Comics | Photos | Opinion | Blogs | Subscribe | Buy Ads | Jobs | Autos | Homes | Rentals | NWsource |

LOCAL



Friday, July 28, 2006 - Last updated 2/1/2007 12:15 p.m. PT

## Six shot, one killed at Seattle Jewish federation

**Five hurt; One person in custody**

By PHUONG CAT LE, BRAD WONG, JOHN IWASAKI and AMY ROLPH
P-I REPORTERS

Six women were shot - one fatally - this afternoon at the Jewish Federation of Greater Seattle by a man who told a witness he was upset about "what was going on in Israel."



**Related Content**

The immediate aftermath

Police spokesman Rich Pruitt said there was one shooter, who was apprehended without incident outside the Jewish Federation building at the corner of Third Avenue and Virginia Street.

"We believe it's a lone individual acting out his antagonism," said David Gomez, who heads the FBI's counterterrorism efforts in Seattle.

Authorities did not release many details, but the FBI said the alleged shooter was between 30 and 40 and agents were investigating the incident as a hate crime. When asked at a news conference if that meant the alleged shooter was Muslim, Seattle Police Chief Gil Kerlikowske said: "You could infer that."

One woman was killed in the attack, police said.

Harborview Medical Center spokeswoman Pamela Steele said five victims were taken to the hospital, all women ranging in age from the 20s to the 40s. Each suffered gunshot wounds to the abdomen, knee, groin or arm. Three were in critical condition. Two were in satisfactory condition.

One of the women in satisfactory condition is about 20 weeks pregnant and was shot in the arm. Doctors believe she will be OK.

The gunman, armed with what police said was a large caliber, semi-automatic handgun, forced his way through the security door at the federation after an employee had punched in her security code, Marla Meislin-Dietrich, a database coordinator for the center, told The Associated Press. "He said 'I am a Muslim American, angry at Israel,' before opening fire on everyone," Meislin-Dietrich said. "He was randomly shooting at everyone."



SEATTLE CENTER
Denny Way
3rd Ave.
Lenora St.
SITE OF SHOOTINGS
SEATTLE P-I

There were about 18 people in the Jewish Federation building at the time, police said.

Fighting has raged in the Middle East since Hezbollah, a Shiite group based in Lebanon, went into Israel and kidnapped two Israeli soldiers and killed eight others. Israel retaliated by striking targets in Lebanon and has sent troops into the southern part of the country. Since the conflict began, more than 400 have been killed in Lebanon and more than 50 soldiers and civilians have been killed in Israel.

The Council on American-Islamic Relations, Seattle, issued a statement Friday night.

"The Muslim community of Greater Seattle area watched in horror as news broke of a shooting at the Jewish Federation building ... We categorically condemn this and any similar acts of violence ... We pray for the safety and health of those injured and offer our heartfelt

---

ADV





INSIDE SEATTLEPI.COM

Day in Pictures Sharapova in Moscow

Cook It Tasty, easy-to-make Zucchini-Pear Soup

Buying an HDTV Which model is best for you?

Search pet-friendly rentals

☑ Dogs OK
☐ Cats OK
Select an area

More search options >>

nwapartments

mypi Personalize now

**ap: top headlines**
- 2 Iraqi women killed by convoy guards
- 7 bodies found after Wash. plane crash
- Physics Nobel goes to German, Frenchman
- Court rejects alleged CIA kidnap victim
- Studies tout treating mini-strokes fast
▸▸ more

**ap: odd news**
- 1,524-pound pumpkin wins Calif. contest
- Politician took short cut in marathon
- Salesman donates kidney to ailing man
- Man jailed for trying to pass $1M bill
- Utah deputies told to watch mileage
▸▸ more

**most read**
- Sex in public restroom upsets Georgetown
- Jaywalkers smarting after rude encounter with cops
- Wreckage of missing plane located, 7 bodies found
- Injury ends Hack Strong's career
- After son attacked, parents push back
▸▸ more

**most e-mailed**
- Young professional groups have exploded in Seattle
- Is Starbucks losing steam?
- Golden retriever nurses stray kitten
- Under the Needle: Eastlake Zoo Tavern carving out a place in New Seattle
- Brain-eating amoebas live in Tucson's water supply
▸▸ more

**popular soundoffs**
- Watada Court-Martial: Let him go
- Watada: What's a (thoughtful) lieutenant to do?
- Group should MoveOn into obscurity
- Under the Needle: Eastlake Zoo Tavern carving out a place in New Seattle
- Jaywalkers smarting after rude encounter with cops
▸▸ more

- Help/troubleshoot
- Customize headlines
- My account

**LOCAL HEADLINES**
- Wreckage of missing plane located, 7 bodies found
- Jaywalkers smarting after rude encounter with cops
- Sex in public restroom upsets Georgetown
- Police hit wall in nightclub shooting
- Tasers found generally safe
- Police question man in son's fatal shooting
- After son attacked, parents push back
- Poetry box bringing unexpected art to Capitol Hill
- Insurance industry blasts aid with firefighter's child
- El Centro de la Raza marks 35 years
- Judges asked to reject death tests from state's troubled toxicology lab
- Firefighters, police guild say Della made threat
▸▸ more

**AP LOCAL HEADLINES**
- Man hits bull and dies in Idaho, two injured in avoiding deer

**OUR AFFILIATES**


NBC

condolences to the family of the victims of this attack. We also hope that the perpetrator of this crime is brought to justice."

Authorities received a 911 call at 4:03 p.m. with reports of shots fired at the Jewish Federation and a possible hostage situation, Assistant Seattle Police Chief Nick Metz said.

