UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

---

UNITED STATES OF AMERICA,

v.                                                    No. 07-cr-204 (CKK)

PATICK SYRING,

Defendant.

---

**MEMORANDUM OF THE AMERICAN CIVIL LIBERTIES UNION**
**OF THE NATIONAL CAPITAL AREA AS *AMICUS CURIAE***

Pursuant to leave of Court granted on October 25, 2007 [Dkt. 19], the American

Civil Liberties Union of the National Capital Area files this memorandum, as *amicus*

*curiae*, in support of the defendant's motion to dismiss the indictment on the ground that

his speech was protected by the First Amendment to the Constitution of the United States.

**INTEREST OF AMICUS**

The American Civil Liberties Union of the National Capital Area is the local

affiliate of the American Civil Liberties Union, a nationwide, non-profit membership

organization with more than 500,000 members that, from its founding in 1920, has been

devoted to protecting and expanding the constitutional rights of all Americans,

particularly their right to freedom of expression under the First Amendment.  In that

cause, the ACLU-NCA has often litigated in this jurisdiction, on the criminal as well as

on the civil side, when First Amendment rights have been threatened.

In our view, the indictment in this case charges crimes based upon statements

alleged to have been made by the defendant which, while loathsome and detestable, were

not criminal acts within the meaning of the relevant federal statutes, and, more importantly, could not form the basis for a criminal conviction without violating the First Amendment.

While the defendant here is well represented, we hope that our brief will be of assistance to the Court in analyzing the important issues this case presents.

## SUMMARY OF ARGUMENT

Mr. Syring's motion to dismiss the indictment presents the question whether the statements he is alleged to have made can support a conviction for the crimes with which he is charged.  We show below that—

1.  As a matter of law, the alleged statements do not constitute "true threats," and therefore do not violate the statutes under which Mr. Syring has been charged;

2.  The First and Fifth Amendments do not permit convictions for statements that are not "true threats," and therefore do not permit a conviction for the statements alleged here; and

3.  The motion to dismiss presents a question of law that is properly before the Court at this time; the answer to that question need not await a jury verdict.

## ARGUMENT

The United States seeks to convict Patrick Syring of crimes based upon pure speech.  While pure speech can, in very limited circumstances, be a crime,[1] our "profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open, and that it may well include vehement, caustic, and sometimes

---

[1]  For example, speech constituting obscenity, defamation, or "fighting words" can constitutionally be proscribed.  *R.A.V. v. City of St. Paul*, 505 U.S. 377, 382-83 (1992).

unpleasantly sharp attacks," *New York Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964),

makes it imperative that the courts vigilantly police the constitutional boundary between

protected and unprotected speech.

This case involves speech that is alleged to be unprotected on the ground that it

was a threat.  The statutes that Mr. Syring is charged with violating proscribe the

transmission in interstate commerce of a "threat to injure the person of another," 18

U.S.C. § 875(c), and the interference with a person's employment on the basis of race,

color, religion or national origin "by force or threat of force," 18 U.S.C. § 245 (b)(2)(C).

As the government acknowledges, the First Amendment prohibits criminal conviction for

an alleged threat unless the defendant's speech constitutes a "true threat."  Government's

Amended Response to Defendant's Motion to Dismiss the Indictment ("Government's

Response") [Dkt. 22] at 5 (citing *Virginia v. Black*, 538 U.S. 343 (2003)).  However

crude and offensive Mr. Syring's voice-mail and e-mail messages may have been, he

committed a crime only if those messages contained "true threats."

The government's argument that Mr. Syring's statements were true threats rests

principally on the fact that they contained the phrase "the only good Arab is a dead

Arab," or "the only good Lebanese is a dead Lebanese."  Government's Response at 8;

*see* Indictment ¶¶ 4-10.  But that phrase is not a threat at all, much less a true threat.  A

threat is "an expression of an intention to inflict evil, injury, or damage on another."

Webster's Third International Dictionary 2382 (1981).  Mr. Syring's words, whether

viewed alone or in context, evince no such intention:  "you would only be good if you

were dead" simply does not mean the same thing as "I will kill you."  There is a world of

difference between "I wish you were dead" and "I will kill you," as any parent of a

teenager understands.  For that simple reason, the Court should grant Mr. Syring's motion to dismiss the indictment.

This memorandum addresses three points supporting the indictment's dismissal. First, although the circuit courts of appeals have articulated varying standards to describe what is a "true threat," none has ever approved of a prosecution where, as here, the speaker's words did not convey an actual intention to harm the alleged victim.  Second, the Free Speech and Due Process guarantees of the Constitution require that any statute proscribing a communication based on its content be read narrowly, and therefore require this Court to reject the government's expansive definition of "threat."  Third, while the question whether a facially threatening statement was actually a true threat is one for the jury, the question whether a statement could possibly qualify as a true threat is a question of law that the court can and should resolve prior to trial.

