## THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | **:** | CRIMINAL NO. : 07-204 (CKK) |
| | **:** | |
| v. | **:** | |
| | **:** | |
| PATRICK SYRING, | **:** | |
| Defendant. | **:** | |
| | **:** | |
| | **:** | |

## GOVERNMENT'S RESPONSE TO THE MEMORANDUM OF THE AMERICAN CIVIL LIBERTIES UNION OF THE NATIONAL CAPITAL AREA AS *AMICUS CURIAE*

The United States of America, by and through the undersigned counsel, and in accordance with the Court's Order dated October 25, 2007, herein responds to arguments raised by the Memorandum of the American Civil Liberties Union of the National Capital Area as Amicus Curiae (hereinafter, the "Memorandum").

Although amicus invites the Court to rule that Defendant's communications cannot, as a matter of law, constitute a true threat. However, its arguments fail to address the entirety of the Indictment's allegations and ignore relevant facts that have been disclosed to the Defendant in discovery. As such, its arguments are not persuasive. Thus, in accordance with the arguments advanced in the United States's Amended Response to Defendant's Motion to Dismiss (hereinafter, the "Response"), the Court should deny Defendant's Motion to Dismiss.

## DISCUSSION

### I.    The Indictment Sufficiently Alleges a True Threat

In arguing that the Indictment fails to allege true threats, amicus relies upon only one

- 2 -

phrase – "the only good Lebanese is a dead Lebanese" / "the only good Arab is a dead Arab." It thus wholly neglects to discuss the substance and context of the other communications by Defendant alleged in the Indictment, including "death to the Arabs" and "You wicked evil Hezbollah-supporting Arabs should burn in the fires of hell for eternity and beyond."

As discussed in the Response, the entirety of Defendant's statements, as well as their context, the reaction of the recipients, and the speaker's intent are relevant to the question whether language is a true threat. Thus, amicus's invitation to interpret only the phrases "the only good Lebanese is a dead Lebanese" / "the only good Arab is a dead Arab," and to interpret them in isolation, inadequately frames the issue for the court and is not useful in determining the true threats issue. Even so, it is worth noting that the Seventh Circuit, in a case outside the true threats context, characterized exactly this phrasing as a "death threat."[1]

As Defendant acknowledges, in ruling on a motion to dismiss, the Court must accept the facts alleged in the Indictment as true and view them in the light most favorable to the United States. In contrast, amicus impermissibly urges only the most benign construction of this phrase ("I wish you were dead," spoken in the context of a teenager's statement to a parent (Amicus Br. at 3)), which, again, is not useful to this court's determination.

A reasonable juror could find that Defendants' statements, including the "the only good

---

[1]See United States v. Peters, 791 F.2d 1270, 1292 (7th Cir. 1985), superseded by statute on other grounds as stated in United States v. Guerrero, 894 F.2d 261, 267 (7th Cir. 1990). Peters's roommate testified at trial that Peters told him "a lot of people would go down" if he spoke to federal agents, and that "the only good snitch is a dead snitch." Id. Holding that the trial court did not abuse its discretion in admitting these statements under Federal Rule of Evidence 403, the Seventh Circuit noted that "death threats, just as other potentially prejudicial evidence, are to be judged by 'the normal process of Fed. R. Evid. 403 balancing.'" (citing United States v. Delillo, 620 F.2d 939, 944 (2d Cir. 1980)).

- 3 -

. . ." phrase, as well as "death to the Arabs," are true threats because they are, in fact, "statements where the speaker means to communicate a serious expression of an intent to commit an act of unlawful violence to a particular individual or group of individuals," Virginia v. Black, 538 U.S. 343 (2003) (citing Watts, 394 U.S. at 708; R.A.V. v. City of St. Paul, 505 U.S. 377, 388 (1992)).

Glaringly, amicus omits any mention of the fact Defendant admitted sending the communications with intent to intimidate Dr. James Zogby, the president of the Arab American Institute. Construction of these statements as true threats or as constitutionally protected speech requires looking beyond their face to the context in which they were made and received. The evidence will show that it is precisely Defendant's repeated reference to death in these multiple statements that caused the victims the greatest concern, thus illustrating the same interest in this case – fear from unknown harm – that the true threats doctrine seeks to protect, as it is interpreted by the Supreme Court. As the Court in Black noted, "the prohibition on true threats protects individuals from the fear of violence and from the disruption that fear engenders, in addition to protecting people from the possibility that the threatened violence will occur." Id. at 359-60. Further, Defendant's linkage of death with people of the same racial and national origin groups to which the recipients belong is an important factor in determining whether the statements were truly threatening.

