## THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **CRIMINAL NO. : 07-204 (CKK)** |
| | : | |
| **v.** | : | |
| | : | |
| **PATRICK SYRING,** | : | |
| **Defendant.** | : | |
| | : | |
| | : | |
| | : | |

## GOVERNMENT'S AMENDED RESPONSE TO DEFENDANT'S MOTION TO DISMISS THE INDICTMENT

The United States of America, by and through the undersigned counsel, respectfully requests the Court to deny Defendant's Motion to Dismiss (hereafter, the "Motion"). The Motion erroneously claims that the defendant's pattern of intimidating and threatening communications is protected by the First Amendment. Contrary to his claim, the First Amendment does not protect "true threats" from criminal prosecution. By definition, true threats are not protected speech. In addition, the determination of whether the conduct and communication at issue amounts to a true threat is a heavily fact-dependent, context-driven one that is reserved for the jury as the finder of facts. Therefore, the defendant's motion is not within the province of a pretrial motion to dismiss and should be denied.

## DISCUSSION

### I.    Background

In a voluntary, noncustodial interview with the FBI, Defendant admitted sending seven communications – four emails and three voice mails – to employees of the Arab American

- 2 -

Institute (AAI) from July 17 to 29, 2006.[1]  Ex. A.  The recipients of Defendant's messages are all

of Arab and/or Lebanese origin, except for one woman.  AAI describes its mission on its website,

which the subject admitted visiting, as encouraging the direct participation of Arab Americans in

political and civic life in the United States.  The Defendant sent these emails to the employees at

their individual work-related email addresses and left voice mails on the individual voice mail in-

boxes of two recipients, as well as on AAI's main line.  The Defendant referred to one of the

recipients by her first name, Valerie.

The messages that the Defendant admitted to sending include repeated statements that

"the only good Lebanese is a dead Lebanese," "the only good Arab is a dead Arab," and "death to

the Arabs."  He referred to himself as being "in Arlington."  In his statement to the FBI, he

admitted to making a specific reference to Lebanese people because he knew that James Zogby,

AAI's director, is Lebanese.  Id. at 3.

Importantly, the reactions of the recipients demonstrate that they felt intimidated and

threatened as a result.  For example, the government anticipates that the testimony of one witness

will be that the phrase "[t]he only good Arab is a dead Arab" sent chills down [his] back.  This

witness will state that, after receiving Defendant's messages, he became concerned with his

personal safety.  He thought about what exit routes would be available if someone were to burst

through AAI's door, and made a practice of looking to see if someone was hanging around the

building's entrance as he entered and exited the building.  The witness is expected to testify that

---

[1]These communications occurred during the war in Lebanon between Israel and
Hezbollah, which began on July 12, 2006, and did not end until August 2006.  His last email sent
in the early morning hours of July 29, 2006, appears to reference a shooting the previous day of
six people (one fatally) in the offices of the Jewish Federation of Greater Seattle.

- 3 -

he did not tell his wife about Defendant's messages, which he described as "death threats," because they had a two-month-old baby at home and he did not want to cause his wife extra stress, and he considered quitting his job as a result.

The fear of violence that the Defendant's messages caused was very real. Several employees are expected to testify that they envisioned the Defendant entering the office with a gun and shooting people. Witnesses are also expected to state that their concerns were heightened by Defendant's fourth email, which referred to the July 28 shooting at the offices of the Jewish Federation of Greater Seattle, where one victim was killed and five others were wounded. The government expects the testimony of one witness to be that this message caused him to see the danger of someone entering AAI's office and doing to them what happened in Seattle, in some kind of retribution. Another witness is expected to testify that, because AAI obviously had nothing to do with the Seattle incident, Defendant's reference to the Seattle shooting could only be interpreted to be a threat that AAI's offices could be similarly targeted.

The Defendant fails to mention the powerful evidence supporting the charges set forth in the indictment through which a reasonable jury could – and should – find that Defendant intended to threaten or intimidate the recipients with bodily harm. Strikingly, the Defendant omits any reference to his noncompelled, noncustiodial admission that he sent the emails and voice mails in question, and that he did this with intent to intimidate the recipients. Defendant quotes inaccurately from certain witness statements and ignores others.[2]

---

[2] Further, the Defendant mischaracterizes Rebecca Abou-Chedid's statement about the language "the only good Lebanese is a dead Lebanese." Abou-Chedid did not state that this language was not a threat. To the contrary, she stated that this language is a well-known phrase to use when you want to dehumanize a Palestinian or someone from Lebanon. Ex. B at 2. She also stated that the communications made her feel threatened and that targeting Lebanese

- 4 -

A rational jury considering the facts alleged in the indictment could determine that the

Defendant, by sending a series of communications stating "the only good Arab is a dead Arab,"

"the only good Lebanese is a dead Lebanese," and "death to Arabs," among other language, to

people of Arab and Lebanese origin, willfully and intentionally threatened and intimidated them

with a reasonable fear of bodily harm.


