IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| UNITED STATES OF AMERICA,<br><br>v.<br><br>PATRICK SYRING,<br><br>Defendant | )<br>)<br>)<br>)   Criminal No. 07-204 (CKK)<br>)<br>)<br>)<br>)<br>) |

## DEFENDANT'S REPLY MEMORANDUM IN SUPPORT
## OF HIS MOTION TO DISMISS THE INDICTMENT

Defendant, Patrick Syring, by his undersigned counsel, hereby files this Reply Memorandum in Support of his Motion to Dismiss the Indictment.[1] As discussed in our initial brief, in the brief of *Amicus Curiae* ACLU-NCA and below, the Indictment in this case violates Mr. Syring's constitutional rights and must, therefore, be dismissed in its entirety and with prejudice because, as a matter of law, his statements fall far short of the requisite "true threats."

### INTRODUCTION

The government seems to miss entirely the point of Defendant's argument. It contends, "Contrary to [Defendant's] claim, the First Amendment does not protect 'true threats' from criminal prosecution." Government's Amended Response to Defendant's Motion to Dismiss the Indictment ("Gov't Response") at 1.[2] Defendant has made no such claim. Our point, stated numerous times throughout our initial brief, is *not* that "true threats" are protected by the First

---

[1] This brief replies both to the government's response to Mr. Syring's opening brief; and to its response to the *amicus* brief filed by the American Civil Liberties Union of the National Capital Area "(ACLU-NCA" or "*Amicus*").

[2] By contrast, we will refer herein to the government's response to the *Amicus* Brief as "Response to *Amicus*."

Amendment.³  Our point, as both we and *Amicus* clearly argue, is that Mr. Syring's comments *do not constitute threats at all, let alone the requisite "true threats;"* and that the government's attempt, therefore, to not only censor Mr. Syring, but to punish him criminally, violates – in the starkest manner imaginable – Mr. Syring's rights under the First, Fifth and Fourteenth Amendments of the Constitution of the United States.  *Ashcroft v. Free Speech Coalition,* 535 U.S. 234, 244 (2002) ("The First Amendment commands, 'Congress shall make no law . . . abridging the freedom of speech.'  The government may violate this mandate in many ways . . . but *a law imposing criminal penalties on protected speech is a stark example of speech suppression*") (emphasis added; cites omitted)).

This case is not even close.  That is, Mr. Syring's comments simply do not constitute a threat of any kind.  They clearly fall short, therefore, of the higher hurdle of a "true threat."

A true threat, of course, is the only kind of threat that can, consistent with the Constitution, be criminally punished.  We all agree that a "true threat" is one "where the speaker means to communicate *a serious expression of intent to commit an act of unlawful violence* to a particular individual or group of individuals."  *Virginia v. Black,* 538 U.S. 343, 359 (2003) (emphasis added; cites omitted).  None of Mr. Syring's comments contains any of those elements.  The comments at the center of this case – "the only good Lebanese/Arab is a dead Lebanese/Arab" and "death to Arabs" – express no intent by Mr. Syring to commit an act of unlawful violence, let alone a "serious" expression thereof.⁴

---

³       For example, in our initial brief, we argued that "the issue here is whether the voice- and e-mail communications fall within the narrow 'true threats' exception to the broad protections of the First Amendment or whether they are, instead, protected speech.  This is a question of law, to be decided by this Court.  *United States v. Popa,* 187 F.3d 672, 674 (D.C. Cir. 1999)."  Defendant's Opening Brief at 10.

⁴       The government claims that "in a case outside the true threats context," the Seventh Circuit "characterized this phrasing as a 'death threat.'"  Response to *Amicus* at 2 (citing *United States v. Peters,* 791 F.2d 1270, 1292 (7th Cir. 1985)).  First, the government's context-caveat is huge:  the court in *Peters* analyzed neither the true threats nor First Amendment issues.  Second, without such analysis, the *Peters* court's reference to "death threats" is always enclosed within quotation marks.  Third, the issue in *Peters* was whether the comments made by the defendant there

2

Nor are his comments converted into true threats by any of the facts or factors to which the government makes repeated reference. For example, a non-threat does not become a true threat by virtue of its being: repeated; communicated to multiple people; sent directly to the recipient's work telephone or e-mail account; sent from a nearby location; made with the intent to intimidate; or frightening to the recipient. Those facts are all immaterial unless they pertain to a true threat.

