UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>v.<br><br>PATRICK SYRING,<br><br>Defendant. | Criminal Action No. 07-204 (CKK) |

**MEMORANDUM OPINION**
(November 19, 2007)

On October 12, 2007 Defendant, Patrick Syring, filed a Motion to Dismiss the two-count Indictment in this case based upon the First, Fifth and Fourteenth Amendments to the Constitution of the United States, as well as Federal Rule of Criminal Procedure 12(b)(2). Defendant argues that the Indictment violates his rights under the First Amendment to the Constitution of the United States by attempting to criminalize protected speech, and also violates his due process rights under the Fifth and Fourteenth Amendments. For the same reasons, Defendant argues that the statutes under which he has been charged, 18 U.S.C. §§ 245(b)(2)(C) and 375(c), are unconstitutional as applied to his conduct. The Government filed an Amended Response to Defendant's Motion to Dismiss on October 30, 2007,[1] and Defendant filed his Reply Memorandum on November 9, 2007.[2] Upon a searching review of the filings currently before

---

[1] The Government initially responded to Defendant's Motion to Dismiss on October 26, 2007, but subsequently amended its Response in order to bring it into compliance with the Court's privacy policies.

[2] On November 1, 2007, with leave of the Court, the American Civil Liberties Union of the National Capital Area ("ACLU-NCA") filed a Memorandum as *Amicus Curiae* in support of Defendant's Motion to Dismiss. The Government filed a Response to the ACLU-NCA's *amicus* brief on November 7, 2007, to which Defendant's November 9, 2007 Reply Memorandum also responded.

the Court, as well as the relevant statutes and case law, the Court shall DENY Defendant's Motion to Dismiss the Indictment.

## I: BACKGROUND

Defendant Syring was indicted on August 15, 2007 on two charges, both related to alleged threats. The Indictment alleges that between July 17 and July 29, 2006, Defendant Syring sent three voice mail messages and four e-mail messages to employees of the Arab American Institute ("AAI"), a non-profit organization that represents the interests of Arab Americans in the United States. Indict. ¶¶ 1-2. At all times relevant to the Indictment, AAI was located in Washington, D.C. and Defendant Syring lived in Arlington, Virginia. *Id.* ¶¶ 1, 3. The Indictment specifically describes the following alleged communications:

- A voice mail recorded on AAI's main telephone line at 11:17 p.m. on July 17, 2006, which stated: "This is Patrick Syring. I just read James Zogby's statements online on the MSNBC website, and I condemn him for his anti-Semitism and anti-American statements. The only good Lebanese is a dead Lebanese. The only good Arab is a dead Arab. Long live the IDF. Death to Lebanon and death to the Arabs." *Id.* ¶ 4.

- An e-mail sent to the addresses of Dr. James Zogby and Natasha Tynes at the AAI office at 11:21 p.m. on July 17, 2006, which stated: "Zogby's anti-Semitic, anti-American statements (and those of the AAI in general) are abhorrent, repulsive and disgusting. The only good Lebanese is a dead Lebanese (as the IDF knows and is carrying out in its security operations, God bless them.) Fuck the Arabs and Fuck James Zogby and his wicked Hizbollah brothers.[3] They will burn in hellfire on this earth and in the hereafter." *Id.* ¶ 5.

- A voice mail recorded on the telephone extension of Valerie Smith at the AAI office on July 18 or July 19, 2006, which stated: "Hello Valerie, you fucking Arab American shit. James Zogby and you are all Hezballah supporters. The only good Arab is a dead Arab. . . You God [inaudible] bitch." *Id.* ¶ 6.

- An e-mail sent to the e-mail address of Valerie Smith at the AAI office at 12:32

---

[3] The variations in the spelling of "Hezbollah" are included in the Indictment.

2

a.m. on July 19, 2006, which stated: " You are a fucking anti-Semitic Arab-American stooge who sympathizes with Hezballah terror. You and your Arab American Institute fuckers should burn in the fires of hell for eternity. The IDF is bombing Lebanon back into the stone age where it belongs. Arabs are dogs. Long live the State of Israel. Death to Arab American terrorists. The only good Lebanese is a dead Lebanese." *Id.* ¶ 7.

