THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | CRIMINAL NO. : 07-204 (CKK) |
| | : | |
| v. | : | |
| | : | |
| PATRICK SYRING, | : | |
| Defendant. | : | |
| | : | |
| | : | |

**GOVERNMENT'S MEMORANDUM IN AID OF SENTENCING**

The United States of America, by and through its counsel, the United States Attorney for the District of Columbia, hereby submits in the above-referenced matter this memorandum in aid of sentencing of defendant Patrick Syring. As will be discussed below, the government requests a sentence withing the Sentencing Guidelines range of 12 to 18 months, followed by a five- year period of supervised release which would include mental health counseling. This range reflects a total offense level of 13.[1]

I.   Introduction

The Defendant, a career State Department employee who was well trained in interacting with public figures, purposefully singled out one such figure for intimidation through fear. The Defendant sought to scare Dr. James Zogby and his employees because of their First Amendment protected advocacy on behalf of Arab-Americans. Despite initially pleading guilty to committing a hate crime and submitting himself to this Court's jurisdiction, the Defendant insisted on repeating the behavior, further terrorizing the victims, and openly flouting the Court's authority. Consequently, as the Court

---

[1] The Government recommends the application of the Guidelines in a slightly different manner than that contained in the Presentence Investigation Report. As more fully described below, on these facts, the Government does not seek a two-level enhancement based on the offense involving multiple threats.

considers sentencing on the Defendant's latest plea, the Government recommends that the Defendant serve a period of incarceration within the United States Sentencing Guidelines, a period between 12-18 months, and thereafter be subject to intense supervision to include monitoring regular mental health counseling.

II.     Statement of the Case

On June 12, 2008, defendant Patrick Syring pled guilty to violating 18 U.S.C. § 245(b)(2)(C) (interference with federally protected rights on the basis of race and national origin) (Count One), a misdemeanor; and 18 U.S.C. § 875(C) (sending threatening communications in interstate commerce), a felony. The maximum penalty, by statute, for 18 U.S.C. § 245 is up to one year of imprisonment, a fine of $200,000, a $ 100 assessment, a five-year term of supervised release, and the obligations to pay restitution and to pay any applicable interest or penalties on fines or restitution not timely made. The maximum penalty for 18 U.S.C. § 875 is up to five years' imprisonment, a fine of not more than $250,000, a $100 assessment, a five-year term of supervised release, and the obligations to pay restitution and to pay any applicable interest or penalties on fines or restitution not timely made. Sentencing is scheduled for July 11, 2008.

III.    Government's Position Regarding Sentencing Factors

The Defendant acknowledged the following conduct as part of the plea: From on and about July 17, 2006, until on and about July 29, 2006, the Defendant transmitted four e-mail and three voice mail telephone communications to the offices of the Arab American Institute (AAI), located with in the District of Columbia. AAI is a nonprofit organization that represents the policy and community interests of Arab Americans throughout the United States and strives to promote Arab American participation in the U.S. electoral system. The Defendant addressed those

communications Dr. James Zogby, the Director of AAI, and to five other employees of AAI. The communications were as follows:

At or about 11:17 p.m. on or about July 17, 2006, the following voice mail was recorded on the Arab American Institute's main telephone line at its Washington D.C. offices:

> This is Patrick Syring. I just read James Zogby's statements online on the MSNBC website, and I condemn him for his anti-Semitism and anti-American statements. The only good Lebanese is a dead Lebanese. The only good Arab is a dead Arab. Long live the IDF. Death to Lebanon and death to the Arabs.

At or about 11:21 p.m. on or about July 17, 2006, the following email was sent to the email addresses of Dr. Zogby and Natasha Tynes at AAI's Washington D.C. offices:

> From: Pat_ 1425 [mailto:pat_1425@hotmail.com]
> Sent: Monday, July 17, 2006 11:21 PM
> To: James Zogby; Natasha Tynes
> Subject: James Zogby's statement on MSNBC website (July 17)
>
> Zogby's anti-Semitic, anti-American statements (and those of the AAI in general) are abhorrent, repulsive and disgusting.
> The only good Lebanese is a dead Lebanese (as the IDF [the Israeli Defense Force] knows and is carrying out in its security operations, God bless them.)
>
> Fuck the Arabs and Fuck James Zogby and his wicked Hizbollah brothers. They will burn in hellfire on this earth and in the hereafter.

On or between July 18 or July 19, 2006, the following voice mail was left on the telephone extension of Valerie Smith at the AAI's Washington D.C. offices:

> Hello Valerie, you fucking Arab American shit. James Zogby and you are all Hezballah supporters. The only good Arab is a dead Arab...You God [inaudible] bitch.

