## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

—————————————————————————————

|                                    |     |                             |
|------------------------------------|-----|-----------------------------|
| **UNITED STATES OF AMERICA**       | )   |                             |
|                                    | )   |                             |
| **v.**                             | )   | **Criminal No. 07-204 (CKK)** |
|                                    | )   |                             |
| **PATICK SYRING,**                 | )   |                             |
|                                    | )   |                             |
| **Defendant.**                     | )   |                             |

—————————————————————————————

## DEFENDANT'S MEMORANDUM IN AID OF SENTENCING

Defendant Patrick Syring, through undersigned counsel, respectfully submits this Memorandum in Aid of Sentencing. After considering the totality of the record in this case, the relevant factors as set forth in 18 U.S.C. § 3553, Mr. Syring's extraordinary twenty-five year career as a public servant with the U.S. Department of State and other good deeds, his acceptance of responsibility, and the fact that – by the time of sentencing – Mr. Syring will have spent nearly four months in the District of Columbia Jail, *we respectfully ask that this Court sentence Mr. Syring to time-served.* The reasons supporting our request are set forth below.

## I. PROCEDURAL BACKGROUND

### A. Offense Conduct

Patrick Syring comes before the Court for sentencing after having pleaded guilty, pre-trial, to the two counts of the Indictment. One of those counts charges Mr. Syring with a misdemeanor charge of interference with federally protected rights, in violation of 18 U.S.C. § 245(b)(2)(C). The other charges Mr. Syring with the felony offense of having made threatening interstate communications, in violation of 18 U.S.C. § 875(c). This Court is well aware of the conduct on which these charges are based.

**B.    Mr. Syring's Plea Agreement**

Mr. Syring entered his plea before this Court on June 12, 2008 pursuant to a plea agreement with the United States.  As the Court knows, this case has somewhat of a tortuous history.  After Mr. Syring was initially charged in this case, he sought to dismiss the indictment on the grounds that it violated his First Amendment right to free speech.  This Court denied that motion, but in doing so, the Court observed that "on its face the Indictment does not present a compelling case."  (Court's November 19, 2007 *Memorandum Opinion*, p. 16)

After the denial of his motion to dismiss, Mr. Syring entered into a plea agreement with the United States under which he was to plead guilty to a misdemeanor charge and, pursuant to Fed. R. Crim. P. 11(c)(1)(C), *the parties agreed to a probationary sentence*.  Thus, based on the conduct at issue, the United States did not believe that it was necessary or appropriate that Mr. Syring serve a jail sentence.  Most importantly, the initial plea offer and agreement clearly reflected the Government's belief that Mr. Syring did not pose a real danger to Mr. Zogby or other employees of the Arab-American Institute.  This is also reflected in the fact that while Mr. Syring's words were intimidating to those who received them, they did not convey any intent to specifically cause harm to any person.

Unfortunately, shortly before Mr. Syring was to be sentenced on his initial plea agreement with the Government, the Court found that Mr. Syring violated the "no contact" provisions of his release by sending an email, which contained similar wording to his earlier threatening emails, to a television station that broadcast interviews of Mr. Zogby.  The television station forwarded the email on to Mr. Zogby, who then reported it to the prosecutor assigned to this case.  As a result, on March 20, 2008, this Court found that Mr. Syring had violated his

conditions of release and ordered him held in jail without bond.   Mr. Syring has been held at the D.C. Jail since that time.

Subsequently, Mr. Syring entered into a new plea agreement with the Government under which Mr. Syring agreed to plead guilty to both counts of the Indictment, as opposed to simply the misdemeanor count.   Under the new plea agreement, the parties agree to the appropriate offense level calculation for Mr. Syring's conduct, but are permitted to argue for an appropriate sentence outside the guideline calculation based on the factors set forth in 18 U.S.C. § 3553.

## II.   <u>PERSONAL BACKGROUND OF MR. SYRING</u>

Prior to the communications giving rise to the charges here, Mr. Syring had never been in any trouble with the law.   Rather, he has lived a quiet, frugal life in which he has dedicated his skills to his twenty-five year career at the State Department.   Over his years of public service, which ended with his retirement last summer, Mr. Syring received six meritorious and superior honor awards from the State Department for special and outstanding service, the most recent of which was awarded in June, 2006.   To further the interests of the United States, Mr. Syring learned six languages as part of his State Department employment.   He also took numerous in-service training classes over the years, again, to make him an even better public servant.

His reliability and trustworthiness were acknowledged by the fact that he earned the Top Secret Security Clearance, which he held for over twenty years while employed by the State Department.   Indeed, even after the State Department learned of the charges here, it did not revoke Mr. Syring's security clearance.

During many of the years of Mr. Syring's public service, he was stationed overseas.   For two of those tours of duty, each of which lasted for two years, Mr. Syring was stationed in Beirut, Lebanon.   Partially as a result of that experience, Mr. Syring developed very strong

political views about the right of Israel to defend itself against aggressors; and about the roles of Hamas and Hezbollah, both of which our own Government has deemed to be terrorist organizations.[1]  Those strong views obviously informed Mr. Syring's conduct here, in tandem with public, televised statements by Dr. Zogby of the American Arab Institute ("AAI") which Mr. Syring viewed as being sympathetic to Hezbollah and Hamas.

In addition to his stellar career at the State Department, Mr. Syring engaged in other good works over the years.  For example:

a)    On May 20, 2000, he volunteered to go to Eritrea during the war between that country and Ethiopia in order to help evacuate both U.S. citizens and others.  He was stationed in Asmara, Eritrea during this time.  In December of that year, he received a Superior Honor Award for his efforts there;

b)    While stationed in Germany, he volunteered for the Frankfurt Switchboard, part of the local chapter of the German AIDS Foundation (Deutsche AIDS Hilfe e.V.; http://www.aidshilfe.de).  Two or three times each month, beginning in 2000 and continuing through part of 2002, he worked for the Switchboard for several hours; and

c)    He donated approximately $1,000.00 in 2006, and again in 2007, to scholarship funds at his *alma mater,* Georgetown University, where he earned his Masters degree in foreign relations in 1981.

Mr. Syring's good works have continued during his incarceration.  As reflected in the letter of Mr. Victor Akuchie, Mr. Syring's case manager at the D.C. Jail, Mr. Syring has been a

---

[1]    Former Deputy Secretary of State Richard Armitage referred to Hezbollah as the "A-team of terrorists" and former Senator Bob Graham called Hezbollah "a violent terrorist group. And they have demonstrated throughout their now 25-year history a hatred of the United States and a willingness to kill our people."  CBS News report of April 18, 2003 (attached hereto as Ex. 7).  On September 5, 2006, President Bush stated, "Hezbollah, the source of the current instability in Lebanon, has killed more Americans than any terrorist organization except al Qaeda."  White House Press Release, Sept. 5, 2006 (attached hereto as Ex. 8).

model prisoner and has used his multi-lingual skills to help teach English to Spanish-speaking inmates. *See* Akuckie letter of June 25, 2008 (attached hereto as Ex. 1).

Thus, both in his private life and through his employment, Mr. Syring has dedicated himself to helping others, and to helping promote the interests of the United States. He has never been in any trouble. What he did here, while unjustified, was motivated by his strong political concerns about Israel and its neighbors. His communications all occurred during times when Israel was under attack by Hezbollah and Hamas and, as such, were clearly aberrational. Mr. Syring, who will soon turn fifty-one, never engaged in any similar conduct over the years, nor was he ever accused, except in this case, of any criminal wrongdoing.

The aberrational nature of Mr. Syring's conduct is highlighted by the extreme surprise of his siblings upon learning about this matter. Presentence Report at ¶ 41. As related in the Presentence, Mr. Syring's brother, Mr. Paul Syring, "explained that this behavior was not typical, instead it was an 'isolated' incident which was 'uncharacteristic.' *Id.* Similarly, all of the defendant's siblings were 'surprised' to hear about the incident." *Id.*

The letters attached hereto as Exhibits 2 through 6, which come from family members that know Mr. Syring well, speak for themselves. They clearly show a person who has lived an exemplary and productive life for 50 years before engaging sending an uncharacteristic and aberrational series of emails, that while clearly wrong, were not motivated out of malice or evil, but rather by Mr. Syring's strong political feelings.

III.    **ADVISORY GUIDELINES SENTENCING RANGE**

Pursuant to the plea agreement, the parties have stipulated to an offense level of 13, which translates to a sentence range of twelve-to-eighteen months of incarceration. The parties agree that under U.S.S.G. § 2A6.1, his base level is twelve, and that three points should be added to the base level under the hate crime provisions of § 3A1.1(a). The Government agrees to a two point reduction for acceptance of responsibility, pursuant to § 3E1.1(a), resulting in an adjusted level of thirteen. Since Mr. Syring's criminal history category is I, the Guidelines range is twelve-to-eighteen months.

This Court is not bound by the Guideline calculation in sentencing Mr. Syring, and we state at the outset, based on the factors set forth in 18 U.S.C. §3553, we believe that the Court should depart downward and sentence Mr. Syring to time-served.    Nonetheless, there are two considerations under the Guidelines that we wish to discuss in more detail.

A.    **Mr. Syring's Acceptance of Responsibility**

Mr. Syring has fully accepted responsibility for his actions here, as evidenced by his guilty plea. Moreover, as noted in the Presentence Report, Mr. Syring stated that to Ms. Moses-Gregory of the Probation Office:

> Given my career with the United States Department of State, including two tours during which I was stationed in Lebanon, I have strong feelings about events in the Middle East, and about the right of Israel to defend itself against aggressors. Nonetheless, I acknowledge that I expressed some of those views in a way I knew was inappropriate. I regret the fears the statements caused the recipients, and the extensive court resources that my actions caused to be consumed.

Presentence Report at ¶ 22.

The government acknowledges that, depending on Mr. Syring's "allocution and subsequent conduct prior to imposition of sentence," a two-level reduction for acceptance of responsibility would be appropriate pursuant to U.S.S.G. § 3E1.1(a).  *See* Plea Agreement Letter of May 12, 2008 at 3 ¶ 4.  Similarly, the Presentence Report concludes that Mr. Syring "has demonstrated an acceptance of responsibility for the offense of conviction and the adjusted offense level is decreased two levels."  Presentence Report at ¶ 32.  The Presentence Report also recommends an additional one point downward departure based on the fact that Mr. Syring cooperated with authorities.  *Id.*

### B.  <u>The Two-Point Enhancement for More than Two Threats</u>

The Guideline calculation prepared by the Presentence Report writer includes a two-point enhancement for more than two threats pursuant to U.S.S.G. §2A6.1(b)(2).  Presentence Report at ¶ 26.  The United States does not seek such an enhancement in this case and we would submit that such an enhancement is not appropriate.   While we understand the basis upon which the Probation Department recommends the enhancement for more than two threats, the Application Note to U.S.S.G. §2A6.1(b)(2) makes clears that the enhancement is discretionary:

> If the offense involved substantially more than two threatening communications to the same victim or a prolonged period of making harassing communications to the same victim, or if the offense involved multiple victims, an upward departure ***may*** be warranted.

*Application Note* 3(B) to U.S.S.G. § 2A6.1 (emphasis added).

We submit that the Court should not include this two-point enhancement in the Guideline calculation of Mr. Syring's offense level.  Mr. Sying's case is unusual and much different than the vast majority of cases that involve threats to other persons that violate federal civil rights laws. As we discuss later in comparing Mr. Syring's case to other civil rights violations, most of these cases involve threats to do harm to specific individuals or even their families.  In those

cases, there was no question as to whether the words conveyed to the victims constituted a true "threat."  In Mr. Syring's case, the nature of the wording of the threat was sufficiently ambiguous as to give rise to a substantial legal issue as to whether the words conveyed in Mr. Syring's communications were protected by his First Amendment rights to free speech.  For this reason, we agree completely with the Government's position that this enhancement does not apply because "[t]he communications as [sic] whole amounted to a true threat, in part, due to their repeated, frequent nature as well as the language used."  (Gov't Sentencing Memorandum at p. 10.)  In other words, the Government concedes that if Mr. Syring's conduct had been confined to one or just a few communications, it would have had a more difficult time proving that Mr. Syring's conduct constituted a "true threat" and that it was the series of communications taken together that provided critical evidence of Mr. Syring's intent.  For this reason, the Government is correct that the communications should be treated as a single threat for purposes of the Guidelines calculation.

## IV.    **SENTENCING UNDER *BOOKER***

As the Court is well aware, the Sentencing Guidelines are no longer mandatory.  They are merely advisory based on the Supreme Court's holding in *United States v. Booker*, 543 U.S. 220 (2005).  Under *Booker*, sentencing courts must treat the advisory Guidelines as just one of a number of sentencing factors set forth in 18 U.S.C. § 3553(a).  Those statutory factors are:

1)    The nature and circumstances of the offense and the history and characteristics of the defendant;
2)    The kinds of sentences available;
3)    The need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and
4)    The need to provide restitution to any victims of the offense.

In applying the § 3553 statutory factors to Mr. Syring's case, a sentence below the guideline range, namely, of time-served, is a just result in this matter given:  (1) Mr. Syring's

lack of any criminal record, (2) Mr. Syring's critical contributions to his family, (3) Mr. Syring's substantial and extraordinary work to benefit society and the world, (4) the extreme impact his offenses have caused him as a result of spending the past four months in the D.C. Jail,[2] and (5) the fact that other people charged with similar, albeit more severe, conduct have been sentenced to one year of unsupervised probation. *See, e.g., United States v. Dale T. Ehrgott,* Case No. CR-N-04-0034-ECR (D. Nev.).

### A. The Nature and Circumstances of the Offense and the History and Characteristics of Mr. Syring Warrant a Sentence Below the Guidelines.

We have outlined earlier in the Memorandum the nature and circumstances of the offenses, as well as the history and characteristics of Mr. Syring. However, we wish to reiterate that the conduct of conviction here was aberrational and occurred at times during which Israel was under attack by either Hezbollah or Hamas.

Mr. Syring has no criminal history whatsoever. His personal and employment history is extraordinary. He served this country for twenty-five years through his career with the State Department. The letters we have submitted to the Court share a common theme: Patrick Syring is a good, hard-working man, who has dedicated his life to serving the United States and the world through his career with the State Department, who has served other people and who has helped take care of his aged parents. He is a sincere, generous, and caring person. We ask the Court to give great consideration to Mr. Syring's achievements.

### B. A Sentence Below the Guidelines Will Reflect the Seriousness of the Offense, Promote Respect for the Law, and Serve as Adequate Deterrence.

In this case, given the circumstances we have described, we believe that a sentence of time served will reflect the seriousness of the offense, promote respect for the law and serve as

---

[2] Despite the Court's recommendation that Mr. Syring be held in the CTF, he has spent his entire time of confinement in the jail itself.

an adequate deterrent.  Mr. Syring, after a stellar career with the State Department, will forever have the stigma of being a convicted felon and, while that is not unique to Mr. Syring, that stigma alone is a form of punishment and, as such, a form of deterrence.  Obviously, Mr. Syring cares passionately about political issues but, given his felony conviction, he will be disenfranchised, at least for a period of several years.  A strong message of specific deterrence has clearly been sent.

Moreover, as mentioned above, others have been convicted of similar crimes but have been sentenced to far less than what the Guidelines call for in Mr. Syring's case.  For example, in *United States v. Dale T. Ehrgott,* Case No. CR-N-04-0034-ECR (D. Nev.), the defendant sent an e-mail to the Council on American-Islamic Relations.  According to the Indictment in that case, attached hereto as Ex. 9, Ehrgott's e-mail said, "We accept you[r] holy war.  Looking forward to it very much.  We can deal with you easily especially because you are on our soil.  You have taught us much about terrorism *so get ready to be the receiver.*"  Ex. 9 at p. 7 (emphasis added). We submit that Ehrgott's statement was a more egregious, direct threat than those made by Mr. Syring.  ***Nonetheless, Ehrgott was allowed to plead to a misdemeanor and was sentenced to one year of unsupervised probation***.  Ex. 9 at p. 20-21.

Similarly, in the case of *United States v. Zachary J. Rolnik,* Case No. 1:02-cr-10049-MLW-1 (D. Mass.), the defendant placed a telephone call to Dr. Zogby in which he threatened to kill Dr. Zogby and his children.  Ex. 10 at p. 5.  The defendant pled guilty to one count of violating 18 U.S.C. 245(b) and was sentenced to ***60 days incarceration***.  *Id*. at pp. 7-8 The defendant's conduct in the Rolnik case was far more direct and dangerous, even to the point of threatening Dr. Zogby's children with death, than anything ever conveyed by Mr. Syring in his voicemails or emails.