Officers converged on the scene and took a man into custody at 4:15 p.m., Kerlikowske said. Shortly before that, the alleged gunman had been talking to a police dispatcher, the police chief said.

Witnesses to the afternoon shooting and people who work at the Jewish Federation described a chaotic, terrifying scene.

Kami Knatt works at the federation's Holocaust center. As she exited the building, she saw a wounded coworker fall down. Knatt took her sweater off and tried to stop the bleeding.

"I asked her 'Are you OK?'. She said, 'No, I've been shot.' I kept saying it's going to be OK."

The victim told Knatt: "I'm going to black out, I'm going to black out." Knatt replied: "You're going to be alright."

Several workers and victims ran toward a nearby Starbucks. There was a small pool of blood outside the coffee shop.

Nathaniel Mullins, 43, was turning onto Lenora Street with his 19-year-old daughter when he heard police say, "Get back! Get back!"

Mullins said he saw two shooting victims. "They were covered in blood," he said.

"We were scared, heck yeah. It shook me for a moment."

Zach Carstensen, who is the director of government relations for the Jewish Federation, said he heard shots and screams.

"People started running and I started running with them," Carstensen said.

Asked whether he thought his office had been targeted because of the conflict in the Mideast, Carstensen said he wasn't sure. "We're all a little shaken," he said.

Sam Peterson, 18, who lives in an apartment on Third and Blanchard, said she was walking to the Lenora Apartment Building when she heard at least one gunshot.

She saw a blond woman "drop to the ground. She screamed."

Immediately after the shooting, a SWAT team searched the federation building, looking for any other victims, anyone hiding or any other possible shooters, Pruitt said.

Police blocked off several city blocks to investigate. The suspect's vehicle was recovered near the shooting scene, Metz said.

"This is a sad day in the city of Seattle," Mayor Greg Nickels said at a late evening news conference. "This is a crime of hate and there's no place for that in Seattle."

Kerlikowske said police officers throughout the city were being asked to step up patrols of synagogues and mosques.

"We are protecting mosques because there is always concern about retaliatory activity," he said.

Three of the women in critical condition were out of surgery last night. All of the women were being held overnight, according to a hospital spokeswoman.

Hospital officials and relatives confirmed the names of four of the victims. Cheryl Stumbo and Layla Bush, 23, were in critical condition last night. Carol Goldman was in satisfactory condition with a knee injury.

A hospital spokesman identified the pregnant woman as Dayna Klein, who was in satisfactory condition with a gunshot wound in her left forearm and was scheduled for surgery Friday night.

Kathryn Bush said last night that her daughter, Layla, who worked as the Federation's office manager and receptionist, said: "She's out of surgery, but that's all we know," "We're taking it moment by moment."



· Hasselbeck says Seahawks shocked by Strong loss
· Army confirms death of soldier who grew up in Idaho
· Gates Foundation commits $100 million to health research
· State workers union raising dues
›› more

**AP WEST HEADLINES**
· Superferry asks for permission to sail in closing arguments
· Divers chart oldest American shipwreck ever found in Alaska
· Researchers find pollution even in remote areas of Glacier
· AP Interview: Tancredo coy about plans to run for re-election
· Reactor down at Palo Verde because of non-nuclear leak
›› more

SEATTLE BLOGS


**The Big Blog**
By Monica Guzman and other P-I editors and staff
· Most read, most watched from Monday
· World of Dorks (Oh, Warcarft) in Toyota ad
· Must-see male flick 'Top Gun' playing at Cinerama


**Strange Bedfellows**
P-I staff on Seattle politics
· Joel Connelly: Elvis sighting in Vancouver
· Treatment, not jail time, for the mentally ill and drug-dependent
· R 67 Ad War

**Seattle Real Estate News**
With the P-I's Aubrey Cohen
· Default predictor
· Buy the store
· Cool tool


**Seattle Traffic**
By Reporter Larry Lange and other P-I staff
· Battle of the ballot mailer: the complete text
· State probes transportation ballot complaint
· South Lake Union Streetcar to begin operating by mid December

ADVERTISING

  

Look who your son just invited over after the game.


Save money. Live better.

Save More Now

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| v. | ) | Criminal No. 07-204 (CKK) |
| | ) | |
| PATICK SYRING, | ) | |
| | ) | |
| Defendant | ) | |
| | ) | |

### [PROPOSED] ORDER

BASED UPON the Defendant's Motion to Dismiss the Indictment, and the government's response thereto, and being familiar with the file and the relevant law, the Court hereby

FINDS THAT the communications set forth in the Indictment do not constitute "true threats" and that, therefore, those communications are protected by the First Amendment's guarantee of the right of free speech; and the Court

FURTHER FINDS THAT the statutes under which Mr. Syring has been charged, as applied to him, are unconstitutional abridgements of his right of free speech and his right to due process; and, therefore,

IT IS HEREBY ORDERED THAT the Indictment in this case be, and hereby is, DISMISSED WITH PREJUDICE.

Dated this _____ day of _____, 2007.


_____
HON. COLLEEN KOLLAR-KOTELLY
U.S. District Judge

cc:    Julieanne Himelstein, Esq.
       Assistant United States Attorney
       Federal Major Crimes Section
       United States Attorney's Office
            for the District of Columbia
       555 Fourth Street, NW, 4th Floor
       Washington, DC 20530

       Barry Kowalski, Esq.
       Karen Ruckert, Esq.
       Assistant United States Attorneys
       Criminal Division
       601 D Street, NW, Room 5802
       Washington, D.C.  20004

       David Schertler, Esq.
       Peter V. Taylor, Esq.
       601 Pennsylvania Avenue, NW
       North Building, 9th Floor
       Washington, DC 20004