I.      **When a Speaker Expresses No Intention to Cause Harm, There is No Precedent for Treating his Statement as a True Threat.**

The Supreme Court has addressed the relationship between true threats and protected speech in only a handful of cases – directly in *United States v. Watts*, 394 U.S. 705 (1969), *NAACP v. Claiborne Hardware Co.*, 458 U.S. 886 (1982), and *Virginia v. Black*, 538 U.S. 343 (2003); in passing in *Rogers v. United States*, 422 U.S. 35 (1975), *R.A.V. v. City of St. Paul*, 505 U.S. 377, 382 (1992), and *Madsen v. Women's Health Center, Inc.*, 512 U.S. 753, 773 (1994).  While these decisions have made clear the importance of separating true threats from "political hyperbole," *Watts*, 394 U.S. at 708, the lower courts have not reached consensus about the proper method of analysis to be

used in distinguishing the two.[2]

Two types of analysis could play a role in drawing that distinction: a subjective one (whether the speaker actually intended to convey a threat) and an objective one (whether a reasonable person would interpret the speaker's statement as conveying a threat). *See generally* G. Robert Blakey & Brian J. Murray, Threats, Free Speech, and the Jurisprudence of the Federal Criminal Law, 2002 BYU L. REV. 829, 937-941 (2002). Prior to the Supreme Court's decision in *Black* (2003), most circuits had held that a speaker's subjective intent was irrelevant. *See Planned Parenthood of the Columbia/ Willamette, Inc. v. American Coalition of Life Activists*, 290 F.3d 1058, 1076 n.10 (9th Cir. 2002) (*en banc*) (collecting cases). In *Black*, however, the Court said that "[t]rue threats encompass those statements where the speaker *means to communicate a serious expression of an intent* to commit an act of unlawful violence to a particular individual or group of individuals." 538 U.S. at 359 (quotation marks omitted; emphasis added). That teaching leaves the lower courts "bound to conclude that speech may be deemed unprotected by the First Amendment as a 'true threat' only upon proof that the speaker subjectively intended the speech as a threat." *United States v. Cassel*, 408 F.3d 622, 633

---

[2] While every other circuit has addressed this issue, the federal courts in the District of Columbia have avoided it almost completely. A few months after *Watts*, the D.C. Circuit held that "merely idle talk or jests" could no longer be criminalized as a true threat. *Alexander v. United States*, 418 F.2d 1203, 1205-06 (D.C. Cir. 1969). It reversed the defendant's conviction and remanded for a new trial due to improper jury instructions. *Id.* at 1209. Thirty years later, this Court denied a motion to dismiss charges against "a man [who] arrived at the White House and expressed what certainly appeared to be a serious desire to kill its occupant." *United States v. Adams*, 73 F. Supp. 2d 2, 3 (D.D.C. 1999).

In neither case did the court articulate a systematic approach to true-threats questions. Since those are the only two published opinions discussing true threats within the circuit, this Court must look primarily to caselaw from other circuits for analytic guidance.

(9th Cir. 2005); *accord United States v. Magleby*, 420 F.3d 1136, 1139-40 (10th Cir.

2005).

Should this case go to trial, the Court would therefore be required to instruct the

jury that it cannot convict Mr. Syring unless the government proves beyond a reasonable

doubt that he actually intended his messages to communicate to the recipients that he

intended to commit an act of unlawful violence upon them. Given the content of his

alleged messages, we have grave doubts that a reasonable jury could so find. The Court

need not consider that question at this time, however, because the government's failure to

allege facts sufficient to satisfy the objective component of the analysis is sufficient to

require dismissal of the charges.

There is universal agreement among the circuits that a communication is not a

true threat unless a reasonable person would view it as expressing a serious intention to

cause harm. *See, e.g., United States v. Kosma*, 951 F.2d 549, 557 (3d Cir. 1991)

(defining "threat" as "'a serious expression of an intention to inflict bodily harm'"

(quoting *Roy v. United States*, 416 F.2d 874, 877-78 (9th Cir. 1969))); *United States v.