Amicus ignores the fact that Defendant also admitted that he used the phrase "the only good Lebanese is a dead Lebanese," because he knew that James Zogby was Lebanese-American, and he wanted Dr. Zogby to realize that he (Defendant) was aware that Dr. Zogby was Lebanese-American. These facts should weigh powerfully in determining whether Defendant communicated a true threat. In light of his admissions, Defendant cannot successfully

- 4 -

argue that he only wished to make a political statement.  He likewise cannot prevail by claiming that he did not purposefully select language that he knew would intimidate the victims on the basis of their race and national origin.  By his own admission, he acted with the requisite intent to intimidate.

The statements' context weighs heavily in determining that a reasonable juror could find that Defendant's language was truly threatening.  All of these factors are unaddressed by the amicus brief.  As discussed in greater detail in the Response, Defendant addressed his communications to the subjects personally, even using one woman's first name; indicated he was located in the same metropolitan area as the victims by stating he was in Arlington, Virginia; referenced racially-motivated violence that occurred just one day prior in the offices of the Jewish Federation of Greater Seattle; spoke in a tone of voice that, the evidence will show, the listeners characterized as cold and deliberate; and contain absolutely no conditional language or indication that Defendant was joking.

Amicus raises the issue of whether true threats should be judged by a subjective standard or an objective standard.  The issue is unnecessary for this court to decide.  In order to sustain its burden of proving a violation of 18 U.S.C. § 245(b), the government is obligated to prove that, by force or threat of force, the defendant willfully injured, intimidated, or interfered with one of several specifically enumerated rights contained in the statute.  Therefore, the government expects that it will prove Syring's subjective intent to intimidate AAI through the threats he communicated.  The jury will ultimately be asked to determine whether a reasonable person would find that a threat existed.  See generally United States v. Magleby, 241 F.3d 1306, 1311 (10th Cir. 2001).

- 5 -

## II.    Defendant's Communications Convey a True Threat

Amicus never provides any reason why this court should determine that, based upon the facts discussed above, Defendant's communications could not be considered truly threatening by a reasonable juror.  Amicus emphasizes four cases in particular in which courts found that language did not constitute a true threat, but does not explain why the analysis of those courts should apply here.  Each of those cases is distinguishable and thus provide no guidance for the Court in ruling on the Defendant's motion.

Specifically, amicus places misguided emphasis on the Second Circuit's decision in New York ex rel. Spitzer v. Operation Rescue National, 273 F.3d 184 (2d Cir. 2001).  Importantly, the Second Circuit's discussion of true threats in Operation Rescue is dicta and therefore not precedential.  In finding that the district court did not abuse its discretion in granting the preliminary injunction at issue, the Second Circuit stated:

> Indeed, we are troubled that the District Court at times overstated the protestors' activities, often by characterizing legitimate First Amendment activity as criminal behavior.  Despite these misgivings, however, we are satisfied that the District Court did not abuse its discretion when it determined that Melfi likely violated F.A.C.E. by physically obstructing patient and staff access at PPR.

Id. at 197.  While the Second Circuit stated that it was "troubled by the district court's willingness to characterize a broad range of protestor statements as 'threats' without giving them the full analysis required by the First Amendment,"  Id. at 196, the court criticized the district court for not actually applying the true threats doctrine.  Indeed, because the Operation Rescue court ultimately upheld the preliminary injunction, this is not a case like Alexander v. United

- 6 -

States, 418 F.2d 1203 (D.C. Cir. 1969), in which the court would have remanded the decision for

a complete record to be made on this issue.

Instead, the Second Circuit expressed that it was "skeptical as to whether any of Melfi's

statements constitute true threats," and discussed one statement in particular. Id. at 196-97.