## II.     Whether Defendant's Communications are a True Threat that May Be Constitutionally Proscribed is not Proper for a Pretrial Motion to Dismiss

Whether communications are truly threatening is a jury question. Alexander v. United

States, 418 F.2d 1203, 1207 (D.C. Cir. 1969). Here, the Defendant has asked this Court to usurp

the jury's role and interpreting facts, weighing facts, and judging the credibility of witnesses.

Notwithstanding this request, pretrial motions to dismiss pursuant to Federal Rule of Criminal

Procedure 12(b)(2) may not be used to argue the insufficiency of evidence, United States v.

Ayarza-Garcia, 819 F.2d 1043, 1048 (11th Cir. 1987), or as a tool for a summary trial, United

States v. Marra, 481 F.2d 1196, 1199-1200 (6th Cir. 1973). Instead, motions to dismiss are

applicable only to a decision "which is capable of determination without the trial of the general

issue," Fed. R. Crim. P. 12(b)(2), which has been defined as "evidence relevant to the question of

guilt or innocence.'" United States v. Yakou, 428 F.3d 241, 246 (D.C. Cir. 2005) (citing Ayarza-

Garcia, 819 F.2d at 1048. Here, guilt or innocence is entirely dependent upon the context

surrounding the communications.

---

specifically had a particularly strong impact. Id.; Ex. C at 2. To claim, as Defendant does, that a
phrase that has been used to dehumanize someone cannot also threaten dramatically
mischaracterizes Abou-Chedid's statement.

- 5 -

While considering a motion to dismiss under Rule 12, the Court must accept the facts

stated in the indictment as true. United States v. Lattimore, 215 F.2d 847, 851 (D.C. Cir. 1954);

Ayarza-Garcia, 819 F.2d at 1047 ("Rule 12 is not intended to authorize 'speaking motions'

through which the truth of the allegations in an indictment are challenged."). Rule 12 motions

are restricted to considering only evidence on the face of the indictment. E.g., United States v.

Jensen, 93 F.3d 667 (9th Cir. 1996). Therefore, the Defendant's attempts to analogize his

statements to those that he claims are used by political leaders has no place at the pre-trial stage

of the proceedings.

As discussed below, courts have consistently held that the determination whether a

communication is a true threat that may be constitutionally proscribed is a heavily contextual and

fact-dependent inquiry that should be resolved by a jury. See Virginia v. Black, 538 U.S. 366-67

(2003) (invalidating statute under the true threats doctrine because it permitted the jury to infer

intent to intimidate from the fact of cross-burning alone, without consideration of other

contextual factors). Such considerations apply with equal force where speech is made in a

political context.

In Alexander v. United States, 418 F.2d 1203 (D.C. Cir. 1969), the D.C. Circuit described

the fact-specific nature of the true threats inquiry. In Alexander, the court set aside defendant's

conviction for threatening the life of the President under 18 U.S.C. § 871(a) and remanded the

case for trial in accordance with the Supreme Court's decision in Watts v. United States, 394

U.S. 705, 707-08 (1969). In Watts, the Supreme Court outlined the requirement that, to be

criminal, communications had to be more than mere hyperbole or conditional statements. The

speaker's statements in Alexander consisted of a series of five telephone calls to the White

- 6 -

House that were "interspersed profusely with discussions of 'the War in Viet Nam,' 'the

Russians,' and other topics of a controversial political nature," while also containing several

statements the government characterized as threatening.  Id. at 370-71.  The Alexander court held

that defendant was entitled to a new trial so that the jury could be instructed regarding the

importance of examining the statement in its full context, including whether the statement was

"idle talk" or "mere jest," and whether the statement was conditional, in line with Watts.  Id. at

1206-07.

　Importantly, the D.C. Circuit in Alexander also stated that, in determining whether the

jury had been improperly instructed under the pre-Watts standard, "**our task is not to judge**

**whether appellant made a threat, for that is for a jury** . . . . Here the evidence offered a

number of possible inferences, leading both to guilt and to innocence, for the factfinders to

consider."  Id. at 1207 (emphasis added).  As in Alexander, the Defendant asserts that his

comments were entirely protected political speech.  However, as the Court in Alexander held,

that issue is reserved for the jury at is not properly decided upon a pretrial motion to dismiss.[3]

---

[3]Defendant's reliance on United States v. Popa, 187 F.3d 672 (D.C. Cir. 1999) assertion
that the true threats inquiry is a question of law is misleading.  The court in Popa found that
otherwise lawful conduct, that is speech protected by the First Amendment, was proscribed by
the statute.  Therefore, the statute in Popa was unconstitutional as applied to that defendant.  By
contrast, the sole issue before this court is whether factually, the defendants comments are "true
threats."  There is no challenge to the true threat doctrine and there is no conflict with First
Amendment principles if a jury determines that the communications were true threats.  Unlike
the statements in Popa, the Defendant's communications are not protected speech if they are
found to be threats.  If a factual determination concludes that, based on all the surrounding
circumstances, the communications are not true threats, then by definition they are protected
speech.

**III.    The Indictment Sufficiently Alleges that Defendant's Statements Include True Threats Outside the Protection of the First Amendment**

A rational jury could determine that Defendant's statements are true threats that are not protected by the First Amendment. The Supreme Court affirmed in <u>Virginia v. Black</u>, 538 U.S. 343 (2003) that the that the government may prosecute true threats, including threats of violence, because they fall outside the protection of the First Amendment. <u>Id.</u> at 359.