Moreover, the government's mantra-like repetition of the *effects* of a true threat is different from what *constitutes* a true threat. The government repeatedly quotes the following line from *Black*: "'Rather, a prohibition on true threats protects individuals from the fear of violence and from the disruption that fear engenders, in addition to protecting people from the possibility that threatened violence will occur.'" *See, e.g.,* Gov't Response at 7 (where it quotes this line twice); Response to *Amicus* at 3, 7 (quoting *Black,* 538 U.S. at 360).

The government seems to construe this oft-repeated quote into an alternative definition or test of what constitutes a true threat, but that is clearly erroneous. Rather, that sentence from *Black* is referring to the *effects* of true threats, and the *benefit* to be derived by the suppression of true threats. That is not to say, however, that wherever those *effects* are found, their *cause* is necessarily a true threat. Indeed, as the Court has recognized, protected speech can also result in fear of violence and the disruption that fear engenders. *See, e.g., NAACP v. Claiborne Hardware Co.,* 458 U.S. 886, 927 (1982) (recognizing that the impassioned speeches at issue there "might have been understood . . . as intending to create fear of violence" but were, nonetheless, protected under the First Amendment); *Collin v. Smith,* 578 F.2d 1197, 1205-1206 (7th Cir), *cert. denied* 439 U.S. 916

---

were relevant to the issue of his supervisory role in a criminal enterprise. For these reasons, *Peters* provides absolutely no authority for the proposition that Mr. Syring's comments constitute true threats.

3

(1978) (recognizing that the constitutionally protected speech of American Nazis can nonetheless result in "the infliction of psychic trauma" and "seriously disturb, emotionally and mentally, at least some, and probably many" of the listeners, many of whom were Jewish residents of Skokie, Illinois, and some of them survivors of Nazi concentration camps). *See also New York ex rel. Spitzer v. Operation Rescue National,* 273 F.3d 184, 196 (2nd Cir. 2001) (noting that, although the speaker's comments made the listener understandably fearful for her safety, excessive reliance on the reaction of the listener would endanger First Amendment values).[5] In other words, a listener's fear of violence, or being disrupted thereby, is not a litmus test for whether the words causing that fear or disruption are true threats.

The First Amendment embodies "our 'profound national commitment to the principle that debate on public issues should be uninhibited, robust and wide-open,'" *Buckley v. Valeo,* 424 U.S. 1, 14 (1976) (quoting *New York Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964)). Even if this were a close question, therefore, the Indictment would have to be dismissed. As the Supreme Court recently acknowledged, "[w]here the First Amendment is implicated, the ties goes to the speaker, not the censor." *Federal Election Comm. v. Wisconsin Right to Life, Inc.,* ___ U.S. ___, 127 S.Ct. 2652, 2669 (2007). "In drawing that line [between what is and is not protected by the First Amendment], the First Amendment requires us to err on the side of protecting political speech rather than suppressing it." *Id.* at 2659.

---

[5] *Operation Rescue* also supports a point made in Mr. Syring's opening brief that was not refuted by the government: that in order to constitute a true threat, a communication must include an expression of "unequivocal immediacy" and express intention. *Id.* The government attempts to distinguish *Operation Rescue* from this case by claiming that "presumably," the listener's fear in that case arose "from multiple sources." Response to *Amicus* at 6-7. This is pure speculation on the government's part. However, even if the government's speculation is correct, that fact would not distinguish *Operation Rescue* from this case. As acknowledged by Ms. Helen Samhan, Executive Director of the AAI and a recipient of the e-mail quoted in ¶ 10 of the Indictment, "the AAI staff 'lived through many hateful calls'" since 9/11. She said that she found Mr. Syring's calls different from those "many hateful calls" because his were "ludicrous and far fetched." She further acknowledged that "[a]s an employee with AAI, [she] realizes that at times they [AAI] are going to receive *negative political feedback* from the public involving Arab related issues." (Emphasis added.) *See* p.2 of the FD 302 of Helen Samhan, dated October 10, 2006, attached hereto as Exhibit 1.