- An e-mail sent to the e-mail address of Rebecca Abou-Chedid at the AAI office at 12:35 a.m. on July 19, 2006, which stated: "You are a fucking Arab American terrorist, a Hezbollah sympathizer pig. James Zogby is a vile evil anti-Semitic pig terrorist member of Hezbollah who is attempting to destroy the State of Israel. God Bless America. God Bless the State of Israel. The only good Lebanese is a dead Lebanese [a smiley face graphic]." *Id.* ¶ 8.

- A voice mail recorded on the AAI's main telephone line at 11:32 p.m. on July 19, 2006, which stated: "Hello, I'm Patrick I'm in Arlington, VA, and I think James Zogby is worse than Osama bin Laden. Since he supports Hezballah, he's an anti-Semitic motherfucker, and the only good Arab is a dead Arab." *Id.* ¶ 9.

- An e-mail to sent to the e-mail addresses of James Zogby, Helen Samhan, Nidal Ibrahim, Valerie Smith, and Rebecca Abou-Chedid at the AAI office at 12:13 a.m. on July 29, 2006 with the subject line "AAI murders in Seattle on July 28." The e-mail stated: "I condemn James Zogby and the AAI for perpetrating the murder and shootings at the Jewish Federation in Seattle on Friday July 28 (as well as the killings in Israel). You wicked evil Hezbollah-supporting Arabs should burn in the fires of hell for eternity and beyond. The United States would be safer without you. God Bless the State of Israel. God Bless America. Sincerely, Patrick in Arlington, VA." *Id.* ¶ 10.

The Indictment contains two counts. Count One alleges that Defendant transmitted "e-mail and telephone communication to the offices of the [AAI] . . . and, by threat of force . . . attempt[ed] to and did willfully intimidate and interfere with [AAI] employees because of their race and national origin, that is because they were Arab and Lebanese Americans, and because they were and had been enjoying employment, and the perquisites thereof, by a private employer, [AAI]," in violation of 18 U.S.C. § 245(b)(2)(C). *Id.* ¶ 11. Count Two alleges that Defendant "willfully and knowingly did transmit in interstate commerce . . . telephone and e-mail

communication to [AAI] employees, in which [he] threatened to injure [AAI] employees," in violation of 18 U.S.C. § 875(c). *Id.* ¶ 12.

## II: DISCUSSION

Federal Rule of Civil Procedure 12(b)(2) provides that a "party may raise by pretrial motion any defense, objection, or request that the court can determine without a trial of the general issue," Fed. R. Crim. P. 12(b)(2), which has been defined as "evidence relevant to the question of guilt or innocence," *United States v. Yakou*, 428 F.3d 241, 246 (D.C. Cir. 2005). In considering a motion to dismiss under Rule 12, the Court is bound to accept the facts stated in the indictment as true. *United States v. Lattimore*, 215 F.2d 847 (D.C. Cir. 1954). Significantly, Defendant has not moved to dismiss the Indictment based on an alleged defect. Instead, Defendant asserts that his communications constitute speech on social and political issues that is protected by the First Amendment, rather than "true threats" that may give rise to criminal charges. Defendant argues that whether his communications constitute "true threats" is a question of law, which must be decided by the Court, and is properly decided on a pretrial motion to dismiss. The Court notes that the D.C. Circuit has upheld district court pretrial dismissals of counts in indictments based on questions of law. *Yakou*, 428 F.3d at 247 (citing *United States v. Espy*, 145 F.3d 1369, 1370 (D.C. Cir. 1998); *United States v. Oakar*, 111 F.3d 146, 147-50 (D.C. Cir. 1997)).