At or about 12:32 a.m. on or about July 19, 2006, the following email was sent to the email address of Ms. Smith at AAI's Washington D.C. offices:

> From: Pat_ 1425 [mailto:pat_1425@hotmail.com]
> Sent: Wednesday, July 19, 2006 12:32 AM
> To: Valerie Smith
> Subject: URGENT: Emergency Summit Registration for July 19
>
> You are a fucking anti-Semitic Arab-American stooge who sympathizes with Hezballah terror.
> You and your Arab American Institute fuckers should burn in the fires of hell for eternity.
> The IDF is bombing Lebanon back into the stone age where it belongs.
> Arabs are dogs.
>
> Long live the State of Israel. Death to Arab American terrorists. The only good Lebanese is a dead Lebanese.

At or about 12:35 a.m. on or about July 19, 2006, the following email was sent to the email address of Rebecca Abou-Chedid at AAI's Washington D.C. offices:

> From: Patrick [mailto:pat1425@yahoo.com]
> Sent: Wednesday, July 19, 2006 12:35 AM
> To: Rebecca Abou-Chedid
> Subject: Information for Arab Americans
>
> You are a fucking Arab American terrorist, a Hezbollah sympathizer pig.
>
> James Zogby is a vile evil anti-Semitic pig terrorist member of Hezbollah who is attempting to destroy the State of Israel.
>
> God Bless America
> God Bless the State of Israel
>
> The only good Lebanese is a dead Lebanese [a smiley face graphic].

At or about 11:32 p.m. on or about July 19, 2006, the following voice mail was recorded on Arab American Institute's main telephone line at its Washington D.C. offices:

> Hello, I'm Patrick I'm in Arlington VA, and I think James Zogby is worse than Osama bin Laden. Since he supports Hezballah, he's an anti-Semitic motherfucker, and the only good Arab is a dead Arab.

At or about 12:13 a.m. on or about July 29, 2006, the following email was sent to the email

addresses of Dr. Zogby, Helen Samhan, Nidal Ibrahim, Ms. Smith, and Ms. Abou-Chedid at AAI's Washington D.C. offices:

> From: Pat1425@yahoo.com [pat1425@yahoo.com]
> Sent: Saturday, July 29, 2006, 12:13AM
> To: James Zogby, Helen Samhan, Nidal Ibrahim, Valerie Smith, Rebecca Abou-Chedid
> Subject: AAI murders in Seattle on July 28
>
> I condemn James Zogby and the AAI for perpetrating the murder and shootings at the Jewish Federation in Seattle on Friday July 28 (as well as the killings in Israel).
>
> You wicked evil Hezbollah-supporting Arabs should burn in the fires of hell for eternity and beyond. The United States would be safer without you.
>
> God Bless the State of Israel
> God Bless America
>
> Sincerely,
>
> Patrick in Arlington, VA.

As part of the plea, the Defendant admitted that he willfully expressed a threat of force through his course of conduct and the specific language he included in those communications. He also admitted that he willfully sent those communications with the intent to either intimidate or interfere with Dr. Zogby and other AAI employees. The Defendant stated that he committed these acts because he objected to the way in which Dr. Zogby and his staff used their employment to advocate public positions in the media on behalf of AAI, thereby enjoying employment by AAI, a private employer; and because Dr. Zogby and his staff were people of Arab and Lebanese descent.

In evaluating the Defendant's conduct, it is important for the Court to consider that the Defendant's language placed the victims in a very real fear of bodily harm. The language that concerned all witnesses in the 2006 communications the most was, "the only good Lebanese [Arab]

is a dead Lebanese [Arab]" and "death to the Arabs." Dr. Zogby, Ms. Abou-Chedid, and Mr. Ibrahim, who are all Arab Americans, described feeling personally threatened after receiving these communications. Ms. Tynes and Ms. Samhan, also Arab Americans, described the messages as threatening. Two other employees, Ms. Smith and Ms. Brown, said the messages caused them fear and concern for the well-being of their colleagues and the Arab American community, and described the language as threatening and intimidating, but they did not express the feeling that they had been personally threatened.

Dr. Zogby characterized "Patrick's" communications as a "threat" and "clearly an effort to intimidate" him. Ms. Abou-Chedid described feeling "shocked," "scared," and "vulnerable." Mr. Ibrahim advised that he felt "shaken" and "fearful." Upon hearing "Patrick's" voice mail #1, Mr. Ibrahim immediately considered it a "death threat" and asked an office administrator how the office handles death threats.