Here, had Mr. Syring not re-offended, he would have been convicted of a misdemeanor and, like Ehrgott, sentenced to a year of probation (although it would have been supervised). Of course, Mr. Syring did re-offend and, as a consequence, is also pleading to a felony. However, the March 2008 communication sent by Mr. Syring was not qualitatively any different from the earlier messages and consisted of only one offending communication. Therefore, time-served, which will amount to nearly four months of confinement in the D.C. Jail, will adequately serve the factors of respect for the law, the seriousness of the offense and the need for deterrence.

### C.  <u>The Need to Avoid Sentencing Disparities</u>.

We respectfully submit that Mr. Syring's conduct, while wrong and unjustifiable, is far less egregious than that of Mr. Ehrgott, Mr. Rolnik and others, who have received lesser sentences. Therefore, time served will be the least disparate sentence that, under the circumstances, can be imposed upon Mr. Syring. That is, whereas others have received only probationary sentences, the issue of avoiding disparity will be best served by releasing Mr. Syring as quickly as possible.

### D.  <u>The Remaining § 3553 Factors Warrant a Sentence Below the Guideline Range</u>.

We respectfully submit that the remaining § 3553 factors also support a sentence below the Guidelines, and that such a sentence is a just and fair sentence for Mr. Syring and the community. A sentence of time served in this case, in light of the other factors we have set forth, does not create an unreasonable disparity in Mr. Syring's punishment compared to other persons similarly situated. To the extent it is disparate, it is Mr. Syring who is receiving the more severe punishment.

A longer jail sentence is not necessary to protect the public from further crimes of Mr. Syring and, as we demonstrate above, it is not necessary to deter others from committing the

same crime.  Having spent nearly four months in the D.C. Jail has served as a very large, very "loud" wake-up call for Mr. Syring, who realizes that – while he has a First Amendment right to express his strongly held political views – he must temper the way in which he expresses those views.  He has truly learned his lesson as a result of his incarceration in the D.C. Jail, something he never wants to repeat.

When the parties reached their initial plea agreement under F.R.Crim.P. 11(c)(1)(C), the Court required the government to file a justification for acceptance of that plea, which the government did.  Dkt. No. 50.  Obviously, the circumstances now are different than they were then, given Mr. Syring's sending of a single message this past March.  Consequently, the government withdrew that plea offer and "upped the ante" by adding a felony count to its plea offer, as well as successfully arguing that Mr. Syring should be detained pending sentencing.  Nonetheless, given that there was no qualitative difference between Mr. Syring's initial volley of messages and the single offending message that he sent in March, we submit that the rationale provided by the government as justification for the Court's acceptance of the earlier plea agreement applies here, as well, to support the conclusion that a time-served sentence is warranted under the facts of this case.

For all of these reasons, we submit that the factors set forth in 18 U.S.C. § 3553 warrant a time-served sentence for Mr. Syring.

**WHEREFORE,** for all the reasons set forth above, Defendant Patrick Syring respectfully asks this Court, after considering the Guidelines the factors set forth in 18 U.S.C. § 3553, to sentence him to time-served.

Respectfully submitted,

SCHERTLER & ONORATO, L.L.P.


_____/s/_____
David Schertler (#367203)
Peter Taylor (#419524)
601 Pennsylvania Avenue, NW
North Building, 9th Floor
Washington, DC  20004
Telephone:  (202) 628-4199
Facsimile:  (202) 628-4177

Date:  July 2, 2008

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and correct copy of the foregoing was served via ECF this 2nd

day of July, 2008 upon the following:

> Julieanne Himelstein, Esq.
> Assistant United States Attorney
> Federal Major Crimes Section
> United States Attorney's Office
>      for the District of Columbia
> 555 Fourth Street, NW, 4th Floor
> Washington, DC 20530
>
> Mark Blumberg, Esq.
> Karen Ruckert, Esq.
> Civil Rights Division
> 601 D Street, NW, 5th Floor
> Washington, D.C.  20004

_____/s/_____
David Schertler

# EXHIBIT 1



June 25, 2008

From:  Mr. Victor Akuchie
       Acting Principal for Central Detention Facility

To:    Whom It May Concern

Re:    Mr. Patrick Syring DCDC# 318-291

Dear Reader,

Mr. Syring is an Active Participant in the Adult Basic Education Program being offered by the Central Detention Facility.  His participation has been from April 2008.  Mr. Syring has a helped to increase the Reading skills of the Spanish Students that he helps each day.  Mr. Syring is currently one of the tutors for CDF GED program.  He is the primary tutor for the (ESOL CLASS); this the immersion class which teaches English to the Spanish inmate population.  In doing so Mr. Syring has become a valuable asset to our program.  Mr. Syring scored the highest among Tutors on the qualifying exam.

Mr. Syring is very responsible and handles all assignments given to him with respect and dignity.  His effort to aiding in the growth of not only himself as a human being but the growth of the students that he takes the time out of each day to teach is well appreciated by his peers.  Mr. has shown himself as a role model inmate.  He hasn't received any disciplinary write ups from any correctional staff.  His current custody level is medium.  Mr. Syring has demonstrated consistent positive adjustment since his incarnation in the DC. Jail.  He has been extremely important in encouraging the Spanish inmates to participate in the educational program at DC. Jail.  He respects staff and conforms to all the rules and regulations of the DC. Department of Corrections.  I wish him well.

# EXHIBIT 2

*Paul F. Syring*
*Attorney at Law*
*2837 Powhattan Parkway*
*Toledo, Ohio 43606*
*Telephone: (419) 472-0335*

June 19, 2008

Judge Kollar-Kotelly
United States District Judge
United States District Court for
the District of Columbia

Re:     *United States of America v. Patrick Syring*
        Case No. 07-204

Dear Judge Kollar-Kotelly:

I write as the brother and youngest sibling of Patrick Syring. Please understand that my entire family, including our parents and siblings, were shocked to learn of the indictment and me personally the profane language contained in the e-mails. This is very uncharacteristic, however, there is no doubt in my mind that Patrick would have never acted on the content of his e-mails. As you will see from a review of his pre-sentence report, Patrick has enjoyed a stable upbringing, a wonderful education and recently completed a very admirable career serving our country with the Department of State. His career with the State Department has, in no doubt, given him perspective and insight to formulate his political beliefs which we are all entitled to hold and share in accordance with the law. In all due respect to the province of the Court, I kindly request your extreme leniency at sentencing, in particular, to any term of incarceration. Understand that regardless of any sentence imposed, as a sibling, my brother Patrick will always enjoy my love and support regardless of the differences in our political beliefs. I can assure you that this has been and will be an isolated brush with the law and involvement with the criminal justice system on the part of Patrick.

Your consideration is greatly appreciated.

Sincerely yours,

Paul F. Syring

# EXHIBIT 3

John R. Syring
2808 Observatory Ave.
Cincinnati, OH  45208-2306
513.608-8668

June 20, 2008

Judge Kollar-Kotelly
U.S. District Judge
United States District Court for the District of Columbia

RE: Patrick Syring's Sentencing

*Blessed is the servant who loves his brother as much when he is sick and useless as when he is well and can be of service to him.  And blessed is he who loves his brother as well when he is afar off as when he is by his side, and who would say nothing behind his back he might not, in love, say before his face.  ~St Francis of Assisi*

Patrick Syring is my older brother of four years and I am writing on his behalf.  It was with great shock that I learned of Patrick's incarceration.  I have always looked up to my brother as an intellectual and cultured person.  Can you image my surprise when I found out about the charges against him?

Patrick and I attended the same catholic elementary school and the same catholic high school.  He graduated at the top of his class in most every school he attended.  My father attended Notre Dame for undergrad and Law school.  Patrick followed in his footsteps for his undergrad degree at Notre Dame in political science.  He then went on for his masters in foreign policy at Georgetown University.  He was accepted right away into the State Department for Foreign Service.  I find Patrick's accomplishments to be very impressive and ambitious.

I never thought that Patrick had any harmful intentions or hatred.  He is always even keeled and gracious. While Patrick was living in Amsterdam on assignment with the State Department, I visited him on my first trip to Europe.  He happily showed me all the sites in Amsterdam and gave me advice as I went on to Paris and London.  I also visited Patrick on a second trip to Europe when he lived in Frankfort, Germany.  Patrick again allowed me to stay with him and we toured the German countryside.  He advised me on the sites to see in Berlin later in the week.

I hosted Patrick when he was in the states on a month long stay and he helped me welcome other visitors into my house.  Patrick is a kind, social man.

Patrick is also very giving and generous.  We had to make the difficult decision recently to move our father into a full care nursing home specializing in Alzheimer's patients.  Patrick has said time and time again, that any and all expenses that are incurred would be

taken care of by him. Our mother, Patricia Syring, has managed most of the arrangements and she and Patrick are close.

Growing up in Toledo Ohio, Patrick and I were close. We shared a bedroom until he went off to college. During his sophomore year at St. Francis de Sales HS, Patrick lived in France with a family that also sent their son overseas. That young man lived with us for the school year. I missed my brother when he was away because I looked up to him so much. We still stay in touch with Pascal, the foreign exchange student that came to the U.S.

It is very unsettling that Patrick has to spend time in prison as I know Patrick to be a very calm, peaceful man. He has never shown me signs of violence or threatening behavior. Please take this into account as you decide how long he will be in prison. I believe the four months that have been served has been adequate punishment and I ask that you be lenient with your sentence.

Another note that is unsettling is the fact that our father, William Syring, is not well and I believe will not live much longer. He is at the Sunset House in Toledo, Ohio and has full time care to manage his health and safety. He is 90 years old and becoming very frail. He eats less and less and his movement is diminishing. I know that Patrick would be spending time in Toledo if he had the opportunity.

Dad is in the nursing home because our mother is not well enough to take proper care of him. Patricia Syring, 84, has chronic anemia and is also not doing the best. She is distraught as I am about Patrick's situation and like the rest of our family continues to support him.

Please note that the behavior, which Patrick has admitted to, is not acceptable and I agree that is was wrong for him to communicate the things he did. But I don't believe Patrick is a threat to anyone.

When I visited him in the Federal Detention Center on April 14, he was very remorseful. I strongly believe he has learned his lesson and will be a law abiding citizen after his release.

If I may be of service to you with more information on Patrick's behalf, please contact me as I am very willing to discuss this further to help Patrick's case.

Respectfully,

John R. Syring

# EXHIBIT 4

June 19, 2008

Judge Kollar-Kotelly,
United States District Judge
United States District Court
District of Columbia

I am the sister of W. Patrick Syring who is currently in the custody in the District of Columbia. Patrick is the oldest of six children born to our parents Patricia and William Syring of Toledo, Ohio who have been married for 51 years. It is my sincere hope that consideration is given to the time Patrick has served and believe that his release would not be a risk to the community. As you know Patrick has served the United States of America as a Foreign Service officer, retiring last year. He has strong opinions about this great nation and the rights of Americans. He has always held strong opinions about many issues. He has told me that he has been assessed by a panel of mental health professionals and found to be neither a danger to himself nor to others. Please consider his time served as just punishment for expressing his views, however strong and emphatically he may have stated them.

Sincerely,

Julia A. Syring
Toledo, Ohio

# EXHIBIT 5



FR. ROBERT MADDEN, CSB

UNIVERSITY OF ST. MICHAEL'S COLLEGE

81 ST. MARY STREET, TORONTO, ONTARIO  M5S 1J4

20 June '08

Judge Kollar-Kotelly
United States District Judge
United States district Judge
The District of Columbia

RE: *United States of America vs. Patrick Syring*
*Case No. 07-204*

Dear Judge Kollar-Kotelly,

William Patrick Syring is my nephew, the oldest of the six children of my sister and brother-in-law, Mr. and Mrs. William Syring. I have known Patrick from his birth, and have remained quite close to him during his school and college years. He was reared in a very wholesome law abiding family and has remained close to the family members. My contact with him was not as regular during his service in the United States Department of State, Foreign Service because of his frequent assignments in foreign countries, including two tours of duty in Lebanon. He did very well in school, having a strong critically analytical intelligence. From all I have observed, he has been devoted to his family, a dutiful, obedient, cooperative thoughtful son, remembering his parents' anniversary, visiting their home regularly on holidays and other occasions, and sending gifts to his parents. More recently, since his father has been afflicted with Alzheimer's disease and is now in a nursing home, he has been particularly attentive to them, on occasion sending flowers to his father and to the attending staff. He has also indicated clearly to his mother that he is ever ready to provide whatever financial assistance she might need.

In all the years I have known him, although he holds and on occasion expresses his opinion on political matters quite strongly, I have never seen any evidence of a violent nature, either by his actions or his words; I am not aware that he has ever been in trouble with the law before. Like the rest of his family, I was shocked to learn of his indictment and of the violent language he used. Although disappointed in and not approving of his behaviour in this matter, the family and I continue to support him at this time, to be in contact with him; we shall, I am sure, do all we can to make him feel welcomed and accepted among us, and to ensure as best we can that he does not repeat his misconduct. I humbly request that in any sentencing, the singular nature of his offense, its, in my experience and that of his family, "out of character" nature, his previous conduct, and his responsible service to the State Department be taken into account and that as lenient a sentence as possible be imposed. Thank you for your consideration of this matter.

Sincerely yours,

(Rev.) Robert Madden, CSB

# EXHIBIT 6

June 19, 2008

Judge Kollar - Kotelly
United States District Judge
United States District Court for the District of Columbia

Dear Judge Kollar - Kotelly

This letter is written on behalf of my son Patrick
Syring currently at the D.C. Department of Corrections.
Patrick is our oldest child. His younger brothers
and sisters are close in age. He accepted the
role of oldest child and big brother with a
true sense of responsibility. This conscientious
responsibility was apparent throughout his behavior
and studies in Grade School, High School, College
and post graduate degree.

Patrick served as a Foreign Service Officer with
the United States State Department for twenty-five
years. Reports of his employment, to the best of my
knowledge, recorded that same sense of responsible
behavior.

His service with the State Department has
included assignments in U.S. Embassies and
Consulates in Suriname, Holland, Guinea,
Brazil, two tours of duty in Lebanon, Argentina,
Brazil and Germany in addition to Washington, D.C.

At the time of his retirement from the Foreign Service, he was offered the opportunity to return to Beirut, Lebanon, for an additional tour of duty.

Because of painful arthritis I have not been able to visit Patrick during his prison confinement. His father, my husband, suffers with dementia and has lived in a nursing community for three years. Bill is a retired lawyer — sixty plus years as a member of the Ohio, Lucas County, and Toledo Bar and American Trial Lawyers Associations. If he were aware of and could understand Patrick's present circumstances, I am certain he would join me in writing and signing this letter.

We love and think of Patrick always and pray that any future decision regarding his case will be made with leniency and with his best interest in mind.

Sincerely
Patricia Syring
(Mrs. William J. Syring)
1818 Parkside Blvd.
Toledo, Oh 43607
419 - 531 - 1347

# EXHIBIT 7

**CBS NEWS**

# Hezbollah: "A-Team Of Terrorists"
**April 18, 2003**

**(CBS)** This is what deputy secretary of state Richard Armitage had in mind a few months ago when he pinned this label on Hezbollah.

"Hezbollah may be the 'A-Team of Terrorists' and maybe al-Qaeda is actually the 'B' team. And they're on the list and their time will come," says Armitage. "There is no question about it - it's all in good time. And we're going to go after these problems just like a high school wrestler goes after a match. We're going to take them down one at a time."

What he's talking about started about two decades ago as a ragtag militia group fighting the Israeli occupation of southern Lebanon. But there's no longer anything ragtag about Hezbollah now, **Correspondent Ed Bradley** reports.

The Islamic government of Iran reportedly subsidizes Hezbollah to the tune of $100 million a year, providing its several thousand well-trained fighters with sophisticated weapons systems. Iran also sends advisors, and according to U.S. intelligence, issues its marching orders.

Sen. Bob Graham, the Florida democrat who chaired the Senate Intelligence Committee in the last Congress, and is now running for president, says the Bush Administration should be more concerned with Hezbollah than they are with Saddam Hussein.

"Does Saddam Hussein or Hezbollah represent the greater threat to the United States," asks Graham. "In my opinion, there's no question that Hezbollah is that greater threat, and yes, we should go after it first and go after it before we go to war with Iraq."

Graham says Hezbollah has a global network of radical Islamic supporters, with enough operatives in the U.S. to pose a terrorist threat here.

"It has a significant presence of its trained operatives inside the United States waiting for the call to action," says Graham.

But if we were to know that classified information, would we be more concerned? Would we be more afraid of Hezbollah than we are today?

"Well, I'm more concerned and more afraid than if I did not know what the scale of their presence was in the United States," says Graham, without any hesitation.

"They are a violent terrorist group. And they have demonstrated throughout their now 25-year history a hatred of the United States and a willingness to kill our people."

Senator Graham is referring to the 1983 truck bombing of the Marine barracks in Lebanon, which resulted in the death of 241 U.S. Marines. Hezbollah's supporters say that attack was a response to shelling by U.S. warships of Islamic factions in the Lebanese civil war. The U.S. called it terrorism.