Fulmer*, 108 F.3d 1486, 1490-91 (1st Cir. 1997); *United States v. Alkhabaz*, 104 F.3d

1492, 1495 (6th Cir. 1997); *United States v. Malik*, 16 F.3d 45, 51 (2d Cir. 1994); *United

States v. Khorrami*, 895 F.2d 1186, 1192 (7th Cir. 1990).[3]

---

[3] There is, however, substantial disagreement among the circuits regarding how
to apply this "reasonable person" standard. Four circuits have held that this objective
inquiry should consider the communication from the viewpoint of a reasonable speaker.
*See Planned Parenthood*, 290 F.3d at 1074-75 (9th Cir.); *Fulmer*, 108 F.3d at 1490 (1st
Cir.); *Kosma*, 951 F.2d at 555 (3d Cir.); *United States v. Vincent*, 681 F.2d 462, 464 (6th
Cir. 1982). Three circuits have held that the proper perspective is that of the reasonable
listener. *See United States v. Worrell*, 313 F.3d 867, 874 (4th Cir. 2002); *United States v.
Dinwiddie*, 76 F.3d 913, 917 (8th Cir. 1996); *Malik*, 16 F.3d at 49 (2d Cir.). Three more
have said that the approach should be "viewpoint neutral" (whatever that means), *see*

In the easy cases, courts have allowed criminal prosecutions (or civil suits) based on statements linguistically equivalent to "I will cause you harm (or ensure that someone else does)." *E.g., United States v. Sutcliffe*, ___ F.3d ___, 2007 WL 2948662, at *2 (9th Cir. Oct. 11, 2007) ("If I ever see you near my family again, and I know how to stalk too, I will kill you.  That's my offer."); *United States v. Morales*, 272 F.3d 284, 286 (5th Cir. 2001) ("I will kill . . . TEACHERS AND STUDENTS AT MILBY."); *United States v. Viefhaus*, 168 F.3d 392 (10th Cir. 1999) ("bombs will be activated in 15 pre-selected major U.S. Cities"); *United States v. Santos*, 131 F.3d 16, 18 (1st Cir. 1997) ("you have upset me to the point that I feel I should assassinate you which would enable me to go down in the history books and if the Secret Service gets in my way they will get it too"); *United States v. Whiffen*, 121 F.3d 18, 21 (1st Cir. 1997) ("Allstate had better stop messing with me or else I'm going to blow up their building."); *Fulmer*, 108 F.3d at 1490 ("The silver bullets are coming."); *United States v. Dinwiddie*, 76 F.3d 913, 917 (8th Cir. 1996) ("Patty, you have not seen violence yet until you see what we do to you."); *Malik*, 16 F.3d at 48 ("What the Court is telling the Plaintiff in his eyes is to deal with each of these defendants family and them physically upon his soon prison discharge"); *Kosma*, 951 F.2d 5 at 550 ("21 guns are going to put bullets through your heart & brains"); *United States v. Orozco-Santillan*, 903 F.2d 1262, 1264 (9th Cir. 1990) ("You're going to get your ass kicked, punk."); *Hoffman*, 806 F.2d at 704 ("Resign or You'll Get Your

---

*United States v. Alaboud*, 347 F.3d 1293, 1297-98 (11th Cir. 2003); *Morales*, 272 F.3d at 288 (5th Cir.); *Metz v. Dep't of the Treasury*, 780 F.2d 1001, 1003 (Fed. Cir. 1986).  And at least two circuits have experimented with different approaches.  *Compare United States v. Hoffman*, 806 F.2d 703, 707 (7th Cir. 1986) (speaker-based) *with United States v. Schneider*, 910 F.2d 1569, 1570 (7th Cir. 1990) (listener-based) *and United States v. Hart*, 457 F.2d 1087, 1090-91 (10th Cir. 1972) (speaker-based) *with United States v. Viefhaus*, 168 F.3d 392 (10th Cir. 1999) (listener-based).  This interstitial disagreement, however, is immaterial to the outcome of this case, as we show in the text.

Brains Blown Out."); *United States v. Maisonet*, 484 F.2d 1356, 1357 (4th Cir. 1973) ("you will never be able to be prejudice [sic] and racist against another Puerto Rican like me").

In harder cases, courts have said that a facially non-threatening statement or action can constitute a true threat when the context renders its meaning equivalent to "I will cause you harm."  *E.g., United States v. Davila*, 461 F.3d 298, 300 (2d Cir. 2006) (envelope containing white powder and a letter referencing anthrax); *United States v. Floyd*, 458 F.3d 844, 849 (8th Cir. 2006) (article regarding the murder of a judge, mailed to other judges on the same court, with the words "Be Aware Be Fair" written on it); *United States v. Zavrel*, 384 F.3d 130, 132 (3d Cir. 2004) (envelopes containing white powder during anthrax scare); *Planned Parenthood*, 290 F.3d at 1059 (wanted posters of abortion doctors published just after three other abortion doctors who had appeared on similar posters were murdered); *United States v. Magleby*, 241 F.3d 1306, 1319 (10th Cir. 2001) (cross-burning on the lawn of a bi-racial family in a predominantly white neighborhood); *United States v. Hart*, 212 F.3d 1067, 1069-70 (8th Cir. 2000) (two Ryder trucks parked in the driveway of an abortion clinic, days after a similar Ryder truck exploded next to the Murrah Federal Building in Oklahoma City).