Specifically, the Second Circuit disagreed with the district court that the speaker, an abortion

protester, threatened a doctor at an abortion clinic soon after another physician was murdered,

telling the doctor, "killing babies is no different than killing doctors." Id. at 196. The Second

Circuit stated that, although the listener understandably feared for her safety, the district court

placed undue reliance upon the reaction of the recipients, noting that "excessive reliance on the

reaction of recipients would endanger First Amendment values, in large part by potentially

misconstruing the ultimate source of the fear." Id. The court then found that the statement

addressed the core of the speaker's anti-abortion protest message; and did not contain the

"unequivocal immediacy and express intention" required to find a true threat.

Operation Rescue is readily distinguishable from this case, and is made even more so by

the Supreme Court's subsequent decision in Virginia v. Black. Here, Defendant issued repeated

statements espousing the death of people belonging to the same racial and national origin groups

as the recipients, causing them to fear possible future violence from Defendant – fears

heightened by the facts that Defendant conveyed the messages to multiple people directly,

through their email and voice mail at work. Defendant's communications thus created an

atmosphere of fear. The Operation Rescue court, in contrast, cautioned against "overreliance"

on victims' fears in a context where such fears could be misplaced as originating from the

speaker. Presumably, the physician who received the threat in Operation Rescue was employed

- 7 -

in an atmosphere of intense fear arising from multiple sources, given that another physician had

recently been killed by a protester and virulent protests were ongoing; thus, although that witness

may have been fearful, the court likely recognized that, under the circumstances, it could not be

said that the speaker was the cause of the witness's fear.  The situation of the witnesses in this

case is different because their fear directly resulted from Syring's statements.  Finally, unlike the

Operation Rescue speaker, Defendant stated he made the statements with intent to intimidate,

and he chose words designed to effect that purpose.

     In Virginia v. Black, decided after Operation Rescue, the Supreme Court recognized the

legal significance of the victim's fear.  In Black, the Supreme Court recognized that "a

prohibition on true threats protect[s] individuals from the fear of violence and from the

disruption that fear engenders, in addition to protecting people from the possibility that the

threatened violence will occur." Id. at 359-60 (internal citations omitted).  The fear experienced

by the recipients as a result of Defendant's statements has been described in the Response, and

included the visualization by several recipients of someone entering the building and opening

fire.

     Applying both Black and Operation Rescue, the Southern District of New York rejected a

defendant's argument that the First Amendment requires proof of a subjective intent to threaten

harm, and in which the defendant "appeared to suggest that this intent to threaten could not exist

where the threat resulted from annoyance at the 'counter-demonstration' of the escorts guiding

patients into the Center, or was delivered as an excited utterance in the heat of a political

contest."  New York ex rel. Spitzer v. Cain, 418 F. Supp. 2d 457, 479 n.15 (S.D.N.Y. 2006).

The court expressly rejected the defendant's argument, finding that it "boil[ed] down to the truly

- 8 -

remarkable proposition that ordinarily illegal conduct is no longer criminalizable when committed in the course of protected First Amendment activity.  This cannot be true.  Crime committed during a political demonstration is crime nonetheless." Id.

The court declined to adopt a subjective standard, rejecting the defendant's argument, like that of amicus here, that it should follow the Ninth Circuit's decision in United States v. Cassel, 408 F.3d 622, 633 (9th Cir. 2005).  Id. at 478-79.  Noting that the Second Circuit had long employed an objective standard in determining a true threat, with a focus on how the statement would be interpreted by a reasonable recipient, the court found that defendant's conduct nonetheless constituted a threat under either an objective or subjective standard.  Id. Specifically, the court found that testimony sufficiently established that the volume of the defendants' voices, their proximity to the recipients, the frequency of their occurrence, and their content indicated that defendants were "strong evidence" that defendants acted with subjective intent to intimidate.  Id. at 479.

Bauer v. Sampson, 261 F.3d 775 (9th Cir. 2001), is also readily distinguishable from the pending case.  In Bauer, the court sustained a civil overbreadth challenge to a workplace violence policy.  Applying an objective standard, the court found that a series of statements published by a college professor in a campus newspaper entitled "Dissent" did not amount to a true threat.  Id. at 783-84.  Writing under fictitious bylines, the speaker made statements including that "I, for one have etched the name of Sherry 'Realpolitick' Miller-White and others of her ilk on my permanent shit list, a two-ton slate of polished granite which I hope to someday drop in [the college's president's] head"; that in a meeting of the university's trustees, "no decent person could resist the urge to go postal"; and containing a fantasy description of a funeral for a

- 9 -

trustee.  Id. at 780.