True threats, as distinguished from protected speech, "encompass those statements where the speaker means to communicate a serious expression of an intent to commit an act of unlawful violence to a particular individual or group of individuals." <u>Id.</u> (citing <u>Watts</u>, 394 U.S. at 708; <u>R.A.V. v. City of St. Paul</u>, 505 U.S. 377, 388 (1992)). Whether the speaker actually intended to carry out the threat is of no consequence. <u>Id.</u> "Rather, a prohibition on true threats protects individuals from the fear of violence and from the disruption that fear engenders, in addition to protecting people from the possibility that the threatened violence will occur." <u>Id.</u> at 359-60.

The Court further stated that "[i]ntimidation in the constitutionally proscribable sense of the word is a type of true threat, where a speaker directs a threat to a person or group of persons with the intent of placing the victim in fear of bodily harm or death." <u>Id.</u> at 359-60. Rather, "the prohibition on true threats protects individuals from the fear of violence and from the disruption that fear engenders, in addition to protecting people from the possibility that the threatened violence will occur." <u>Id.</u> at 359-60.

Relevant factors that juries must consider in applying the true threats doctrine include context, whether the communication is personally communicated to the recipient, the reaction of the recipient, the presence or absence of any conditional language, or indication that the sender is

- 8 -

joking, repetition of the message, and the sender's educational level.  E.g., Watts, 394 U.S. at

706-08; Alexander, 418 F.2d at 1206-07.[4]

Here, the indictment sets forth facts very different from the scenario held by the Supreme

Court in Watts to constitute sheer political hyperbole that may not be prosecuted as a true threat.

In Watts, the speaker addressed President Johnson at a public anti-war rally before a cheering

crowd, using language that is expressly conditional – "if they ever make me carry a rifle the first

man I want in my sights is L.B.J."  Id. at 706.  Whether President Johnson even heard the

comments, or reacted by feeling intimidated or frightened, is not known and is not mentioned in

the opinion.

In stark contrast, Defendant sent repeated email and voice mail messages to the recipients

personally, even referring to one employee by her first name.  His messages referenced death

multiple times to people of the same racial and national origin groups that the recipients identify

with ("the only good Arab is a dead Arab" / "the only good Lebanese is a dead Lebanese" /

"death to Arabs").

Importantly, Defendant's messages contain absolutely no conditional language.  They do

_____

[4]Absent among the factors held proper in consideration of the issue whether a recipient
was truly threatened is the question whether the recipient is a "public figure."  This defense may
be relevant to a libel claim, but defendant cites no case law showing it is relevant in this context,
nor has the government been able to locate any.  It is logically inconsistent to claim that a public
figure cannot be threatened, when statutes like 18 U.S.C. § 871(a), which criminalizes true
threats to the President – arguably the most public figure in the world – exist.  Indeed, the very
case Defendant relies upon in an attempt to distinguish his communications as protected political
speech, United States v. Kelner, was an opinion in which the Sixth Circuit affirmed a conviction
for threatening former Palestine Liberation Organization leader Yasser Arafat, also a public
figure, under 18 U.S.C. § 875(c).  534 F.2d 1020 (6th Cir. 1976).  Moreover, the evidence will
show that the Arab American Institute employees who received Defendant's communications
were not "public figures" and they did not invite Defendant's threats by having their names listed
on a website.

- 9 -

not reference any event or condition that must take place before violence could occur. Further, defendant told the recipients he is located in Arlington, Virginia – indicating to them that geographic distance did not mitigate the potential for harm. The repetition of the messages, combined with their reference to an actual shooting adds more than enough facts for a jury to find that the communications were threats. Finally, as discussed above, Defendant admitted sending the messages with intent to intimidate and the testimony of the recipients will show they that they were in fact intimidated and threatened.

The Defendant's citation to consider N.A.A.C.P. v. Claiborne Hardware, 458 U.S. 886 (1982) and related cases is misleading. This prosecution does not involve "mere advocacy of the use of force or violence does not remove speech from the protection of the First Amendment," Id. at 927; such an argument is absorbed by the true threats doctrine, which is the category of speech at issue. Rather, he is charged with intimidating and threatening specific individuals within the meaning of Virginia v. Black. Defendant did not convey the statements at issue to anyone other than the specific individuals who received them. Consistent with Claiborne Hardware, therefore, the issue before the Court is not whether defendant is alleged to have incited others to imminent lawless action, or used "fighting words," but rather whether he intimidated and threatened the recipients of his communications. The fact that defendant discussed violence while employing language that was intimidating and threatening does not move them out of the true threats context and into an incitement context.

All of these considerations are not appropriate in the context of a motion to dismiss. Rather, consistently with guidance from the Supreme Court and the D.C. Circuit, they are issues for the trier of fact. On its face, the indictment sets forth facts sufficient for a reasonable jury to

- 10 -

determine that defendant intimidated and threatened the recipients in violation of 18 U.S.C.

§ 245(b)(2)(C) and 18 U.S.C. § 875.

## CONCLUSION

For the reasons discussed above, the United States respectfully requests the Court to deny

Defendant's motion to dismiss.