Contrary to the government's position, the issue of whether to dismiss the Indictment because it violates the Constitution is ripe for decision now. Because the Constitution protects Mr. Syring's subject speech, the Indictment must be dismissed.

## FACTS

The critical facts are set forth in detail in Defendant's opening brief.[6] However, the government makes at least two egregious misstatements concerning Mr. Syring's comments, which must be corrected. First, the government states, "When asked why he used language repeatedly *referring to the death of Arab and Lebanese AAI staff*, Defendant admitted that he chose those words . . ." Response to *Amicus* at 14 (emphasis added). Mr. Syring made no such statement. He was never asked whether, and certainly never stated that, he ever referred to the death of AAI staff. The FD-302a reflecting what Mr. Syring said when interviewed by the FBI, attached as Exhibit A to the Gov't Response, shows quite the opposite.

A similarly egregious misstatement is made by the government when it says that Mr. Syring "sought to intimidate [AAI staff] by referring repeatedly to their deaths." Response to *Amicus* at 16. He said no such thing, as evidenced, again, by the FD 302a from his interview by the FBI.

## ARGUMENT

**I.    The Issue of Whether the Indictment Violates the Constitution is Ripe for Decision now; Postponing That Decision Until After Trial Will Result in an Unconstitutional Chilling of First Amendment Rights, and not Only Those of Mr. Syring.**

---

6    The government contends that "the Defendant mischaracterizes Rebecca Abou-Chedid's statement about the language 'the only good Lebanese is a dead Lebanese.' Abou-Chedid did not state that this language was not a threat." Gov't Response at 3 n.2. Comparison of our quote of the FD-302a pertaining to Ms. Abou-Chedid, Defendant's Opening Brief at 4, with the FD-302a itself (Gov't Response at Ex. B p.2) shows that we accurately quoted what she is reported to have told the FBI.

5

The government contends that this Court is handcuffed from vindicating constitutional rights at this point in the case, and that the issue of whether the Indictment violates the Constitution "is not properly decided upon a pretrial motion to dismiss." Gov't Response at 1, 4 – 6. The government is wrong.

Even in the context of *civil* litigation, the Supreme Court has recognized the propriety and desirability of prompt determination where First Amendment rights are implicated, as well as the unconstitutional chilling of those rights that can result from even the threat of protracted litigation. For example, in *Wisconsin Right to Life* – a civil case involving a challenge to the constitutionality of the Bipartisan Campaign Reform Act ("BCRA") – the Court cautioned, "Consider what happened in these cases," noting how the District Court had "permitted extensive discovery on the assumption that [Appellants'] intent was relevant," including numerous depositions and the production of "many documents related to its operations, plans, and finances." *Id.*, 127 S.Ct. at 2666 n.5. The Supreme Court noted that "[s]uch litigation *constitutes a severe burden on political speech.*" *Id.* (emphasis added). It further recognized that "[l]itigation . . . will unquestionably chill a substantial amount of political speech." *Id.* at 2666.

> To safeguard this liberty [freedom of speech], the proper standard for an as-applied challenge to BCRA § 203 must be objective, focusing on the substance of the communication rather than amorphous considerations of intent and effect. It must also entail minimal if any discovery, to allow parties to *resolve disputes quickly without chilling speech through the threat of burdensome litigation.* . . . In short, it must give the benefit of any doubt to protecting rather than stifling speech.

*Id.* (emphasis added; cites omitted).

Here, then, the government's suggestion that the Court must wait until after trial to address the constitutionality of the Indictment, and of the statutes as applied to Mr. Syring, clearly and unconstitutionally chills not only Mr. Syring's freedom of speech, but that of the

6

public in general. If the government was right, people may well keep silent out of fear of having to incur the expense and anguish of defending against criminal charges, including trial and possible appeals, before they can hope to vindicate their First Amendment rights. This is a result to be avoided. "Many persons, rather than undertake the considerable burden (and sometimes risk) of vindicating their rights through case-by-case litigation, will choose simply to abstain from protected speech – harming not only themselves but society as a whole, which is deprived of an uninhibited marketplace of ideas." *Virginia v. Hicks,* 539 U.S. 113, 119 (2003) (citation omitted).[7]