  A. *The Statutes Under Which Defendant is Charged Must Be Interpreted Consistent With the First Amendment*

The First Amendment to the United States Constitution provides that "Congress shall make no law . . . abridging the freedom of speech." "The hallmark of the protection of free

4

speech is to allow 'free trade in ideas'-even ideas that the overwhelming majority of people might find distasteful or discomforting." *Virginia v. Black*, 538 U.S. 358 (2003) (quoting *Abrams v. United States*, 250 U.S. 616 (1919)). Nevertheless, the First Amendment's protections are not absolute, and the Supreme Court has "long recognized that the government may regulate certain categories of expression consistent with the Constitution." *Id.* The First Amendment permits "restrictions upon the content of speech in a few limited areas, which are 'of such slight social value as a step to truth that any benefit that may be derived from them is clearly outweighed by the social interest in order and morality.'" *R.A.V. v. City of St. Paul*, 505 U.S. 377, 382-83 (1992) (quoting *Chaplinksy v. New Hampshire*, 315 U.S. 568, 572 (1942)). The parties agree that the only such exception relevant to the instant case is that the First Amendment permits the imposition of criminal sanctions on the expression of "true threats." *See* Def.'s Mot. to Dismiss at 2; Gov't Resp. to MTD at 9.[4]

The Indictment charges Defendant with violating two criminal laws by sending the communications described above. In particular, Count One charges Defendant with a violation of 18 U.S.C. § 245(b)(2)(C), which provides:

> Whoever . . . by force or threat of force willfully injures, intimidate or interferes with, or attempts to injure, intimidate or interfere with . . . any person because of his race, color, religion or national origin and because he is or has been . . . applying for or enjoying employment, or any perquisite thereof, by any private employer . . . shall be fined under this title, or imprisoned for not more than one

---

[4] Defendant's Motion to Dismiss also argues that Defendant's communications are not obscene, "fighting words," or likely to incite imminent unlawful action. However, the Government does not contend that any of these exceptions to the First Amendment's protections apply in the instant case; rather, the parties agree that the salient issue is whether Defendant's communications constitute true threats that may be criminalized consistent with the First Amendment. *See* Def.'s Mot. to Dismiss at 2; Gov't Resp. to MTD at 9. The Court therefore does not address any of the other exceptions to the First Amendment's protections.

year, or both.

Count Two is brought pursuant to 18 U.S.C. § 875(c), which provides "Whoever transmits in interstate or foreign commerce any communication containing . . . any threat to injure the person of another, shall be fined under this title or imprisoned not more than five years, or both." The Indictment thus charges Defendant with criminal action based on his speech.

The Supreme Court has cautioned that where a statute "makes criminal a form of pure speech, [it] must be interpreted with the commands of the First Amendment clearly in mind. What is a threat must be distinguished from what is constitutionally protected speech." *Watts v. United States*, 394 U.S. 705, 707 (1969). As a result, courts have concluded that Section 875(c), as well as statutes worded similarly to Section 245(b)(2)(C), may only be constitutionally applied to speech insofar as it constitutes a true threat. *See, e.g., United States v. Morales*, 272 F.3d 284 (5th Cir. 2001); *United States v. Nishnianidze*, 342 F.3d 6, 15 (1st Cir. 2003); *United States v. Stewart*, 411 F.3d 825, 828 (7th Cir. 2005) (cases arising under Section 875(c)); *see also Planned Parenthood of the Columbia/Willamette, Inc. v. Am. Coalition of Life Activists*, 290 F.3d 1058, 1071 (9th Cir. 2002) (en banc); *United States v. Hart*, 212 F.3d 1067, 1071 (8th Cir. 2000) (considering the Freedom of Access to Clinics Entrances Act ("FACE"), 18 U.S.C. § 248(c)(1)(A), which contains almost identical wording to Section 245(b)(2)(C)).

    B.    *Defining a "True Threat"*

In *Black*, the Supreme Court defined true threats as "those statements where the speaker means to communicate a serious expression of an intent to commit an act of unlawful violence to a particular individual or group of individuals." *Black,* 538 U.S. at 359 (citations omitted). The Supreme Court further emphasized that the "speaker need not actually intend to carry out the

threat," because "the prohibition on true threats protects individuals from the fear of violence and from the disruption that fear engenders, in addition to protecting people from the possibility that the threatened violence will occur." *Id.* at 360 (quotations omitted).[5]