The possibility of future violence portended by "Patrick's" messages was, for these witnesses, very real. Dr. Zogby, Mr. Ibrahim, Ms. Smith, and Ms. Tynes all envisioned "Patrick" entering the office with a gun and shooting people. Ms. Tynes and Ms. Smith drew comparisons between the possibility of violence toward AAI and the Columbine school shooting. These witnesses observed

that some people actually carry out threats like these. Immediately upon hearing the first voice mail, Mr. Ibrahim surveyed the surroundings of his office space, looking for places to take cover and escape routes should "Patrick" actually come to shoot up the AAI office.

Dr. Zogby, Mr. Ibrahim, and Ms. Smith's concerns were heightened by the fourth email Defendant sent, which referred to the July 28, 2006 shooting at the offices of the Jewish Federation of Greater Seattle, where one victim was killed and five others were wounded. Dr. Zogby said this message "made clear in [his] mind the danger of someone actually coming in the office and doing to us what was done there, assuming that would be some sort of retribution." Mr. Ibrahim, another of the recipients of the fourth email, observed that, because AAI obviously had nothing to do with the Seattle incident, "Patrick's" reference to the Seattle shooting could only be interpreted to be a threat that AAI's offices could be similarly targeted.

Mr. Ibrahim, who had a newborn son, gave serious thought to quitting his job because of the death threats from "Patrick" and deliberated whether he should assume the risk of continuing to work at AAI. He did not tell his wife about the threats because he did not want to alarm her. Unlike Mr. Ibrahim, most witnesses discussed the communications with family members. When Ms. Abou-Chedid told her mother about the messages, her mother insisted that Abou-Chedid take cabs at night, which Ms. Abou-Chedid has done since the threats from "Patrick."

Nearly all of the witnesses mentioned thinking of, and asking questions about, the security in the building. Specifically, as a consequence of the threats, Mr. Ibrahim developed the habit of checking whether anyone was standing inside or outside the street floor lobby of their office building before leaving at night. Mr. Ibrahim also kept a picture of the Defendant taped to the wall above his

computer at work so that he will be sure to recognize Syring if he saw him. At the same time, Ms. Abou-Chedid remained worried about running into Syring when she attended meetings at the State Department.

In addition, the Court should also take into account the Defendant's e-mail he sent to LinkTV March 13, 2008, and subsequent to the his guilty plea on January 3, 2008 to Count One of the Indictment. In a hearing on March 20, 2008 the Court found by clear and convincing evidence that the Defendant had violated an order that he was to have no contact of any kind with any employee of AAI. This stay-away condition had been in place from the time of Defendant's arraignment and release on his personal recognizance, and was reiterated by the Court during the Defendant's original plea on January 3, 2008.

Specifically, LinkTV received an email on March 13, 2008 from the same email address Defendant had admitted using to email AAI in July 2006. The email was sent via the Program Feedback feature of LinkTV's website following a broadcast of "Viewpoint" that Dr. Zogby had hosted earlier that day. "Viewpoint" is a weekly television show on current events and issues that pertain to the Arab American community that airs on Link TV. Link TV is broadcast on the Direct TV network, airs on Thursday evenings between 5:00 - 6:00 pm East Coast time, and has international dissemination. On Thursday, March 13, 2008, Dr. Zogby conducted his show which included interviews with his guests Nathan Brown of the Carnegie Endowment for International Peace and presidential candidate Ralph Nader.

The email stated:

> I condemn Link TV and James Zogby for advocacy of Arab terrorism.
> Link TV and James Zogby promote the interests of Hezbollah, Hamas and Arab terror.

> Link TV and James Zogby are Arab terroists. [sic]
> The only good Arab is a dead Arab.
> The only good Lebanese is a dead Lebanese.
> May God destroy Lebanon and Palestine, and May God preserve the State of Israel and its Defense Forces (IDF).

Despite acknowledging his obligations in open court, the Defendant intentionally sent a message he knew would be delivered to the victim of his crime. This email contained the language "The only good Arab is a dead Arab. The only good Lebanese is a dead Lebanese," identical to that which formed the basis of the Indictment to which the defendant had pled guilty on January 3, 2008, just slightly more than two months prior. The e-mail was sent within hours after Dr. Zogby's broadcast, Dr. Zogby has a regular, ongoing relationship with LinkTV, the e-mail identifies Dr. Zogby by name, refers to Dr. Zogby as an "Arab Terrorist" and the threatens that the only good Arab is a dead Arab.