But Hezbollah's leader, Sheikh Hasan Nasrallah, who we met in Beirut, insists that his group no longer poses a threat to the U.S. Unlike the leadership of al-Qaeda, he isn't hiding from anyone. You may never have heard of Nasrallah before, but he is a hugely popular figure, not just in the region but also among Arabs living in the West

" I believe the Americans are just saying what the Israelis want them to say. I consider this to be an Israeli accusation coming out of an American mouth and nothing more," says Nasrallah.

When he became its leader ten years ago, Nasrallah turned Hezbollah into a formidable fighting force. Few people know more about him than journalist Nick Blanford, who has covered Lebanon for eight years and is now writing a book about Hezbollah and Sheikh Nasrallah.

"People adore him. I mean, I talked to some Hezbollah fighters that speak of him almost as they would a wife or a mother," says Blanford. "They think of him before they go to sleep at night, that he's always in their thoughts, so he has this tremendous power over the rank and file."

The militant Islamic group has enough power and trained skilled commandos who are specialized in attacking Israeli forces that have occupied southern Lebanon for 22 years. Their most effective weapon: remote-controlled roadside bombs that were detonated when Israeli patrols passed by -- as in the 1983 attack in southern Lebanon.

All told, Israel lost more than 900 soldiers in Lebanon. In May 2000, the Israeli Army withdrew.

What did Israel's withdrawal do for Hezbollah in the eyes of the Arab world?

"Well, there's enormous boost for Hezbollah," says Blanford. "I mean, this was a small Arab organization that had defeated the

mightiest military force the Middle East has ever seen."

With the Israelis out of Lebanon, Nasrallah encouraged, and assisted, the Palestinian uprising against Israel. He has acknowledged sending secret agents carrying weapons to the West Bank, where he is considered a hero. Some kids in the Gaza Strip even dress like him, down to the beard and the glasses. At one event, a boy playing Nasrallah was flanked by one child who played a security guard, and another child dressed as a suicide bomber.

In Lebanon, where Hezbollah runs a network of schools and hospitals and participates in local elections, Nasrallah, a Muslim, is a hero even to the country's Christian President, Emile Lahoud.

"For us Lebanese, and I can tell you a majority of Lebanese, Hezbollah is a national resistance movement," says Lahoud. "If it wasn't for them, we couldn't have liberated our land. And because of that, we have big esteem for the Hezbollah movement."

President Lahoud has such high esteem for Hezbollah, he's ceded control of the border with Israel to them -- a border where Hezbollah and Israeli soldiers now confront each other just a few yards apart.

This side is controlled by Hezbollah. The other side is controlled by Israel. Hezbollah has already fired rockets across the border, and U.S. officials believe that in the past two years they've been stockpiling rockets in this area hidden in caves and underground bunkers -- higher quality Iranian rockets that could reach Haifa about fifty miles away.

Openly calling for terrorism against Israel, Nasrallah is also urging on suicide operations.

"In Palestine, these operations are the only way to root out the Zionists," says Nasrallah during a speech.

That's the kind of material Hezbollah broadcasts daily on its own television station, Al Manar, which reaches a worldwide audience by satellite. Because of Washington's support for Israel, Hezbollah is conducting a ferocious propaganda offensive against the United States.

This propaganda message broadcast on Al Manar portrays U.S. foreign policy as Satanic and shows an image of the Statue of Liberty, a skull for her face, wearing a gown dripping with the blood of other nations.

But even though he's one of the most powerful anti-American voices in the Middle East, Nasrallah says he has no use for Saddam Hussein. In fact, he blames the U.S. for Saddam's rise.

"The U.S. provided political and military support to the Iraqi regime for decades. They created this mess. I don't believe Saddam alone should be held accountable. We should also go after those who supported him -- like the American government."

Nasrallah has described the war on Saddam as a Satanic American-Zionist plan to dominate the Arab world. But what is Satanic about removing Saddam from power?

"The United States isn't seeking democracy in Iraq. It's after the oil in Iraq," says Nasrallah. "And that isn't exactly a humanitarian pursuit. The U.S. wants to impose its political will on Iraq and wants to impose Israel's domination in the region. Certainly these objectives are not moral objectives in my opinion. In fact, we say they are satanic objectives."

And yet, Nasrallah has spoken out against terrorist attacks on the U.S., including the 9/11attack.

"We reject those methods, and believe they contradict Islam and the teachings of the Quran, which do not permit this barbarity," says Nasrallah.

But Senator Graham doesn't buy it.

"There are a number of lessons we should learn from Sept. 11th. One of those lessons is that these terrorist groups tend to do what they say they're going to do," says Graham. "If they define the United States as being Satanic - and that therefore they want to kill us - they will find ways to carry out that objective."

Is he convinced that they possess weapons of mass destruction?

"I'm not certain whether they possess them," adds Graham. "But I am confident that they could possess them through their close affiliation with Iran, which has a larger warehouse of chemical and biological weapons, and is closer to gaining nuclear weapons capability than Iraq."

So if Iran wants them to have weapons of mass destruction, will they have it? Graham believes they will, and in large quantities, too.

Iran isn't the only country that supports Hezbollah. Syria allows Hezbollah to train fighters in remote camps in Syria and territory under its control in Lebanon.

"In recent years they have been infiltrating into this core in the United States people who have gone through their training camps and have the skills of terrorist activity," says Graham.

Case 1:07-cr-00204-CKK     Document 76-8     Filed 07/02/2008     Page 4 of 4

According to the FBI, Hezbollah has never conducted a terrorist attack in the United States. The FBI says that its members here are raising money for activities overseas and nothing more than that.

But there has to be a first for every organization. The first for al-Qaeda was Sept.11, 2001. When will the first attack against an American in America by Hezbollah take place?

We asked Lebanon's President Lahoud, a political ally of Hezbollah, if Americans have anything to fear from them.

"Americans? For sure not," says Lahoud.

The United States is the strongest backer of Israel. But it's the same kind of thing you see with al-Qaeda, attacking the United States to get at Israel.

"Well, believe me, they don't have anything to attack the U.S. or any U.S. citizen for sure," assures Nasrallah. "But Israel is our enemy. That's something else. It has nothing else to do with the U.S."

But that's not what he said last month just days before the war began.

"We are confident," says Nasrallah. "The Iraqi people cannot accept the humiliation of a U.S. occupation government," which he added, "would be a Zionist occupation government." Then he warned the Americans they'd be met with rifles, blood and suicide operations.

"American policies in the region encourage this kind of retaliation, whether we agree with it or not. I am expressing the reality," says Nasrallah.

"I believe the continuation of American policy will make enemies of all Arabs and Muslims - meaning hundreds of millions of Arabs and one billion four hundred million Muslims around the world. Lots of groups will surface, not necessarily al-Qaeda, and they'll be impossible to bring to justice."

© MMIII, CBS Worldwide Inc. All Rights Reserved.

> Feedback  > Terms of Service  > Privacy Statement

# EXHIBIT 8



THE WHITE HOUSE
PRESIDENT
GEORGE W. BUSH


CLICK HERE TO PRINT

For Immediate Release
Office of the Press Secretary
September 5, 2006

## President Discusses Global War on Terror
Capital Hilton Hotel
Washington, D.C.

- National Strategy for Combating Terrorism
- Fact Sheet: The President's National Strategy for Combating Terrorism
- In Focus: National Security



VIDEO    Multimedia

President's Remarks
view

1:15 P.M. EDT

THE PRESIDENT: Thank you all very much. (Applause.) Thank you all.
Please be seated. General Hendrix, thank you for the invitation to be here. Thanks for the kind introduction. I'm honored to stand with the men and women of the Military Officers Association of America. I appreciate the Board of Directors who are here, and the leaders who have given me this platform from which to speak. I'm proud to be here with active members of the United States military. Thank you for your service. I'm proud to be your Commander-in-Chief. (Applause.)

I am pleased also to stand with members of the diplomatic corps, including many representing nations that have been attacked by al Qaeda and its terrorist allies since September the 11th, 2001. (Applause.) Your presence here reminds us that we're engaged in a global war against an enemy that threatens all civilized nations. And today the civilized world stands together to defend our freedom; we stand together to defeat the terrorists; and were working to secure the peace for generations to come.

I appreciate my Attorney General joining us today, Al Gonzales. Thank you for being here. (Applause.) The Secretary of Homeland Security, Michael Chertoff, is with us. (Applause.) Three members of the United States Senate -- I might say, three important members of the United States Senate -- Senate President Pro Tem Ted Stevens of Alaska. Thank you for joining us, Senator. (Applause.) Chairman of the Appropriations Committee, Senator Thad Cochran of Mississippi. (Applause.) The Chairman of the Armed Services Committee, John Warner of Virginia. (Applause.)

I thank Norb Ryan, as well, for his leadership. I do appreciate all the folks that are at Walter Reed who have joined us today. I'm going to tell the parents of our troops, we provide great health care to those who wear the uniform. I'm proud of those folks at Bethesda and Walter Reed -- are providing you the best possible care to help you recover from your injuries. Thank you for your courage. Thank you for joining us here today. May God bless you in your recovery. (Applause.)

Next week, America will mark the fifth anniversary of September the 11th, 2001 terrorist attacks. As this day approaches, it brings with it a flood of painful memories. We remember the horror of watching planes fly into the World Trade Center, and seeing the towers collapse before our eyes. We remember the sight of the Pentagon, broken and in flames. We remember the rescue workers who rushed into burning buildings to save lives, knowing they might never emerge again. We remember the brave passengers who charged the cockpit of their hijacked plane, and stopped the terrorists from reaching their target and killing more innocent civilians. We remember the cold brutality of the enemy who inflicted this harm on our country -- an enemy whose leader, Osama bin Laden, declared the massacre of nearly 3,000 people that day -- I quote -- "an unparalleled and magnificent feat of valor, unmatched by any in humankind before them."

In five years since our nation was attacked, al Qaeda and terrorists it has inspired have continued to attack across the world. They've killed the innocent in Europe and Africa and the Middle East, in Central Asia and the Far East, and beyond. Most recently, they attempted to strike again in the most ambitious plot since the attacks of September the 11th -- a plan to blow up passenger planes headed for America over the Atlantic Ocean.



Five years after our nation was attacked, the terrorist danger remains. We're a nation at war – and America and her allies are fighting this war with relentless determination across the world. Together with our coalition partners, we've removed terrorist sanctuaries, disrupted their finances, killed and captured key operatives, broken up terrorist cells in America and other nations, and stopped new attacks before they're carried out. We're on the offense against the terrorists on every battlefront – and we'll accept nothing less than complete victory. (Applause.)

In the five years since our nation was attacked, we've also learned a great deal about the enemy we face in this war. We've learned about them through videos and audio recordings, and letters and statements they've posted on websites. We've learned about them from captured enemy documents that the terrorists have never meant for us to see. Together, these documents and statements have given us clear insight into the mind of our enemies – their ideology, their ambitions, and their strategy to defeat us.

We know what the terrorists intend to do because they've told us – and we need to take their words seriously. So today I'm going to describe – in the terrorists' own words, what they believe… what they hope to accomplish, and how they intend to accomplish it. I'll discuss how the enemy has adapted in the wake of our sustained offensive against them, and the threat posed by different strains of violent Islamic radicalism. I'll explain the strategy we're pursuing to protect America, by defeating the terrorists on the battlefield, and defeating their hateful ideology in the battle of ideas.

The terrorists who attacked us on September the 11th, 2001, are men without conscience – but they're not madmen. They kill in the name of a clear and focused ideology, a set of beliefs that are evil, but not insane. These al Qaeda terrorists and those who share their ideology are violent Sunni extremists. They're driven by a radical and perverted vision of Islam that rejects tolerance, crushes all dissent, and justifies the murder of innocent men, women and children in the pursuit of political power. They hope to establish a violent political utopia across the Middle East, which they call a "Caliphate" – where all would be ruled according to their hateful ideology. Osama bin Laden has called the 9/11 attacks – in his words – "a great step towards the unity of Muslims and establishing the Righteous… [Caliphate]."

This caliphate would be a totalitarian Islamic empire encompassing all current and former Muslim lands, stretching from Europe to North Africa, the Middle East, and Southeast Asia. We know this because al Qaeda has told us. About two months ago, the terrorist Zawahiri – he's al Qaeda's second in command – declared that al Qaeda intends to impose its rule in "every land that was a home for Islam, from [Spain] to Iraq. He went on to say, "The whole world is an open field for us."

We know what this radical empire would look like in practice, because we saw how the radicals imposed their ideology on the people of Afghanistan. Under the rule of the Taliban and al Qaeda, Afghanistan was a totalitarian nightmare – a land where women were imprisoned in their homes, men were beaten for missing prayer meetings, girls could not go to school, and children were forbidden the smallest pleasures like flying kites. Religious police roamed the streets, beating and detaining civilians for perceived offenses. Women were publicly whipped. Summary executions were held in Kabul's soccer stadium in front of cheering mobs. And Afghanistan was turned into a launching pad for horrific attacks against America and other parts of the civilized world – including many Muslim nations.

The goal of these Sunni extremists is to remake the entire Muslim world in their radical image. In pursuit of their imperial aims, these extremists say there can be no compromise or dialogue with those they call "infidels" – a category that includes America, the world's free nations, Jews, and all Muslims who reject their extreme vision of Islam. They reject the possibility of peaceful coexistence with the free world. Again, hear the words of Osama bin Laden earlier this year: "Death is better than living on this Earth with the unbelievers among us."

These radicals have declared their uncompromising hostility to freedom. It is foolish to think that you can negotiate with them. (Applause.) We see the uncompromising nature of the enemy in many captured terrorist documents. Here are just two examples: After the liberation of Afghanistan, coalition forces searching through a terrorist safe house in that country found a copy of the al Qaeda charter. This charter states that "there will be continuing enmity until everyone believes in Allah. We will not meet [the enemy] halfway. There will be no room for dialogue with them." Another document was found in 2000 by British police during an anti-terrorist raid in London – a grisly al Qaeda manual that includes chapters with titles such as "Guidelines for Beating and Killing Hostages." This manual declares that their vision of Islam "does not… make a truce with unbelief, but rather confronts it." The confrontation… calls for… the dialogue of bullets, the ideals of assassination, bombing, and destruction, and the diplomacy of the cannon and machine gun."

Still other captured documents show al Qaeda's strategy for infiltrating Muslim nations, establishing terrorist enclaves, overthrowing governments, and building their totalitarian empire. We see this strategy laid out in a captured al Qaeda document found during a recent raid in Iraq, which describes their plans to infiltrate and take over Iraq's western Anbar Province. The document lays out an elaborate al Qaeda governing structure for the region that includes an Education

Case 1:07-cr-00204-CKK    Document 76-9    Filed 07/02/2008    Page 4 of 8

Department, a Social Services Department, a Justice Department, and an "Execution Unit" responsible for "Sorting out, Arrest, Murder, and Destruction."

According to their public statements, countries that have – they have targeted stretch from the Middle East to Africa, to Southeast Asia. Through this strategy, al Qaeda and its allies intend to create numerous, decentralized operating bases across the world, from which they can plan new attacks, and advance their vision of a unified, totalitarian Islamic state that can confront and eventually destroy the free world.

These violent extremists know that to realize this vision, they must first drive out the main obstacle that stands in their way – the United States of America. According to al Qaeda, their strategy to defeat America has two parts: First, they're waging a campaign of terror across the world. They're targeting our forces abroad, hoping that the American people will grow tired of casualties and give up the fight. And they're targeting America's financial centers and economic infrastructure at home, hoping to terrorize us and cause our economy to collapse.

Bin Laden calls this his "bleed-until-bankruptcy plan." And he cited the attacks of 9/11 as evidence that such a plan can succeed. With the 9/11 attacks, Osama bin Laden says, "al Qaeda spent $500,000 on the event, while America… lost – according to the lowest estimate – $500 billion… Meaning that every dollar of al Qaeda defeated a million dollars" of America. Bin Laden concludes from this experience that "America is definitely a great power, with… unbelievable military strength and a vibrant economy, but all of these have been built on a very weak and hollow foundation." He went on to say, "Therefore, it is very easy to target the flimsy base and concentrate on their weak points, and even if we're able to target one-tenth of these weak points, we will be able [to] crush and destroy them."

Secondly, along with this campaign of terror, the enemy has a propaganda strategy. Osama bin Laden laid out this strategy in a letter to the Taliban leader, Mullah Omar, that coalition forces uncovered in Afghanistan in 2002. In it, bin Laden says that al Qaeda intends to "[launch]," in his words, "a media campaign… to create a wedge between the American people and their government." This media campaign, bin Laden says, will send the American people a number of messages, including "that their government [will] bring them more losses, in finances and casualties." And he goes on to say that "they are being sacrificed… to serve… the big investors, especially the Jews." Bin Laden says that by delivering these messages, al Qaeda "aims at creating pressure from the American people on the American government to stop their campaign against Afghanistan."