But the circuit courts have consistently rejected efforts to treat a statement as a true threat when its language facially does not take the form of a threat and its context does not make clear that the language conveys a threat.  For example, in *New York ex rel. Spitzer v. Operation Rescue National*, 273 F.3d 184, 196 (2d Cir. 2001), an abortion protestor told an abortion doctor, soon after the murder of another doctor at her clinic, that "killing babies is no different than killing doctors."  The district court concluded that

this statement was a true threat, but the Second Circuit disagreed:  "This statement did

not indicate the unequivocal immediacy and express intention of a true threat."  *Id*. at 197

(internal quotation marks and citation omitted).[4]  Although the court affirmed a

preliminary injunction barring the defendant from demonstrating in front of the clinic, it

did so without reference to this statement, which, it concluded, "is entitled to First

Amendment protection."  *Id*.

Similarly, in *Bauer v. Sampson*, 261 F.3d 775 (9th Cir. 2001), a professor

published a newspaper attacking his college administration.  He wrote a fantasy

description of the funeral of one of the school's trustees at which the other trustees and

the university president died of asphyxiation, and included cartoons depicting beheadings

and a man pointing a rifle.  *Id*. at 780.  The court concluded that violent overtones in an

emotionally charged environment could not transform content expressing no intent to do

harm into a true threat.  *Id*. at 780.[5]

In *United States v. Landham*, 251 F.3d 1072 (6th Cir. 2001), the defendant left his

ex-wife a series of voice messages.  Some called her offensive names ("'herpes slut,'

'cuntless fuck,' and 'unmotherly piece of crap'"), *id*. at 1086; others referenced an

ongoing battle over custody of their children: "You're going to lose Rachel Gail as well

---

[4]  We do not understand the court's reference to "immediacy" to mean that the *carrying out* of the threat must be immediate.  "Leave Black Rock by the end of the month or you'll leave it feet first" would be a true threat whether made on the first day of the month or the twenty-ninth.

[5]  Likewise, in *United States v. Baker*, 890 F. Supp. 1375, 1390 (E.D. Mich. 1995), *aff'd on other grounds sub nom. United States v. Alkhabaz*, 104 F.3d 1492 (6th Cir. 1997), the court dismissed before trial an indictment based on an Internet posting of "fictional stories generally involved the abduction, rape, torture, mutilation, and murder of women and young girls," including one "who shared the name of one of [the defendant's] classmates at the University of Michigan," because the story did not show an intention to cause actual harm.

as Priscilla. You better talk to me now. . . .  They're going to take them away from you and they're going to convict you so you just watch out." *Id*. at 1083-84.  The court held that this was protected speech.  The defendant "d[id] not state that he is going to take [the] children away," but rather referred to third parties "with the power to take away custody as well as to charge [the ex-wife] with illusory crimes." *Id*. at 1084.  His statement may have frightened and intimidated his ex-wife, but that was not enough to make it a threat.

In one case involving vituperative telephone calls, the government did not even attempt to argue that a set of messages similar to (and worse than) Mr. Syring's contained a true threat.  In *United States v. Khorrami*, *supra*, 895 F.2d at 1188, 1190, the defendant placed dozens of anonymous calls to the office of the Jewish National Fund, making statements such as "death to all Jews," "Jews are scum," and "Fuck all Jews."   He was charged with "mak[ing] a telephone call . . . without disclosing his identity and with intent to annoy, abuse, threaten, or harass," in violation of 47 U.S.C. § 223(a)(1)(C),[6] a charge based on his conduct (making a call with the requisite mental state) rather than on the content of his speech.  But he was *not* charged with making threats, and it does not appear that this charging decision was accidental:  Mr. Khorrami also mailed a set of wanted-style posters bearing pictures of the JNF's President, Executive Vice-President, and Director of Communications, adorned with comments such as "Must be killed," and "Execute now!"  *Id*. at 1189.  For that, he was charged with mailing threatening communications, in violation of 18 U.S.C. § 876.  *Id*. at 1190.  Thus, it appears that the United States recognized that the phrase "death to all Jews" was not a true threat.

---

[6]  The court's opinion erroneously references subparagraph (B), which deals with child pornography, rather than subparagraph (C).  *Khorrami*, 895 F.2d at 1190.