The court found that the workplace regulation was overbroad because it purported to prohibit expressions with violent overtones which are not true threats because a reasonable person would not foresee that the statement would be interpreted as a threat.  Id. at 782.  The court determined that, although the speaker's writings had some violent content, they are "hyperbole of the sort found in non-mainstream political invective and in context are patently not threats."  The court also stressed that the writings were "made in an underground campus newspaper in the broader context of especially contentious campus politics."  Id. at 780.

In the pending case, in contrast, Defendant's communications repeatedly espouse death to individuals of the same racial and ethnic groups as the recipients and were communicated to them directly via their work-related email and voice mail, and conveyed the information that the sender was in the same geographic area as the recipients.  Moreover, the evidence will show that the recipients were actually intimidated and threatened, and that Defendant acted with intent to intimidate them and chose language that would intimidate them.  Unlike the writings to a college newspaper in Bauer, Defendant conveyed his messages to the recipients individually, even addressing one recipient by her first name.  Bauer contains no discussion of the effect of the communication on the recipient or of the sender's intent.  Finally, as will be discussed below, courts have consistently held that the issue whether language is political hyperbole or truly threatening is a question for the jury.

Amicus's reliance upon United States v. Landham, 251 F.3d 1072 (6th Cir. 2001) is also not persuasive because that court's holding rests upon a factual context materially different from the pending case.  In Landham, the speaker and recipient were parents engaged in a child

- 10 -

custody dispute regarding their daughter, Priscilla.  The defendant was charged with one count of

18 U.S.C. § 875(c), based upon his statement that "[y]ou will not have Priscilla by her second

birthday, because I'm going to have all your children . . . you will not have Priscilla to raise . . .

I'm going to get her."  Id. at 1081.

    The Landham court held that, as a matter of law, the intent element of § 875(c) could not

be met because, as Priscilla's biological father with full parental rights, the defendant could not

legally be charged with kidnapping under either state or federal law.  Id. at 1081-82.  In addition,

the court stressed the importance of viewing the statements in their full context, holding that no

rational trier of fact could find that the defendant communicated a true threat to kidnap.  Id. at

1083.  The court thus noted that multiple calls by the defendant to the recipient made it clear that

defendant was referring to the custody dispute, and that this was the only possible interpretation

of defendant's statements.[2]

    Unlike the scenario in Landham, it is far from clear that no rational trier of fact could

determine that the Defendant in this case intentionally threatened and intimidated the recipients.

As discussed in greater detail above, a reasonable trier of fact could determine that Defendant's

communications constitute a serious expression of harm, that Defendant intended to intimidate

the recipients, and that Defendant did in fact intimidate and threaten them.

    In actuality, amicus's citation to United States v. Baker, 890 F. Supp. 1375, 1390 (E.D.

Cmich. 1995), aff'd, United States v. Alkhabaz, 104 F.3d 1492 (6th Cir. 1997), provides

significant support for the proposition that the defendant in the pending case transmitted a true

threat.  In Alkhabaz, the court examined on appeal the issue whether the district court erred by

_____

    [2]Among the other calls examined by the court include the statement that, "you're going to
lose custody of Rachel as well as Priscilla."

- 11 -

dismissing the indictment for failure to cite a true threat under 18 U.S.C. § 875 – examining a

factual context very different from that of the case at bar.  The defendant exchanged email

messages with another speaker, who was uncharged because his whereabouts could not be

determined, that "expressed a sexual interest in violence against women and girls."  104 F.3d at

1493.  The appellate court found that the district court did not err by determining that

defendant's statements were not threatening, because "[e]ven if a reasonable person would take

the communications between [defendant] and Gonda as serious expressions of an intention to

inflict bodily harm, no reasonable person would perceive such communications as being

conveyed to effect some change or achieve some goal through intimidation."  Id.  Explaining this

analysis, the court in Alkhabaz wrote:

> To determine what type of action Congress intended to prohibit, it is
> necessary to consider the nature of a threat. At their core, threats are
> tools that are employed when one wishes to have some effect, or
> achieve some goal, through intimidation. This is true regardless of
> whether the goal is highly reprehensible or seemingly innocuous.