Respectfully submitted,

JEFFREY A. TAYLOR
UNITED STATES ATTORNEY

RENA J. COMISAC
ACTING ASSISTANT ATTORNEY GENERAL
CIVIL RIGHTS DIVISION


_____
Julieanne Himelstein (Bar # )
Assistant United States Attorney
555 Fourth Street, NW
Washington, DC 20530


_____
Mark Blumberg
Special Litigation Counsel
Karen Ruckert
Trial Attorney
United States Department of Justice
Civil Rights Division
601 D Street, NW Fifth Floor
Washington, D.C. 20004

# Exhibit A

FD-302 (Rev. 10-6-95)

- 1 -

FEDERAL BUREAU OF INVESTIGATION

Date of transcription    10/05/2006

    William Patrick Syring, born ████████, residential address
████████████████████████, telephone number
██████████████ was interviewed at his place of employment, U.S.
Department of State, ████████████████████████,
office telephone number ████████████████. Syring was initially
telephoned by Agent Bristol asking to meet with him outside his
place of employment. Syring requested that Agent Bristol come to
his office. After being advised of the identity of the
interviewing Agents and the nature of the interview, Syring
provided the following information:

    Syring was told by Agent Bristol that the Federal Bureau
of Investigation (FBI) was investigating him for a civil rights
violation involving threatening e-mails and telephone calls by
Syring to an Arab American organization in Washington, D.C. Syring
was told that he was not in custody and he was free to leave at any
time. Agent Bristol informed Syring that the FBI was willing to
interview him elsewhere, but Syring advised that his office was
fine (interview was done in an adjacent conference room). Syring
advised that he was willing to answer any questions but he did not
want to sign anything.

    Syring was told that the FBI was investigating several
threatening e-mails and telephone calls sent to the Arab American
Institute, ██████████████████████████████, in July
2006. Syring was asked if he is the subscriber to e-mail
addresses' pat1425@hotmail.com and pat1425@yahoo.com. Syring
stated that he was. When asked if anyone else lived with him at
██████████████████████████ he replied no.
Syring advised that he did not share those e-mail addresses with
anyone else. Syring stated that he had a third e-mail address of
pat1425@gmail.com.

    Agent Bristol advised Syring that the FBI would like to
review four e-mails believed sent by Syring to the Arab American
Institute, along with three telephone call messages, to see why he
wrote and said what he did. Syring advised he would have no
problem with that.

Investigation on    10/4/06    at  Washington, D.C.

File # 44B-WF-234426                         Date dictated
    SA Dan Parker
by  SA Greg H. Bristol:ghb

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency;
it and its contents are not to be distributed outside your agency.

FD-302a (Rev. 10-6-95)

44B-WF-234426

Continuation of FD-302 of     William Patrick Syring                    , On 10/4/06        , Page   2

     Syring advised that he has a Toshiba lap top computer at his residence which he uses for e-mail transmissions. He did not subscribe to any internet company but uses "wireless internet" from a connection that a neighbor has with Comcast cable.

     Syring was shown a one page document captioned "Threatening emails received by the Arab American Institute, FBI 44B-WF-234426, Email 1, 7/17/06, 11:21PM," which included the following e-mail message:

> From:     Pat_1425@hotmail.com
>
> Sent:     Monday, July 17, 2006, 11:21PM
>
> To:     James Zogby; Natasha Tynes
>
> Subject:     James Zogby's statements on MSNBC website (July 17)
>
> Text:     Zogby's anti-Semitic, anti-American statements (and those of the AAI in general) are abhorrent, repulsive and disgusting. The only good Lebanese is a dead Lebanese (as the IDF knows and is carrying out in its security operations, God bless them.) Fuck the Arabs and Fuck James Zogby and his wicked Hizbollah brothers. They will burn in hellfire on this earth and in the hereafter.

     This e-mail text was read out loud by Agent Bristol. Syring admitted sending that e-mail to James Zogby, who he was disgusted with. Just before sending that e-mail, Syring saw Zogby on a television show giving an interview about the 2006 Israel-Lebanon conflict, perhaps on channel 56 or the BBC channel. Syring could not recall if the show was on tape or it was a live show, but he thought it was around 11:00PM. During the television interview, Zogby discussed his interpretation of that conflict. Syring thought Zogby had a pro Arab, anti Israeli viewpoint, which upset him (Syring). Syring wanted to let Zogby know how he felt, so he decided to send him an e-mail. From his residence in Arlington, Virginia, Syring "google" searched Zogby's name, and found the website of the Arab American Institute, in Washington, D.C.

FD-302a (Rev. 10-6-95)

44B-WF-234426

Continuation of FD-302 of ___William Patrick Syring___ , On 10/4/06 , Page ___3___

     When asked why he decided to also send the e-mail to Tatasha Tynes, Syring stated there was no specific reason. When looking at their website, he saw several names of employees who had e-mail addresses, and he randomly selected Tynes' name because he wanted to make sure his message got to Zogby. When asked if he had ever met Zogby or Tynes, Syring stated he had not; however, he noted that Zogby was "out in the public spotlight" often.