Contrary to the government's position, the Supreme Court has held that "the judicial function *commands* analysis of whether the specific conduct falls within the reach of the statute and if so whether the legislation is consonant with the Constitution." *Landmark Communications, Inc. v. Virginia,* 435 U.S. 829, 843 (1978) (emphasis added). Similarly, as we pointed out in our initial Brief, the issue of "[w]hether the Government has infringed a defendant's rights under the First Amendment is, of course, a question of law . . ." *United States v. Popa,* 187 F.3d 672, 674 (D.C. Cir. 1999) (citing *United States v. Doe,* 968 F.2d 86, 88 (D.C.Cir. 1992)).[8] *See also, United States v. Francis,* 164 F.3d 120, 123 n.4 (2nd Cir. 1999) ("[W]e note that the question of whether a defendant's communication is a true threat rather than speech protected by the First Amendment – a threshold question of law for the court . . . is different from the question of whether a reasonable person would interpret the communication as a true threat – a question for the jury at trial . . ." (cites omitted)).

---

[7] Indeed, the Supreme Court has recognized the danger of "self-censorship; a harm that can be realized even without an actual prosecution." *Virginia v. Am. Booksellers Ass'n,* 484 U.S. 383, 393 (1988). Because of that danger, the Court held that, in certain circumstances, litigants need not even wait for actual enforcement of a statute if the existence of the law could chill the exercise of First Amendment rights. *Id.*

[8] The government contends that Defendant's reliance on *Popa* "is misleading" because there, "the statute . . . was unconstitutional as applied to that defendant." Gov't Response at 6 n.3. Since Defendant here also argues that the statutes are, as applied to him, unconstitutional (Defendant's Opening Brief at 1, 10), it is unclear why the government calls his reliance on *Popa* misleading.

We adopt the argument set forth in the brief of *Amicus Curiae,* at pp. 20-21, on this point, and incorporate that argument herein by reference. Additionally, we submit that the government's reliance on *Alexander v. United States,* 418 F.2d 1203, 1207 (D.C.Cir. 1969), Gov't Response at 4 – 6, is misplaced. There is no indication in *Alexander* that the defendant ever filed a motion to dismiss, or made any other pre-trial challenge based upon the Constitution or otherwise. Rather, "Appellant brought this litigation here by separate appeals from the conviction and the denial of his motion for a new trial." *Id.* at 1205. Moreover, the court there did not even "reach the question whether appellant's statements were to any extent protected by the First Amendment . . ." *Id.* at 1207 n.23. Thus, *Alexander* is inapposite both procedurally and substantively.

Where, as here, there are no material facts in dispute, the threshold question of law presented by the Motion to Dismiss is ripe for decision. *United States v. Yakou,* 428 F.3d 241, 246-247 (D.C.Cir. 2005); *United States v. Safavian,* 429 F.Supp.2d 156, 158-159 (D.D.C. 2006); F.R.Crim.P. 12(b)(2).

> **II.     The Indictment Must be Dismissed Because Mr. Syring's Statements are Protected Speech Under the First Amendment, and Because the Statutes Upon Which the Charges are Based are, as Applied to Mr. Syring, Unconstitutional.**

In its Response to Mr. Syring's opening brief, the government devotes only a little over three pages to the substantive issue here. Gov't Response at 7-10. In that brief discussion, the government does not address most of the arguments contained in Mr. Syring's opening brief, apparently conceding them. Mr. Syring stands by the arguments made in his opening brief but, since the government does not contest many of them, will not repeat them here. Mr. Syring also

adopts, and incorporates by reference, the excellent analysis contained in the ACLU-NCA's *amicus* brief at pp. 2-17.

Part of the government's abbreviated substantive discussion involves what it contends to be "[r]elevant factors that juries must consider . . ." *Id.* at 7. At this procedural stage, what might be relevant factors for jurors sheds no light on whether, as a matter of law, Mr. Syring's statements rise to the level of true threats that fall outside of the First Amendment's protections, *i.e.,* whether a jury is even entitled to pass judgment under the facts alleged.