Courts determining whether communications constitute true threats have generally applied an objective standard. *See Planned Parenthood*, 290 F.3d at 1075 n.7 (collecting cases from all circuits). Thus, courts in all jurisdictions consider whether a reasonable person would consider the statement a serious expression of an intent to inflict harm, although the circuits disagree on whether the proper perspective is that of a "reasonable listener" or a "reasonable speaker." *See e.g., Nishnianidze*, 342 F.3d at 15 (a "true threat is one that a reasonable recipient familiar with the context of the communication would find threatening"); *United States v. Zavrel*, 384 F.3d 130, 136 (3d Cir. 2004) (same); *Porter v. Ascension Parish Sch. Bd.*, 393 F.3d 608, 616 (5th Cir. 2004) (speech is a true threat "if an objectively reasonable person would interpret the speech as a 'serious expression of an intent to cause a present or future harm'"); *Stewart*, 411 F.3d at 828 (speech is a true threat if it "came in a context or under such circumstances wherein a reasonable person would foresee that the statement would be interpreted by those to whom the maker communicates a statement as a serious expression of an intention to inflict bodily harm upon or take the life of another individual"); *United States v. Floyd*, 458 F.3d 844, 849 (8th Cir. 2006) ("reasonable listener" standard).[6]

Moreover, in considering whether a communication is a true threat all circuits "consider

---

[5] As such, it is entirely irrelevant whether or not Defendant had any intent to actually inflict harm upon the AAI employees to whom he directed his communications.

[6] The D.C. Circuit has not addressed the proper standard for determining whether a communication constitutes a true threat.

context, including the effect of an allegedly threatening statement on the listener." *Planned Parenthood*, 290 F.3d at 1074-75 n.7. This focus on context derives from *Watts*, wherein the Supreme Court explicitly considered the context of the defendant's speech in determining that his remarks constituted protected political hyperbole, rather than a true threat. *Watts*, 394 U.S. at 708. Watts, an 18 year-old war protester, was convicted under 18 U.S.C. § 871, a statute that prohibits "knowingly and willfully . . . [making] any threat to take the life of or to inflict bodily harm upon the President." 394 U.S. at 705. Watts participated in a public rally at the Washington Monument, at which he told a discussion group of other young people "I have already received my draft classification as 1-A and I have got to report for my physical this Monday coming. I am not going. If they ever make me carry a rifle the first man I want to get in my sights is L.B.J." *Id.* at 706. During Watts' trial, his counsel stressed that Watts' statement was conditional upon an event that he said would never occur and that both he and the crowd laughed after the statement was made. *Id.* at 707. In ordering judgment entered for Watts, the Supreme Court concluded that "[t]aken in context, and regarding the expressly conditional nature of the statement and the reaction of the listeners, we do not see how it could be interpreted [as a true threat rather than political hyperbole]." *Id.* at 708.

As a result, courts have determined that alleged threats must be analyzed "in light of [their] entire factual context," and have specified factors to be considered, including: the reaction of the recipient of the threat and of other listeners; whether the threat was conditional; whether the threat was communicated directly to its victim; whether the maker of the threat had made similar statements to the victim in the past; and whether the victim had reason to believe the maker of the threat had a propensity to engage in violence. *United States v. Dinwiddie*, 76 F.3d

913, 925 (8th Cir. 1996) (citations omitted); *see also United States v. Kosma*, 951 F.2d at 553-54 (3d Cir. 1991) (alleged threats must be analyzed in context); *United States v. Carrier*, 672 F.2d 300, 305 (2d Cir. 1982) (same).

    C.    *Whether a Communication is a True Threat is Generally a Question of Fact*

The parties disagree on whether the Court can determine pretrial if Defendant's communications constitute true threats. As noted above, Defendant (and *Amicus Curiae*) maintain that the question is one of law. In contrast, the Government asserts that "the determination of whether the conduct and communication at issue amounts to a true threat is a heavily fact-dependent, context driven one that is reserved for the jury as the finder of facts." Gov't Resp. to MTD at 1. In support of this contention, the Government relies on *Alexander v. United States*, in which the D.C. Circuit stated "our task is not to judge whether the appellant made a threat, for that is for the jury." 418 F.2d 1203, 1207 (D.C. Cir. 1969). However, as Defendant and *Amicus* point out, *Alexander* did not squarely address whether the issue of a true threat can be resolved on a motion to dismiss an indictment, but rather found that the district court had erroneously instructed the jury based on pre-*Watts* case law, and that in light of *Watts*' instruction to consider all relevant circumstances, "a jury conceivably could have deemed appellant's statements hyperbole." *Id.* at 1206-07. For his part, Defendant cites *United States v. Popa*, in which the D.C. Circuit stated that "[w]hether the Government has infringed on a defendant's rights under the First Amendment is, of course, a question of law, which we would normally review *de novo*." 187 F.3d 672, 674 (D.C. Cir. 1999). Again, however, that case does not squarely resolve the issue because the quoted statement referred to the appellate standard of review, not the district court's review on a motion to dismiss the indictment.