In addition, the Defendant had admitted at his January 3, 2008 plea hearing that he knew Dr. Zogby was Lebanese and that his references to dead Lebanese in his earlier threats were made because of Dr. Zogby's heritage. At that plea, the defendant admitted that he sent e-mails his earlier e-mails with that language to Dr. Zogby with the intent to scare him and because of his work advocating on behalf of Arab Americans.

The Defendant amply demonstrated his powerful desire to scare Dr. Zogby. He had previously sent non-threatening e-mails to LinkTV which expressed his opinions about the worth of Dr. Zogby's opinions. The defendant's choice to escalate his communication to threats in his own name, despite being under the supervision of the Court, suggested a conscious disregard for the possibility of incarceration and willingness to forego his own freedom in service to his goal.

Dr. Zogby's reaction to the March 13 e-mail was, in some ways, more powerful than his reaction to the earlier communications. Dr. Zogby felt relief after the Defendant pled guilty on January 3, 2008. At the time, he felt that risk to his family and himself had been minimized by the Court's involvement. However, after the March 13, e-mail, Dr. Zogby became even more alarmed. He could not fathom why someone awaiting sentencing for a hate crime would repeat the same behavior that had him indicted. He believed that the likelihood of Syring causing him physical harm had increased.

### A.   United States Sentencing Guidelines

The presentence writer believes that defendant's total offense level is 14. This represents a base offense level of 12, PSR, at page 9, ¶25, plus 2 for a specific offense characteristic of offense involving two or more threats, PSR, at page 9, ¶26, plus 3 for selecting a victim because of the actual or perceived race, color, religion, national origin, and or ethnicity of that individual, PSR, at page 9, ¶27, minus 3 for acceptance of responsibility, PSR, at page 9, ¶26.[2]

The presentence writer recommends the application of a two-level enhancement because the offense involved more than two threats pursuant to Guideline 2A6.1(b)(2), PSR, page 9, ¶26. While the PSR's application of 2A6.1(b)(2) is plausible, the nature and circumstances of the threats here built on themselves as they were repeated. The communications as whole amounted to a true threat, in part, due to their repeated, frequent nature as well as the language used. Consequently, the Government recommends treating the 2006 communications as a single threat for guidelines purposes, thereby eliminating the application of 2A6.1(b)(2) and implicating only a two-level

---

[2] The 2 level enhancement, if applied would necessarily raise the guideline level above 16, which would warrant a greater reduction for acceptance of responsibility .

reduction for acceptance of responsibility rather than a three-level reduction. Therefore, defendant's total offense level would be 13 rather than 14.

IV.   Government's Recommendation

The government's position is that a Guidelines sentence of 12-18 months' incarceration is an appropriate sentence. Such a sentence would also meet the aims of 18 U.S.C. Section 3553(a), in that it is sufficient to address the nature and circumstances of the offense and the history and characteristics of the Defendant, as well as the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense.

The government further recommends that this period of incarceration should be followed by a five-year period of supervised release that would include mental health counseling and separate anger management therapy to be monitored by the probation office as appropriate. Based, in part, on the Court ordered evaluation of the defendant and the defendant's disturbing wiliness to risk additional incarceration by his behavior while under the Court's supervision, substantial mental health treatment is appropriate. Probation officers should be permitted to obtain regular reports of the Defendant's counseling once he is released to ensure compliance and assess his substantive progress to determine the degree of risk that the Defendant may pose to the victims and others.

The Defendant is ripe for Probation's Intensive Supervision program. While the program appears geared toward sexual offenders and violent offenders with three or more violent offenses, the unpredictably of Mr. Syring's behavior suggests that he is a great risk to the victim. Once released, he should be subjected to an enhanced level of scrutiny by Probation.[3]

Respectfully submitted,
JEFFREY A. TAYLOR
UNITED STATES ATTORNEY
Bar No. 498610

_____
Grace Chung Becker
Acting Assistant Attorney General
Civil Rights Division

_____
Julieanne Himelstein #417136
Assistant United States Attorney
555 Fourth Street, NW
Washington, DC 20530

_____
Mark Blumberg
Special Litigation Counsel
Karen Ruckert
Trial Attorney
United States Department of Justice
Civil Rights Division
601 D Street, NW Fifth Floor
Washington, D.C. 20004

---

[3] According to the PSR, the defendant has sufficient assets to pay the cost of his counseling and any additional costs posed by Probation Intensive Supervision program, PSR, at page 16, ¶68. Therefore, the Government recommends that the sentence include an order that Mr. Syring be made responsible for those costs as they are incurred.