Bin Laden and his allies are absolutely convinced they can succeed in forcing America to retreat and causing our economic collapse. They believe our nation is weak and decadent, and lacking in patience and resolve. And they're wrong. (Applause.) Osama bin Laden has written that the "defeat of… American forces in Beirut" in 1983 is proof America does not have the stomach to stay in the fight. He's declared that "in Somalia… the United States [pulled] out, trailing disappointment, defeat, and failure behind it." And last year, the terrorist Zawahiri declared that Americans "know better than others that there is no hope in victory. The Vietnam specter is closing every outlet."

These terrorists hope to drive America and our coalition out of Afghanistan, so they can restore the safe haven they lost when coalition forces drove them out five years ago. But they've made clear that the most important front in their struggle against America is Iraq – the nation bin Laden has declared the "capital of the Caliphate." Hear the words of bin Laden: "I now address… the whole… Islamic nation: Listen and understand… The most… serious issue today for the whole world is this Third World War… [that] is raging in [Iraq]." He calls it "a war of destiny between infidelity and Islam." He says, "The whole world is watching this war," and that it will end in "victory and glory or misery and humiliation." For al Qaeda, Iraq is not a distraction from their war on America – it is the central battlefield where the outcome of this struggle will be decided.

Here is what al Qaeda says they will do if they succeed in driving us out of Iraq: The terrorist Zawahiri has said that al Qaeda will proceed with "several incremental goals. The first stage: Expel the Americans from Iraq. The second stage: Establish an Islamic authority or amirate, then develop it and support it until it achieves the level of Caliphate… The third stage: Extend the jihad wave to the secular countries neighboring Iraq. And the fourth stage: …the clash with Israel."

These evil men know that a fundamental threat to their aspirations is a democratic Iraq that can govern itself, sustain itself, and defend itself. They know that given a choice, the Iraqi people will never choose to live in the totalitarian state the extremists hope to establish. And that is why we must not, and we will not, give the enemy victory in Iraq by deserting the Iraqi people. (Applause.)

Last year, the terrorist Zarqawi declared in a message posted on the Internet that democracy "is the essence of infidelity and deviation from the right path." The Iraqi people disagree. Last December, nearly 12 million Iraqis from every ethnic and religious community turned out to vote in their country's third free election in less than a year. Iraq now has a unity government that represents Iraq's diverse population – and al Qaeda's top commander in Iraq breathed his last breath.

(Applause.)

Despite these strategic setbacks, the enemy will continue to fight freedom's advance in Iraq, because they understand the stakes in this war. Again, hear the words of bin Laden, in a message to the American people earlier this year. He says: "The war is for you or for us to win. If we win it, it means your defeat and disgrace forever."

Now, I know some of our country hear the terrorists' words, and hope that they will not, or cannot, do what they say. History teaches that underestimating the words of evil and ambitious men is a terrible mistake. In the early 1900s, an exiled lawyer in Europe published a pamphlet called "What Is To Be Done?" – in which he laid out his plan to launch a communist revolution in Russia. The world did not heed Lenin's words, and paid a terrible price. The Soviet Empire he established killed tens of millions, and brought the world to the brink of thermonuclear war. In the 1920s, a failed Austrian painter published a book in which he explained his intention to build an Aryan super-state in Germany and take revenge on Europe and eradicate the Jews. The world ignored Hitler's words, and paid a terrible price. His Nazi regime killed millions in the gas chambers, and set the world aflame in war, before it was finally defeated at a terrible cost in lives.

Bin Laden and his terrorist allies have made their intentions as clear as Lenin and Hitler before them. The question is: Will we listen? Will we pay attention to what these evil men say? America and our coalition partners have made our choice. We're taking the words of the enemy seriously. We're on the offensive, and we will not rest, we will not retreat, and we will not withdraw from the fight, until this threat to civilization has been removed. (Applause.)

Five years into this struggle, it's important to take stock of what's been accomplished – and the difficult work that remains. Al Qaeda has been weakened by our sustained offensive against them, and today it is harder for al Qaeda's leaders to operate freely, to move money, or to communicate with their operatives and facilitators. Yet al Qaeda remains dangerous and determined. Bin Laden and Zawahiri remain in hiding in remote regions of this world. Al Qaeda continues to adapt in the face of our global campaign against them. Increasingly, al Qaeda is taking advantage of the Internet to disseminate propaganda, and to conduct "virtual recruitment" and "virtual training" of new terrorists. Al Qaeda's leaders no longer need to meet face-to-face with their operatives. They can find new suicide bombers, and facilitate new terrorist attacks, without ever laying eyes on those they're training, financing, or sending to strike us.

As al Qaeda changes, the broader terrorist movement is also changing, becoming more dispersed and self-directed. More and more, we're facing threats from locally established terrorist cells that are inspired by al Qaeda's ideology and goals, but do not necessarily have direct links to al Qaeda, such as training and funding. Some of these groups are made up of "homegrown" terrorists, militant extremists who were born and educated in Western nations, were indoctrinated by radical Islamists or attracted to their ideology, and joined the violent extremist cause. These locally established cells appear to be responsible for a number of attacks and plots, including those in Madrid, and Canada, and other countries across the world.

As we continue to fight al Qaeda and these Sunni extremists inspired by their radical ideology, we also face the threat posed by Shia extremists, who are learning from al Qaeda, increasing their assertiveness, and stepping up their threats. Like the vast majority of Sunnis, the vast majority of Shia across the world reject the vision of extremists – and in Iraq, millions of Shia have defied terrorist threats to vote in free elections, and have shown their desire to live in freedom. The Shia extremists want to deny them this right. This Shia strain of Islamic radicalism is just as dangerous, and just as hostile to America, and just as determined to establish its brand of hegemony across the broader Middle East. And the Shia extremists have achieved something that al Qaeda has so far failed to do: In 1979, they took control of a major power, the nation of Iran, subjugating its proud people to a regime of tyranny, and using that nation's resources to fund the spread of terror and pursue their radical agenda.

Like al Qaeda and the Sunni extremists, the Iranian regime has clear aims: They want to drive America out of the region, to destroy Israel, and to dominate the broader Middle East. To achieve these aims, they are funding and arming terrorist groups like Hezbollah, which allow them to attack Israel and America by proxy. Hezbollah, the source of the current instability in Lebanon, has killed more Americans than any terrorist organization except al Qaeda. Unlike al Qaeda, they've not yet attacked the American homeland. Yet they're directly responsible for the murder of hundreds of Americans abroad. It was Hezbollah that was behind the 1983 bombing of the U.S. Marine barracks in Beirut that killed 241 Americans. And Saudi Hezbollah was behind the 1996 bombing of Khobar Towers in Saudi Arabia that killed 19 Americans, an attack conducted by terrorists who we believe were working with Iranian officials.

Just as we must take the words of the Sunni extremists seriously, we must take the words of the Shia extremists seriously. Listen to the words of Hezbollah's leader, the terrorist Nasrallah, who has declared his hatred of America. He says, "Let the entire world hear me. Our hostility to the Great Satan [America] is absolute... Regardless of how the world has changed after 11 September, Death to America will remain our reverberating and powerful slogan: Death to America."

Iran's leaders, who back Hezbollah, have also declared their absolute hostility to America. Last October, Iran's President declared in a speech that some people ask – in his words – "whether a world without the United States and Zionism can be achieved... I say that this... goal is achievable." Less than three months ago, Iran's President declared to America and other Western powers: "open your eyes and see the fate of pharaoh... if you do not abandon the path of falsehood... your doomed destiny will be annihilation." Less than two months ago, he warned: "The anger of Muslims may reach an explosion point soon. If such a day comes... [America and the West] should know that the waves of the blast will not remain within the boundaries of our region." He also delivered this message to the American people: "If you would like to have good relations with the Iranian nation in the future... bow down before the greatness of the Iranian nation and surrender. If you don't accept [to do this], the Iranian nation will... force you to surrender and bow down."

America will not bow down to tyrants. (Applause.)

The Iranian regime and its terrorist proxies have demonstrated their willingness to kill Americans – and now the Iranian regime is pursuing nuclear weapons. The world is working together to prevent Iran's regime from acquiring the tools of mass murder. The international community has made a reasonable proposal to Iran's leaders, and given them the opportunity to set their nation on a better course. So far, Iran's leaders have rejected this offer. Their choice is increasingly isolating the great Iranian nation from the international community, and denying the Iranian people an opportunity for greater economic prosperity. It's time for Iran's leader to make a different choice. And we've made our choice. We'll continue to work closely with our allies to find a diplomatic solution. The world's free nations will not allow Iran to develop a nuclear weapon. (Applause.)

The Shia and Sunni extremists represent different faces of the same threat. They draw inspiration from different sources, but both seek to impose a dark vision of violent Islamic radicalism across the Middle East. They oppose the advance of freedom, and they want to gain control of weapons of mass destruction. If they succeed in undermining fragile democracies, like Iraq, and drive the forces of freedom out of the region, they will have an open field to pursue their dangerous goals. Each strain of violent Islamic radicalism would be emboldened in their efforts to topple moderate governments and establish terrorist safe havens.

Imagine a world in which they were able to control governments, a world awash with oil and they would use oil resources to punish industrialized nations. And they would use those resources to fuel their radical agenda, and pursue and purchase weapons of mass murder. And armed with nuclear weapons, they would blackmail the free world, and spread their ideologies of hate, and raise a mortal threat to the American people. If we allow them to do this, if we retreat from Iraq, if we don't uphold our duty to support those who are desirous to live in liberty, 50 years from now history will look back on our time with unforgiving clarity, and demand to know why we did not act.

I'm not going to allow this to happen – and no future American President can allow it either. America did not seek this global struggle, but we're answering history's call with confidence and a clear strategy. Today we're releasing a document called the "National Strategy for Combating Terrorism." This is an unclassified version of the strategy we've been pursuing since September the 11th, 2001. This strategy was first released in February 2003; it's been updated to take into account the changing nature of this enemy. This strategy document is posted on the White House website – whitehouse.gov. And I urge all Americans to read it.

Our strategy for combating terrorism has five basic elements:

First, we're determined to prevent terrorist attacks before they occur. So we're taking the fight to the enemy. The best way to protect America is to stay on the offense. Since 9/11, our coalition has captured or killed al Qaeda managers and operatives, and scores of other terrorists across the world. The enemy is living under constant pressure, and we intend to keep it that way – and this adds to our security. When terrorists spend their days working to avoid death or capture, it's harder for them to plan and execute new attacks.

We're also fighting the enemy here at home. We've given our law enforcement and intelligence professionals the tools they need to stop the terrorists in our midst. We passed the Patriot Act to break down the wall that prevented law enforcement and intelligence from sharing vital information. We created the Terrorist Surveillance Program to monitor the communications between al Qaeda commanders abroad and terrorist operatives within our borders. If al Qaeda is calling somebody in America, we need to know why, in order to stop attacks. (Applause.)

I want to thank these three Senators for working with us to give our law enforcement and intelligence officers the tools necessary to do their jobs. (Applause.) And over the last five years, federal, state, and local law enforcement have used those tools to break up terrorist cells, and to prosecute terrorist operatives and supporters in New York, and Oregon, and Virginia, and Texas, and New Jersey, and Illinois, Ohio, and other states. By taking the battle to the terrorists and their

supporters on our own soil and across the world, we've stopped a number of al Qaeda plots.

Second, we're determined to deny weapons of mass destruction to outlaw regimes and terrorists who would use them without hesitation. Working with Great Britain and Pakistan and other nations, the United States shut down the world's most dangerous nuclear trading cartel, the AQ Khan network. This network had supplied Iran and Libya and North Korea with equipment and know-how that advanced their efforts to obtain nuclear weapons. And we launched the Proliferation Security Initiative, a coalition of more than 70 nations that is working together to stop shipments related to weapons of mass destruction on land, at sea, and in the air. The greatest threat this world faces is the danger of extremists and terrorists armed with weapons of mass destruction – and this is a threat America cannot defeat on her own. We applaud the determined efforts of many nations around the world to stop the spread of these dangerous weapons. Together, we pledge we'll continue to work together to stop the world's most dangerous men from getting their hands on the world's most dangerous weapons. (Applause.)

Third, we're determined to deny terrorists the support of outlaw regimes. After September the 11th, I laid out a clear doctrine: America makes no distinction between those who commit acts of terror, and those that harbor and support them, because they're equally guilty of murder. Thanks to our efforts, there are now three fewer state sponsors of terror in the world than there were on September the 11th, 2001. Afghanistan and Iraq have been transformed from terrorist states into allies in the war on terror. And the nation of Libya has renounced terrorism, and given up its weapons of mass destruction programs, and its nuclear materials and equipment. Over the past five years, we've acted to disrupt the flow of weapons and support from terrorist states to terrorist networks. And we have made clear that any government that chooses to be an ally of terror has also chosen to be an enemy of civilization. (Applause.)

Fourth, we're determined to deny terrorist networks control of any nation, or territory within a nation. So, along with our coalition and the Iraqi government, we'll stop the terrorists from taking control of Iraq, and establishing a new safe haven from which to attack America and the free world. And we're working with friends and allies to deny the terrorists the enclaves they seek to establish in ungoverned areas across the world. By helping governments reclaim full sovereign control over their territory, we make ourselves more secure.

Fifth, we're working to deny terrorists new recruits, by defeating their hateful ideology and spreading the hope of freedom - - by spreading the hope of freedom across the Middle East. For decades, American policy sought to achieve peace in the Middle East by pursuing stability at the expense of liberty. The lack of freedom in that region helped create conditions where anger and resentment grew, and radicalism thrived, and terrorists found willing recruits. And we saw the consequences on September the 11th, when the terrorists brought death and destruction to our country. The policy wasn't working.

The experience of September the 11th made clear, in the long run, the only way to secure our nation is to change the course of the Middle East. So America has committed its influence in the world to advancing freedom and liberty and democracy as the great alternatives to repression and radicalism. (Applause.) We're taking the side of democratic leaders and moderates and reformers across the Middle East. We strongly support the voices of tolerance and moderation in the Muslim world. We're standing with Afghanistan's elected government against al Qaeda and the Taliban remnants that are trying to restore tyranny in that country. We're standing with Lebanon's young democracy against the foreign forces that are seeking to undermine the country's sovereignty and independence. And we're standing with the leaders of Iraq's unity government as they work to defeat the enemies of freedom, and chart a more hopeful course for their people. This is why victory is so important in Iraq. By helping freedom succeed in Iraq, we will help America, and the Middle East, and the world become more secure.

During the last five years we've learned a lot about this enemy. We've learned that they're cunning and sophisticated. We've witnessed their ability to change their methods and their tactics with deadly speed – even as their murderous obsessions remain unchanging. We've seen that it's the terrorists who have declared war on Muslims, slaughtering huge numbers of innocent Muslim men and women around the world.

We know what the terrorists believe, we know what they have done, and we know what they intend to do. And now the world's free nations must summon the will to meet this great challenge. The road ahead is going to be difficult, and it will require more sacrifice. Yet we can have confidence in the outcome, because we've seen freedom conquer tyranny and terror before. In the 20th century, free nations confronted and defeated Nazi Germany. During the Cold War, we confronted Soviet communism, and today Europe is whole, free and at peace.

And now, freedom is once again contending with the forces of darkness and tyranny. This time, the battle is unfolding in a new region – the broader Middle East. This time, we're not waiting for our enemies to gather in strength. This time, we're confronting them before they gain the capacity to inflict unspeakable damage on the world, and we're confronting their

hateful ideology before it fully takes root.

We see a day when people across the Middle East have governments that honor their dignity, and unleash their creativity, and count their votes. We see a day when across this region citizens are allowed to express themselves freely, women have full rights, and children are educated and given the tools necessary to succeed in life. And we see a day when all the nations of the Middle East are allies in the cause of peace.

We fight for this day, because the security of our own citizens depends on it. This is the great ideological struggle of the 21st century — and it is the calling of our generation. All civilized nations are bound together in this struggle between moderation and extremism. By coming together, we will roll back this grave threat to our way of life. We will help the people of the Middle East claim their freedom, and we will leave a safer and more hopeful world for our children and grandchildren.

God bless. (Applause.)