Like the defendants in *Operation Rescue*, *Bauer*, *Landrum* and *Khorrami*, Mr. Syring used words that did not on their face state a threat. A threat is a statement of intent. As noted earlier, "the only good Arab is a dead Arab" does not mean "I intend to kill you or harm you because you are an Arab." Café Press, a popular Internet vendor, sells a whole line of clothing emblazoned with the slogan, "THE ONLY GOOD COMMIE IS A DEAD COMMIE." Café Press does not intend to kill Communists, nor do the people who buy or wear its T-shirts.[7] At worst, Mr. Syring's statement expresses a hope that a third party outside of his control – namely, the Israeli Army – will kill Arabs or Lebanese, just as the defendant in *Landrum* expressed a hope that a third party would take his children from his ex-wife and convict her of crimes.[8]

Nor does anything in the indictment suggest that the context of Mr. Syring's words changed their facially non-threatening meaning into a message of serious intent to inflict harm. Context can turn non-threatening speech into threatening speech only by altering what that speech means: in *Hart*, parking Ryder trucks near a building took on

---

[7] *See* http://www.cafepress.com/insanehippie/1260204. Prices range from $17.99 to $34.99. *See also* http://www.bkv.tv/phpBB2/viewtopic.php?t=4779:

Q: "Why do you think that most superheroes created in the golden era are all pretty much orphans?"

A: "Because the only good parent is a dead parent."

[8] Mr. Syring's messages repeatedly refer to the IDF (the Israeli Defense Forces) as the entity that will bring death to Lebanese. *E.g.*, "The only good Lebanese is a dead Lebanese (as the IDF knows and is carrying out in its security operations, God bless them.)," Indictment ¶ 5; "The IDF is bombing Lebanon back into the stone age where it belongs." *Id*. ¶ 7.

The government stresses that Mr. Syring's statements "contain absolutely no conditional language. They do not reference any event or condition that must take place before violence could occur." Government's Response at 8-9. In a technical sense, the government is right: Mr. Syring did not say that AAI employees would be killed conditional on some event. But that is because *he did not say that AAI employees would be killed at all*.

the meaning "I will blow up the building" because such a truck had been used in the just-completed Oklahoma City bombing; in *Floyd*, the phrase "Be Aware Be Fair" took on the meaning "I will kill you if I don't like your decision" because it was appended to an article about a judge's murder. The indictment does not contain any factual allegations that, if true, would show that "the only good Arab is a dead Arab" was anything more than it appears to be on its face – a crude, offensive statement of opinion, but not a threat.[9]

In arguing to the contrary, the government emphasizes three bits of context that allegedly transform Mr. Syring's statements into threats. Its arguments are unpersuasive as a matter of logic, and as a matter of law they are undercut by *Operation Rescue*, in which the Second Circuit considered and rejected almost identical arguments.

First, the government notes that in Mr. Syring's case "the reactions of the recipients demonstrate that they felt intimidated and threatened." Government's Response at 2. But the subjective reaction of a listener cannot create a threat where none existed. *See Operation Rescue*, 273 F.3d at 196 (finding that the defendant's speech was protected even though "it is understandable that the clinic doctor feared for her safety, and that [the defendant's] protest and strong rhetoric reinforced that fear"). In addition to its illogic, the government's "excessive reliance on the reaction of recipients [also] would

---

[9] To be legally sufficient, an indictment must allege facts that as a matter of law constitute an offense. *Hamling v. United States*, 418 U.S. 87, 117 (1974). Here, that requires the indictment to allege facts showing that the charged statements were true threats. If "the alleged threat is direct," then it is sufficient to recite the statements. *Landham*, 251 F.3d at 1080. But if the threatening nature of a statement "involves the context," then "it is incumbent on the Government to make that context clear in such an indictment." *Id*. In other words, an indictment for making threats cannot be based on statements whose ordinary meaning is non-threatening absent the allegation, in the indictment, of contextual facts showing that its actual meaning was threatening.

endanger First Amendment values," *id*., creating "the risk that an otherwise innocuous statement might become a threat if directed at an unusually sensitive listener." *Whiffen*, *supra*, 121 F.3d at 21. Freedom of speech cannot be calibrated to the sensibilities of the easily frightened, lest we "'burn the house to roast the pig.'" *Ashcroft v. American Civil Liberties Union*, 535 U.S. 564, 605 (2002) (striking down regulation of the Internet calibrated to the protection of children) (quoting *Butler v. Michigan*, 352 U.S. 380, 383 (1957) (striking down a statute "quarantining the general reading public against books not too rugged for grown men and women in order to shield juvenile innocence.")).

Second, the government points out that Mr. Syring "told the recipients he is located in Arlington, Virginia – indicating to them that geographic distance did not mitigate the potential for harm." Government's Response at 9. But unless Mr. Syring had made a true threat, there was no danger to "mitigate" — he posed no greater "potential for harm" than *every other* vocal supporter of Israel's 2006 incursion into Lebanon who was located within easy traveling distance of Washington, D.C. In *Operation Rescue*, the defendant was not just in an adjacent city; she was face to face with the doctor and therefore perfectly able to act on a violent impulse if she wished. But as the Second Circuit recognized, a speaker's physical ability to *carry out* a threat does not *create* a threat where one does not otherwise exist before.