104 F.3d at 1495.  The court consequently stated that:

> Accordingly, to achieve the intent of Congress, we hold that, to
> constitute "a communication containing a threat" under Section
> 875(c), a communication must be such that a reasonable person (1)
> would take the statement as a serious expression of an intention to
> inflict bodily harm (the mens rea), and (2) would perceive such
> expression as being communicated to effect some change or achieve
> some goal through intimidation (the actus reus).

Id.

     In the case at bar, Defendant admitted acting in order to achieve a goal through

intimidation – by stating that he wanted to intimidate Dr. Zogby, and wanted the employees who

received his messages to convey them to Dr. Zogby.  Further, the facts of the case at bar will

- 12 -

show that the recipients believed Defendant communicated with the goal of seeking to intimidate

them from doing their jobs to represent the interests of Arab Americans in the United States.

Thus, Alkhabaz supports a finding that defendant conveyed a true threat.

   Further, amicus's argument that the United States did not argue that the language

employed by the defendant in United States v Khorrami, 895 F.2d 1188, 1190 (7th Cir. 1990),

which included the phrase, "death to all Jews," as a true threat, entirely misstates the holding of

that case. Khorrami upheld the defendant's conviction under 18 U.S.C. § 876 based upon

mailing of a "wanted poster" containing photographs of Israeli leaders with statement such as

"Execute now!" but the court was never presented on appeal with an argument that the phrase,

"death to all Jews" failed to constitute a true threat. Id. at 1192, 1193. Moreover, simply

because the government charged this statement pursuant to 47 U.S.C. § 223(a)(1)(c), in

Khorrami, rather than 18 U.S.C. § 875 or 18 U.S.C. § 245, in no way proves that this statement –

or any others used by defendant – could not also constitute a true threat under these statutes. It

certainly does not support the characterization by amicus that the United States has somehow,

therefore, already recognized that the phrase "death to all Jews" was not a true threat. Further, in

deciding the true threats issue, the court notably rejected the defendant's argument that his

speech constituted political hyperbole, finding that "[t]he question of whether the language

constitutes a threat is an issue of fact for the jury. If a reasonable recipient, familiar with the

context of the communication, would interpret it as a threat, the issue should go to the jury." Id.

at 1193. The court continued by pointing out that the context of a statement is critical to the

determination whether it is a true threat or mere political hyperbole, and found that there was

sufficient evidence to support the jury's conclusion that the "wanted" poster was a true threat.

- 13 -

Id. at 1193.

These cases, therefore, do not support a finding that the court should grant defendant's motion to dismiss. Rather, if anything, they support the proposition that a jury should determine whether defendant's statements are true threats.


**III.    There Is No Risk that Prosecuting Defendant Will Result in Chilling Speech**

Amicus erroneously asserts that Defendant cannot be prosecuted for his conduct because he did not have "fair warning" that his conduct was prohibited. The amicus brief incorrectly equates a "vagueness review" of statutory prohibitions with the factual inquiry associated with a true threat analysis. Further, amicus ignores Syring's admissions to the FBI that he intended to intimidate Dr. Zogby and that he made specific reference to Lebanese people in his threats because he wanted Dr. Zogby to know that he knew Dr. Zogby was Lebanese-American and therefore the comments would have a special resonance.

In Bouie v. City of Columbia, 378 U.S. 347, 351 (1964), cited by amicus, the Supreme Court held that a criminal statute must be sufficiently definite to "give a person of ordinary intelligence fair notice that his contemplated conduct is forbidden by the statute." Here, the relevant statutes proscribe threats of physical harm. On their face, there is nothing vague about 18 U.S.C. § 245 or 18 U.S.C. § 875. Courts have found them to be constitutional. See, e.g., United States v. Makowski, 120 F.3d 1078, 1081 (9th Cir. 1997) (rejecting petitioner's argument that 18 U.S.C. § 245 is void for vagueness); United States v. Jackson, 986 F. Supp. 829, 836 (S.D.N.Y. 1997) (rejecting petitioner's argument that 18 U.S.C. § 875 is void for vagueness), aff'd, 196 F.3d 383 (2d Cir. 1999). Moreover, any issue of determining what conduct is