     Syring emphasized that he felt he was expressing his political opinion, and at no time did he feel he was threatening anyone or doing anything wrong. When asked to explain his statement that the "only good Lebanese is a dead Lebanese," Syring stated that he was only trying to intimidate Zogby, not hurt him, and realized then and now that he was exaggerating a bit. Syring expanded his explanation by saying that he has never thought of hurting anyone affiliated with Zogby's organization. Syring advised that he was not part of any group that wanted to hurt Arabs. When asked why he used the Lebanese reference, Syring stated that it was his understanding that Zogby was Lebanese, and he wanted his statement to reflect that.

     Syring was shown a one page document captioned "Threatening emails received by the Arab American Institute, FBI 44B-WF-234426, Email 2, 7/19/06, 12:32AM," which included the following e-mail message

          From:     Pat_1425@hotmail.com

          Sent:     Wednesday, July 19, 2006, 12:32AM

          To:     Valerie Smith

          Subject:     URGENT: Emergency Summit Registration for July 19

          Text:     You are a fucking anti-Semitic Arab-American stooge who sympathizes with Hezballah terror. You and your Arab American Institute fuckers should burn in the fires of hell for eternity. The IDF is bombing Lebanon back into the stone age where it belongs. Arabs are dogs. Long live the State of Israel. Death to Arab American terrorists. The only good Lebanese is a dead Lebanese.

FD-302a (Rev. 10-6-95)

44B-WF-234426

Continuation of FD-302 of ___William Patrick Syring___ , On __10/4/06__ , Page __4__

    This e-mail text was read out loud by Agent Bristol. Syring admitted sending that e-mail to Valerie Smith, after seeing Zogby's name mentioned during a television broadcast discussing the 2006 Israel-Lebanon conflict. Zogby's statements upset Syring. Syring thought Zogby's statements were wrong, and he wanted to tell him that.

    Syring then got onto his computer, pulled up the Arab American Institute website, and randomly selected the e-mail address of Valerie Smith, whose position at the Arab American Institute he could not recall. Syring thought if he sent his e-mail to another staff member, it would be relayed to Zogby. Syring stated that he felt his e-mail was a political statement and he never intended to hurt Smith, who he has never met.

    Syring advised that he feels strongly on his statements, including that groups like Arab American Institute sympathize with Hezbollah terror. When he wrote "The only good Lebanese is a dead Lebanese" to Valerie Smith, he was trying to intimidate Zogby, not harm him or her in any way.

    Syring denied drinking alcohol during the writing of this e-mail transmission or any of the others. Syring denied consuming illegal drugs or any prescription medication during that same period.

    Syring was shown a one page document captioned "Threatening emails received by the Arab American Institute, FBI 44B-WF-234426, Email 3, 7/19/06, 12:35AM," which included the following e-mail message:

From:    Pat_1425@yahoo.com

Sent:    Wednesday, July 19, 2006, 12:35AM

To:    Rebecca Abou-Chedid

Subject:  Information for Arab Americans

Text:    You are a fucking Arab American terrorist, a
          Hezbollah sympathizer pig. James Zogby is a
          vile evil-Semitic pig terrorist member of
          Hezbollah who is attempting to destroy the
          State of Israel. God Bless America
          God Bless the State of Israel
          The only good Lebanese is a dead Lebanese.
          http://us.il.yimg.com/us.yimg.com/i/mesg/tsmileys2/01.gif

FD-302a (Rev. 10-6-95)

44B-WF-234426

Continuation of FD-302 of ___William Patrick Syring___ , On 10/4/06 , Page 5

    This e-mail text was read out loud by Agent Bristol. Syring admitted sending that e-mail to Rebecca Abou-Chedid, who he didn't know. Syring picked Rebecca Abou-Chedid's name randomly off the Arab American Institute's website, which listed several e-mail addresses of staff members. It was his expectation that if she got an e-mail like this, she would forward it Zogby who would read it. Syring stated the text of the e-mail was his political statement, and he still felt that members of Hezbollah are terrorists. Syring opined that Zogby was vile and evil. In regards to his "The only good Lebanese is a dead Lebanese" comment, Syring stated that he sent it as an act of intimidation toward Zogby, not as a threat toward Rebecca Abou-Chedid or Zogby.

    Syring was shown a one page document captioned "Threatening emails received by the Arab American Institute, FBI 44B-WF-234426, Email 4, 7/29/06, 12:13AM," which included the following e-mail message:

| | |
|---|---|
| From: | Pat_1425@yahoo.com |
| Sent: | Saturday, July 29, 2006, 12:13AM |
| To: | James Zogby; Helen Samhan; ▮▮▮▮▮▮▮▮▮▮ Valerie Smith; Rebecca Abou-Chedid |
| Subject: | AAI murders in Seattle on July 28 |
| Text: | I condemn James Zogby and the AAI for perpetrating the murder and shootings at the Jewish Federation in Seattle on Friday July 28 (as well as the killings in Israel). You wicked evil Hezbollah-supporting Arabs should burn in the fires of hell for eternity and beyond. The United States would be safer without you. God Bless the State of Israel God Bless America |

               Sincerely,

               Patrick in Arlington, VA

    This e-mail text was read out loud by Agent Bristol. Syring admitted sending that e-mail to James Zogby, and the other names listed above. Syring recalled watching a BBC broadcast that night, perhaps on channel 22, Maryland Public TV, or ABC's Nightline show,

FD-302a (Rev. 10-6-95)

44B-WF-234426

Continuation of FD-302 of ___William Patrick Syring___ , On 10/4/06 , Page 6

which starts at 11:30PM, which discussed the murder that occurred on
7/28/06 in Seattle, in which an Arab man walked into an office of the
Jewish Federation, and shot and killed a staff member there.