The government does, however, correctly define what constitutes true threats. *Id.* As it concedes, true threats are limited to "those statements where the speaker means to communicate *a serious expression of an intent to commit an act of unlawful violence* to a particular individual or group of individuals." *Black,* 538 at 359 (emphasis added). It is that very sort of statement that is completely missing from the Indictment. The statements it does contain are protected First Amendment speech. Since the statements are not true threats, they do not constitute violations of the statutes under which Mr. Syring has been charged or, if they do, those statutes are unconstitutional as applied to Mr. Syring. This is why the Indictment must be dismissed.

As is clear from an examination of the statements attributed to Mr. Syring, none rises to the level of a true threat because none contains "a serious expression of an intent to commit an act of unlawful violence" to anyone. *Id.* They simply express his opinion, however distasteful, that "the only good Arab/Lebanese is a dead Arab/ Lebanese," or mimic the Hezbollah slogan ("Death to America") with "Death to Lebanon and death to the Arabs." These statements threaten no one. Rather, like the statements of Charles Evers at issue in *Claiborne Hardware Co.,* 458 U.S. at 927-928, they are simply "emotionally charged rhetoric" made in "the

9

passionate atmosphere" of the Israeli/Hezbollah war that was then taking place; and in reaction to statements by Dr. Zogby about that war that Mr. Syring had just read or heard on television.

Mr. Syring's opinions – the focal point of the criminal charges – are all contained in larger context of messages that register his protest to what he perceives to be the positions and alignments of the Arab American Institute. Mr. Syring clearly feels strongly about those perceptions and, of course, protests are a form of political speech protected by the First Amendment.[9] As the Supreme Court held in *Black,* political speech is "at the core of what the First Amendment is designed to protect." *Id.,* 538 U.S. at 365. Political speech, moreover, entails attempts to "influence others" to adopt one's political views, such as through the expression of disapproval, advocacy, wearing of symbols (such as armbands) and other means. *Tinker v. Des Moines Independent Community School Dist.,* 393 U.S. 503, 514 (1969).

As we point out in our opening brief, Evers' statements in *Claiborne Hardware* – which the Supreme Court found to be protected by the First Amendment – were far closer to true threats than anything allegedly said by Mr. Syring. Evers' comments were directed at a discrete group of people who were alleged to have violated the NAACP's boycott of white-owned stores, whose names had been taken down and publicized and who, he declared, would "'have their necks broken' by their own people." *Id.* at 900 n.28. Evers also warned that "[i]f we catch any of you going in any of them racist stores, we're gonna break your damn neck," or words to that effect. *Id.* He declared that the NAACP would "enforce" the boycott. *Id.* at 938.

Unlike Mr. Syring's alleged comments, which merely express his politically hyperbolic belief or opinion that "the only good Arab/Lebanese is a dead Arab/ Lebanese," Evers' comments actually contained threatening language. Unlike the present case, Evers' comments

---

[9] Indeed, in a concurring opinion in *R.A.V. v. City of St. Paul,* 505 U.S. 377 (1992), Justice White contrasts fighting words – the category of proscribed communication at issue there – with protected communication that is a means of "expressing views, rallying supporters, or *registering a protest* . . ." *Id.* at 401 (emphasis added).

10

were made in an atmosphere where acts of violence had been carried out by those attempting to enforce the boycott against boycott violators, including spraying the house of one such violator with bullets. *Id.* at 903-904. Even so, the Court ruled that Evers' comments were protected speech. Consequently, Mr. Syring's much more innocuous statements of opinion, protest and political hyperbole are clearly protected speech. He threatened no one.

In its discussion of *Watts v. United States,* 394 U.S. 705 (1969) (*per curium*), the government contends that "the indictment [here] sets forth facts very different from the scenario" in that case. Gov't Response at 8. As the government notes, Watts' statement was directed at then-President Johnson. The government correctly notes that the *Watts* opinion fails to mention "[w]hether President Johnson even heard the comments, or reacted by feeling intimidated or frightened . . ." Gov't Response at 8. The absence of any such discussion highlights the fact that those factors do not determine whether, as a matter of law, communication rises to the level of a true threat.