9

Courts in other jurisdictions have more directly addressed the question, and have concluded that "whether words used are a true threat is generally best left to the triers of fact. Surrounding factual circumstances may not easily be required to be recounted in all indictments. The initial burden is on the government to prove a 'true' threat. Only where the factual proof is insufficient as a matter of law should the indictment be dismissed.'" *Carrier*, 672 F.2d at 306. Thus, the Court should "dismiss the indictment only if the language [is] so facially insufficient that no reasonable jury could find that the language amounted to a true threat." *United States v. Zavalidroga*, 156 F.3d 1241 (9th Cir. 1998); *see also United States v. Whiffen*, 121 F.3d 18, 22 (1st Cir. 1997) ("The proper interpretation of [defendant's] remarks, however, is a question of fact and, therefore, appropriately left for the jury. We cannot conclude that the interpretation preferred by [defendant] is, as a matter of law, the correct one.").

> D.  *A Reasonable Jury Could Conclude that Defendant's Communications, Taken in Context, Amounted to a True Threat*

Defendant argues that the communications he sent to the AAI and its employees are not true threats, but are rather "deeply-held political views and [] opposition to the publicly expressed views of [AAI's President, Dr. James Zogby] and the AAI." Def.'s Mot. to Dismiss at 26. Defendant stresses that the communications "all concern events then unfolding between Israel and Hezbollah or, in the final instance, a shooting by a Muslim-American man at the Jewish Federation building in Seattle." *Id.* at 24. According to Defendant, his comments are "at worst, insulting political hyperbole," and therefore not true threats. *Id.* at 28.

In support of this assertion, Defendant relies heavily on *N.A.A.C.P. v. Claiborne Hardware Co.*, 458 U.S. 886 (1982), in which the Supreme Court found that civil liability for

10

business losses sustained by white business owners during an N.A.A.C.P. boycott could not be imposed upon a field organizer (Charles Evers), in part because his speech was protected under the First Amendment. *See* Def.'s Mot. to Dismiss at 13-16, 27. Defendant correctly stresses that in *Claiborne*, Evers gave speeches in which he told his audience that they would be watched, that blacks who traded with white merchants would be answerable to him, and that "uncle toms" who broke the boycott would "have their necks broken" by their own people. *Id.* at 900 n.28. Moreover, as part of the boycott in question, "store watchers" stood outside of boycotted stores, identified those who traded with the merchants, and published a list of those who violated the boycott, and a number of incidents of violence occurred in the context of the boycott. *Id.* at 903-04. Nevertheless, the Supreme Court determined that the "emotionally charged rhetoric of Charles Evers' speeches did not transcend the bounds of protected speech" because although they used strong language, they were not followed by violence, and there was no evidence (other than the speeches) that Evers ever authorized, ratified, or directly threatened violence. *Id.* at 928-29.

However, as the *en banc* Ninth Circuit noted in *Planned Parenthood*, *Claiborne* did not arise under a threats statute, such that the Supreme Court "had no need to consider whether Evers's statements were true threats of force within the meaning of a threats statute; it held only that his speeches did not incite illegal activity. . . ." *Planned Parenthood*, 290 F.3d at 1073-74. Furthermore, even if *Claiborne* were directly on point, the context in which Evers made his comments easily distinguishes *Claiborne* from the instant case. Evers made his speeches publicly and, as the Supreme Court noted they were "lengthy addresses [that] generally contained an impassioned plea for black citizens to unify, to support and respect each other, and to realize the political and economic power available to them," which also contained "strong language."