END 1:59 P.M. EDT

---

**Return to this article at:**
http://www.whitehouse.gov/news/releases/2006/09/20060905-4.html

 CLICK HERE TO PRINT

# EXHIBIT 9

CLOSED

# United States District Court
## District of Nevada (Reno)
## CRIMINAL DOCKET FOR CASE #: 3:04-cr-00034-RAM-RAM All Defendants

Case title: USA VS DALE T. EHRGOTT

Date Filed: 03/03/2004
Date Terminated: 01/14/2005

Assigned to: Magistrate Judge Robert A. McQuaid, Jr
Referred to: Magistrate Judge Robert A. McQuaid, Jr

### Defendant (1)

**Dale T. Ehrgott**
*TERMINATED: 01/14/2005*

represented by **Ramon Acosta**
Federal Public Defender
201 West Liberty Street
Suite 102
Reno, NV 89501-
Email: ramon_acosta@fd.org
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: FPD*

### Pending Counts

18:875C.F Transmitting Threat in Interstate Commerce
(1)

18:245.M Interfering with Federally Protected Activity
(1)

18:875A.F Transmitting Threat in Interstate Commerce
(1s)

18:875A.F Transmitting Threat in Interstate Commerce
(2s)

### Disposition

Dismissed w/o Prejudice; Disposed Date 1/13/2005

Convicted Final Plea of Guilty; 25.00 assessment; Disposed Date 1/13/2005

Dismissed w/o Prejudice; Disposed Date 1/13/2005

Dismissed w/o Prejudice; Disposed Date 1/13/2005

### Highest Offense Level (Opening)

Felony

### Terminated Counts

None

### Disposition

### Highest Offense Level (Terminated)

None

### Complaints

**Disposition**

None

---

### Plaintiff

**USA**                         represented by    **Paul L. Pugliese**
                                                   U.S. Attorney's Office
                                                   100 West Liberty Street
                                                   Suite 600
                                                   Reno, NV 89501
                                                   Email: Paul.L.Pugliese@usdoj.gov
                                                   *LEAD ATTORNEY*
                                                   *ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 03/03/2004 | 1 | INDICTMENT re EHRGOTT. (Entered: 03/04/2004) |
| 03/03/2004 | 2 | AO 257 re EHRGOTT. (Entered: 03/04/2004) |
| 03/03/2004 | 3 | GRAND JURY RETURNS (Dtd: 3/3/04) ORD re EHRGOTT tht indictmnts be fld; no sealed indictmnts. Summons to Iss to appear on 4/13/04 @ 3pm. (C/R: Stephanie Koetting) (Entered: 03/04/2004) |
| 03/03/2004 | 4 | SUMMONS ISSUED re EHRGOTT to appear on 4/13/04 @ 3pm. (Entered: 03/04/2004) |
| 04/13/2004 | 5 | FINANCIAL AFFIDAVIT re EHRGOTT. (Entered: 04/15/2004) |
| 04/13/2004 | 6 | ORDER APPOINTING COUNSEL ORD re EHRGOTT tht FPD is appt'd to represent D. See ord for specs. (Entered: 04/15/2004) |
| 04/13/2004 | 7 | BOND re EHRGOTT posted on 4/13/04. (Entered: 04/15/2004) |
| 04/13/2004 | 8 | ORDER REGARDING PRETRIAL PROCEDURE ORD re EHRGOTT tht P/T mtn's due 5/13/04; Disp mtn's due 5/24/04 & No Reply.See ord for specs. (Entered: 04/15/2004) |
| 04/14/2004 | 9 | INITIAL/ ARRAIGNMENT & PLEA (Dtd: 4/13/04) ORD re EHRGOTT tht FPD is appt'd to represent D. D pleads not guilty to Ct 1. Case is stckd for J/T on 5/25/04 @ 10am w/cal call 5/24/04 @ 9am. Ord re: P/T procedure is entered & cps srvd on cnsl in open Crt. D i (Entered: 04/15/2004) |
| 04/27/2004 | 10 | MOTION FOR DISCOVERY re EHRGOTT. (Entered: 04/28/2004) |
| 05/05/2004 | 11 | ORDER REGARDING TRIAL ORD re EHRGOTT tht attchd is a list of cases set for trial on 5/25/04 @ 10am w/cal call 5/24/04 @ 9am. Cnsl shl immediately subpoena all witnesses. See ord for specs. (Entered: 05/05/2004) |
| 05/17/2004 | | TRAVERSE Stip to cont P/T mtn's & trial obo Prtys. (Entered: 05/18/2004) |

| 05/18/2004 | 12 | STIPULATION re EHRGOTT to cont trial to 7/13/03 & p/t mtns to 5/25/04 & rspns to 6/8/04. 3161(h)(8)(A)&(B)(i)(iv) cited. (Entered: 05/18/2004) |
| 05/18/2004 | 13 | MINUTE ORDER ORD re EHRGOTT tht stip to cont p/t mtns & trial (#12) is apprvd by Crt. (Entered: 05/18/2004) |
| 06/25/2004 | 14 | ORDER REGARDING TRIAL ORD re EHRGOTT tht attchd is a list of cases set for trial on 7/13/04 @ 10am w/cal call 7/12/04 @ 9am. See ord for specs. (Entered: 06/29/2004) |
| 06/30/2004 | 15 | GRAND JURY RETURNS (Dtd: 6/30/04) ORD re EHRGOTT tht indictmnts be fld; no sealed indictmnts. SSI fld. A&P on SSI sched for 7/9/04 @ 3pm bef RAM. (C/R: Carol Hummel) (Entered: 07/01/2004) |
| 06/30/2004 | 16 | SUPERSEDING INDICTMENT re EHRGOTT. (Entered: 07/01/2004) |
| 07/02/2004 | 17 | NOTICE (OTHER) re EHRGOTT of intent to use certified domestic records of regularly conducted activity obo Govt. (m/f) (Entered: 07/02/2004) |
| 07/02/2004 | 18 | MOTION IN LIMINE re: EHRGOTT obo Govt. (m/f) (Entered: 07/06/2004) |
| 07/07/2004 | | TRAVERSE Stip to cont trial obo Prtys. (Entered: 07/07/2004) |
| 07/08/2004 | 19 | ORDER ON STIPULATION ORD re EHRGOTT tht trial currently set for 7/13/04 is cont'd to 10am on 9/14/04 & cal call 9/13/04 @ 9am. 3161(h)(8)(A)&(B)(i)(iv) cited. (Entered: 07/08/2004) |
| 07/08/2004 | 20 | MINUTE ORDER ORD re EHRGOTT tht A&P to SSI sched for 7/9/04 @ 3pm is cont'd to 8/6/04 @ 3pm. Cnsl hv also submitted a stip to cont trial. Cnsl hv been notified. (Entered: 07/09/2004) |
| 08/09/2004 | 21 | ARRAIGNMENT/PLEA (Dtd: 8/6/04) ORD re EHRGOTT tht D pleads not guilty to Cts 1 & 2. Case is stckd for J/T on 9/14/04 @ 10am w/cal call 9/13/04 @ 9am. Previous ord re: P/T procedure governs this case. D is cont'd on present terms of release. USPO shl prepa (Entered: 08/09/2004) |
| 09/01/2004 | 22 | MINUTE ORDER ORD re EHRGOTT tht D shl hv til 9/7/04 to rspnd to Govt's pndg mtn in lim (#18). Rspn shl be faxed to chmbrs & to opposing cnsl. There shl be no reply. Hrg on mtn in lim (#18) is set for 1:30pm 9/8/04. (Entered: 09/01/2004) |
| 09/01/2004 | 23 | MINUTE ORDER ORD re EHRGOTT tht jury instructs by either prty shl be submitted in the following manner - See ord for specs. (Entered: 09/01/2004) |
| 09/01/2004 | 27 | MOTION FOR MISCELLANEOUS RELIEF for hrg on mtn in limine obo P. (m) (Entered: 09/08/2004) |
| 09/01/2004 | 28 | PROPOSED VOIR DIRE obo P. (m) *Copy to ECR* (Entered: 09/08/2004) |
| 09/02/2004 | 24 | MINUTE ORDER Mtn for hrg on mtn in lim fld 9/1/04 denied as moot in light of our ord (#22) settng mtn for hrg. (Entered: 09/02/2004) |
| 09/07/2004 | 25 | RESPONSE TO MOTION re: Ehrgott; response to mtn in limine (#18) obo D. (f) (Entered: 09/08/2004) |
| 09/07/2004 | 26 | JURY INSTRUCTIONS re: Ehrgott; proposed JT instructions obo D. (m) (Entered: 09/08/2004) |
| 09/07/2004 | 29 | PROPOSED JURY INSTRUCTIONS obo P. (m) *Cpy to ECR* Additional attachment(s) added on 7/6/2007 (DRM, ). (Entered: 09/08/2004) |

| 09/08/2004 | 30 | PROPOSED JURY INSTRUCTIONS additional obo Ehrgott (Entered: 09/10/2004) |
|---|---|---|
| 09/08/2004 | 31 | PROPOSED VOIR DIRE copy obo Ehrgott (Entered: 09/10/2004) |
| 09/08/2004 | 32 | STATUS CONFERENCE re Ehrgott dtd 9/8/04 re Mtn limine #18: Ord P mtn limine #18 on the issue of subj intent of D is granted. see ord for spcfcs; Mtn is granted in respect to the issue of the reaction of the receipients at CARE and evid that this was (Entered: 09/10/2004) |
| 09/08/2004 | 33 | PROPOSED VOIR DIRE obo D, Ehrgott. (Entered: 09/10/2004) |
| 09/08/2004 | 34 | NOTICE (OTHER) EXPERT WITNESS obo D, Ehrgott. (m) (Entered: 09/10/2004) |
| 09/09/2004 | 35 | PROPOSED JURY INSTRUCTIONS SECOND ADDITIONAL propsd Jury Instructns obo D, Ehrogott. (Entered: 09/10/2004) |
| 09/09/2004 | 36 | MOTION FOR MISCELLANEOUS RELIEF req clarificatn of Crts rlg on Gvts mtn in lim (#32) obo D, Ehrgott. (m) (Entered: 09/10/2004) |
| 09/10/2004 | 37 | RESPONSE IN OPPOSITION obo mtn for clarificatn (#36) obo Gvt. (m) (Entered: 09/10/2004) |
| 09/10/2004 | 38 | MINUTE ORDER J/T will commenc on 9/14/04 @ 1:30PM. Cnsl hv been teleph notif. (Entered: 09/10/2004) |
| 09/13/2004 | 39 | MINUTE ORDER ORD re EHRGOTT tht mtn (#36) is granted & denied as follows - See ord for specs. (Entered: 09/13/2004) |
| 09/14/2004 | 40 | JURY TRIAL re Ehrgott 1st Day dtd 9/14/04: various exhbt admitted; P exhbts 1-3 are ordered admitted into evidence. Trial cont 9/15/04, 930am. D cont on bond; C/R Cathy Worken. Additional attachment(s) added on 7/6/2007 (DRM, ). (Entered: 09/15/2004) |
| 09/16/2004 | 41 | JURY TRIAL (Dtd: 9/15/04 - Day 2) ORD re EHRGOTT tht Benjamin Butler, Cary Hooper, Arsalan Iftikhar, John Pizer all testify. Mtn for jgmnt of acquittal is denied. Trial cont'd to 9/16/04 @ 9am. D is cont'd on bond. (C/R: Cathy Worken) (Entered: 09/17/2004) |
| 09/16/2004 | 42 | JURY NOTES re EHRGOTT. (Entered: 09/20/2004) |
| 09/17/2004 | 43 | JURY TRIAL (Dtd: 9/16/04 - 3rd Day) ORD re EHRGOTT tht opening argumnt presented. Responsive argumnt presented. Crt finds & adjudges a mistrial. Matter is resched for trial by jury on stckd call of 11/30/04 @ 10am. Cal call will be set on 11/29/04 @ 9am. (Entered: 09/20/2004) |
| 09/17/2004 | 44 | JURY VERDICT re EHRGOTT - Unsigned. (Entered: 09/20/2004) |
| 09/17/2004 | 45 | EXHIBIT LIST re EHRGOTT obo Govt. (Entered: 09/20/2004) |
| 09/17/2004 | 46 | EXHIBIT LIST re EHRGOTT obo D. (Entered: 09/20/2004) |
| 09/17/2004 | 47 | ORDER ORD re EHRGOTT tht clk of crt shl provide cpy o fthis ord to cnsl for P & D. Clk shl not provide them w/cps of the attchd exhbts, as prtys were provided these @ the time jury instructns were argued & settled. See ord for specs. Additional attachment(s) added on 7/6/2007 (LK, ). (Entered: 09/20/2004) |
| 09/20/2004 | | TRAVERSE Jury Disks obo Prtys - Located on left side of file. (Entered: 09/20/2004) |
| 11/08/2004 | 48 | TRANSCRIPT as to Trial Testimony of Benjamin Butler, Ibrahim Hooper, Arsalan Iftikhur & John Piser dtd 9/15/04 bef ECR. (C/R: Cathy M. Worken) (Entered: |

(4)

| | | 11/09/2004 |
|---|---|---|
| 11/10/2004 | 49 | MINUTE ORDER ORD re EHRGOTT tht jury trial currently sched on 11/30/04 is advanced to commence instead on 11/29/04 @ 10am. Cal call @ 11/29/04 is vacated. (Entered: 11/10/2004) |
| 11/16/2004 | | TRAVERSE re EHRGOTT Stip to Cont Trial obo Prtys. (Entered: 11/17/2004) |
| 11/17/2004 | 50 | ORDER ON STIPULATION ORD re EHRGOTT tht trial sched for 11/29/04 @ 10am is cont'd to 1/11/05 @ 10am. 3161(h)(8)(A) & (B)(i)(iv) cited. (Entered: 11/17/2004) |
| 12/27/2004 | 51 | ORDER ORD re EHRGOTT tht attchd is a list of cases which are presently set for trial on 1/11/05 @ 10am w/cal call 1/10/05 @ 9am. See ord for specs. (Entered: 12/28/2004) |
| 01/03/2005 | 52 | SUPERSEDING INFORMATION - FELONY re EHRGOTT. (Entered: 01/04/2005) |
| 01/03/2005 | 53 | AO 257 re EHRGOTT. (Entered: 01/04/2005) |
| 01/03/2005 | 54 | MINUTE ORDER ORD re EHRGOTT tht actn is referred to RAM for all furthr procdngs. J/T sched for 1/11/05 is vacated. (Entered: 01/04/2005) |
| 01/03/2005 | 55 | TRAVERSE re EHRGOTT Certificate of the Asst. Atty Gen. (Entered: 01/04/2005) |
| 01/04/2005 | 56 | MINUTE ORDER ORD re EHRGOTT tht @ the req of both prtys, a hrg is set for 1/13/05 @ 2:15pm where D will enter a plea of guilty to the SSI fld on 1/3/05. D will be referred to USPO for presentence rpt. Cnsl hv been notified. (Entered: 01/05/2005) |
| 01/13/2005 | 57 | PLEA AND SENTENCING (Dtd: 1/13/05) ORD re EHRGOTT tht plea of guilty is accepted & D is adjudged guilty. Sentence is imposed as to Superseding Misdo. D is advised of right to appl. (C/R: Kathryn French) (Entered: 01/14/2005) |
| 01/13/2005 | 58 | PLEA AGREEMENT/MEMORANDUM re EHRGOTT. (Entered: 01/14/2005) |
| 01/14/2005 | 59 | JUDGMENT re EHRGOTT tht D plead guilty to 1 Ct superseding class A misdo info. D is sentenced to unsupervised probatn for term of 1 yr. D shl perform 50 hrs of community srvc which will be supervised by USPO. $25 assessmnt fee due frm D. (Entered: 01/14/2005) |
| 01/18/2005 | | TRAVERSE Ord for Dismuml obo Govt. (Entered: 01/19/2005) |
| 01/20/2005 | 60 | ORDER ORD re EHRGOTT tht SSI fld 6/30/04 is dismissed. See ord for specs. (Entered: 01/20/2005) |
| 01/20/2005 | 61 | MOTION FOR MISCELLANEOUS RELIEF re EHRGOTT to modify sentence of probatn & probatn conditns obo D, Ehrgott. (m) (Entered: 01/20/2005) |
| 01/24/2005 | 62 | RESPONSE TO MOTION re EHRGOTT to mtn to modify sentence of probatn & probatn conditns (#61) obo Govt. (m/f) (Entered: 01/24/2005) |
| 01/27/2005 | 63 | TRANSCRIPT as to Change of Plea to SSI dtd 1/13/05 bef RAM. (C/R: Kathryn M. French) (Entered: 01/27/2005) |
| 01/27/2005 | 64 | MINUTE ORDER ORD re EHRGOTT tht a hrg is sched on 2/7/05 @ 10:30am re: Ds mtn (#61). Mr. Pugliese, Mr. Acosta & USPO hv been notified. (Entered: 01/27/2005) |
| 02/07/2005 | 65 | STATUS CONFERENCE (Dtd: 2/7/05) Re: Ds, mtn to modify sentc of probatn & probatn condits (#61). Mtn grntd. Status conf set for 8/1/05 @ 9am. If evid of compliance w/comun srv requiremnt is provided to crt, prior to that dt, status conf may |

| | | be vacated. (C (Entered: 02/10/2005) |
|---|---|---|
| 02/08/2005 | 66 | JUDGMENT D, Ehrgott G to misdemeanor informatn. D sentc to unsupervised probatn for 1 year. D sh perform 50 hrs of commun srv wh will be supervised by Ds atty, Mr. Ramon Acosta. Ds cnsl sh propose type of commun srv for Crts apprvl. (Entered: 02/10/2005) |
| 06/23/2005 | 67 | LETTER dtd 6/23/05 from the Salvation Army Reno Corps, re Ehrgott has completed 51 hours of community service. (Entered: 06/24/2005) |
| 06/30/2005 | 68 | NOTICE (OTHER) of Ehrgott completion of community service requirement and mtn to vacate status conf (Entered: 06/30/2005) |
| 07/01/2005 | 69 | MINUTE ORDER Ehrgott mtn to vacate status conf #68 is granted. The status conf set for 8/1/05 9am is hereby vac. (Entered: 07/05/2005) |

| PACER Service Center | | |
|---|---|---|
| **Transaction Receipt** | | |
| 06/24/2008 06:31:54 | | |
| PACER Login: | cs0202 | Client Code: | Syring |
| Description: | Docket Report | Search Criteria: | 3:04-cr-00034-RAM-RAM |
| Billable Pages: | 4 | Cost: | 0.32 |