Third, the government stresses that Mr. Syring "sent repeated email and voice mail messages to the recipients personally," not as part of public discourse. Government's Response at 8. But the repetition of a non-threat doesn't make it a threat, nor is an e-mail addressed to a workplace or an after-hours message left on a workplace voice-mail machine a particularly threatening manner of communication. Indeed, one might just as easily conclude

that Mr. Syring purposefully called late at night in order to connect with an answering machine rather than with a live person (which the government surely would have argued was even more threatening). Once again, the decision in *Operation Rescue* points to the proper decision here. The statement by the defendant there was made to the doctor alone, and face-to-face rather than through an impersonal medium of communication. *See* 273 F.3d at 196. The *Operation Rescue* defendant wanted to express to a committed adversary the depth of her disagreement on an issue of public importance, just as "Syring wanted to let Zogby [and other AAI employees] know how he felt" about the conflict between Israel and Lebanon. Government's Response at Exhibit A, p. 2. That both did so in crude, personal statements rather than eloquent public ones does not mean that their speech loses the protection of the First Amendment. *See Madsen*, 512 U.S. at 774 (holding that anti-abortion protestors have a constitutional right to approach and speak to abortion-clinic patients personally unless their speech is a true threat or falls within another First Amendment exception).

The government's "context" argument is therefore insubstantial. This is not a case where a seemingly innocuous phrase ("you will sleep well tonight") will be shown to be a terrifying threat when used among cognoscenti. The "context" that Mr. Syring (1) left several e-mails and voice-mails, (2) from Arlington, which (3) frightened the recipients, does not change his crude political vituperation into true threats.

## II.    The First and Fifth Amendments Require that "Threat" be Narrowly Construed.

As discussed above, courts have consistently been unwilling to treat a statement as a true threat unless it uses language equivalent to "I intend to cause you harm" or unless its context renders its meaning equivalent to "I intend to cause you harm." This outcome is no accident. It follows logically from the Fifth Amendment's command that a

14

criminal defendant have notice that his conduct was wrongful and from the First Amendment's limits on laws that chill protected speech.

Due process mandates that "no [person] shall be held criminally responsible for conduct which he could not reasonably understand to be proscribed." *Bouie v. City of Columbia*, 378 U.S. 347, 351 (1964).  This fair-warning requirement has three consequences that are relevant here.

First, unless Congress has defined a term used in a statute, it must be "interpreted as taking [its] ordinary, contemporary, common meaning."  *Perrin v. United States*, 444 U.S. 37, 42 (1979).  Congress has not defined the term "threat" as used in 18 U.S.C. § 875(c) and 18 U.S.C. § 245 (b).  Thus, it takes its ordinary meaning: "an expression of an *intention* to inflict evil, injury, or damage on another."  Webster's Third International Dictionary 2382 (emphasis added).

Second, "the canon of strict construction of criminal statutes . . . ensures fair warning by so resolving ambiguity in a criminal statute as to apply it only to conduct clearly covered."  *United States v. Lanier*, 520 U.S. 259, 266 (1997).  The ordinary definition of "threat" "clearly cover[s]" only those statements that, because of their language and context, state an intention to cause harm.  It covers a statement that "you have not seen violence yet until you see what we do to you." *Dinwiddie*, 76 F.3d at 917. It covers the transmission a letter referencing anthrax in an envelope containing white powder, which in context means "I will poison you."  *Davila*, 461 F.3d at 300.  But it does not cover statements that indicate no intention to act at all, such as "killing babies is the same as killing doctors," *Operation Rescue*, 273 F.3d at 196, – or "the only good Arab is a dead Arab."

Third, "due process bars courts from applying a novel construction of a criminal statute to conduct that neither the statute nor any prior judicial decision has fairly disclosed to be within its scope." *Lanier*, 520 U.S. at 266. Thus, even if this Court could adopt a broader reading of "threat," it could not apply it to Mr. Syring. Neither the ordinary meaning of "threat," nor the line of decisions refusing to treat statements that indicate no intention to act as threats, would have disclosed to Mr. Syring that his statements might be criminal.

Vigorous application of the rule against novel constructions is especially important when a criminal statute regulates speech. An ordinary criminal statute distinguishes prohibited activity from permissible activity – *i.e.*, activity that a legislature could prohibit, but has not. A statute prohibiting threats, on the other hand, distinguishes prohibited activity from *constitutionally protected* activity. If there is a possibility that a court will define "threat" more broadly than it ordinarily is defined, as the government seems to advocate here, "[t]he severity of criminal sanctions may well cause speakers to remain silent rather than communicate even arguably unlawful words, ideas, and images." *Reno v. American Civil Liberties Union*, 521 U.S. 844, 872 (1997).