- 14 -

prohibited by statutes that proscribe threats is subsumed within a true threats analysis. See Virginia v. Black, 538 U.S. 343 (2003). Undoubtedly, a person of ordinary intelligence understands that it is unlawful to threaten someone with physical harm. See United States v. Sutcliffe, __ F.3d __, 2007 WL 2948662, at *4 (9th Cir. Oct. 11, 2007) (holding that 18 U.S.C. § 875(c) is constitutional because "an ordinary citizen can understand what is meant by the terms threat to kidnap and threat to injure"). Consequently, Defendant is not entitled to dismissal of the charges on the grounds that he thought he was permitted to threaten AAI personnel.

As described above, a true threat is one in which the "defendant's statements are made in a context or under such circumstances where a reasonable person would foresee that the statement would be interpreted by those to whom the maker communicates a statement as a serious expression of an intention to inflict bodily harm." United States v. Khorrami, 895 F.2d 1186, 1192 (7th Cir. 1990). The question before the Court, with the facts viewed in the light most favorable to the government at this stage of the proceedings, is whether a reasonable juror could determine that Defendant meant to communicate a serious expression of an intention to harm AAI staff.

Amicus concedes that a true threat analysis is context specific (declaring that a statement is not a true threat "unless its context renders its meaning equivalent to 'I intend to cause you harm'"), yet it ignores the circumstances surrounding Syring's threats by focusing solely on the phrase "the only good Arab is a dead Arab." Most importantly, amicus ignores Syring's admission that he communicated his threats with the intent to intimidate the listeners. When asked why he used language repeatedly referring to the death of Arab and Lebanese AAI staff, Defendant admitted that he chose those words because he wanted to intimidate Dr. Zogby, and

- 15 -

that he referred to "dead Lebanese" because he knew that Dr. Zogby was Lebanese-American and he wanted Dr. Zogby know Defendant was aware of that fact.

The threats were repetitive and often grouped together with emails immediately following voice mails. Several threats named staff members specifically and referred to them in ways that suggested that their lives were valueless, such as repeatedly calling Dr. Zogby a "motherfucker," calling Valerie Smith a "bitch," and referring to all Arabs as dogs and terrorists. Defendant repeatedly referred to AAI staff in the various communications as "wicked" and "evil." In addition, he referred to AAI staff "burning in hellfire on this earth." (emphasis added). The e-mails and voice mails culminated with Syring's reference to the murder of one Jew and the shooting of another in a Seattle office, a veiled warning of what could happen at the AAI office.

In combination, these statements are no different than those cited by amicus that were held to be true threats in United States v. Dinwiddie, 76 F.3d 913 (8th Cir. 1996). In Dinwiddie, the Court found true threats where the defendant repeatedly warned a physician who performed abortions that "[w]hoever sheds man's blood, by man his blood shall be shed." Id. at 925. As the Court noted, "Mrs. Dinwiddie did not specifically say to Dr. Crist, 'I am going to injure you,'" rather, "the manner in which Mrs. Dinwiddie made her statements, the context in which they were made, and Dr. Crist's reaction to them all support[ed] the conclusion that the statements were 'threats of force' that 'intimidated' Dr. Crist." Id.

When viewed alongside the facts of the cases amicus cites as finding true threats when language is viewed in combination with context, defendant's communications are similarly threatening. They are certainly more overtly threatening than those held to be true threats in

- 16 -

United States v. Hart, 212 F.3d 1067 (8th Cir. 2000), in which the defendant parked two Ryder trucks in the driveways of two abortion clinics during a visit to the city by President Clinton. Employees of the clinics testified that they feared the trucks could contain bombs.  Id. at 1071. The defendant in Hart argued that his actions in parking the trucks could not have constituted a threat, because that was not inherently dangerous.  Id. at 1072.  However, the appellate court declined to set aside the jury's finding that a reasonable person would have been threatened by Hart's conduct, given the reaction of the recipients, the heightened level of security concerns that existed that day due to the President's visit, and the similarity of the scenario to the Oklahoma City bombings.  Id.