When asked by Agent Bristol whether he thought the Arab
American Institute was involved in that shooting in anyway, Syring
stated not directly, but he did feel that organizations like the Arab
American Institute are indirectly behind the killings of Jews
everywhere.  Syring does feel the United States would be safer without
Zogby.

Syring selected the other names on the above e-mail's "to"
line from the Arab American Institute's website, in a random manner.
Syring thought that if he sent it to more than one e-mail address, it
had a better chance of reaching Zogby.  In addition to never meeting
Zogby, Smith and Abou-Chedid, he has never met Helen Samhan and Nidal
Ibrahim.

When asked by Agent Bristol how Syring knew that Zogby was
Lebanese, Syring stated that he has heard Zogby mention that he was
Lebanese during interviews on the television.  When asked if he has
gone to any other Arabic website, Syring advised that he might have
checked out one or two of them.  He did recall going to the Council of
American-Islamic Relations (CAIR) website to learn what they were
about, but he was not sure if he sent them an e-mail.

The only response that Syring received from the Arab
American Institute, was an e-mail he received stating that if he
continued sending them e-mails they would notify the FBI.  Syring did
not recall who sent him that e-mail.

Agent Bristol gave Syring an 8x14 excel spreadsheet
captioned "Verbatim of e-mails and phone messages, printed 10/2/06 by
GHB," which contained a time line of Syring's four e-mails and three
telephone calls.  Agent Bristol then told Syring that three telephone
messages were received at the Arab American Institute's office, which
were believed to have been made by him.  Agent Bristol advised that he
would read the threatening telephone phone message, and asked Syring
to "follow along" on the 8x14 spreadsheet.

FD-302a (Rev. 10-6-95)

44B-WF-234426

Continuation of FD-302 of ___William Patrick Syring___ , On 10/4/06 , Page 7

     Agent Bristol then read out loud the following telephone
message that was written on this 8x14 spreadsheet, known as
"Threatening phone message #1 of 3," which was believed to have been
sent to the Arab American Institute on or about 11:17PM, 7/17/06:

> "Hi this is Patrick Syring.  I just read Jimmy
> Zogby's statements online on the MSNBC website,
> and I condemn him for his anti-Semitism and anti-
> American statements.  The only good Lebanese is
> a dead Lebanese.  The only good Arab is a dead
> Arab.  Long live the IDF.  Death to Lebanon and
> death to the Arabs."

Agent Bristol then played a CD labeled:

Lab #:              060920250ZB

Case ID:            44B-WF-234426

Date:               9/28/06

Description:        Duplicate copy of Q1 - standard audio
                  format

     The following was heard by Agents Bristol and Parker, along
with Syring:

> "Old messages.  Messages delivered at 11:17PM,
> Monday, July 17th.  To listen, press 0.  Hi this
> is Patrick Syring.  I just read Jimmy Zogby's
> statements online on the MSNBC website, and I
> condemn him for his anti-Semitism and anti-
> American statements.  The only good Lebanese
> is a dead Lebanese.  The only good Arab is a
> dead Arab.  Long live the IDF.  Death to
> Lebanon and death to the Arabs."

     After Agent Bristol pressed "pause" on the CD player, Syring
was asked if that was a true recording of the telephone message that
he left on the Arab American Institute answering machine on or about
7/17/06.  Syring stated that it was, indicating "that was me." Syring
said he made that telephone call minutes before sending "E-mail #1,"
after watching Zogby on the television and getting upset by what he
heard, for the same reasons as explained above.

FD-302a (Rev. 10-6-95)

44B-WF-234426

Continuation of FD-302 of ___William Patrick Syring_____ , On 10/4/06_____ , Page ___8___

        Syring stated he looked up the telephone number of the Arab American Institute by logging onto the Arab American Institute's website, a number which he does not recall. He then called it from his residential telephone number of ████████████ Syring continues to believe that Zogby is anti-Semitic and anti-American.

        When asked to explain his verbal comment "The only good Lebanese is a dead Lebanese, the only good Arab is a dead Arab, and death to Lebanon and death to the Arabs," as heard in the 7/17/06 recording, Syring stated that he was trying to intimidate Zogby, and never had any intent for him to die. Syring expanded by saying the message was "a political message," and he was angry when he left it.

        Agent Bristol then read out loud the following telephone message that was written on this 8x14 spreadsheet, known as "Threatening phone message #2 of 3," which was believed to have been sent to the Arab American Institute on or about the late evening of 7/18/06:

> "Hello Valerie you fucking Arab American shit. Ah...James Zogby and you are all Hezbollah supporters. The only good Arab is a dead Arab ...you God damn bitch."