The government contrasts the facts of *Watts* with those presented here, claiming that Mr. Syring "sent repeated . . . messages to the recipients personally . . ." As pointed out above and by *Amicus,* however, neither repetition nor a personal address turn a non-threat into a true threat.

Next, the government contends that Mr. Syring "referenced death multiple times to people of the same racial and national origin groups" with which the recipients identify. *Id.*[10] As we pointed out in our opening brief, however, true threats rarely involve broad groups – in

---

[10] One cannot help but notice how often the government resorts to this somewhat contorted phrase in attempting to refer to Mr. Syring's comments. Other variations include, "Defendant's linkage of death with people of the same racial and national origin groups to which the recipients belong . . ." Response to *Amicus* at 3; ". . . espousing the death of people belonging to the same racial and national origin groups as the recipients . . .", *id.* at 6; ". . . repeatedly espouse death to individuals of the same racial and ethnic groups as the recipients . . .", *id.* at 9. Use of such tortured phrasing is likely based on the government's accurate perception that it cannot, with any credibility, claim that Mr. Syring threatened to kill or harm any of the recipients of his messages, or anyone else at AAI or elsewhere. The government's contorted attempt to find a way to describe Mr. Syring's comments is, in itself, a near-admission that those comments are not threats, let alone true threats.

11

this case, an entire nation and all Arabs. As we noted in our opening brief, "[a]ttacking a group presents a harder problem. Under the law of libel, defamation of a broad group or class is not usually actionable. And this kind of speech . . . approaches the area of political and social commentary. To this extent *it makes a stronger claim for First Amendment protection.*" *Anti-Defamation League of B'nai B'rith v. FCC,* 403 F.2d 169, 174 (D.C. Cir. 1967), *cert. denied,* 394 U.S. 930 (1969) (J. Skelly Wright, concurring) (emphasis added). The government never contests this point.

In its final attempt to distinguish *Watts,* the government argues that Mr. Syring's "messages contain absolutely no conditional language." Gov't Response at 8. Again, however, the absence of conditional language does not convert a non-threat into a true threat.

In a footnote, the government sets up a straw man, arguing that "[a]bsent among the factors held proper in consideration of the issue whether a recipient was truly threatened is the question of whether the recipient is a 'public figure.' . . . [D]efendant cites no case law showing it is relevant in this context, nor has the government been able to locate any." *Id.* at 8 n.4. This is an argument that Mr. Syring never made. Rather, citing *Matter of M.W.G.,* 427 A.2d 427 (D.C. 1981), we made the point – in the context of arguing that the squeamish or overly sensitive cannot define the bounds of the First Amendment's protection – that certain groups, because of their role in society, are expected to exercise a greater degree of fortitude when it comes to offensive speech. Defendant's Opening Brief at 23. On this point, which we *did* argue, the government offers no response.[11]

---

[11] In connection with this argument, we also argued that certain groups, because of whom or what they represent, serve as "lightening rods" to both supporters and opponents. Ms. Helen Samhan, Executive Director of AAI, stated that the AAI is such an organization: "As an employee with AAI, [Ms.] Samhan realizes that at times they [AAI] are going to receive negative political feedback from the public involving Arab related issues." Ex. 1, attached hereto. That the Arab American Institute was getting other e-mails can also be inferred from Exhibit A, attached to the Government's Response. At page ten of that exhibit, the FBI Agent writes, "Syring denied ever using the email address of 'swilt1@peoplepc.com.' Syring did not know who Scott M. Wilt was."

12

Next, the government argues that Mr. Syring "admitted sending the messages with intent to intimidate . . ." Gov't Response at 9. Indeed, it puts much stock in this point, to which it refers repeatedly in its Response to *Amicus*. Whereas Mr. Syring did, according to the FD 302a, say that that was his intent, the government neglects to point out that in that same FD 302a, Mr. Syring is quoted as saying, repeatedly, that he never meant to hurt Dr. Zogby or any other recipient of his messages; and that his messages were meant to convey his strong political opposition to the political messages being made by Dr. Zogby. For example, that FD 302a says, "Syring *emphasized that he felt he was expressing his political opinion*, and *at no time did he feel he was threatening anyone or doing anything wrong*. When asked to explain his statement that the 'only good Lebanese is a dead Lebanese,' Syring stated that he was *only trying to intimidate Zogby, not hurt him*, and realized then and now that he [sic] *exaggerating a bit*." Gov't Response at Ex. A p. 3 (emphasis added).[12]

Thus, it is clear that – in Mr. Syring's view – he was engaged in expressing his political views and protests, albeit in a hyperbolic manner. In that context, Mr. Syring says he was trying to intimidate Dr. Zogby, but not hurt him.