*Claiborne*, 458 U.S. at 928. In contrast, Defendant's communications were made privately, via e-mails and voice mails directed to the AAI that specifically identified Dr. Zogby, as well as via more pointed communications addressed to individual employees at the AAI, one of which identified the recipient by her first name.

> This distinction is one that courts have considered significant, noting that:
>
> In targeting the recipient personally, the speaker leaves no doubt that he is sending the recipient a message of some sort. In contrast, political statements made at rallies or through the media are far more diffuse in their focus because they are generally intended, at least in part, to shore up political support for the speaker's position.

*United States v. Polson*, 154 F. Supp. 2d 1230, 1234 (S.D. Ohio 2001) (quoting *Planned Parenthood of the Columbia/Willamette, Inc. v. Am. Coalition of Life Activists*, 244 F.3d 1007, 1018-19 (9th Cir. 2001), *rev'd in part*, *Planned Parenthood*, 290 F.3d 1058); *see also United States v. Bellrichard*, 994 F.2d 1318, 1321 (8th Cir. 1993) ("As a general proposition, correspondence of this sort delivered to a person at home or at work is more likely to be taken by the recipient as a threat than is an oral statement made at a public gathering."). Furthermore, although Defendant argues that his communications were strictly political in nature, the same courts have concluded that "a threatening communication melded with some form of political expression . . . does not constitute protected speech simply because there is a political idea attached." *Polson*, 154 F. Supp. 2d at 1235; *Bellrichard*, 994 F.2d at 1322 ("a person may not escape prosecution for uttering threatening language merely by combining the threatening language with issues of public concern."). As such, the Court rejects Defendant's argument that his communications are inherently protected speech because they were prompted by comments made by Dr. Zogby that Defendant perceived as "anti-American, anti-Semitic, and pro-

Hezbollah." Def.'s Mot. to Dismiss at 28.

Defendant further argues that his communications are not true threats because, properly understood, his statement that "the only good Arab [or Lebanese] is a dead Arab [or Lebanese]" is a common phrase that is "dehumanizing but not a threat." *Id.* at 3. Defendant bases this argument on statements purportedly made to the FBI by one of the AAI employees who received Defendant's communications. *Id.* Defendant likewise argues that his statement "Death to Lebanon[/Arabs]" is not a true threat because it is "simply a modified 'echo' of Hezbollah's mantra, 'Death to America,'" citing a speech by President Bush as support. *Id.* at 5. Defendant thus invites the Court to determine the true meaning of his statements by moving beyond the face of the Indictment, and delving into the sufficiency of the evidence. The Court declines to do so on this Motion to Dismiss the Indictment. The Court notes that the D.C. Circuit has suggested that a district court may dismiss an indictment pretrial "on sufficiency-of-the-evidence grounds where the material facts are undisputed and only an issue of law is presented." *Yakou*, 428 F.3d at 247. Here, it is obvious that material facts regarding the context of Defendant's communications are highly disputed. As such, the Court has focused its consideration on the allegations contained in the Indictment.

Nevertheless, Defendant is correct that the context of his communications may prove critical to properly understanding them. Indeed, the Government's opposition to Defendant's Motion to Dismiss turns on just that assertion. The Government argues that, in addition to recounting the words of Defendant's communications, the allegations of the Indictment also demonstrate a number of factors that provide context necessary to understand the import of Defendant's words. In particular, the Government notes that Defendant's communications were

13

repetitive and frequent within a period of days, and did not include conditional language. Gov't Resp. at 8. Again, many of the communications were directed specifically to the recipients, including one voice mail that addressed the recipient by her first name. *Id.* Some of the communications alerted the recipients that Defendant was in Arlington, Virginia, i.e., in close physical proximity to the AAI offices in Washington, D.C. *Id.* at 9. Finally, Defendant's last e-mail made particular reference to a violent shooting, for which Defendant stated he held AAI responsible. *See* Gov't Resp. to MTD at 8-9. In addition, that e-mail included the statement "The United States would be safer without you." Indict. ¶ 10.