1   DANIEL G. BOGDEN

    United States Attorney

2   PAUL L. PUGLIESE

    Assistant United States Attorney

3   100 W. Liberty Street, Suite 600

    Reno, Nevada 89501

4   Tel: (775) 784-5438

    Fax: (775) 784-5181

5   Attorneys for Plaintiff

FILED

2004 MAR -3 PH 3:41

CLERK S. WILSON
CLERK

BY M

6                 UNITED STATES DISTRICT COURT

7                   DISTRICT OF NEVADA

8   UNITED STATES OF AMERICA,      )     CR-N-04-0034-ECR-RAM

                                    )

9              Plaintiff,        )

             v.                  )     **INDICTMENT FOR VIOLATION OF:**

10                                   )     **TITLE 18, UNITED STATES CODE,**

    DALE T. EHRGOTT,             )     **SECTION 875(c) - Transmitting Threat in**

11                                   )     **Interstate Commerce**

             Defendant.       )

12   _____ )

13   THE GRAND JURY CHARGES THAT:

14            On or about August 28, 2003, in the District of Nevada, the defendant, DALE T.

15   EHRGOTT, did willfully and knowingly transmit in interstate commerce from Reno, Nevada, to

16   Washington, D.C., an electronic mail communication via the internet to members of the Council on

17   American-Islamic Relations, which electronic mail message contained a threat to injure members of the

18   Council on American-Islamic Relations, to wit: "We accept you[r] holy war. Looking forward to it very

19   much. We can deal with you easily especially because you are on our soil. You have taught us much

20   about terrorism so get ready to be the receiver," all in violation of Title 18, United States Code, Section

21   875(c).

22                               A TRUE BILL:

23

24                               FOREPERSON

25   DANIEL G. BOGDEN

    United States Attorney

26

27

28   PAUL L. PUGLIESE

    Assistant United States Attorney

(7)

1 DANIEL G. BOGDEN
United States Attorney
2 PAUL L. PUGLIESE
Assistant United States Attorney
3 100 W. Liberty Street, Suite 600
Reno, Nevada 89501
4 Tel: (775) 784-5438
Fax: (775) 784-5181
5 Attorneys for Plaintiff

FILED

2004 JUN 30 PH 1: 18

LANCE S. WILSON
CLERK

BY _____ DEPUTY.

6                    UNITED STATES DISTRICT COURT

7                         DISTRICT OF NEVADA

8 UNITED STATES OF AMERICA,                )
                                           )
9                     Plaintiff,           )   CR-N-04-0034-ECR-RAM
                                           )
        v.                                 )
10                                         )   SUPERSEDING INDICTMENT FOR
   DALE T. EHRGOTT,                        )   VIOLATION OF:
11                                         )
                                           )   TITLE 18, UNITED STATES CODE,
12                    Defendant.           )   SECTION 875(c) - Transmitting Threat in
   _____)   Interstate Commerce (Counts One and Two)

13 THE GRAND JURY CHARGES THAT:

14                            COUNT ONE

15     On or about August 28, 2003, in the District of Nevada, the defendant, DALE T.

16 EHRGOTT, did willfully and knowingly transmit in interstate commerce from Reno, Nevada, to

17 Washington, D.C., an electronic mail communication via the internet to members of the Council

18 on American-Islamic Relations, which electronic mail message contained a threat to injure

19 members of the Council on American-Islamic Relations, to wit: "We accept you[r] holy war.

20 Looking forward to it very much. We can deal with you easily especially because you are on our

21 soil. You have taught us much about terrorism so get ready to be the receiver," all in violation of

22 Title 18, United States Code, Section 875(c).

23                            COUNT TWO

24     On or about October 6, 2003, in the District of Nevada, the defendant, DALE T.

25 EHRGOTT, did willfully and knowingly transmit in interstate commerce from Reno, Nevada, to

26 Washington, D.C., an electronic mail communication via the internet to members of the Council

16

⑧

1  on American-Islamic Relations, which electronic mail message contained a threat to injure

2  members of the Council on American-Islamic Relations, to wit: "You are making a lot of people

3  angry and you idiots are sitting ducks," all in violation of Title 18, United States Code, Section

4  875(c).

5                                          A TRUE BILL:

6

7                                          FOREPERSON

8  DANIEL G. BOGDEN
   United States Attorney
9

10

11 PAUL L. PUGLIESE
   Assistant United States Attorney
12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

1  DANIEL G. BOGDEN
   United States Attorney
2  PAUL L. PUGLIESE
   Assistant United States Attorney
3  100 W. Liberty Street, Suite 600
   Reno, Nevada 89501
4  Tel: (775) 784-5438
   Fax: (775) 784-5181
5  Attorneys for Plaintiff

6              UNITED STATES DISTRICT COURT

7                  DISTRICT OF NEVADA

8  UNITED STATES OF AMERICA,        )
                                    )   CR-N-04-0034-ECR-RAM
9              Plaintiff,           )
                                    )
         v.                         )   SUPERSEDING INFORMATION FOR
10                                  )   VIOLATION OF:
   DALE T. EHRGOTT,                 )
11                                  )   TITLE 18, UNITED STATES CODE,
               Defendant.           )   SECTION 245(b)(2)(C) and (E)- Interfering
12 _____)   with Federally Protected Activity
                                        (Count One)
13

14 THE UNITED STATES ATTORNEY CHARGES THAT:

15                      COUNT ONE

16      On or about August 28, 2003, in the District of Nevada, the defendant, DALE T.

17 EHRGOTT, did willfully and knowingly, by threat of force, intimidate and interfere with

18 members of the Council on American-Islamic Relations, by sending an electronic mail message

19 containing a threat to injure members of the Council on American-Islamic Relations, to wit: "We

20 accept you[r] holy war. Looking forward to it very much. We can deal with you easily

21 especially because you are on our soil. You have taught us much about terrorism so get ready to

22 be the receiver," because members of the Council on American Islamic Relations were Islamic,

23 because they were enjoying employment with a private employer, and because they were

24 \ \ \

25 \ \ \

26 \ \ \

52

(10)

1    using a facility of interstate commerce, i.e., publicizing their organization's mission via

2    television commercials and internet communications, all in violation of Title 18, United States

3    Code, Section 245(b)(2)(C) and (E).

4

5                          DANIEL G. BOGDEN
                           United States Attorney
6

7                          _Paul L. Pugliese_

8                          PAUL L. PUGLIESE
                           Assistant United States Attorney
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26                                           2

FILED

2005 JAN 13 PM 4: 37

LANCE S. WILSON
CLERK

BY_____

UNITED STATES DISTRICT COURT
DISTRICT OF NEVADA
RENO, NEVADA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CR-N-04-0034-ECR (RAM) |
| | ) | |
| Plaintiff, | ) | MINUTES OF THE COURT |
| | ) | |
| vs. | ) | DATE: JANUARY 13, 2005 |
| | ) | |
| DALE T. EHRGOTT, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

PRESENT: HONORABLE ROBERT A. McQUAID, JR., U.S. MAGISTRATE JUDGE

Deputy Clerk: Rosemary Damron    Reporter: Kathryn French

U.S. Attorney by: Paul Pugliese

Counsel for the Defendant: Ramon Acosta, Ass't FPD

U.S. Probation Officer: Martin Mace

PROCEEDINGS: **ENTRY OF PLEA to AMENDED SUPERSEDING MISDEMEANOR
INFORMATION (Class A); SENTENCING**

2:20 p.m. Court convenes.

The defendant is present on bond with counsel.

The Court is in receipt of the Memorandum of Plea Agreement which
shall be filed.

The defendant is sworn.    True Name: Dale T. Ehrgott
Education: High School    Age: 40 years old

The defendant recites the circumstances of the offense in his own
words.  The government recites what it would be prepared to prove
at trial.

A plea of guilty to the Superseding Misdemeanor Information is
entered.  It is the finding of the Court that the defendant is
fully competent and capable of entering an informed plea, that it
is a knowing and voluntary plea.  The defendant is aware of the
nature of the charges and the consequences of the plea.  The plea

5·7

12

Page Two
CR-N-04-34-ECR (RAM)
USA vs Dale T. Ehrgott
January 13, 2005


of guilty is a knowing and voluntary plea supported by an
independent basis in fact, containing each of the essential
elements of the offense.

The plea of guilty is accepted and the defendant is adjudged
guilty.

Counsel waive referral to the U.S. Probation Office for a
presentence investigation and report.

Allocution presented to the Court by counsel.

**SENTENCE** is imposed as to the  Superseding Misdemeanor
Information filed on January 3, 2005.

Defendant is sentenced as follows: One (1) year of UNSUPERVISED
Probation with mandatory conditions; 50 hours of community
service; Mr. Acosta will propose the type of community service
for the Court's approval; the community service would be
supervised by the U.S. Probation Office; mandatory special
assessment of $25.00.

Defendant is advised of his appeal rights.

2:45 p.m. Court adjourns.


                              LANCE S. WILSON, CLERK

                         By:  Rosemary Danifon
                              Deputy Clerk

(13)



**U.S. Department of Justice**

*United States Attorney*
*District of Nevada*

---

| | |
|---|---|
| *100 West Liberty, Suite 600* | *(775) 784-5438* |
| *Reno, Nevada 89501* | *FAX: (775) 784-5181* |

January 13, 2005

## MEMORANDUM OF PLEA NEGOTIATIONS

TO:        Honorable Robert A. McQuaid, Jr.
             United States Magistrate Judge

FROM:     Paul L. Pugliese
             Assistant United States Attorney

SUBJECT:  United States v. Dale T. Ehrgott
             CR-N-04-0034-ECR-RAM

I.            **PLEA NEGOTIATION**

        The defendant, Dale T. Ehrgott, is charged in a superseding information filed on January 3, 2005, with a single count of interference with a federally protected activity in violation of Title 18, United States Code, Section 245(b). The Government and the defendant have agreed to the following:

        1.  The defendant will plead guilty to the single count of superseding information filed on January 3, 2005.  The Government will file a motion to dismiss the superseding indictment filed on June 30, 2004, upon acceptance of defendant's plea.

        2.  The parties agree and consent that the case may be remanded to a United States Magistrate Judge for entry of plea and sentencing.

        3.  This plea is made pursuant to Rule 11(c)(1)(B) of the Federal Rules of Criminal Procedure and is not intended to be binding on the Court.

        4.  The parties agree that, pursuant to <u>United States v. Booker</u>, No. 04-104 (U.S.S.C. 2005), the United States Sentencing Commission Guidelines are advisory and should be used by the Court in determining a reasonable sentence along with the factors to be considered in imposing a sentence set forth at Title 18, United States Code, Section 3553.

        5.  The Base Offense Level for the offense set forth in count one of the superseding information, pursuant to U.S.S.G. §2H1.1(a)(1) and §2A6.1(a)(1), is Level 12.

        6.  The parties agree and stipulate that the Guidelines advise that the Offense Level should be decreased by 4-levels pursuant to U.S.S.G. §2A6.1(b)(5) because the specific offense characteristics contained in U.S.S.G. §2A6.1(b)(1) - (4) do not apply and the offense involved a single instance evidencing little or no deliberation.

55  (14)

United States v. Dale T. Ehrgott
January 13, 2005
Page 2

      7. The parties agree and stipulate that the Guidelines advise that the Offense Level will be increased by 3-levels pursuant to U.S.S.G. §3A1.1 because the victim was selected because of the actual or perceived religion of any person.

      8. The Government agrees not to oppose the defendant's request for a reduction of 2 levels for Acceptance of Responsibility under U.S.S.G. §3E1.1(a) as long as the defendant continues to clearly demonstrate his acceptance of Responsibility in all further criminal proceedings.

      9. The parties are unaware of any other facts or circumstances beyond those set forth, above, that would allow for any other adjustments to the Offense Level under U.S.S.G. Chapters Two or Three.

      10. The parties agree that the Criminal History Category is based upon information concerning this offense and the defendant as it is known at the present time and may change based upon the investigation by the United States Probation Office and the findings of the Court at the time of sentencing.

      11. The Government will recommend a sentence that includes a 1-year period of probation with the mandatory conditions set forth at Title 18, United States Code, Section 3563(a)(1), (a)(3), and (a)(6)(B), to include 50 hours of community service as assigned by the U.S. Probation Department.

      12. The defendant is aware that his sentence will be imposed in accordance with the Federal Sentencing Guidelines and Policy Statements. The defendant is aware that the Court has jurisdiction and authority to impose any sentence within the statutory maximum set for the offense to which the defendant pleads guilty.

      13. The defendant is also aware that Title 18, United States Code, Section 3742, gives the defendant a right to appeal the sentence to be imposed and that other federal laws give the defendant rights to appeal other aspects of his conviction. In exchange for the concessions made by the United States in the instant plea agreement, the defendant knowingly and expressly waives his right to appeal any sentence to be imposed, further waives his right to appeal the manner in which that sentence was determined on the grounds set forth in Title 18, United States Code, Section 3742, and further waives his right to appeal any other aspect of his conviction or sentence.



United States v. Dale T. Ehrgott
January 13, 2005
Page 3


II.          PENALTY:

Statutory:

       Title 18, United States Code, Section 245(b) provides for a penalty of imprisonment of not more than one year, a fine under Title 18, United States Code, or both.

       Title 18, United States Code, Section 3571(b)(5), provides that a fine of not more than $100,000.00 may be imposed in addition to any term of imprisonment.

       Probation is available as a punishment for this offense. If the Court sentences the defendant to probation, Title 18, United States Code, Section 3561(c)(2) provides that a term of probation may not exceed 5 years.

       Under 18 U.S.C. §3559(a)(6), the instant offense is a Class A misdemeanor, and, therefore, pursuant to 18 U.S.C. §3583(b)(3), an authorized term of supervised release of not more than 1 year may be imposed.

       A federal prison sentence can no longer be shortened by early release on parole, because parole has been abolished.

       Title 18, United States Code, Section 3663 permits restitution as deemed appropriate by the Court.

       Pursuant to Title 18, United States Code, Section 3013, a mandatory special assessment of $25.00 must be imposed for the count of conviction.

Sentencing Guidelines:

       Pursuant to Title 18, United States Code, Section 3551, et seq., the Sentencing Reform Act of 1984, and the Sentencing Guidelines, the possible range of sentence to imprisonment for the offense of interference with a federally protected activity in violation of Title 18, United States Code, Section 245(b) is from 4-10 months for Offense Level 9 with a Criminal History Category I to 27-33 months for an Offense Level 11 with a Criminal History Category VI, depending upon the Court's determination of the Offense Level and the Criminal History Category. (NOTE: Statutory maximum is 12 months imprisonment)

       Probation is available if the minimum term of imprisonment under the Guideline range is in Zone A, U.S.S.G. §5B1.1(a)(1) and §5C1.1(b).

(16)

United States v. Dale T. Ehrgott
January 13, 2005
Page 4

If the minimum term is in Zone B, probation is only available if it includes a condition or combination of conditions that require intermittent confinement, community confinement, or home detention. U.S.S.G. §5B1.1(a)(2) and §5C1.1(c)(3). The Court may also impose a sentence of imprisonment that includes a term of supervised release with a condition that substitutes community confinement or home detention, provided that at least one month is satisfied by imprisonment. U.S.S.G. §5C1.1(c)(2).

If the minimum term is in Zone C, a term of imprisonment must be imposed, but may include a term of supervised release with a condition that substitutes community confinement or home detention, but at least one-half the minimum term must be satisfied by imprisonment. U.S.S.G. §5C1.1(d)(2) .

If the minimum term is in Zone D, then the minimum term must be satisfied by a sentence of imprisonment only. U.S.S.G. §5C1.1(f).

Since the maximum term of imprisonment is 1 year and supervised release is not required by statute in the instant case, the imposition of supervised release is discretionary. U.S.S.G. §5D1.1(a) and (b).