There is a significant loss to society if the law chills speech that comes close to the line separating true threats from protected speech, but does not cross it. "The language of the public arena" – especially regarding hotly contested issues like the relationship between Israel and its neighbors in the Middle East – "is often vituperative, abusive, and inexact." *Watts*, 394 U.S. at 708. A great virtue of the First Amendment is that it "does not protect only the articulate, the well known, and the popular." *Kleindienst v. Mandel*, 408 U.S. 753, 768 (1972). That virtue vanishes if anyone who speaks rudely,

coarsely, or offensively is forced to bear the risk that his speech will fall within an expansive (and expanded for his case) definition of "threat," perhaps sending him to prison for a lengthy term.[10]

Moreover, statements that toe the line between true threats and protected speech can have a communicative impact that cannot be duplicated using tamer language. As Justice Harlan wrote in *Cohen v. California*, 403 U.S. 15 (1971),

> much linguistic expression serves a dual communicative function: it conveys not only ideas capable of relatively precise, detached explication, but otherwise inexpressible emotions as well. In fact, words are often chosen as much for their emotive as their cognitive force. We cannot sanction the view that the Constitution, while solicitous of the cognitive content of individual speech, has little or no regard for that emotive function which, practically speaking, may often be the more important element of the overall message sought to be communicated.

*Id.* at 26. If emotional, visceral, or even offensive statements of animosity get swept up in an overly broad definition of criminally punishable threats, then the ability to express a range of legitimate messages will be lost. "The hallmark of the protection of free speech is to allow free trade in ideas – even ideas that the overwhelming majority of people might find distasteful or discomforting." *Black*, 538 U.S. at 358 (internal citations and quotation marks omitted). "The only good Arab is a dead Arab" is an opinion, though an offensive and discomforting one. It is protected by the First Amendment.[11]

---

[10] The maximum penalties for violating 18 U.S.C. § 875(c) and 18 U.S.C. § 245 (b)(2)(C) are imprisonment for five years and one year, respectively.

[11] As Justice Holmes explained long ago, "the very meaning of a line in the law is that right and wrong touch each other, and that anyone may get as close to the line as he can if he keeps on the right side." *Louisville & Nashville R.R. Co. v. United States*, 242 U.S. 60, 74 (1916). Mr. Syring had a constitutional right to go right up to the line, so long as he did not cross it — as he did not. Even if the Court concludes that his speech was right on the line, then the indictment must be dismissed, for "[w]here the First Amendment is implicated, the tie goes to the speaker, not the censor" — or here, the prosecutor. *Federal Election Comm'n v. Wisconsin Right to Life, Inc.*, 127 S. Ct. 2652, 2669 (2007).

### III.     Whether a Statement Could Constitute a True Threat is a Question of Law that the Court Can and Should Decide Before Trial.

The government asserts flatly that "[w]hether communications are truly threatening is a jury question," Government's Response at 4, and that the issue "is not Proper for a Pretrial Motion to Dismiss." *Id.* (argument heading). The government's suggestion that a constitutional challenge to the sufficiency of an indictment cannot be heard pre-trial is startling, and if taken seriously, would produce absurd and abusive results. Imagine an indictment charging a person with making threatening communications because he said "President Bush is a war criminal." The hypothetical indictment offers no reason to think that the phrase was a coded message of some sort, but alleges that it was threatening. Under the government's approach, the indictment would survive a motion to dismiss and the defendant would be required to face a jury trial.

Not only would such an approach be pointlessly wasteful of judicial resources (because any resulting conviction would have to be reversed), it would be a dangerous tool of political oppression in the hands of a prosecutor, as demonstrated by the hypothetical example just given. The financial and emotional toll of a criminal trial on the defendant is hard to exaggerate,[12] and giving prosecutors *carte blanche* to force politically or socially unpopular individuals to trial on flimsy charges *based only on their*

---

[12] "'[A]s a litigant,' Judge Learned Hand once observed, 'I should dread a lawsuit beyond almost anything else short of sickness and death.' L. Hand, The Deficiencies of Trials to Reach the Heart of the Matter, in 3 Association of the Bar of the City of New York, Lectures on Legal Topics 89, 105 (1926)." *Zauderer v. Office of Disciplinary Counsel*, 471 U.S. 626, 642 (1985) (alteration by the Court). And Judge Hand was speaking of a *civil* lawsuit.