The question for this Court and a jury to resolve, assuming the truth of Syring's admissions, is what form the intimidation took.  Defendant did not seek to intimidate the staff by means such as threatening to cut off their funding, seeking their criminal prosecution, or limiting their non-profit tax status.  Instead, he sought to intimidate them by referring repeatedly to their deaths.  Over and over again, Defendant specifically condemned Dr. Zogby and the AAI.  He called Valerie Smith by her first name when calling her a "bitch."  He didn't just say that all Arabs generally should die as the amicus brief suggests.  Instead, he said, "I think James Zogby is worse than Osama bin Laden.  Since he supports Hezbollah, he's an anti-Semitic motherfucker, and the only good Arab is a dead Arab."

Syring's e-mail to an AAI staffer that she is "a fucking Arab-American terrorist Hezbollah sympathizer pig" combined with reference to Dr. Zogby as "a vile evil anti-Semitic pig terrorist" is designed to state that their violent deaths are justified in the same way that Regina Dinwiddie suggested that Dr. Crist's violent death was justified.  See Dinwiddie, 76 F.3d

- 17 -

at 925.  We know from Syring's own statements that he sought to enhance the power of these comments by specifically stating that the "only good Lebanese is a dead Lebanese" because he knew the nationality was specific to Dr. Zogby.  Contrary to the contention of amicus, Syring's communications are not the language of the "public arena," which is merely "vituperative, abusive, and inexact" (Amicus Br. at 16) (citing Watts, 394 U.S. at 708).  They were personal and, in context, terrifying.

Amicus cannot genuinely claim that prosecuting Defendant for maliciously targeting Dr. Zogby with the specter of his own death and that of his staff would chill legitimate debate over Middle East policy.  Similarly, amicus cannot genuinely claim that Defendant was confused as to the permissible line between "emotional, visceral, or even offensive statements of animosity," (Amicus Br. at 17) and those that are criminal.  Defendant told the FBI that he meant to intimidate his audience, and he was successful.

Amicus seeks to categorize the phrase "the only good Arab is a dead Arab" as a sterile opinion without other consequence.  Whereas their conclusion may be accurate if the words were uttered to no one in particular while a bar patron watched an evening newscast, this Court should not divorce the words from their context.  Defendant sought to make the words personally intimidating to individuals whom he repeatedly targeted.  Based on the anticipated testimony of the witnesses, Defendant scared the victims.  This is conduct that an ordinary individual ought to know is impermissible.

## IV.    In Accordance with Federal Rule of Criminal Procedure 12, the Court Should Deny Defendant's Motion to Dismiss

The cases and arguments relied upon by amicus do not refute the principle that,

- 18 -

consistent with Federal Rule of Criminal Procedure 12(b), the Court should not usurp the jury's

traditional role as factfinder in deciding a motion to dismiss. Consequently, when, as here, the

determination whether defendant's statements were truly threatening requires a consideration of

context, and therefore of facts beyond those alleged in the Indictment, such a determination is

not a matter of law for the Court, but rather is a question of fact. It is the province of the jury,

for example, to listen to the recordings of defendant's voice mails and to testimony of the

victims' reactions and to assess their credibility, and to determine what weight, if any, they

should be given in light of other factors. If the case before the Court were a different one – one

in which the statements contained in the indictment alone were such that a rational juror could

not possibly determine them to be a true threat rather than protected speech – then dismissal as a

matter of law could be warranted. In this case, however, it cannot be said that defendant's

statements are so clearly protected speech that the only possible construction they could be given

is one of political hyperbole (such as amicus's hypothetical statement that "President Bush is a

war criminal"). Instead, they must be viewed in context.

Amicus's argument that in First Amendment cases, a court "has an obligation to make an

independent examination of the whole record," in order to make sure that 'the judgement does

not constitute a forbidden intrusion on the field of free expression,'" Bose Corp. v. Consumers

Union, Inc., 466 U.S. 485, 499 (1984) (quoting New York Times Co. v. Sullivan, 376 U.S. 254,

284-86 (1964), demonstrates precisely why this case presents a question of fact for the jury. In

the stage of a motion to dismiss, the Court cannot possibly independently examine the whole

record, because evidence has not been presented. Nor is that the appropriate standard under Rule

12, which requires the Court to consider the allegations set forth in the Indictment in the light

- 19 -

most favorable to the government.