        Agent Bristol then pressed "play" on the CD player, and the following was heard by Agents Bristol and Parker, along with Syring:

> "To delete press star...8:09AM, Wednesday, July 19. Rebecca, it's a hate message...Hello Valerie you fucking Arab American shit. Ah...James Zogby and you are all Hezbollah supporters. The only good Arab is a dead Arab...you God damn bitch."

        After Agent Bristol pressed "pause" on the CD player, Syring was asked if that was a true recording of the telephone message that he left on the Arab American Institute answering machine on or about 7/18/06. Syring stated that it was, indicating "that was me." Syring opined that he left the phone message shortly before he sent Valerie Smith an e-mail on 7/19/06, at 12:32AM, because he wanted the message to get to Zogby.

FD-302a (Rev. 10-6-95)

44B-WF-234426

Continuation of FD-302 of ____William Patrick Syring____ , On __10/4/06__ , Page __9__

    When asked what he meant by "The only good Arab is a dead Arab," Syring stated that he was trying to intimidate Zogby, and had no intentions of harming Zogby or Smith. Syring stated that he made that telephone call from his residence, to the same telephone number that he used in "Threatening phone message #1 of 3."

    Agent Bristol then read out loud the following telephone message that was written on this 8x14 spreadsheet, known as "Threatening phone message #3 of 3," which was believed to have been sent to the Arab American Institute on or about the evening of 7/19/06:

> "Hello, I'm Patrick...I'm in Arlington, Virginia, and I think James Zogby is worse than Osama bin Laden. Since he supports Hezbollah, he's an anti-Semitic mother-fucker, and the only good Arab is a dead Arab."

    Agent Bristol then pressed "play" on the CD player, and the following was heard by Agents Bristol and Parker, along with Syring:

> "To delete press star D...message delivered at 11:32PM, Wednesday, July 19th. To listen, press zero. Hello, I'm Patrick...I'm in Arlington, Virginia, and I think James Zogby is worse then Osama bin Laden. Since he supports Hezbollah, he's an anti-Semitic mother-fucker, and the only good Arab is a dead Arab. Message C, skip."

    Agent Bristol then asked Syring if that was a true recording of the telephone message that he left on the Arab American Institute answering machine on or about 7/19/06. Syring stated that it was, and he made that telephone call from his residence.

    When asked by Agent Bristol whether he felt Zogby was trying to "overthrow" the government of Israel, Syring stated that he did not know; however, he definitely thought Zogby was anti-Israel.

    When asked by Agent Bristol whether he had sent any other e-mails to the Arab American Institute before the aforementioned 7/17/06 email, Syring stated perhaps, but not more than one or two, of which he could not recall the contents of the e-mails.

FD-302a (Rev. 10-6-95)

44B-WF-234426

Continuation of FD-302 of ____William Patrick Syring____, On 10/4/06 , Page 10

     Syring indicated that he did not save any of the e-mails that he sent to the Arab American Institute, nor did he have a "Zogby file" on his computer's hard drive.

     When asked if he had any friends who were Arabic, he stated that he had some. Syring expanded by saying his anger was directed at Zogby and those Arabs who were trying to overthrow Israel.

     Syring stated that the U.S. Department of State assigned him to Lebanon between 1993-94, as an economic officer. His duties included trade promotions and commercial activities. He had an assignment in Dubai after "9/11."

     Syring advised that he was not part of any group that expressed hatred towards Arabs. He has not visited any anti-Arab hate group website nor has he gone to any anti-Arab "chat rooms." Syring has not expressed his anger towards Zogby and Arab terrorists except to his family members.

     When asked by Agent Bristol whether he has contacted his elected officials to voice his anti-Arab sentiments, Syring stated that he might have, but he was not sure.

     Syring denied ever using the email address of ███████████████████ Syring did not know who Scott M. Wilt was.

     Because of his foreign service assignments, Syring stated that he possesses a Florida's driver's license, which lists his address as ████████████ Naples, Florida. That address is where his brother lives, and he (Patrick Syring) remains a registered voter there.

     At the end of this interview, Agents requested permission to conduct a "consent search" of Syring's Arlington residence, which he agreed to. Agents Bristol and Parker then left Syring's place of employment (with Patrick Syring), and drove in a FBI vehicle to Syring's residence, ████████████████████ Initially, Syring stated that he did not want to sign FBI form "FD-26, Consent to Search." Syring was explained that a signature was necessary before Agents could search anything in his residence. Syring was told that his signature only meant that:

FD-302a (Rev. 10-6-95)

44B-WF-234426

Continuation of FD-302 of ___William Patrick Syring___ , On 10/4/06 , Page 11

    1.) He was asked by Special Agents of the FBI to permit a complete search of his condo/town home, located at ████ ████████████████████, and his Toshiba laptop computer,

    2.) That he was advised of his right to refuse consent,

    3.) That he gave this permission voluntarily,

    4.) That he authorized the listed Agents to take any items which they determined to be related to their investigation.

    After this explanation was given, Syring signed FBI form FD-26. Agents seized Syring's Toshiba laptop computer. There were no visual signs (posters, writings, publications, etc.) of any "hate towards Arabs" in any part of Syring's residence.