The government argues that this admission is evidence that Mr. Syring was engaged in a true threat. That cannot, however, be the case, as it is inconsistent with the Supreme Court's definition of a true threat as "*a serious expression of an intent to commit an act of unlawful violence* to a particular individual or group of individuals." *Black,* 538 U.S. at 359. There simply is no expression of an intent to commit an act of unlawful violence in anything Mr. Syring is quoted as having said or e-mailed. Where there is no true threat, an intent to intimidate does not create one. Indeed, as the Supreme Court says in *Black*, almost immediately after

---

[12]  As is evidenced by the FD 302a itself, Mr. Syring made these points before retaining – and, thus, without benefit of having consulted – counsel.

13

defining "true threat," "[i]ntimidation *in the constitutionally proscribable sense* of the word *is a type of true threat*, where a speaker *directs a threat* to a person or group of persons with the intent of placing the victim in fear of bodily harm or death." *Id.* at 360 (emphasis added). Thus, the requirement to demonstrate that there be a true threat remains even where a speaker's intent is intimidation. *See also Claiborne Hardware,* 458 U.S. at 927-928, 938 (speeches that were intended to "create fear of violence" and intimidate listeners into complying with economic boycott were, nonetheless, protected speech).

Moreover, in the context of expressing one's political views, to say you are trying to "intimidate" an opponent falls short of an admission that one has engaged in a true threat. For example, a political action committee may raise money, run ads and help get out the vote in an attempt to "intimidate" an office-holder into voting their way, but such activity does not constitute a true threat simply because the PAC's intent is to "intimidate" the office-holder. In short, in the context of hyperbolic political expressions and protests, as elsewhere, the word "intimidate" is far from non-ambiguous and, as we note above, "[w]here the First Amendment is implicated, the tie goes to the speaker, not the censor." *Wisconsin Right to Life,* 127 S.Ct. at 2669 (fn. omitted).

In its Response to *Amicus,* the government makes much of the fact that Mr. Syring referred to the Lebanese because he knew that that was Dr. Zogby's heritage. The government uses this fact to try to bolster its intimidation argument. In light of Ms. Abou-Chedid's acknowledgement that the phrase, "the only good Lebanese is a dead Lebanese" is simply a common put-down in Lebanon, meant to dehumanize the person to whom it is directed; and that it is so common that it was a topic in one of her college classes; the government's reliance on this aspect of Mr. Syring's choice of words actually undercuts its argument that this phrase

14

constitutes a true threat. As we pointed out in our opening brief, and as corroborated by Government Exhibit A, Mr. Syring was stationed in Lebanon for two years in the mid-1990s. Therefore, he would be aware of how this common put-down would be interpreted by a person of Lebanese heritage.

Also in its Response to *Amicus,* at pp. 15 – 17, the government relies on two pre-*Black* decisions from the Eighth Circuit: *United States v. Dinwiddie,* 76 F.3d 913 (8th Cir.), *cert. denied,* 519 U.S. 1043 (1996); and *United States v. Hart*, 212 F.3d 1067 (8th Cir. 2000), *cert. denied,* 531 U.S. 1114 (2001). Because both decisions were handed down pre-*Black*, they suffer from their lack of benefit of *Black*'s definition of true threats.