Defendant acknowledges these statements and the context provided in the Indictment, but nevertheless maintains that his statements cannot constitute a true threat because "[n]o one is targeted. There is no statement that Mr. Syring is going to do anything to anybody. There is no suggestion of anything imminent happening," Def.'s Mot. to Dismiss at 24-25. Significantly, however, in *United States v. Khorrami*, 895 F.2d 1186 (7th Cir. 1990) and *United States v. Gilbert*, 884 F.2d 454 (9th Cir. 1989), *overruled on other grounds*, the courts upheld convictions under analogous threat statutes, notwithstanding the fact that, in each case, the defendants' mailings did not directly spell out the harm aimed at the recipient.

In *Khorrami*, the defendant sent communications to the headquarters of the Jewish National Fund ("JNF"), including (1) a "Wanted" poster with pictures of Israeli officials and JNF officers that stated "Must be Killed" and "Long live Palestine;" and (2) an altered copy of the JNF Mission's Calendar that included swastikas and typewritten statements with anti-Semitic content including "Death" to the "occupiers of beloved Palestine," and "to the fucking JNF" and "Long live" "the beloved Iranians," "the beloved PLO," and "his holiness Khomeinee, the only

14

leader of the free world." *See* 894 F.2d at 1189. In upholding Khorrami's conviction, the Seventh Circuit rejected an argument that the poster was merely "political hyperbole," finding a reasonable jury could conclude that the poster constituted a true threat when viewed in context. *Id.* at 1193. Similarly, in *Gilbert*, the defendant mailed a letter and several posters to the founder of an adoption agency that placed minority children with white families. The letter "'condemned' the [recipient's] actions and warned her to 'keep her human trash off of his property.'" 884 F.2d at 455. The posters contained various messages threatening violence against minorities and those who associate with minorities. *Id.* at 455-56. The Ninth Circuit likewise upheld Gilbert's conviction, finding that the mailings could be viewed as a threat in context. *Id.* at 457. Specifically, the court stated that the recipient:

> received a letter from a man who was obviously an extremist and espoused the ideas of a traditionally violent group. The letter condemned [the recipient's] actions. The letter was accompanied by posters calling for a revolution-a term fraught with violence-and advocating lynch mobs, the shooting of black miscegenists, and the hanging of whites. While the mailings may not have said 'we're going to hurt you, Susan Smith,' they certainly said 'we don't like what you're doing, and we hurt people who do things we don't like.' The fact that a threat is subtle does not make it less of a threat.

*Id.* at 457.

Both *Khorrami* and *Gilbert* demonstrate the significance of context in determining whether speech constitutes a true threat. Defendant posits one interpretation of his communications, while the Government posits the diametric opposite. While both acknowledge that context is key to determining the true import of Defendant's words, much of the context to which they point does not appear on the face of the Indictment.[7] The Court agrees with

---

[7] The Indictment does not include allegations regarding a number of issues that the Government stresses in its papers. In particular, the Indictment does not allege that Defendant

15

Defendant that on its face the Indictment does not present a compelling case. Nevertheless, even based on the meager context alleged in the Indictment, it possible that a reasonable jury could interpret Defendant's communications as "a serious expression of an intent to commit an act of unlawful violence to a particular individual or group of individuals." *Black*, 538 U.S. at 359. The Court therefore concludes that whether Defendant's communications constituted a true threat is an issue properly left to the jury as the trier of facts. As such, the Court shall deny Defendant's Motion to Dismiss the Indictment.

### III: CONCLUSION

For the foregoing reasons, the Court shall DENY Defendant's [11] Motion to Dismiss the Indictment. An appropriate Order accompanies this Memorandum Opinion.

Date:   November 19, 2007

/s/
COLLEEN KOLLAR-KOTELLY
United States District Judge

---

admitted that he intended to intimidate, or that he chose his words because he knew that Dr. Zogby was Lebanese. *See* Gov't Resp. to Mot. to Dismiss at 1-2. The Indictment also does not allege that the recipients are of Arab or Lebanese origin, that they felt threatened by the communications, or how they reacted to the communications. *Id.* at 2-3. Most significantly, the Indictment does not–as the Government suggests–allege that Defendant's communications "referr[ed] repeatedly to [the recipients'] deaths." *See* Gov't Resp. to *Amicus* at 16.