Under U.S.S.G. §5E1.2(c), a fine may be imposed depending upon the Court's finding of the appropriate Offense Level, which may range from a minimum of $1,000.00 at Offense Level 9 to a maximum of $20,000.00 at Offense Level 11. Pursuant to U.S.S.G. §5E1.2(e), the Court is authorized to waive any fine, impose a lesser fine or an alternative sanction, such as community service, if a defendant establishes he does not have the ability to pay a fine.

Pursuant to U.S.S.G. §5E1.3, a mandatory special assessment of $25.00 must be imposed for each count of conviction.

III.        ESSENTIAL ELEMENTS OF THE OFFENSE

Before a verdict of guilty may be reached, the Government would have to prove the essential elements of the offense beyond a reasonable doubt as follows:

| | |
|---|---|
| First: | That the defendant used force or threats of force; |
| Second: | That the defendant intimidated or interfered with or attempted to intimidate or interfere with the victim; |
| Third: | That the defendant acted because of the victim's race, color, |

17

United States v. Dale T. Ehrgott
January 13, 2005
Page 5

> religion, or national origin, and, because the victim was enjoying employment with a private employer and because the victim was using a facility of interstate commerce; and,

>> Fourth:    That the defendant acted willfully.

## IV.    FACTS TO SUPPORT A PLEA OF GUILTY

On August 28, 2003, the Defendant willfully sent an e-mail from his computer in Reno, Nevada to members of the Council on American-Islamic Relations containing the following language: "We accept you[r] holy war. Looking forward to it very much. We can deal with you easily especially because you are on our soil. You have taught us much about terrorism so get ready to be the receiver." The Defendant sent the e-mail in order to intimidate and interfere with members of the Council on American-Islamic Relations and because they were Islamic and enjoying employment with a private employer and because they were using a facility of interstate commerce, i.e., publicizing their organization's mission via television commercials and internet communications as a means to support its stated mission of empowering the Muslim community in America through political and social activism.

## V.    STATEMENT OF THE DEFENDANT

I, DALE T. EHRGOTT, hereby acknowledge that I have thoroughly read and reviewed this memorandum with my attorney and agree that this memorandum completely and accurately states the facts supporting my plea of guilty and the negotiations between myself, my attorney, and the United States Attorney's Office. I have discussed the contents of this memorandum with my attorney and it has been explained to my satisfaction.

I have explained the facts and circumstances surrounding this case completely to my attorney and have been advised of what legal courses of action I might take. These discussions have included what might happen if I go to trial, what evidence the Government has against me, and the possible defenses, if any, I may have to these criminal charges.

My attorney has not promised me anything not mentioned in this plea memorandum and, in particular, my attorney has not promised that I will get any specific sentence. I understand that any discussions with my attorney about the possible sentence I might receive from the Court are just predictions and not binding on the Court. I know I cannot withdraw my guilty plea because my attorney's sentencing predictions turn out to be wrong.

My attorney has also explained to me my Constitutional Rights, including my right to a jury trial, to confront my accusers, to call witnesses on my own behalf, and my right to

(18)

United States v. Dale T. Ehrgott
January 13, 2005
Page 6

remain silent. My attorney has further explained to me that I have to waive these rights, that is, give them up, in order to have my guilty plea accepted by the Court.

I understand that the United States Attorney's Office will fully inform the Court and the United States Probation Office of the nature, scope, and extent of my conduct regarding the facts and circumstances of the charges against me, and any and all related matters in aggravation or mitigation concerning the issue of my sentencing.

I know if the Government is making a non-binding recommendation as to what type of sentence I should receive, the Court does not have to follow that recommendation. I also understand that I cannot withdraw my guilty plea because the Court decides to not follow the non-binding sentencing recommendation of the Government.

I further understand that the matter of sentencing is entirely up to the Court. Any stipulations or agreements between myself, my attorney, and the United States Attorney's Office are not binding upon the Court. I know the Court will decide my sentence based upon the facts of this case and my personal background. I fully understand that my sentence could be anywhere within the range set forth in Section II of this memorandum.

Finally, I understand that the decision to plead guilty or go to trial is mine alone. As stated above, I have discussed this case fully with my attorney and received legal advice about what is the best course of action that I should take. My decision after receiving this advice is to plead guilty under this agreement.

_____
DALE T. EHRGOTT
Defendant

_____
1-13-2005
Date

_____
RAMON ACOSTA
Assistant Federal Public Defender
Counsel for Defendant

_____
1-13-2005
Date

(19)

AO 245B  (Rev. 12/03) Judgment in a Criminal Case
    Sheet 1

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEVADA

**FILED**

2005 JAN 14  AM 8: 35

LANCE S. WILSON
CLERK

UNITED STATES OF AMERICA
vs.

DALE T. EHRGOTT,

### JUDGMENT IN A CRIMINAL CASE

**CASE NUMBER:**    CR-N-04-0034-ECR (RAM)

_____ DEPUTY

THE DEFENDANT:

Ramon Acosta, Ass't Federal Public Defender
**DEFENDANT'S ATTORNEY**

| | | |
|---|---|---|
| (X) | pled guilty to the one-count  superseding class A misdemeanor information |
| ( ) | pled nolo contendere to count(s) _____ |
| | which was accepted by the court. |
| ( ) | was found guilty on count(s) _____ |
| | after a plea of not guilty. |

The defendant is adjudicated guilty of these offense(s):

| Title & Section | Nature of Offense | Offense Ended | Count |
|---|---|---|---|
| 18:245(b)(2)(C) and (E) | Interfering with Federally Protected Activity | August 28, 2003 | 1 |

The defendant is sentenced as provided in pages 2 through __4__ of this judgment.  The sentence is imposed pursuant to the Sentencing Reform Act of 1984.

( )    The defendant has been found not guilty on count(s) _____
( )    Count(s) _____ (is)(are) dismissed on the motion of the United States.

IT IS ORDERED that the defendant shall notify the United States Attorney for this district within 30 days of any change of name, residence, or mailing address until all fines, restitution, costs, and special assessments imposed by this judgment are fully paid.  If ordered to pay restitution, the defendant shall notify the court and United States attorney of material changes in economic circumstances.

January 13, 2005
Date of Imposition of Judgment

Signature of Judge

ROBERT A. McQUAID, JR.
U.S. MAGISTRATE JUDGE
Name and Title of Judge

1-13-05

Date



DIST... NEVADA
ENTERED ... ED

**JAN 1 4 2005**

CLERK U.S. DISTRICT COURT
_____ DEPUTY

59

20

AO 245B (Rev. 12/03) Judgment in a Criminal Case
Sheet 4 - Probation

DEFENDANT:    DALE T. EHRGOTT                                     Judgment - Page __2__
CASE NUMBER:  CR-N-04-0034-ECR (RAM)

# PROBATION

The defendant is hereby sentenced to UNSUPERVISED probation for a term of __ONE (1) YEAR.__

The defendant shall not commit another federal, state, or local crime.

The defendant shall not unlawfully possess a controlled substance. The defendant shall refrain from any unlawful use of a controlled substance. The defendant shall submit to one drug test within 15 days of placement on probation and at least two periodic drug tests thereafter, as determined by the court.

( )    The above drug testing condition is suspended based on the court's determination that the defendant poses a low risk of future substance abuse. (Check, if applicable.)
( )    The defendant shall not possess a firearm, destructive device, or any other dangerous weapon. (Check, if applicable.)
( )    The defendant shall cooperate in the collection of DNA as directed by the probation officer. (Check, if applicable.)
( )    The defendant shall register with the state sex offender registration agency in the state where the defendant resides, works, or is a student, as directed by the probation officer. (Check, if applicable.)
( )    The defendant shall participate in an approved program for domestic violence. (Check, if applicable.)

If this judgment imposes a fine or a restitution, it is a condition of probation that the defendant pay in accordance with the Schedule of Payments sheet of this judgment.

The defendant must comply with the standard conditions that have been adopted by this court as well as with any additional conditions on the attached page.

## STANDARD CONDITIONS OF SUPERVISION

1)    the defendant shall not leave the judicial district without the permission of the court or probation officer;
2)    the defendant shall report to the probation officer and shall submit a truthful and complete written report within the first five days of each month;
3)    the defendant shall answer truthfully all inquiries by the probation officer and follow the instructions of the probation officer;
4)    the defendant shall support his or her dependants and meet other family responsibilities;
5)    the defendant shall work regularly at a lawful occupation unless excused by the probation officer for schooling, training, or other acceptable reasons;
6)    the defendant shall notify the probation officer ten days prior to any change in residence or employment;
7)    the defendant shall refrain from excessive use of alcohol;
8)    the defendant shall not frequent places where controlled substances are illegally sold, used, distributed, or administered;
9)    the defendant shall not associate with any persons engaged in criminal activity, and shall not associate with any person convicted of a felony unless granted permission to do so by the probation officer;
10)   the defendant shall permit a probation officer to visit him or her at any time at home or elsewhere and shall permit confiscation of any contraband observed in plain view of the probation officer;
11)   the defendant shall notify the probation officer within seventy-two hours of being arrested or questioned by a law enforcement officer;
12)   the defendant shall not enter into any agreement to act as an informer or a special agent of a law enforcement agency without the permission of the court;
13)   as directed by the probation officer, the defendant shall notify third parties of risks that may be occasioned by the defendant's criminal record or personal history or characteristics, and shall permit the probation officer to make such notifications and to confirm the defendant's compliance with such notification requirement.



AO 245B   (Rev. 12/03) Judgment in a Criminal Case
    Sheet 4A - Probation

| DEFENDANT: | DALE T. EHRGOTT | Judgment - Page  3 |
|---|---|---|
| CASE NUMBER: | CR-N-04-0034-ECR (RAM) | |

## ADDITIONAL PROBATION TERMS

1.   <u>Community Service</u> - The defendant shall perform 50 hours of community service which will be supervised by the Probation Office.  The defendant's counsel shall propose the type of community service for the Court's approval.

(52)

AO 245B   (Rev 12/03) Judgment in a Criminal Case
    Sheet 5 - Criminal Monetary Penalties

| | |
|---|---|
| DEFENDANT:   DALE T. EHRGOTT | Judgment - Page  4 |
| CASE NUMBER:  CR-N-04-0034-ECR (RAM) | |

## CRIMINAL MONETARY PENALTIES

| | Assessment | Fine | Restitution |
|---|---|---|---|
| Totals: | $25.00<br>Due and payable immediately. | Waived | |

23

AO 245B   (Rev. 12/03) Judgment in a Criminal Case
          Sheet 1

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEVADA
## AMENDED/
## JUDGMENT IN A CRIMINAL CASE

FILED

UNITED STATES OF AMERICA
vs.

DALE T. EHRGOTT,

CASE NUMBER:     CR-N-04-0034-ECR (RAM)

Ramon Acosta, Ass't Federal Public Defender

THE DEFENDANT:                    DEFENDANT'S ATTORNEY

(X)   pled guilty to the one-count   superseding class A misdemeanor information
( )   pled nolo contendere to count(s) _____
      which was accepted by the court.
( )   was found guilty on count(s) _____
      after a plea of not guilty.

The defendant is adjudicated guilty of these offense(s):

| Title & Section | Nature of Offense | Offense Ended | Count |
|---|---|---|---|
| 18:245(b)(2)(C) and (E) | Interfering with Federally Protected Activity | August 28, 2003 | I |

The defendant is sentenced as provided in pages 2 through _4_ of this judgment. The sentence is imposed pursuant to the Sentencing Reform Act of 1984.

( )   The defendant has been found not guilty on count(s) _____
( )   Count(s) _____ (is)(are) dismissed on the motion of the United States.

IT IS ORDERED that the defendant shall notify the United States Attorney for this district within 30 days of any change of name, residence, or mailing address until all fines, restitution, costs, and special assessments imposed by this judgment are fully paid. If ordered to pay restitution, the defendant shall notify the court and United States attorney of material changes in economic circumstances.

February 7, 2005
Date of Imposition of Amended Judgment

Signature of Judge

ROBERT A. McQUAID, JR.
U.S. MAGISTRATE JUDGE
Name and Title of Judge

2-7-05
Date

AO 245B   (Rev. 12/03) Judgment in a Criminal Case
        Sheet 4 - Probation
================================================================

DEFENDANT:     DALE T. EHRGOTT                                    Judgment - Page ___2___
CASE NUMBER:   CR-N-04-0034-ECR (RAM)

# PROBATION

The defendant is hereby sentenced to UNSUPERVISED probation for a term of <u>ONE (1) YEAR.</u>


The defendant shall not commit another federal, state, or local crime.

The defendant shall not unlawfully possess a controlled substance. The defendant shall refrain from any unlawful use of a controlled substance. The defendant shall submit to one drug test within 15 days of placement on probation and at least two periodic drug tests thereafter, as determined by the court.

( x )   The above drug testing condition is suspended based on the court's determination that the defendant poses a low risk of
        future substance abuse.  (Check, if applicable.)
(  )    The defendant shall not possess a firearm, destructive device, or any other dangerous weapon.  (Check, if applicable.)
(  )    The defendant shall cooperate in the collection of DNA as directed by the probation officer.  (Check, if applicable.)
(  )    The defendant shall register with the state sex offender registration agency in the state where the defendant resides, works,
        or is a student, as directed by the probation officer.  (Check, if applicable.)
(  )    The defendant shall participate in an approved program for domestic violence.  (Check, if applicable.)

        If this judgment imposes a fine or a restitution, it is a condition of probation that the defendant pay in accordance with the
Schedule of Payments sheet of this judgment.

AO 245B  (Rev. 12/03) Judgment in a Criminal Case
Sheet 4A - Probation

DEFENDANT:       DALE T. EHRGOTT                                          Judgment - Page  3
CASE NUMBER:   CR-N-04-0034-ECR (RAM)

## ADDITIONAL CONDITIONS

1.  Community Service - The defendant shall perform 50 hours of community service which will be
    supervised by the defendant's attorney, Mr. Ramon Acosta.   The defendant's counsel shall propose
    the type of community service for the Court's approval.

AO 245B   (Rev 12/03) Judgment in a Criminal Case
Sheet 5 - Criminal Monetary Penalties

DEFENDANT:      DALE T. EHRGOTT                                          Judgment - Page   4
CASE NUMBER:   CR-N-04-0034-ECR (RAM)

## CRIMINAL MONETARY PENALTIES

|          | Assessment | Fine | Restitution |
|----------|-----------|------|-------------|
| Totals:  | $25.00<br>Due and payable immediately. | Waived | |

(27)

# EXHIBIT 10

CLOSED

# United States District Court
## District of Massachusetts (Boston)
## CRIMINAL DOCKET FOR CASE #: 1:02-cr-10049-MLW-1

Case title: USA v. Rolnik

Date Filed: 02/14/2002
Date Terminated: 08/28/2002

Assigned to: Chief Judge Mark L. Wolf

### Defendant (1)

**Zachary J. Rolnik**
*TERMINATED: 09/03/2002*

represented by **John F. Palmer**
Law Office of John F. Palmer, P.C.
One Faneuil Hall Marketplace
South Building, 4th Floor
Boston, MA 02109
617-723-7010
Fax: 617-723-5601
Email: jpalmer@socialaw.com
*TERMINATED: 09/03/2002*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: Retained*

### Pending Counts

18:245.M(b)(5)INTERFERENCE WITH
FEDERALLY PROTECTED
ACTIVITIES
(1)

### Disposition

Deft is committed to the custody of the
USPB for a total term of 60 days. SA -
$25.00; Fine $5,000.00

### Highest Offense Level (Opening)

Misdemeanor

### Terminated Counts

None

### Disposition

### Highest Offense Level (Terminated)

None

### Complaints

None

### Disposition

### Notice

**Pretrial Services**                      represented by  **Pretrial Services**
                                                            US Pretrial Services
                                                            1 Courthouse Way
                                                            Boston, MA 02210
                                                            *LEAD ATTORNEY*
                                                            *ATTORNEY TO BE NOTICED*