*speech* would have a chilling effect so frigid that no court ought to endorse it.[13]

The government claims that its position is mandated by *Alexander v. United States*, 418 F.2d 1203 (D.C. Cir. 1969). Of course it is not. The defendant in *Alexander* called the White House and "made 'approximately six statements of a threatening nature'" to the telephone operator, *id*. at 1204, including, "If I had a gun I would blow President Johnson's brains out." *Id*. at 1207 n.17. At his first trial, the district court instructed the jury that the charged offense of knowingly and willfully threatening the President "could be committed by 'merely idle talk or jests' and that it was not a defense 'that the alleged threats were uttered conditionally.'" *Id*. at 1205. The court of appeals concluded that those instructions were erroneous in light of *Watts*. *Id*. at 1207. Rather than dismissing the indictment, it remanded for a new trial, reasoning that its "task is not to judge whether appellant made a threat, for that is for a jury." *Id*. (footnote omitted).

But this does not mean, as the government claims, that all questions regarding true threats are jury questions. Just as a conviction for making a threat can be reversed after trial because the evidence was constitutionally insufficient, *e.g., United States v. Watts*, an indictment can be dismissed before trial when it is based on constitutionally insufficient facts. Any reading of *Watts* makes it clear that that case never should have gone to trial. This is hardly a novel proposition. *See, e.g., United States v. Baker, supra* n.5, 890 F. Supp. at 1390 (dismissing indictment before trial because, as a matter of law, the defendant's charged statements did not show an intention to cause actual harm).

---

[13] The likelihood of such prosecutorial abuse may be greater than we would like to believe. *See, e.g.,* Dan Eggen, "Ex-Attorney General Says Politics Drove Federal Prosecution; House Panel Evaluating Justice Dept.," The Washington Post, October 24, 2007 at A3. And juries unsympathetic to a defendant's politics might be all too ready to conclude that any offensive statement near the line was a true threat.

As the Second Circuit explained in *United States v. Francis*, 164 F.3d 120, 123 n.4 (2d Cir. 1999), there is a distinction between "the question of whether a defendant's communication is a true threat rather than speech protected by the First Amendment – a threshold question of law for the court" – and "the question of whether a reasonable person would interpret the communication as a true threat – a question for the jury at trial." The only disputed question in *Alexander* was whether a reasonable person would interpret the defendant's facially threatening statements as true threats, rather than as idle talk by a drunk man. *See id.* at 1204-05. That is a question of fact, and the court properly sent it back to a jury. There was no dispute regarding the antecedent legal question whether the statements could constitutionally be prosecuted as true threats: because they indicated a clear (albeit conditional) intent to cause harm, they plainly could. Had that question been disputed, the *Alexander* court should have answered it, and nothing in its opinion suggests that it would not have done so.

The *Francis* approach – in which the court decides whether a statement could be understood as a true threat and, if so, the jury then decides whether a reasonable person actually would have understood it as a true threat – is the proper one, and the Supreme Court's teachings about the importance of protecting free speech make it clear that a case like this deserves more, not less, pretrial judicial gatekeeping than run-of-the-mill criminal cases. "[I]n cases raising First Amendment issues," a court "has an obligation to 'make an independent examination of the whole record' in order to make sure that 'the judgment does not constitute a forbidden intrusion on the field of free expression.'" *Bose Corp. v. Consumers Union of the U.S., Inc.*, 466 U.S. 485, 499 (1984) (quoting *New York Times Co. v. Sullivan*, 376 U.S. 254, 284-286 (1964)). The government's proposed rule

would improperly limit the court to fulfilling that obligation only after a trial.  The
*Francis* rule properly balances the court's role as a guardian of the First Amendment with
the jury's role as fact-finder.[14]

### CONCLUSION

For the reasons stated above and in Mr. Syring's motion, the indictment in this
case should be dismissed

Respectfully submitted,

/s/ *Arthur B. Spitzer*

_____
Arthur B. Spitzer (D.C. Bar No. 235960)
American Civil Liberties Union
   of the National Capital Area
1400 20th Street, N.W., Suite 119
Washington, DC 20036
Tel: (202) 457-0800
Fax: (202) 452-1868
E-mail: artspitzer@aol.com

*Counsel for Amicus Curiae**

November 1, 2007

---

[14]  In civil litigation that involves similar First Amendment concerns, courts
perform similar gatekeeping functions.  For example, in considering a motion to dismiss
a complaint alleging that the defendant's speech constituted defamation or false light
invasion of privacy, a court must decide as a matter of law "whether the disputed article
(1) contains express or implied verifiably false statements of fact, which (2) are
reasonably capable of defamatory meaning or otherwise place appellant in an offensive
false light."  *Weyrich v. New Republic, Inc.*, 235 F.3d 617, 623 (D.C. Cir. 2001).  See also
*Jankovic v. International Crisis Group*, 494 F.3d 1080, 1091 (D.C. Cir. 2007) (same).

* Counsel wishes to acknowledge the assistance of Mr. James Cox, a recent law
school graduate now awaiting the results of his bar examination, whose work contributed
greatly to the preparation of this memorandum.