As applied to this case, amicus's argument would obviate the need for any jury trial whatsoever in any case where a defendant raises a First Amendment defense, resulting in mini-trials at the motion to dismiss stage that are proscribed by the cases cited in the government's Response. Moreover, the grand jury, by returning indictments based only upon probable cause, presents a fundamental constitutional check on the concerns of prosecutorial overreaching that amicus raises.

Amicus also misconstrues the guidance of the D.C. Circuit in <u>Alexander v. United States</u>, 418 F.2d 1203 (D.C. Cir. 1969). Amicus incorrectly asserts that the only issue before the <u>Alexander</u> jury was "whether a reasonable person would interpret the defendant's facially threatening statements as true threats, rather than as idle talk by a drunk man." Rather, the court recognized multiple contextual factors at issue, noting that "[a]ll circumstances considered, a jury conceivably could have deemed appellant's statements hyperbole, expressing strong disagreement with the President and his policies, rather than threats upon his life." <u>Id.</u> at 1206-07. As discussed in the Response, defendant's statements included what is arguably political rhetoric mixed with statements such as, "If I had a gun I would blow President Johnson's brains out" and "Do you think I wouldn't do it if I had the artillery to do it with?" <u>Id.</u> at 1206 n.16. The court further noted that the jury may have been led to accept the utterances as threats because the defendant placed evening telephone calls; but also noted that defendant's educational level and use of alcohol may lead a jury to find that the timing and destination of the calls was less indicative of a threat. <u>Id.</u> at 1207. The same contextual factors the <u>Alexander</u> court found should be considered by a jury are also relevant in this case. Thus, under <u>Alexander</u>,

- 20 -

the question whether defendant's communications constituted a true threat rather than protected speech is one for the jury.

## **CONCLUSION**

For the reasons discussed above, the United States respectfully requests the Court to deny Defendant's motion to dismiss.

Respectfully submitted,

JEFFREY A. TAYLOR
UNITED STATES ATTORNEY

RENA J. COMISAC
ACTING ASSISTANT ATTORNEY GENERAL
CIVIL RIGHTS DIVISION

_____
Julieanne Himelstein (Bar # )
Assistant United States Attorney
555 Fourth Street, NW
Washington, DC 20530

_____
Mark Blumberg
Special Litigation Counsel
Karen Ruckert
Trial Attorney
United States Department of Justice
Civil Rights Division
601 D Street, NW Fifth Floor
Washington, D.C. 20004

## THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | **:** | **CRIMINAL NO. : 07-204 (CKK)** |
| | **:** | |
| **v.** | **:** | |
| | **:** | |
| **PATRICK SYRING,** | **:** | |
| **Defendant.** | **:** | |
| | **:** | |
| | **:** | |

### [PROPOSED] ORDER

HAVING CONSIDERED Defendant's Motion to Dismiss the Indictment, the Amended

Response of the United States thereto, and the Memorandum of Amicus American Civil

Liberties Union of the National Capital Area, and being familiar with the file and the relevant

law,

THE COURT HEREBY ORDERS THAT Defendant's Motion to Dismiss the Indictment

is DENIED.

Dated this ____ day of _____, 2007.

_____
HON. COLLEEN KOLLAR-KOTELLY
U.S. District Judge

- 2 -

cc:     David Schertler, Esq.
        Peter V. Taylor, Esq.
        601 Pennsylvania Avenue, NW
        North Building, 9th Floor
        Washington, D.C. 20004

        Arthur B. Spitzer, Esq.
        American Civil Liberties Union
              of the National Capital Area
        1400 20th Street, NW, Suite 119
        Washington, DC 20036

        Julieanne Himelstein, Esq.
        Assistant United States Attorney
        Federal Major Crimes Section
        United States Attorney's Office
              For the District of Columbia
        555 Fourth Street, NW 4th Floor
        Washington, DC 20530


        Mark Blumberg, Esq.
        Special Litigation Counsel
        Karen Ruckert, Esq.
        Trial Attorney
        United States Department of Justice
        Civil Rights Division
        601 D Street, NW Fifth Floor
        Washington, D.C. 20004