    Before leaving Syring's residence, Agent Parker gave Syring one copy of FBI form FD-597 (property receipt), reflecting that the FBI received the following items from him:

    One Toshiba laptop computer (Satellite), serial #24120350.

    Syring was provided with an original "Target Letter," dated 10/4/06, signed by Assistant United States Attorney Julieanne Himelstein, directing him to appear at her office on 10/11/06.

    Syring refused a ride back to his office, indicating that he wished to return to work on the Metro Rail.

Exhibit B

FD-302a (Rev. 10-6-95)

44B-WF-234426

Continuation of FD-302 of ____Rebecca Abou-Chedid_____ , On 10/10/2006 , Page 2

      Abou-Chedid advised that was the e-mail which she read
during the early hours of 7/19/06, which made her feel threatened.
Abou-Chedid was aware that James Zogby, President of AAI, had days
before received a similar threatening e-mail, in which the writer
also said that "The only good Lebanese is a dead Lebanese." AAI
also had received a voice message from "Patrick" a day or so
before, that condemned James Zogby for his anti-Semitism and anti-
American statements.

      Minutes after reading the 12:35AM email, Abou-Chedid
stated that she sarcastically sent "Patrick" a reply e-mail, which
"thanked him for the e-mail." She wrote that if he threaten her
again, she would forward his e-mail to the FBI." Shortly later
Abou-Chedid answered another incoming telephone call to AAI (on
their main line); in which the caller did not speak. Abou-Chedid
then said on the telephone "...If this is Patrick you need to stop
calling here." The caller then hung up. Abou-Chedid left AAI
around 2:00AM, 7/19/06, and asked for an escort by AAI employee
Jason Assir to a taxi for safety reasons.

      Abou-Chedid remains upset about how the e-mail writer
used the phrase "The only good Lebanese is a dead Lebanese," as
that is a well known phrase to use when you want to "dehumanize" a
Palestinian or someone from Lebanon. That phrase was used by
Israeli Chief of Staff Rafael Eitan in 1983, after the 1982 Israeli
invasion of Lebanon, when he was talking negatively towards
Lebanon, according to Abou-Chedid. When Abou-Chedid attended
college she recalled discussing that phrase during Arab/Israel
conflict classes.

      Agent Bristol showed Abou-Chedid a copy of the following
e-mail known as Email #4:

        From:      Pat1425@yahoo.com

        Sent:      Saturday, July 29, 2006 12:13AM

        To:        James Zogby; Helen Samhan;
                  Valerie Smith; Rebecca Abou-Chedid

        Text:      "I condemn James Zogby and the AAI for
                  perpetrating the murder and shootings at
                  the Jewish Federation in Seattle on Friday
                  July 28 (as well as the killings in Israel).
                  You wicked evil Hezbollah-supporting Arabs

Exhibit C

FD-302a (Rev. 10-6-95)

44B-WF-234426

Continuation of FD-302 of ____REBECCA ABOU-CHEDID____ , On 12/15/2006 , Page __2__

ABOU-CHEDID recognized the phrase, "The only good Arab is a dead Arab" as coined by a famous Israeli general. Only someone who is really angry, with a good understanding of the Arab-Israeli conflict, who wants to kill an Arab, could use this phrase. That "Patrick in Arlington" modified it to target specifically a Lebanese person, like people who work in the AAI office, was very impactful for ABOU-CHEDID.

ABOU-CHEDID is more scared of "Patrick in Arlington" now that ABOU-CHEDID has reported "Patrick in Arlington" to the Federal Bureau of Investigation and "Patrick in Arlington" is being investigated and may now "be in trouble" because of ABOU-CHEDID. ABOU-CHEDID does not want "Patrick in Arlington" to have any specific reason to hate ABOU-CHEDID personally. After learning that "Patrick in Arlington" works at the Department of State (DOS), ABOU-CHEDID is scared of running into "Patrick in Arlington" when on official business on behalf of AAI at DOS.

"Patrick in Arlington" was obviously "angry and vicious," and the signature which indicated "Patrick in Arlington" was close to the AAI office in the District of Columbia was additionally concerning. If a person like "Patrick in Arlington" makes a bad decision about what to do to another person or group, the time required to make that act happen is important. Because of the proximity of Arlington, Virginia to Washington, D.C., "Patrick in Arlington" could act without time to stop and think about what he was doing. "Patrick in Arlington" was clearly threatening AAI, because "Patrick in Arlington" was consistent, targeted different people in the AAI office, and harassed the AAI office with repeated contacts.

Within a couple of days of receiving email from "Patrick in Arlington," ABOU-CHEDID told her mother about the email from "Patrick in Arlington" and ABOU-CHEDID's mother "freaked out." ABOU-CHEDID's mother was concerned about ABOU-CHEDID's safety and told ABOU-CHEDID to carry mace so that ABOU-CHEDID could protect herself in the event of a physical attack. In retrospect, ABOU-CHEDID should not have told ABOU-CHEDID's mother about "Patrick in Arlington," as the information just upset ABOU-CHEDID's mother.

The contact from "Patrick in Arlington" in which he names ABOU-CHEDID by name specifically was intimidating.