The government's reliance on *Dinwiddie* is misplaced for another reason, as well. The government claims that two of Mr. Syring's name-calling messages were "designed to state that [the recipients'] violent deaths are justified in the same way that Regina Dinwiddie suggested that Dr. Crist's violent death was justified." Response to *Amicus* at 16. Although we vehemently disagree with the government's characterization of those name-calling messages, the government's reliance on *Dinwiddie* for this point is interesting since the court there held: "The same reasoning applies to *Mrs. Dinwiddie's advocacy of the view that it is justifiable to use violence against doctors who perform abortions. Punishing Mrs. Dinwiddie for expressing this opinion would violate the First Amendment.*" *Id.* at 926 n.10 (emphasis added).

## **CONCLUSION**

As with Mrs. Dinwiddie, punishing Mr. Syring for expressing his opinion that "the only good Lebanese/Arab is a dead Lebanese/Arab" violates the First Amendment. That expression of opinion, made in the context of an angry expression of political protest in reaction to Dr. Zogby's broadcast comments; as well as his mimicry of Hezbollah's chosen slogan "Death to America" by twisting it on those Mr. Syring saw as allies of Hezbollah; is protected speech under the First Amendment. It comes nowhere close to constituting a true threat and cannot, therefore, be the subject of criminal prosecution without violating Mr. Syring's constitutional rights.

As noted by the Supreme Court toward the end of its opinion in *Wisconsin Right to Life,*

> [A]s is often the case in this Court's First Amendment opinions, we have gotten this far in the analysis without quoting the Amendment itself: "Congress shall make no law . . . abridging the freedom of speech." The Framers' actual words put these cases in proper perspective. Our jurisprudence over the past 216 years has rejected an absolutist interpretation of those words, *but when it comes to drawing difficult lines in the area of pure political speech – between what is protected and what the Government may ban – it is worth recalling the language we are applying. . . . [W]hen it comes to defining what speech qualifies as [protected by the First Amendment], . . . we give the benefit of the doubt to speech, not censorship*. The First Amendment's command that "Congress shall make no law . . . abridging the freedom of speech" demands at least that.

*Id.* at 2674 (emphasis added).

For the reasons argued herein, as well as in Mr. Syring's opening brief and in the brief filed by *Amicus Curiae*, it is clear that the comments contained in the Indictment do not rise to the level of true treats, as required by the Constitution. Therefore, the Indictment states no violation of the statutes under which Mr. Syring has been charged. However, if the Indictment meets the elements of those statutes, then those statutes, as applied to Mr. Syring here, are

16

unconstitutional.  Either way, the charges brought against Mr. Syring violate his right of free speech under the First, Fifth and Fourteenth Amendments to the Constitution of the United States.  Consequently, the Indictment must be dismissed with prejudice.  That is the relief Mr. Syring respectfully seeks from this Court.

Dated this 9th day of November, 2007.

Respectfully submitted,

SCHERTLER & ONORATO, L.L.P.

_____/s/_____
David Schertler (#367203)
Peter V. Taylor (#419524)
601 Pennsylvania Avenue, NW
North Building, 9th Floor
Washington, DC 20004
Telephone:  (202) 628-4199
Facsimile:  (202) 628-4177

*Counsel for Mr. Patrick Syring*

# EXHIBIT 1

FD-302a (Rev. 10-6-95)

44B-WF-234426

Continuation of FD-302 of ___Helen Samhan_____ , On __10/10/2006__ , Page __2__

    Samhan felt nervous after reading that e-mail. It worries her when her colleagues receive threatening e-mails like "Patrick in Arlington" was sending to them. Samhan found "Patrick's" statement that AAI perpetrated a murder in Seattle as outrageous, calling him "unstable."

    Samhan wondered after receiving that e-mail why she was selected to receive it, but concluded that "Patrick" must have gotten her e-mail address off the AAI website. After receiving that e-mail, Samhan felt "intimidated" by "Patrick in Arlington." His repeated e-mails and phone messages to AAI employees were a topic of conversation in the AAI office.

    Samhan stated that the AAI staff "lived through many hateful telephone calls" after "9/11," but the e-mails and phone calls from "Patrick in Arlington" were different and more bothersome because his statements were ludicrous and far fetched, especially how AAI was involved in a murder in Seattle. As an employee with AAI, Samhan realizes that at times they are going to receive negative political feedback from the public involving Arab related issues. Few are vulgar, according to Samhan, and even less are as "bizarre" like the ones sent by "Patrick in Arlington."