**Plaintiff**

**USA**                                    represented by  **S. Theodore Merritt**
                                                            United States Attorney's Office
                                                            John Joseph Moakley Federal Courthouse
                                                            1 Courthouse Way
                                                            Suite 9200
                                                            Boston, MA 02210
                                                            617-748-3123
                                                            Fax: 617-748-3954
                                                            Email: theodore.merritt@usdoj.gov
                                                            *LEAD ATTORNEY*
                                                            *ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 02/14/2002 | 1 | INFORMATION filed as to Zachary J. Rolnik Zachary J. Rolnik (1) count(s) 1 (sad) (Entered: 02/19/2002) |
| 02/15/2002 | 2 | File referred to Judge Richard G. Stearns for determination as to whether the case should be contiued before the District Court or referred to a Magistrate of this Court. (sad) (Entered: 02/19/2002) |
| 02/15/2002 | | Judge Richard G. Stearns . ENDORSED ORDER as to Zachary J. Rolnik : granting [2-1] referral/referred to a Magistrate Judge . (sad) (Entered: 02/19/2002) |
| 02/19/2002 | | CASE reassigned from Judge Stearns to Mag. Judge Joyce L. Alexander for disposition. (sad) (Entered: 02/19/2002) |
| 03/12/2002 | 3 | NOTICE issued of Hearing/Conference as to Zachary J. Rolnik, set Arraignment for 2:30 3/13/02 for Zachary J. Rolnik before Mag. Judge Joyce L. Alexander (jdj) (Entered: 03/12/2002) |
| 03/13/2002 | | Initial appearance as to Zachary J. Rolnik held (Defendant informed of rights.) (sat) (Entered: 03/26/2002) |
| 03/13/2002 | | First appearance through counsel as to Zachary J. Rolnik . (sat) (Entered: 03/26/2002) |
| 03/13/2002 | | PLEA entered by Zachary J. Rolnik . Court accepts plea. Not Guilty: Zachary J. Rolnik (1) count(s) 1 (sat) (Entered: 03/26/2002) |
| 03/13/2002 | 4 | Mag. Judge Joyce L. Alexander. CLERK'S NOTES as to Zachary J. Rolnik re: initial appearance and arraignment held. The government states the charges and the maximum penalty. The government and defense jointly move (orally) for conditions of release. The court allows the motion (see bail papers) and releases the defendant with conditions. The court orders that whereas the parties do not consent to disposition before a Magistrate Judge, this case is herbey returned to the distruct judge for a Rule |

| | | 11 hearing. Whereas all pre-trial matters referred to the magistrate judge have been resolved, the case is hereby returned to the miscellaneous business docket clerk to be redrawn to a district judge. Court Reporter: Tape no. 2002-19. (sat) (Entered: 03/26/2002) |
|---|---|---|
| 03/13/2002 | 5 | NOTICE of Appearance of counsel for Zachary J. Rolnik , by Attorney John F. Palmer. (sat) (Entered: 03/26/2002) |
| 03/28/2002 | 6 | MOTION by Zachary J. Rolnik for Rule 11 Hearing , filed; c/s. (sat) (Entered: 03/28/2002) |
| 04/04/2002 | | Return receipt rec'd for mail Zachary Rolnik sent to:, as to Zachary J. Rolnik , with delivery on March 12, 2002, (cannot read name) accepted by: (sat) (Entered: 04/04/2002) |
| 04/05/2002 | | Mag. Judge Joyce L. Alexander . ENDORSED ORDER as to Zachary J. Rolnik: "The case is hereby returned to the District Court." (ktb) (Entered: 04/11/2002) |
| 04/09/2002 | | CASE reassigned from Judge Alexander to Judge Mark L. Wolf . (cmg) (Entered: 04/09/2002) |
| 04/29/2002 | 7 | Plea Agreement as to Zachary J. Rolnik, filed, c/s. (ktb) (Entered: 04/29/2002) |
| 05/28/2002 | 8 | NOTICE issued of Hearing/Conference as to Zachary J. Rolnik, set Change of Plea Hearing for 2:30 6/6/02 for Zachary J. Rolnik cc/cl. (ktb) (Entered: 05/31/2002) |
| 05/28/2002 | 9 | NOTICE issued of Hearing/Conference as to Zachary J. Rolnik, set Change of Plea Hearing for 2:30 6/6/02 for Zachary J. Rolnik cc/cl. (ktb) (Entered: 05/31/2002) |
| 06/06/2002 | | Change of Plea Hearing as to Zachary J. Rolnik held. Govt files certificate of prosecution in Court. Govt informs the Court that a waiver of indictment is not necessary since the deft is charged with a misdemeanor. Plea agreement dated, marked as exhibit 1. (eaf) (Entered: 06/13/2002) |
| 06/06/2002 | | PLEA entered by Zachary J. Rolnik . Court accepts plea. Guilty: Zachary J. Rolnik (1) count(s) 1 Deft released under same conditions. (eaf) (Entered: 06/13/2002) |
| 06/06/2002 | 10 | Judge Mark L. Wolf . CLERK'S NOTES as to Zachary J. Rolnik , re: cop; ; Court Reporter: Twomey (eaf) (Entered: 06/13/2002) |
| 06/06/2002 | 11 | Judge Mark L. Wolf . ORDER entered as to Zachary J. Rolnik :, set Sentencing for 3:00 8/28/02 for Zachary J. Rolnik . (eaf) (Entered: 06/13/2002) |
| 08/14/2002 | 12 | MOTION by Zachary J. Rolnik for downward departure , filed, c/s. (ktb) (Entered: 08/15/2002) |
| 08/14/2002 | 13 | MEMORANDUM by Zachary J. Rolnik in support of [12-1] motion for downward departure (ktb) (Entered: 08/15/2002) |
| 08/23/2002 | 14 | SENTENCING MEMORANDUM by Zachary J. Rolnik as to Zachary J. Rolnik, filed, c/.s (ktb) (Entered: 08/23/2002) |
| 08/26/2002 | 15 | RESPONSE by USA as to Zachary J. Rolnik re: [12-1] motion for downward departure, filed. c/s. (ktb) (Entered: 08/26/2002) |
| 08/26/2002 | 16 | Letter (non-motion) filed by USA by S. Theodore Merritt , dated: 8/26/02 to Judge Wolf advising the court that Dr. James Zogby will be attending the sentencing in this case, FILED. (ktb) (Entered: 08/27/2002) |

| 08/28/2002 | | Sentencing held Zachary J. Rolnik (1) count(s) 1 . (ktb) (Entered: 09/03/2002) |
|---|---|---|
| 08/28/2002 | 17 | Judge Mark L. Wolf . CLERK'S NOTES as to Zachary J. Rolnik re: Sentencing; granting [12-1] motion for downward departure as to Zachary J. Rolnik (1); Court Reporter: Twomey (ktb) (Entered: 09/03/2002) |
| 08/30/2002 | 18 | Judge Mark L. Wolf . JUDGMENT entered Zachary J. Rolnik (1) count(s) 1. Deft is committed to the custody of the USPB for a total term of 60 days. SA - $25.00; Fine $5,000.00 , Zachary J. Rolnik (1) count(s) 1. Deft is committed to the custody of the USPB for a total term of 60 days. SA - $25.00; Fine $5,000.00 , Zachary J. Rolnik (1) count(s) 1. Deft is committed to the custody of the USPB for a total term of 60 days. SA - $25.00; Fine $5,000.00 (ktb) (Entered: 09/03/2002) |
| 08/30/2002 | 19 | Judge Mark L. Wolf . Statement of reasons as to Zachary J. Rolnik (ktb) (Entered: 09/03/2002) |
| 09/03/2002 | | **JS3 Closing Card for Zachary J. Rolnik Terminated Defendant Zachary J. Rolnik (ktb) (Entered: 09/03/2002) |
| 09/03/2002 | | Case closed as to all defendants, as to Zachary J. Rolnik party Zachary J. Rolnik (ktb) (Entered: 09/03/2002) |

| PACER Service Center | | |
|---|---|---|
| Transaction Receipt | | |
| 06/24/2008 09:43:01 | | |
| PACER Login: | cs0202 | Client Code: | Syring |
| Description: | Docket Report | Search Criteria: | 1:02-cr-10049-MLW |
| Billable Pages: | 2 | Cost: | 0.16 |

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA,      )
                               )     **02 CR 10049**
            Plaintiff,         )
                               )    VIOLATION:
     v.                        )    18 U.S.C. § 245(b)(5) -
                               )    Interference with Federally
ZACHARY J. ROLNIK,             )    Protected Activities
                               )
                               )
                               )
            Defendant.         )
                               )
                               )
_____)

I N F O R M A T I O N

     The United States Attorney charges:

COUNT ONE: [18 U.S.C. § 245(b)(5) - INTERFERENCE WITH FEDERALLY
                            PROTECTED ACTIVITIES]

     On or about September 12, 2001, in Hanover, Massachusetts,

within the District of Massachusetts, and in Washington, District

of Columbia, within the District of the District of Columbia, the

defendant

                    ZACHARY J. ROLNIK

did, by threat of force, willfully  intimidate and interfere with

Dr. James J. Zogby, an Arab American citizen, by placing a

telephone call from Massachusetts to Dr. Zogby's office in the

District of Columbia, threatening to kill him and his children,

because Dr. James J. Zogby had been aiding and encouraging other

persons to participate, without discrimination on account of race, color, religion or national origin, in federal benefits and activities such as voting, campaigning for elective office, and enjoying public services, programs, and facilities provided or administered by the United States.

All in violation of Title 18, United States Code, Section 245(b)(5).

Dated this ___14th___ day of February, 2002

Respectfully submitted:

RALPH F. BOYD, JR.                MICHAEL J. SULLIVAN
Assistant Attorney General    United States Attorney
Civil Rights Division
Department of Justice       By:
                                S. THEODORE MERRITT
                                Assistant U.S. Attorney

CHRISTOPHER A. SANTORO
Trial Attorney
Criminal Section
Civil Rights Division
Department of Justice

AO 245B Sheet 1 - Judgment in a Criminal Case - D. Massachusetts (10/01)

# United States District Court

## District of Massachusetts

| UNITED STATES OF AMERICA | **JUDGMENT IN A CRIMINAL CASE** |
|---|---|
| v. | (For Offenses Committed On or After November 1, 1987) |
| **ZACHARY ROLNIK** | **Case Number:  1: 02CR10049-001** |

John Palmer
_____
Defendant's Attorney

**THE DEFENDANT:**

[x] pleaded guilty to count(s): 1     DOCKET

[ ] pleaded nolo contendere to counts(s)_____ which was accepted by the court.

[ ] was found guilty on count(s)_____ after a plea of not guilty.

Accordingly, the court has adjudicated that the defendant is guilty of the following offense(s):

| Title & Section | Nature of Offense | Date Offense Concluded | Count Number(s) |
|---|---|---|---|
| 18 USC § 245(b)(5) | Interference with Federally Protected Activities | 09/12/01 | 1 |

[ ] See continuation page

The defendant is sentenced as provided in pages 2 through _4_ of this judgment. The sentence is imposed pursuant to the Sentencing Reform Act of 1984.

[ ] The defendant has been found not guilty on counts(s)_____ and is discharged as to such count(s).

[ ] Count(s) _____ is dismissed on the motion of the United States.

IT IS FURTHER ORDERED that the defendant shall notify the United States Attorney for this district within 30 days of any change of name, residence, or mailing address until all fines, restitution, costs, and special assessments imposed by this judgment are fully paid. If ordered to pay restitution, the defendant shall notify the court and United States Attorney of any material change in the defendant's economic circumstances.

08/28/02
_____
Date of Imposition of Judgment

Defendant's Soc. Sec. No.: XXX-XX-3739

_____
Signature of Judicial Officer

Defendant's Date of Birth: XX/XX/1961

The Honorable Mark L. Wolf
_____
Name and Title of Judicial Officer

Defendant's USM No.: 24177-038

Judge, U.S. District Court

Defendant's Residence Address:
146 Pleasant Street
Hanover, MA 02339

Date
_____
August 30, 2000

Defendant's Mailing Address:
Same as above

A TRUE COPY ATTEST
TONY ANASTAS
CLERK
U..S. DISTRICT COURT
DISTRICT OF MASSACHUSETTS
BY
DEPUTY CLERK

(1)

AO 245B Sheet 2 - Imprisonment - D. Massachusetts (10/01)

CASE NUMBER: 1:02CR10049-001                                    Judgment - Page  2  of  4
DEFENDANT: ZACHARY ROLNIK

# IMPRISONMENT

The defendant is hereby committed to the custody of the United States Bureau of Prisons to be imprisoned for a total term of       60    day(s)

[x]  The court makes the following recommendations to the Bureau of Prisons:
That the defendant serve his sentence in a community confinement center.

[ ]  The defendant is remanded to the custody of the United States Marshal.

[ ]  The defendant shall surrender to the United States Marshal for this district:
    [ ]  at _____ on _____
    [ ]  as notified by the United States Marshal.

[x]  The defendant shall surrender for service of sentence at the institution designated by the Bureau of Prisons:
    [x]  before _12:00 pm_  on _10/07/02_
    [ ]  as notified by the United States Marshal.
    [ ]  as notified by the Probation or Pretrial Services Officer.

# RETURN

I have executed this judgment as follows:

_____

_____

_____

    Defendant delivered on _____ to _____
at _____ , with a certified copy of this judgment.

                                                                  _____
                                                                   UNITED STATES MARSHAL

                                    By  _____
                                                   Deputy U.S. Marshal

AO 245B   Judgment in a Criminal Case — D. Massachusetts (10/01)
Sheet 5, Part A — Criminal Monetary Penalties

Judgment - Page  3 of  4

CASE NUMBER:  1: 02CR10049-001
DEFENDANT: ZACHARY ROLNIK

## CRIMINAL MONETARY PENALTIES

The defendant shall pay the following total criminal monetary penalties in accordance with the schedule of payments set forth on Sheet 5, Part B.

| | Assessment | Fine | Restitution |
|---|---|---|---|
| **TOTALS** | $25.00 | $5,000.00 | |

☐ The determination of restitution is deferred until _____ . An *Amended Judgment in a Criminal Case* (AO 245C) will be entered after such determination.

☐ The defendant shall make restitution (including community restitution) to the following payees in the amount listed below.

If the defendant makes a partial payment, each payee shall receive an approximately proportioned payment, unless specified otherwise in the priority order or percentage payment column below. However, pursuant to 18 U.S.C. § 3664(i), all nonfederal victims must be paid in full prior to the United States receiving payment.

| Name of Payee | *Total Amount of Loss | Amount of Restitution Ordered | Priority Order or Percentage of Payment |
|---|---|---|---|
| | | | |

☐ See Continuation Page

| **TOTALS** | $0.00 | $0.00 | |

☐ If applicable, restitution amount ordered pursuant to plea agreement _____

☐ The defendant shall pay interest on any fine or restitution of more than $2,500, unless the fine or restitution is paid in full before the fifteenth day after the date of the judgment, pursuant to 18 U.S.C. § 3612(f). All of the payment options on Sheet 5, Part B may be subject to penalties for delinquency and default, pursuant to 18 U.S.C. § 3612(g).

☐ The court determined that the defendant does not have the ability to pay interest, and it is ordered that:

☐ the interest requirement is waived for the    ☐ fine and/or    ☐ restitution.

☐ the interest requirement for the    ☐ fine and/or    ☐ restitution is modified as follows:

* Findings for the total amount of losses are required under Chapters 109A, 110, 110A, and 113A of Title 18, United States Code, for offenses committed on or after September 13, 1994 but before April 23, 1996.

⑨

AO 245B    Judgment in a Criminal Case - D. Massachusetts (10/01)
Sheet 5, Part B — Criminal Monetary Penalties

Judgment - Page  4  of  4

CASE NUMBER:  1: 02CR10049-001
DEFENDANT: ZACHARY ROLNIK

## SCHEDULE OF PAYMENTS

Having assessed the defendant's ability to pay, payment of the total criminal monetary penalties shall be due as follows:

A ☐ Lump sum payment of _____ due immediately, balance due

    ☐ not later than _____ , or
    ☐ in accordance with ☐ C, ☐ D, or ☐ E below; or

B ☒ Payment to begin immediately (may be combined with C, D, or E below); or

C ☐ Payment in _____ (e.g., equal, weekly, monthly, quarterly) installments of _____ over a period of
    _____ (e.g., months or years), to commence _____ (e.g., 30 or 60 days) after the date of this judgment; or

D ☐ Payment in _____ (e.g., equal, weekly, monthly, quarterly) installments of _____ over a period of
    _____ (e.g., months or years), to commence _____ (e.g., 30 or 60 days) after release from imprisonment to a
    term of supervision; or

E ☐ Special instructions regarding the payment of criminal monetary penalties:

Unless the court has expressly ordered otherwise in the special instruction above, if this judgment imposes a period of imprisonment, payment of criminal monetary penalties shall be due during the period of imprisonment. All criminal monetary penalties, except those payments made through the Federal Bureau of Prisons' Inmate Financial Responsibility Program, are made to the clerk of the court, unless otherwise directed by the court, the probation officer, or the United States attorney.

The defendant shall receive credit for all payments previously made toward any criminal monetary penalties imposed.

☐ Joint and Several

    Case Number, Defendant Name, and Joint and Several Amount:

☐ The defendant shall pay the cost of prosecution.    ☐ See Continuation Page

☐ The defendant shall pay the following court cost(s):

☐ The defendant shall forfeit the defendant's interest in the following property to the United States:

Payments shall be applied in the following order: (1) assessment, (2) restitution principal, (3) restitution interest, (4) fine principal, (5) community restitution, (6) fine interest (7) penalties, and (8) costs, including cost of prosecution and court costs.

⑩